## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CUMULUS MEDIA NEW HOLDINGS INC., | Civil Action No.: |
| *Plaintiff,* | |
| v. | COMPLAINT |
| THE NIELSEN COMPANY (US) LLC, | DEMAND FOR JURY TRIAL |
| *Defendant.* | |

Cumulus Media New Holdings Inc. ("Cumulus") complains and alleges as follows against Defendant The Nielsen Company (US) LLC ("Nielsen"):

### Nature of Action

1.     For years, Nielsen has enjoyed unrivaled dominance as the sole provider[1] of national radio ratings data[2]—a product no national radio broadcaster or national network can do without. Nielsen is also the dominant provider of local radio ratings data, a separate product with separate demand and a distinct pricing structure. While radio stations have persevered through significant challenges by innovating and adapting, Nielsen has flexed its monopoly power and impeded competition from entering the markets for local radio ratings data and national radio ratings data. It has imposed supracompetitive prices— including a unilateral 36% price hike on Cumulus' national radio ratings data in 2022, and consistent increases in the prices of local radio ratings data—and acted as an illegal

---

[1] While Ipsos provides ratings data for live, play-by-play sports nationally, it does not provide data outside of that limited context, and does not provide national radio ratings data, as defined herein.

[2] As used in this Complaint, the term "radio ratings data" refers to ratings data for broadcast radio, and does not include ratings for podcasts, Sirius Radio, or Spotify.

monopolist by engaging in coercive conduct, strong-arm negotiation tactics, and restrictive terms. Nielsen has now added another unlawful tactic: creating a policy that conditions access to its indispensable national radio ratings data on the purchase of separate local radio ratings data, which it prices at an uneconomic level. This tying scheme is a textbook abuse of monopoly power.

2.      Nielsen's national radio ratings data and local radio ratings data serve as a primary tool for advertisers, advertising agencies, national networks and local radio stations to evaluate audience reach and frequency. Local radio ratings data measure listening within a single geographic area, showing how individual stations perform against their competitors in audience size, demographics, and time spent listening. Nielsen's national radio ratings data, by contrast, includes radio ratings from all geographies Nielsen measures across the United States. Nielsens refers to this product as the "Nationwide" product.

3.      Cumulus, owner of local radio stations across the United States, purchases local radio ratings data for its own analyses and to sell radio advertising inventory, *i.e.*, radio commercial spots, to advertisers and advertising agencies. Westwood One, Inc. ("Westwood One"), a subsidiary of Cumulus, is a national network (or national radio network), *i.e.,* an entity that produces national programming and services for radio stations and then syndicates those products in exchange for advertising inventory. Westwood One, through Cumulus, purchases national radio ratings data for its own analyses and for use in the sale of the radio advertising inventory that it has accumulated to advertisers and advertising agencies.

4.     In 80 geographies where Cumulus owns a local radio station, Nielsen is either the only or the dominant provider of local radio ratings data. Each of these 80 geographies is a separate relevant market for the sale of local radio ratings data. As such, Nielsen possesses market power in all 80 markets for local radio ratings data at issue in this case (the "Local Radio Ratings Data Markets"). Another company, Eastlan Ratings ("Eastlan"), could compete in these Local Radio Ratings Data Markets, but has been impeded by Nielsen's anticompetitive practices.

5.     Nielsen is the <u>only</u> provider of national radio ratings data and is a monopolist in this market (the "National Radio Ratings Data Market").

6.     National networks must purchase Nielsen national radio ratings data to sell advertising inventory. Most national advertisers and advertising agencies are unwilling to purchase advertising inventory from national networks without Nielsen's national radio ratings data.

7.     In September 2024, Nielsen announced a new policy to illegally maintain its market power in both the National Radio Ratings Data Market and the Local Radio Ratings Data Markets (the "Tying Policy"). Specifically, Nielsen announced that if a national network owns, manages, operates, or has a sales or operating agreement or similar business relationship with local radio stations (a "shared-ownership local radio station"), Nielsen would exclude from the national radio ratings data purchased by the national network any geographies where the shared-ownership local radio stations do not purchase Nielsen's local radio ratings data.

8.     Thus, under this new Tying Policy, unless Cumulus subscribes to Nielsen's local radio ratings data in all the geographies where it and Nielsen have a presence,

Westwood One would lose access to the Nationwide product (*i.e.*, comprehensive national radio ratings data). As Rich Tunkel, Managing Director for Nielsen Audio, said on a July 25, 2025, call with Cumulus, a national radio ratings data product without these geographies "would be Swiss cheese," and "have holes." Mr. Tunkel admitted that any product without comprehensive Nationwide ratings would not be the "real" or a "useful" product. Tunkel also agreed that Nielsen was tying Nielsen's local radio ratings data and Nationwide products together.

9.     The practical effect of Nielsen's Tying Policy is to coerce Cumulus into purchasing local radio ratings data it neither wants nor needs in order to preserve access to indispensable national radio ratings data—so that Westwood One can sell to national advertisers and advertising agencies that require broad, consistent advertising exposure across the country. For example, Cumulus's one local radio station in Los Angeles, CA, does not currently purchase Nielsen's Los Angeles, CA, local radio ratings data, so, under the new Tying Policy, the national radio ratings data sold to Westwood One by Nielsen would not include any data on any radio stations in Los Angeles, CA—one of the largest geographies in the country. As a result, Cumulus's one local radio station would be forced to purchase Nielsen's expensive local radio ratings data for the entire Los Angeles, CA, geography, so that Westwood One can receive comprehensive national radio ratings data that include all geographies, including Los Angeles, CA (*i.e.*, the Nationwide product). As another example, Cumulus currently purchases Eastlan's local radio rating data in Memphis, TN, and would be compelled to re-purchase local radio rating data from Nielsen so that Westwood One could receive national radio ratings data that includes Memphis, TN (*i.e.*, the Nationwide product).

10.    Therefore, Cumulus is forced to choose between on one hand, overpaying for Nielsen's products that it does not need or want, and on the other hand, risking significant losses in advertising revenue and market share, irreparably damaging its relationships and its goodwill with advertisers, advertising agencies, affiliates, and content and service partners, and creating issues for Westwood One that threaten its viability.

11.    On August 18, 2025, Cumulus, through counsel, sent Nielsen a cease-and-desist letter explaining why the Tying Policy was anticompetitive and illegal.

12.    On September 16, 2025, Nielsen reacted by making a "new" proposal to cover its tracks. Instead of untying the products, Nielsen changed the window dressing, all the while not rescinding its Tying Policy. Nielsen offered to sell the Nationwide product to Cumulus, but for almost *ten times* what Cumulus currently pays for the product, and at a price almost as high as the price Cumulus would pay under the Tying Policy for both the Nationwide product and the local radio ratings data in *all* local geographies in which Nielsen and Cumulus have a presence. Nielsen also stated that Cumulus could purchase the Nationwide product and the local radio ratings data in the 32 geographies Cumulus wants to purchase (significantly fewer than what it currently purchases). But this offer was made at a price intended to disqualify itself as an option. This "new" proposal was simply another attempt to strong-arm Cumulus into purchasing both the tied and tying products, is a de facto or constructive tie, and has the same anticompetitive intent and effect: to coerce Cumulus to purchase Nielsen's local radio ratings data instead of Eastlan's.

13.    In contrast, Nielsen sells Nationwide as a standalone product to national networks without shared-ownership local radio stations for an amount similar to what Cumulus paid before Nielsen implemented its Tying Policy, and much less than what

Nielsen is currently proposing Cumulus pay. Significantly, these national networks do not own any local radio stations that could purchase local radio ratings data.

14.     In addition, Nielsen has not provided Cumulus with a list of prices for local radio ratings data from each geography, despite Cumulus's repeated requests spanning months. Instead, Nielsen has stated that the price of local radio ratings data for each geography depends on the amount and price of other Nielsen products Cumulus purchases.

15.     If Westwood One does not receive comprehensive national radio ratings data, *i.e.* the Nationwide product, Westwood One would be forced to operate without that data beginning with the issuance of Nielsen's Spring 2026 Ratings Book. The impacts, however, of Nielsen's Tying Policy will be felt much sooner, as advertising inventory is sold months, if not a year in advance. As such, Cumulus and Westwood One's relationships with advertisers, advertising agencies, content and service partners, and advertising inventory partners will be severely impacted soon.

16.     Nielsen's Tying Policy forces local radio stations to purchase Nielsen's local radio ratings data in all geographies where they and Nielsen have a presence, if their national network with shared ownership wishes to purchase Nielsen's Nationwide product. In antitrust terms, Nielsen possesses monopoly power in the National Radio Ratings Data Market and uses this power to condition the purchase of the Nationwide product (the "tying" product) on the purchase of Nielsen's local radio ratings data (the "tied" product). Through this illegal tying, Nielsen seeks to exercise and expand its market power in the Local Radio Ratings Data Markets.

17.     The rationale for the Tying Policy is clear. Even though local radio stations are facing significant and increasing challenges, Nielsen has consistently raised the price

of local radio ratings data. As a result, local radio stations may choose to purchase Eastlan data, despite a resulting loss in advertising revenue, because the lost advertising revenue is *lower* than the difference in price between Nielsen's product and Eastlan's product. Faced with this increasing threat to its market power, Nielsen has not offered more competitive prices or improved products; instead, it has resorted to anticompetitive actions to maintain its market power.

18.    In fact, this announced policy is just the most recent example of Nielsen resorting to illegal, anticompetitive conduct to exercise and expand its market power in the Local Radio Ratings Data Markets.

19.    In 2022, Nielsen forced upon Cumulus its "Subscriber First Policy" that dictated that local radio stations must purchase local radio ratings data for the geography in which they are located (*e.g.*, San Francisco, CA), or those stations will not appear in any of Nielsen's summary-level local radio ratings data purchased by anyone. Summary-level local radio ratings data are the local radio ratings data generally purchased by advertisers and advertising agencies and are used to understand the rankings by audience of local radio stations in a geography. Advertisers frequently consult these rankings when contemplating and making their advertising inventory purchases.

20.    Because of this Subscriber First Policy, Cumulus was forced to purchase local radio ratings data in multiple geographies to avoid having local radio stations they own excluded from summary-level local radio ratings data that advertisers consult. The Subscriber First Policy prevented Cumulus from purchasing and using Eastlan data.

21.    Upon information and belief, the Subscriber First Policy resulted in other local radio stations purchasing local radio ratings data from Nielsen instead of Eastlan to avoid Nielsen removing their stations from summary-level local radio ratings data.

22.    Because of these anticompetitive actions in the Local Radio Ratings Data Markets and Nielsen's similarly anticompetitive actions in the National Radio Ratings Data Market, Eastlan and other potential competitors cannot develop the scale, expertise or acceptance by the industry required to enter the National Radio Ratings Data Market.

23.    In summary, Nielsen has leveraged its monopoly power in the National Radio Ratings Data Market by conditioning access to its indispensable national radio ratings data (the Nationwide product) on the purchase of its local radio ratings data, as part of a scheme to maintain its market power in both the National and Local Radio Ratings Data Markets. At the same time, Nielsen excludes non-subscribing local radio stations from its summary-level local radio ratings data, further entrenching its control over Local Radio Ratings Markets.

24.    The effects of Nielsen's conduct are devastating. Through its anticompetitive conduct, Nielsen has effectively eliminated any opportunity for Eastlan or any other potential competitor to enter and/or gain footholds in Local Radio Ratings Data Markets, and develop the scale, expertise, and reputation necessary to enter the National Radio Ratings Data Market. As a result, Nielsen faces diminished or no competition and is not incentivized by competition to innovate or improve its products or services, or to compete on price. To the contrary, Nielsen has the ability to raise its prices as it desires, and charges supracompetitive prices to Cumulus, national networks, and local radio stations.

## Parties

25.     Plaintiff Cumulus Media New Holdings Inc. ("Cumulus") is a Delaware corporation with its headquarters located at 780 Johnson Ferry Rd NE, Suite 500, Atlanta, GA 30342. Cumulus maintains offices across the United States, including in New York, NY.

26.     Cumulus is an audio media company comprised of entities owning and/or operating 395 radio stations across the United States, as well as Westwood One, which provides syndicated programming nationally.

27.     Westwood One's portfolio features a variety of popular programs, including syndicated talk shows such as The Mark Levin Show, music programming such as American Country Countdown, and exclusive live sports coverage, including National Football League ("NFL") and National Collegiate Athletic Association ("NCAA") broadcasts. Through Westwood One, Cumulus offers national advertisers a streamlined solution with a single point of sale for their campaigns.

28.     Westwood One also serves as a sales agent to sell third parties' advertising inventory. In addition, Westwood One purchases advertising inventory from both Cumulus owned local radio stations and third-party radio stations and sells that advertising inventory to national advertisers.

29.     Defendant The Nielsen Company (US) LLC is a Delaware limited liability company, with its headquarters located at 675 6th Ave, New York, NY 10010.

30.     Nielsen is the only provider of national radio ratings data and either the only or the dominant provider of local radio ratings data in 80 geographies in which Cumulus has radio stations. Nielsen is responsible for sales, marketing, distribution, technical

support, and customer service related to radio ratings products in the United States, including throughout this Judicial District.

31.     Upon information and belief, Nielsen is a subsidiary of Nielsen Holdings Limited, formerly Nielsen Holdings plc.

32.     In October 2022, Nielsen Holdings plc completed its sale to a private equity consortium led by an affiliate of Elliot Investment Management L.P. and Brookfield Business Partners L.P.

33.     Nielsen has repeatedly committed overt acts in furtherance of monopolization, and unlawful tying arrangements, under Section 2 of the Sherman Act. Nielsen has also repeatedly committed overt acts in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.

## Jurisdiction, Venue, and Commerce

34.     This action arises, in part, under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, to prevent, restrain and remedy violations of Section 2 of the Sherman Act, 15 U.S.C. § 2. This Court has jurisdiction over the federal law claims alleged herein pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1337. This Court also has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202.

35.     This action arises, in part, under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. This Court has supplemental jurisdiction over Cumulus's claims arising under these laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support antitrust claims under both federal and California law.

36.     This Court has personal jurisdiction over Nielsen because, on information and belief, Nielsen: (1) purposefully has availed itself of the rights and benefits of the laws

of the State of New York, (2) either directly or through intermediaries has conducted, transacted, or solicited business in the State of New York and in this Judicial District, (3) maintains an office in the State of New York and in this Judicial District such that it is continuously and systematically present in New York, or (4) maintains registered agents for service of process in the State of New York and in this Judicial District.

37.    Venue is proper in this Judicial District under 28 U.S.C. §§ 1391 based on information and belief that Nielsen maintains at least one regular and established place of business in the Judicial District, located at 675 6th Ave New York, NY 10010.

38.    Nielsen's anticompetitive conduct has taken place in—and negatively affected the continuous flow of interstate trade and commerce in—the United States in that, among other things:

a.    Nielsen has provided its local radio ratings data and national radio ratings data throughout the United States;

b.    The anticompetitive scheme described herein has affected hundreds of millions of dollars of commerce. Nielsen has inflicted antitrust injury by artificially excluding competitors in the Local Radio Ratings Data Markets, increasing prices paid by Cumulus, reducing the quality of services and support received by Cumulus and others, stifling choice and competition, and causing other antitrust injuries described herein.

39.    Nielsen's actions must be stopped, and the harm to Cumulus must be remedied.

## Nielsen's Anti-Competitive Conduct

### A.  Structure of Radio Broadcasting

40.    Radio broadcasting today includes both local radio stations and national networks, at times owned by the same company. At its simplest, local radio stations serve their own communities, while national networks create programs or partner with content creators to reach listeners across the country, including through syndication of these programs to local radio stations.

### i.    Local Radio Stations

41.    Local radio stations broadcast daily programming to audiences within defined geographic areas, which can be received by any consumer with a radio, free of charge, or through streaming. As they are licensed to serve specific coverage areas, these stations design their programming to match the interests and demographics of local listeners, which can include music, talk shows, local news, weather, traffic updates, and community-focused content. This programming can be original to the radio station or syndicated from national networks. For example, Z100, a popular local radio station in New York, NY, will broadcast both nationally syndicated programming such as the On Air with Ryan Seacrest show as well as programming from local radio personality Crystal Rosas. As another example, The Score 1260, a radio station in Syracuse, NY, focused on sports programming, will broadcast local show Street Talk with Ted & Amy, as well as coverage of football games from the NFL.

42.    Multiple stations within the same geography may also be owned by the same company, with stations often focusing on different programming oriented to different audiences. For example, Cumulus owns three local radio stations in the Syracuse, NY

geography, with one station focusing on alternative music programming, another on hit music programming, and The Score 1260 on sports programming.

43.    The boundaries of each geographic area for radio broadcasting are often set in the industry by Nielsen and referred to as "Radio Markets." There are currently 275 Radio Markets in the United States, with examples including New York, NY, and Greensboro-Winston Salem-High Point, NC. Nielsen provides local radio ratings data for 243 of the 275 geographies.

<em>ii.    National Networks</em>

44.    While local radio stations may develop their own programming, national networks act as large-scale content producers and distributors. Companies including Premiere Networks (owned by iHeartMedia, Inc.), Westwood One (owned by Cumulus), and National Public Radio ("NPR") supply programs to thousands of affiliated stations across the country. These range from talk shows including The Mark Levin Show, to entertainment programs such as The Bobby Bones Show, to news programming including Morning Edition, to sports programming including NFL and NCAA games. Providers of this content may sign revenue share agreements with national networks, where a certain percentage of the revenue earned by the national network from selling advertising inventory would be remitted to the content or service provider as payment for the content or services.

45.    National networks distribute their content through affiliation agreements with local radio stations. These agreements specify which programs the local radio station will air, the time at which these programs will be aired (which can be either fixed or flexible), and how advertising inventory will be divided between the national network and

the affiliated local radio station. For example, if a syndicated morning show has twelve minutes per hour of advertising time, the affiliated local radio station might receive nine of those minutes per hour to sell, and the national network would keep the other three minutes per hour to sell. While the shows are created and their distribution coordinated nationally, they are broadcast locally under the local radio station's brand. Additionally, national networks might acquire advertising inventory from local radio stations for cash, seeking to re-sell that advertising inventory for a profit. A national network might also serve as a sales agent on behalf of a third party who has their own syndicated show but does not have the infrastructure to syndicate, distribute or monetize the show.

### iii.    *National Networks With Shared-Ownership Local Radio Stations*

46.    Some industry participants own both national networks and local radio stations. Companies such as iHeartMedia, Inc. and Cumulus participate in both national network programming and local radio broadcasting—while also syndicating shows to local radio stations they do not own as well as stations with which they share ownership. For example, Westwood One syndicates its programming to more than 9,500 affiliate stations both owned and not owned by Cumulus. This structure allows it to sell advertising packages that combine national advertising inventory in its network programming, and local inventory in targeted areas.

### B.  Background on Radio Advertising

### i.    *Advertising Inventory*

47.    Advertising inventory refers to the amount of time that a station or network has available to sell to advertisers, or in other words, radio commercial time.

48.     When a local radio station airs its own locally produced programming, it retains full control over all advertising inventory. This advertising inventory is sold directly to advertisers, directly or through advertising agencies, sold to national networks, bartered to a national network in return for services, or managed for sale by national networks for a fee.

49.     When a station carries syndicated programming from a national network (*e.g.,* The Score 1260 airing ESPN), the advertising inventory is generally split between the national network and the local station. The national network often sells its advertising inventory to major brands such as Progressive, Home Depot, or McDonald's, while the local radio station often sells its advertising inventory to businesses in its own local area. As a result, a listener might hear a nationally produced advertisement for a car brand followed immediately by a local advertisement promoting a neighborhood car dealership selling that same brand.

50.     National networks also purchase advertising inventory from local radio stations outside their own programming. For example, Westwood One might buy overnight advertising inventory from local radio stations to run national promotions, while NPR could purchase local advertising inventory to promote its membership campaigns.

         *ii.*     *Purchase of Advertising Inventory by Advertisers*

51.     National brands (such as Walgreens or Home Depot) that need broad, consistent exposure across multiple geographies often purchase (directly or through an advertising agency) the national network's advertising inventory (*i.e.*, "network buys").

52.     National brands may also buy advertising inventory from local radio stations if they wish to target specific local geographies (*i.e.*, "national spot buys"), a

strategy in which agencies purchase advertising inventory in specific local areas, or a group of specific local areas, rather than across the full network. For example, a furniture retailer with locations in only 20 states might buy advertisements in places where it has stores and avoid locations where it has none.

53.     In addition to national advertisers, local businesses and multi-regional advertisers may also buy advertising inventory from local radio stations.

54.     The buying and selling of advertising inventory is often facilitated by advertising agencies. National brands, local businesses, and multi-regional advertisers will also often engage an advertising agency to determine which advertising inventory to purchase, the price they should pay, and the duration of the campaign.

55.     In addition to advertising agencies, another intermediary is Act 1, which sells software that analyzes national radio ratings data. Nielsen sells its national radio ratings data product not as a report but as data that must be analyzed by Act 1's software. Act 1 provides a portal in which Nielsen customers can run reports, analyze data, and export information to help them buy and sell advertising inventory. Act 1 accepts only Nielsen data as input.

56.     For local radio ratings data, Nielsen sells Tapscan, which is a data analysis software for its local radio ratings data that includes a portal through which Nielsen's local radio ratings data customers can run queries, analyze data, and run reports that are often exported and provided to advertisers and advertising agencies.

57.     Media-buying platforms such as Mediaocean, Strata, and AdVantage also function as intermediaries in this process. These platforms are used to buy and sell advertising inventory in multiple different mediums (*i.e.*, tv, radio, etc.). These platforms

will integrate Nielsen's national radio ratings data and/or local radio ratings data into their platforms, allowing advertisers and agencies to plan, compare, and purchase advertising inventory efficiently in one system.

58.    Mediaocean is generally used by national advertisers and advertising agencies while Strata and AdVantage are generally, but not always, used by regional and local advertisers and advertising agencies. Buyers of advertising inventory prefer integrated platforms such as Mediaocean, one of the more prominent media-buying platforms used by national advertisers and advertising agencies for network buys and national spot buys, because it allows them to build their advertising campaigns using centralized data on one platform. Because Mediaocean only accepts Nielsen's local radio ratings data, a seller of advertising inventory who uses Eastlan data would be unable to transact with the buyers on Mediaocean.

59.    At the same time, local businesses and multi-regional advertisers may purchase advertising inventory directly from the local radio stations. Cumulus sells its local advertising inventory through Cumulus-employed sales personnel, often directly to local businesses. However, many local businesses still hire advertising agencies to buy advertising inventory from local radio stations. In larger geographies, more than half of advertising revenue is from clients who use an advertising agency to purchase advertising inventory on their behalf.

### C.  Radio Ratings

60.    The radio advertising ecosystem requires measurements on audiences to establish the value of advertising inventory. Radio ratings data track who is listening, when they are listening, and for how long, producing information on audience size,

demographics, and listening habits. This data enables advertisers to compare stations and programs across geographies, help advertising agencies plan and price campaigns, and give local radio stations and national networks a verified way to demonstrate their audience.

61.     In the United States, there are two separate radio ratings data products: local radio ratings data or national radio ratings data (also referred to as network ratings). Local radio ratings data measure listening within a single geography (*i.e.*, the particular Radio Market defined by Nielsen), showing how individual stations perform against their competitors in audience size, demographic reach, and time spent listening. National radio ratings data, by contrast, measure listening across the United States.

> ### i.     *Local Radio Ratings Data*

62.     Local radio stations purchase local radio ratings data, which are used to sell advertising inventory to local businesses and advertising agencies that target specific geographies. The local radio ratings data contain metrics that are important to advertisers and advertising agencies, including audience size, demographic reach, and time spent listening.

63.     Local radio ratings data across the United States have been overwhelmingly provided by Nielsen for at least the past 12 years.

64.     Nielsen's local radio ratings data are provided at either the summary level or at the respondent level. Summary-level data offer a broad snapshot of the audience while respondent-level data provide information at a higher level of specificity, including based on zip code. Summary-level data are the less expensive and more widely used option. Advertising agencies, advertisers and even local radio station purchasers of local radio

ratings data generally buy only summary-level data, if they purchase local radio ratings data.

65.     Tapscan is an analytical software sold by Nielsen that allows purchasers of local radio ratings data to analyze the data for use in the buying and selling of advertising inventory. In effect, Nielsen feeds local radio ratings data into its Tapscan portal, where they are accessed by Nielsen customers. Today, Tapscan only accepts Nielsen data as input (it previously accepted Eastlan data), and Tapscan's output, such as Excel spreadsheets, can easily be uploaded to media-buying platforms such as Strata or Mediaocean.

66.     At the local level, when an advertising agency is engaged to create an advertising campaign, it generally will issue a Request for Proposal ("RFP") to certain radio stations. In response, a local radio station may compile a proposal using local radio ratings data accessed through Tapscan that includes proposed time slots for the advertisements, historical audiences for those slots, and rates, and submit its proposal to the advertising agency. The advertising agency can then upload this information into its media-buying platform such as Mediaocean, Strata, or AdVantage, and evaluate it, including against competitive proposals, based on pricing and audience data to create a media plan that aligns with its goals for its client.

67.     When an advertiser directly contacts a local radio station, the local radio station will also provide proposed time slots for the advertisements, historical audiences for those slots, and rates, generally using Nielsen's local radio ratings data from Tapscan.

68.     Local advertisers and advertising agencies can also perform analyses after their advertisement has aired, which is referred to in the industry as a post-buy analysis, to analyze how their advertisement performed as compared to the performance projected

based on information provided by local radio stations. Local radio stations sometimes provide this information but advertisers and advertising agencies may also review Nielsen's summary-level data for this information.

69.     Advertising agencies and/or advertisers often rely on rankings of radio stations in Nielsen's summary-level local radio data to determine who can submit an RFP, who they should approach for a potential purchase of advertising inventory, or if they should purchase advertising inventory from that local radio station. If a local radio station does not appear in these rankings, some advertising agencies or advertisers will be unaware of the popularity of the station and would not consider buying advertising inventory from that station. In addition, advertising agencies might not be able to justify buying from that station to their clients.

70.     Advertising agencies, and/or advertisers wishing to perform a post-buy analysis to see how their advertisements performed using their own access to Nielsen's summary-level data may not purchase advertising inventory from local radio stations that do not appear in summary-level data because they are unable to perform this analysis.

71.     Nielsen collects data for local radio ratings using two approaches. In select geographies, typically larger geographies, Nielsen uses Portable People Meters ("PPM"), which are wearable electronic devices that detect encoded tones in each station's radio program and automatically record exposure. Since PPM data are collected in real-time, local radio ratings in PPM areas can be monitored daily. PPM data are provided to local radio ratings data customers on a monthly basis.

72.     For smaller geographic areas, Nielsen uses a self-reported listening log often referred to as a listening diary. In some of these geographies, Nielsen reports ratings

every month showing a three-month rolling average, which is referred to as Continuous Diary Measurement ("CDM"). In very small areas with low populations, known as "Two Book" diary geographies, Nielsen conducts only two diary surveys annually, typically during the Spring (April-June) and Fall (October-December).

ii.      *National Radio Ratings Data*

73.     Nielsen is the only provider of national radio ratings data in the United States. These data are analyzed using specialized software, Act 1, by national networks, advertisers, and advertising agencies.

74.     National radio ratings data are most relevant to national networks and national advertisers, providing a consolidated picture of a program's audience across multiple geographies. Westwood One receives Nielsen data on all geographies measured by Nielsen across the United States and can highlight specific "reach" (number of people who hear the content) and "impressions" (number of times people hear the content) metrics to sell its advertising inventory. National radio ratings data can help Westwood One assess the popularity of its programming to sell advertisements. For example, it can receive data aggregated to show the performance of syndicated shows (such as Westwood One's Jim Rome Show) across all affiliated stations. Additionally, a national network can use the national radio ratings data to determine "reach" metrics or demographics for collections of advertising inventory pulled from multiple sources of advertising inventory.

75.     National networks such as Westwood One will provide detailed and customized national radio ratings data to advertising agencies and advertisers to support their proposals when selling advertising inventory. With this national radio ratings data, advertisers and advertising agencies can assess the advertising inventory they would like

to purchase and how much to pay for this advertising inventory, and whether past advertisements generated the intended audience. While certain advertisers and advertising agencies may also purchase national radio ratings data, they require these analyses from the national network (such as Westwood One) when proposing campaigns and during post-buy analyses.

76.    Specifically, national advertising agencies issue RFPs to national networks that include a list of requirements, such as cut-off times, types of programming during which an advertisement may air, or the geographies in which the advertisement must air. In response, national networks such as Westwood One use Nielsen's national radio ratings data accessed through Act 1 to generate and submit a proposal with advertising inventory and rates. The proposal then might be uploaded to a media-buying platform such as Mediaocean by the advertising agency. At times, the advertising agency will build out a proposed schedule (which would include time slots and rates) in Act 1's software for its advertisements and upload that schedule to platforms such as Mediaocean.

77.    National advertisers and advertising agencies can also perform post-buy analyses using national radio ratings data. If the programming does not garner sufficient impressions or meet other metrics based on the Nielsen data compared to what was promised by Westwood One in its proposal, Westwood One may be required to "make good" the impressions or the other metrics that the advertiser was expecting either in the form of additional advertising inventory or a cash payment.

78.    National radio ratings data are essential in every step of selling advertising inventory for a national network. Without complete national radio ratings data, national networks cannot effectively evaluate shows, package inventory, respond to RFPs, engage

with advertisers or advertising agencies, be awarded business, or perform post-buy analyses for purchasers of advertising inventory.

        *iii.*    *National Radio Ratings Data and Local Radio Ratings Data Are Distinct Products.*

79.    Nielsen's local radio ratings data and national radio ratings data are distinct products.

80.    Nielsen's national radio ratings data cover the United States and are used and purchased by national networks. A national network would be unable to aggregate local radio ratings data from its shared-ownership local radio stations, because, among other reasons, the national network would not have local radio ratings data from geographies where the network does not have a shared-ownership local radio station presence. For example, Cumulus does not own a local radio station in New York, NY, and does not purchase local radio ratings data for that geography. Westwood One, however, would require its national radio ratings data include the New York, NY, geography, as certain advertisers will be interested in that geography and Westwood One may syndicate to an affiliated local radio station in that geography. As such, Westwood One must purchase and use national radio ratings data.

81.    Similarly, local radio stations would not use or purchase national radio ratings data. Local radio stations only require data for the specific geography or geographies where their programming airs and would not pay for superfluous data outside of that geography or geographies. For example, a local radio station in Los Angeles, CA, selling to advertisers in Los Angeles, CA, would have no use for national radio ratings data, which are more expensive.

82.     Nielsen itself views the local radio ratings data and national radio ratings data as separate products, as it sells them as separate products. There are multiple purchasers that only subscribe to local radio ratings data (such as local radio stations or regional broadcasters), and multiple purchasers that only subscribe to national radio ratings data (such as national networks that do not own local radio stations).

83.     Further, Nielsen's national radio ratings data can only be analyzed by the Act 1 software and is fed into the Act 1 portal, while Nielsen's local radio ratings data is frequently analyzed by Tapscan and is fed into the Tapscan portal.

84.     Nielsen also restricts cross-use of these products by Westwood One and Cumulus's local radio stations. Westwood One cannot share the data it purchases with shared-ownership local radio stations if they do not own a license to the same Nielsen information. Similarly, Westwood One cannot use the local radio ratings data to which Cumulus's local radio stations subscribe unless it owns a license to the same information. Upon information and belief, Nielsen imposes similar restrictions on other national networks that share ownership with local radio stations.

### D.  Nielsen Dominates the Local Radio Ratings Data Markets and the National Radio Ratings Data Market

85.     Nielsen wields significant influence over the radio advertising industry and has done so since it purchased Arbitron in 2013.

86.     In the vast majority of local radio ratings data geographies, Nielsen is the only provider of local radio ratings data. Eastlan, Nielsen's only current competitor, provides local radio ratings in some local radio station geographies, but Eastlan most frequently operates in geographies where Nielsen does not or no longer provides local radio ratings data. Eastlan, however, has the ability, willingness, and incentive to enter a new

geography with even a single local radio station purchasing its data, upon information and belief.

87.    Nielsen faces no competition in the National Radio Ratings Data Market as it is the only provider of national radio ratings data.

       i.    *Local Radio Ratings Data Markets*

          a.    <u>Relevant Product Market</u>

88.    The provision of local radio ratings data is the tied market relevant to this dispute.

89.    Local radio stations seeking to sell advertising inventory to local businesses and advertising agencies targeting specific geographic locations purchase local radio ratings data.

90.    Local radio stations and advertising agencies typically purchase local radio ratings data only for the geographies in which they operate, because advertising preferences—such as target demographics like age and gender—often differ by geography. They also typically only purchase local radio ratings data from one provider, as they are expensive and local radio stations typically face thin margins.

91.    Nielsen is the predominant provider of local radio ratings data.

92.    Nielsen's local radio ratings data are provided at either the summary level or at the respondent level. Summary-level data offer a broad snapshot of the audience while respondent-level data provide the information at a higher level of specificity, including based on zip code. Summary level-data are the less expensive and much more widely used option.

93.     Local radio ratings data are provided through a portal, such as Nielsen's Tapscan, which allows users to analyze and export local radio ratings data. Analytical software used to parse local radio ratings data, such as Tapscan, cannot also be used to parse national radio ratings data.

94.     There are no reasonable substitutes for local radio ratings data. Local advertisers and advertising agencies generally expect proposals to purchase advertising inventory from local radio stations to be supported by local radio ratings data.

95.     National radio ratings data are not a substitute for local radio ratings data. For example, a local radio station in San Francisco, CA, and a San Francisco, CA, advertising agency seeking to buy advertising in that geography would not subscribe to national radio ratings data to purchase or sell advertising inventory or assess how the inventory should be priced, as national radio ratings data are both generally more expensive, require a different set of software, and contain different information than what the station or local advertising agency needs. Instead, the San Francisco, CA, local radio station or local advertising agency would purchase only the local radio ratings data for the San Francisco, CA, geography.

b.  Relevant Geographic Market

96.     The relevant geographic markets for local radio ratings data are each of the geographies, or Radio Markets, as defined by Nielsen. Cumulus operates in 80 geographies where Nielsen sells local radio ratings data, and the provision of local radio ratings data in each geography is a separate Local Radio Ratings Data Market. Each Local Radio Ratings Data Market offers a unique product, as it measures audience data influenced by the geography's demographics and socioeconomic factors and is primarily tailored to serve

customers, such as radio stations and advertising agencies, operating within that specific geographic area. As such, each is its own Local Radio Ratings Data Market.

97.    There are no reasonable substitutes for local radio ratings data. Local radio ratings data from one geography is not a substitute for a local radio ratings data from another geography. For example, Cumulus's local radio stations could not use local radio ratings data from San Francisco, CA, to sell advertising inventory in New Orleans, LA.

98.    In 75 of these 80 markets, Nielsen is the only provider of local radio ratings data and possesses a 100% market share. In five of these 80 markets, Eastlan also provides local radio ratings data, but upon information and belief, Nielsen receives the vast majority of the revenue paid for the provision of local radio ratings data.

99.    Upon information and belief, in all 80 Local Radio Ratings Data Markets, all or the vast majority of advertising revenue transacted using local radio ratings uses Nielsen's local radio ratings data.

100.    In addition, the Local Radio Ratings Data Markets include many barriers to entry, as described below.

101.    Further, Nielsen has consistently increased the prices of its local radio ratings data per geography in every negotiation cycle, regardless of market dynamics or attempts to negotiate prices to reflect market dynamics. Nielsen's ability to profitably raise prices substantially above the competitive level is direct evidence of Nielsen's market power in the Local Radio Ratings Data Markets.

ii.    *National Radio Ratings Data Market*

a.    Relevant Product Market

102.    As outlined above, the provision of national radio ratings data is a distinct product from local radio ratings data. The national radio ratings data product is sold as a separate product and often to different buyers and used for a different purpose than local radio ratings data, as described above.

103.    The market for national radio ratings data is the National Radio Ratings Data Market.

104.    Nielsen is the only provider of national radio ratings data in the United States. In particular, Nielsen is the only provider of national radio ratings data in the United States used by national networks, advertisers, and advertising agencies to buy or sell advertising inventory. Nielsen, therefore, possesses a dominant share (100%) of the National Radio Ratings Data Market. In addition, the market for national radio ratings data includes many barriers to entry, as described below, including those erected by Nielsen.

105.    Furthermore, in the past decade, Nielsen has unilaterally and substantially increased the price of national radio ratings data, without any regard to metrics or factors that could impact the price, to an amount that is significantly higher than what a competitive market price would be. For example, Nielsen unilaterally raised the price of its product sold to Cumulus by almost 36% in 2022. Nielsen's ability to raise prices substantially above a competitive level is direct evidence of monopoly power in the National Radio Ratings Data Market.

106.    Nielsen indisputably holds a monopoly in the National Radio Ratings Data Market.

b.  <u>Relevant Geographic Market</u>

107.    The relevant geographic market for national radio ratings data is the United States. The data provided are from all geographies within the United States, and national radio ratings data are purchased by customers across the United States.

108.    In addition, Nielsen provides national radio ratings data for various geographic areas from various data centers across the country.

iii.    *There Are Multiple Barriers to Entry to Both the National Radio Ratings Data Market and the Local Radio Ratings Data Markets.*

109.    At every step of the advertisement buying process, Eastlan and other potential competitors face significant barriers to entering both the National Radio Ratings Data Market and the Local Radio Ratings Data Markets.

110.    First, Eastlan or any potential competitor must convince local radio stations that its data will be accepted by advertisers and advertising agencies in lieu of Nielsen data, but they cannot, as a result of Nielsen's conduct. In fact, upon information and belief, in the years leading up to the Subscriber First Policy, Eastlan had experienced success in convincing local radio stations to purchase Eastlan data in lieu of Nielsen data. But Nielsen's Subscriber First Policy, discussed further below, prevented Eastlan from becoming more widely known and accepted. As a result, Eastlan must convince local radio stations that its lower pricing can compensate for the losses from losing certain advertisers and advertising agencies by switching to Eastlan data.

111.    Second, as a result of Nielsen's stranglehold over the entire national and local radio ratings ecosystem, Eastlan faces difficulties in having its data accepted by intermediaries. On the national level, Nielsen's monopoly over the National Radio Ratings Data Market prevents any potential competitors from even attempting to enter the market.

For example, neither Act 1 nor Mediaocean accepts national radio ratings data, or in the case of Mediaocean, local radio ratings data, from anyone but Nielsen, and national networks and local radio stations would be unable to sell advertising inventory to advertisers and advertising agencies on these platforms if they purchased Eastlan data.

112.    These barriers exist despite Eastlan's lower prices and Eastlan having the ability, willingness, and incentive to enter a new geography so long as a single local radio station is willing to purchase its data, upon information and belief.

### E. Nielsen Engaged in Multiple Anticompetitive Practices to Maintain its Market Power in the Local Radio Ratings Data Markets

113.    Nielsen possesses market power over 80 Local Radio Ratings Data Markets in which Cumulus owns a radio station.

114.    Nielsen also possesses a monopoly over the National Radio Ratings Data Market, as it is the sole provider of national radio ratings data.

115.    Nielsen has taken multiple anticompetitive actions to maintain its market power in the Local Radio Ratings Data Markets and retain its ability to charge inflated prices to local radio stations for local radio ratings data.

*i.    Reasons for the Tying*

116.    Eastlan is generally present only in geographies where Nielsen does not have a presence. If provided with the opportunity, Eastlan would attempt to challenge Nielsen in additional Local Radio Ratings Data Markets by providing lower priced products that better meet the needs of local radio stations and other purchasers of local radio ratings data.

117.    In the past decade, local radio stations have faced diminishing margins and a shrinking pool of radio advertisers. For example, in San Francisco, CA, revenue earned

by the entire radio industry decreased from $223 million in 2018 to $154 million in 2024. Nielsen, however, has continued to increase its prices.

118.    In response, local radio stations have sought cheaper alternatives to Nielsen's local radio ratings data, such as purchasing Eastlan's local radio ratings data. This option results in a loss of advertising revenue from not being included in Nielsen's summary-level data, which is used by agencies to rank stations based on audience sizes. But for local radio stations, the savings from not purchasing Nielsen's local radio ratings data often outweigh any loss in advertising revenue. In other words, local radio stations' profit increases by not purchasing Nielsen's local radio ratings data, because of Nielsen's high prices that do not reflect market realities.

119.    Cumulus has been subject to Nielsen's market power in both the Local Radio Ratings Data Markets and National Radio Ratings Data Market since 2013. The prices Cumulus has paid to Nielsen for products it purchases have consistently increased over the years, even while the number of advertisers and advertising dollars has shrunk, and the quality of Nielsen's local radio ratings data and support have deteriorated (Nielsen's local radio ratings data have even lost their accreditation in many markets). Attempts to lower the prices paid in successive contracts in light of industry reality and a degraded product were summarily rebuffed. Because of Nielsen's prices, Cumulus has been forced to drop services and stop purchasing local radio ratings data in certain geographies.

ii.    *The Tying Policy*

120.    In response to its customers' attempts to pick and choose which products they want to purchase, and within what geographies, if any, in September 2024, Nielsen announced a new policy that conditions the sale of the Nationwide product, its

comprehensive national radio ratings data, to networks with shared-ownership local radio stations upon all the shared-ownership local radio stations subscribing to Nielsen's local radio ratings data, if Nielsen provides that data. Thus, if one or more shared-ownership local radio stations fail to subscribe to Nielsen's local radio ratings data in a geography where Nielsen provides that data, no data from any radio station in those geographies will appear in the national radio ratings data purchased by the national network.

121.    For Cumulus, under this new Tying Policy, Westwood One would lose access to comprehensive national radio ratings data beginning with the Spring 2026 Ratings Book, to be issued in August or September 2026.

122.    Cumulus sent Nielsen a cease-and-desist letter on August 18, 2025, describing why this Tying Policy is illegal under the antitrust laws.

123.    After engaging counsel, Nielsen's response—as expected for a monopolist engaging in anticompetitive conduct—was to purport to offer the Nationwide product to Cumulus at almost ten times the previous price. Nielsen also offered an alternative, that Cumulus could purchase the Nationwide product and the local radio ratings data in the 32 geographies Cumulus wants to purchase, but also at a price that disqualified itself as an option. These offers were chimeras, made at a price point Nielsen knew would force Cumulus to accept the original overtly tied product terms.

124.    Nielsen's transparent intentions are made clear by the fact that Nielsen sells Nationwide as a standalone product to national networks without shared-ownership local radio stations for an amount similar to what Cumulus currently pays for the Nationwide product, and significantly less than what Nielsen is currently proposing Cumulus pay for

Nationwide. Notably, these national networks do not own any local radio stations that could purchase local radio ratings data.

125.    Nielsen has steadfastly refused to provide market-by-market pricing for local radio ratings data in individual Local Radio Ratings Data Markets, despite Cumulus's repeated requests over the course of months. Instead, Nielsen has stated that the price of local radio ratings data depends on Cumulus's purchase of other Nielsen products.

126.    Nielsen is still exploiting its control over the tying product, Nationwide, to coerce Cumulus to buy from Nielsen the tied product, local radio ratings data, for each and every local radio market in which Cumulus owns a radio station, and prevent Cumulus from purchasing this data from Eastlan.

127.    National advertisers and advertising agencies require Westwood One and similarly situated national networks to provide national radio ratings data to purchase advertising inventory, and Nielsen is the only provider of national radio ratings data.

128.    As a Nielsen executive admitted, national radio ratings data without data from local radio geographies where Cumulus owns local radio stations would be "Swiss cheese" and not "useful." He also agreed that Nielsen was tying the Nationwide and local ratings data products together.

<em>iii.    Harms From the Tying Policy</em>

129.    Nielsen is leveraging its monopoly power in the National Radio Ratings Data Market and conditioning the sale of its national radio ratings data (the tying product) to coerce companies such as Cumulus into subscribing to its overpriced local radio ratings data (the tied product) to maintain its market power in the Local Radio Ratings Data Markets. These companies are forced to choose between overpaying for Nielsen's products

that they neither need nor want, and risking significant losses in advertising revenue for their network's shows and programs, among other harms.

130.    Through this tie, Nielsen is impeding Eastlan and potential competitors from competing in the 80 Local Radio Ratings Data Markets and the National Radio Ratings Data Market, and foreclosing Eastlan from 75 of these markets. Nielsen is impeding Eastlan's ability to compete in these markets because the sale of the Nationwide product to a national network is conditioned on the local stations it owns, or with which it shares ownership, purchasing Nielsen's local radio ratings data in the geographies where it and Nielsen have a presence, instead of Eastlan's data. Upon information and belief, Eastlan either provides or has the ability and willingness to provide local radio ratings data for almost all, if not all, of these geographies.

131.    If Cumulus were to resist the Tying Policy, losing access to the Nationwide product would have severe ramifications for Westwood One, and Cumulus. Westwood One will suffer material financial losses and reputational harm, and loss of goodwill in relationships with advertisers, advertising agencies, affiliates, and content and service partners.

132.    Missing data from even one or two major geographies could significantly lower metrics measuring the national audience for a network, underreporting the audience of a national network's programming, reduce revenue opportunities for that network's programming, and render a network's shows and programs less competitive and less marketable to advertisers. For example, missing data from the San Francisco, CA, geography, one of the largest in the country, will meaningfully underreport the audience for some of Westwood One's programming.

133.    Furthermore, an advertising agency may require, on behalf of its client, that a response to an RFP include data from certain markets, such as San Francisco, CA. If radio ratings data from San Francisco, CA, do not appear in Westwood One's analyses, Westwood One may be automatically excluded from consideration, may not have its proposal seriously considered for this RFP, and may be unable to sell advertising inventory to this advertiser. In fact, if Cumulus no longer purchases local radio ratings data for this geography, Westwood One will face difficulties in selling advertising inventory to any national advertiser that requires data from San Francisco, CA. Even if Cumulus would prefer not to purchase local radio ratings data concerning San Francisco, CA, it would be compelled to do so under this policy.

134.    Even if the advertising agency purchases national radio ratings data from Nielsen, it expects national networks such as Westwood One to provide comprehensive ratings data underpinning its response to an RFP. Failure to do so would likely result in the advertising agency declining to purchase advertising inventory from Westwood One, or at a minimum, placing Westwood One at a material disadvantage vis-à-vis other sellers of advertising inventory.

135.    Lack of comprehensive national radio ratings data would also harm Westwood One's relationship with content and service providers. Content and service providers sign revenue share agreements with Westwood One, and any decrease in revenue from Westwood One's impaired ability to sell advertising inventory would likely result in content and service providers leaving Westwood One. Any sense of Westwood One's impaired ability to sell advertising inventory will sow doubts and raise concerns that might drive the content or service provider to leave Westwood One.

136.    Westwood One's relationships with the thousands of its affiliates would also be in jeopardy. Affiliates broadcast Westwood One programming. If Westwood One loses access to the Nationwide product, Westwood One would be unable to accurately monetize the inventory of affiliates in those geographies, which will hurt the relationship and cause the affiliate to broadcast programming from a competitor instead.

137.    Even before Westwood One loses access to the Nationwide product, advertisers and advertising agencies would likely elect not to purchase advertising inventory from Westwood One, knowing that Westwood One is likely to lose access to the Nationwide product later in 2026.

138.    Specifically, many advertisers will want to sign contracts with Westwood One in late 2025 for the purchase of advertising inventory that will run throughout 2026. If these advertisers expect Westwood One to lose access to the Nationwide product later in 2026, they will likely purchase inventory from entities that do not face these issues, either competitors in the national network industry or in other mediums.

139.    Westwood One would also face difficulties in its business as a sales agency for advertising inventory, and in its role purchasing and repackaging sales inventory for sale to national advertisers for the same reasons stated above.

140.    Alternatively, if Cumulus purchases both the tied (local radio ratings data in all markets) and tying (Nationwide) products, or even the Nationwide product and local radio ratings for the 32 markets, Cumulus will not purchase local radio ratings data from Eastlan.

141.    For example, if Cumulus had originally decided to not purchase local radio ratings data from Nielsen in certain geographies for the upcoming contract, and instead,

was planning on purchasing Eastlan data, Nielsen's Tying Policy prevents Cumulus from being able to freely choose between Nielsen and Eastlan data in those geographies.

142.    Even in geographies where Eastlan does not currently have a presence, Eastlan would be willing and able to enter the market if Cumulus's local radio stations purchased Eastlan's local radio ratings data.

*iv.    Subscriber First Policy*

143.    In addition to tying the sale of its national radio ratings data to the sale of its local radio ratings data, in 2022, Nielsen forced upon Cumulus its Subscriber First Policy, where it would exclude all non-subscribing local stations from the local radio summary-level data, which is usually the only type of data purchased by advertising agencies. As a result, Cumulus was required to purchase local radio ratings data from Nielsen for a geography if its local radio stations wished to appear in any summary-level data for that geography.

144.    For example, Cumulus did not subscribe to the Memphis, TN, local radio ratings data from Nielsen, despite owning local radio stations in Memphis, TN, because of the high price. As a result, subscribers to Nielsen's Memphis, TN, summary-level local radio ratings data could no longer view data about Cumulus's Memphis, TN, stations or see Cumulus's Memphis, TN, stations on Nielsen's rankings of stations, creating roadblocks for Cumulus to sell local advertising inventory. Nielsen's exclusion of Cumulus's Memphis, TN, stations from summary-level data resulted in losses in advertising revenue for Cumulus. For example, one advertising agency explicitly attributed its decision to stop purchasing any advertising inventory from Cumulus's local radio stations to the fact that those stations no longer appeared in the Nielsen summary-level local radio ratings data for Memphis, TN.

145.    Cumulus would have elected not to subscribe to Nielsen's local radio ratings data in other Local Radio Ratings Data Markets, but nevertheless has continued to subscribe because the exclusion of Cumulus-owned radio stations from the summary-level local radio ratings data in these geographies would be harmful to Cumulus's local radio stations and would result in a loss of advertisers and advertising revenue.

146.    Nielsen implemented this Subscriber First Policy to force Cumulus and other local radio stations to subscribe to Nielsen's overpriced local radio ratings data, rather than similar and lower priced data from Eastlan.

147.    Notably, Nielsen did not implement a similar policy for the national and local television ratings data it provides to television networks with shared-ownership television stations. Comscore is a strong competitor in the television market, and, as a result, Nielsen is unable to take anticompetitive actions.

148.    Forcing local radio stations to subscribe to Nielsen local radio ratings data harms competition because it prevents Eastlan or other potential competitors from entering, attempting to enter, or gaining a foothold in the Local Radio Ratings Data Markets, and offering lower prices and better products. It also forces companies such as Cumulus to continue purchasing local radio ratings data from Nielsen and paying exorbitant prices to do so.

149.    The Subscriber First Policy is also an anticompetitive change in product design, as Nielsen changed the design of its summary-level local radio ratings data in a manner that degraded the quality of the product for advertisers, advertising agencies, and radio stations that purchase that product, in an effort to lock out and/or disadvantage competitors such as Eastlan. There is no efficiency or quality improvement that can justify

this change. Instead of competing on the merits, Nielsen is coercing buyers of local radio ratings data to buy that product from Nielsen instead of Eastlan by threatening to remove them from the accompanying summary-level data if they do not succumb to Nielsen's demands. The Subscriber First Policy poses a formidable barrier to Eastlan and potential competitors entering or seeking to enter Local Radio Ratings Data Markets.

150.    Nielsen's anticompetitive actions, including the Tying Policy and Subscriber First Policy, reinforce a cycle where both advertising agencies and advertisers remain unfamiliar with and hesitant to adopt Eastlan's offerings, further entrenching Nielsen's market power in the Local Radio Ratings Data Markets and impeding competition.

### F.  Nielsen Engaged in Anticompetitive Practices to Maintain its Monopoly in the National Radio Ratings Data Market

151.    Nielsen is the only provider of national radio ratings data and possesses a monopoly in the National Radio Ratings Data Market.

152.    Nielsen's actions to prevent Eastlan from gaining a foothold in the Local Radio Ratings Data Markets also prevent Eastlan from developing the scale, reputation and relationships necessary to gain a foothold in the National Radio Ratings Data Market.

153.    As a result, Eastlan and potential competitors have been prevented from entering the National Radio Ratings Data Market.

### Anticompetitive Effects and Competitive Harm

154.    Rather than competing on the merits, Nielsen has stifled competition in the Local Radio Ratings Data Markets and the National Radio Ratings Data Market. Through its Subscriber First Policy and the Tying Policy, Nielsen is trying to block local radio

stations' ability to purchase Eastlan's local radio ratings data instead of Nielsen's local radio ratings data.

155.    For example, upon information and belief, in multiple geographies, the Subscriber First Policy deterred a local radio station from considering or purchasing Eastlan's local radio ratings data. Upon information and belief, the actual amount of foreclosure is likely significantly larger.

156.    Because of Nielsen's anticompetitive practices, which effectively foreclose competition in the Local Radio Ratings Data Markets, Eastlan and potential competitors are impeded from competing in both the Local Radio Ratings Data Markets and the National Radio Ratings Data Market. This is despite the fact that Eastlan offers improvements over Nielsen's local radio ratings data product, such as providing a larger, more representative sample by using a hybrid recruitment methodology of e-diaries and telephone interviews. For example, Eastlan will ensure representative samples by balancing against day of the week, age, gender, race and zip code, which allows the sample to better mirror the market and provide more accurate information to advertisers and advertising agencies.

157.    Eastlan's local radio ratings products are also more affordable than those from Nielsen in most markets, often significantly so. By subscribing to Eastlan, local radio stations could benefit from substantially lower prices without compromising the quality of the radio ratings produced (or even improving the quality of the radio ratings produced). For example, in Memphis, TN, the price of Nielsen local radio ratings data was more than six times what Cumulus currently pays for Eastlan's local radio ratings data for Memphis, TN.

158.    Because it has impaired competitors in the Local Radio Ratings Data Markets and faces no competitors in the National Radio Ratings Data Market, Nielsen faces no pressure to innovate or improve service.

159.    A notable example is the flawed design and deployment of its PPM rating method. While PPM-powered ratings data are significantly more expensive than that generated using the CDM or Two Book diary methods, there are well-documented inaccuracies with the PPM method, such as its inability to detect inaudible tones from headphones, as well as challenges in recruiting participants and ensuring they follow proper usage instructions. Customers, such as Cumulus, prefer the CDM or Two Book diary methods. But despite repeated requests from Cumulus to adopt CDM in major geographies, Nielsen has consistently refused.

160.    In fact, Nielsen was un-accredited in 17 geographies by the Media Ratings Council because of deficiencies with the PPM-powered local radio ratings data. The deficiencies in Nielsen's PPM-powered local radio ratings data are so severe that roughly 43% of the total population of people ages 12 and above who live in geographies measured by Nielsen's PPM method are in unaccredited geographies. In total, roughly 31% of the total U.S population ages 12 and above who live in geographies measured by Nielsen are in unaccredited geographies. Instead of attempting to re-earn accreditation, it appears Nielsen has simply decided to make no changes, because Nielsen faces no competition and therefore does not need accreditation to sell its data. A significant portion of Nielsen's radio revenue is derived from PPM-powered local radio ratings data.

161.    Nielsen's product quality and service to its customers has also deteriorated, despite its price increases. Issues experienced recently include the reissuance of market

reports, unplanned service outages, delayed release of data, unrecorded intervals, and less reliable data. Since the beginning of the year, customers have received over 50 notifications of service issues, which is a significant increase over the past year. This has resulted in severe disruptions to its customers' businesses. Nielsen has not sought to fix these issues in the long run, because it lacks the incentive to do so.

162.    Nielsen's anticompetitive conduct in both the Local Radio Ratings Data Markets and the National Radio Ratings Data Market has resulted in reduced output, less innovation, reduced choice, and higher prices than there would have been in a competitive market. Specifically, Nielsen's market power has enabled it to raise prices unilaterally and charge supracompetitive prices, while the quality and support of Nielsen's products have diminished over time. Customers such as Cumulus-owned stations and other independent local radio stations, as well as national networks such as Westwood One, are left with no choice but to continue paying inflated prices for Nielsen's products. In addition, Nielsen's conduct has discouraged new entrants from entering either market. As a result, potential new entrants cannot provide local radio ratings data or national radio ratings data and provide the healthy competition that results in cheaper prices or additional product innovations that could even attract new users.

163.    If Eastlan were allowed to compete in Local Radio Ratings Data Markets, Nielsen would be forced to respond by lowering its prices for local ratings products, offering the CDM method in additional geographies, and/or innovating its products or increasing the value of its products.

164.    Despite Nielsen historically advertising itself as an unbiased and accurate market reporter, it continues to provide faulty data, exemplified by the imposition of its

Subscriber First Policy that specifically excluded certain local radio stations from summary-level local radio ratings data. This has resulted in advertisers and advertising agencies purchasing advertising inventory based on data that they believe to be accurate but does not reflect an accurate number of listeners or accurate rankings of stations broadcasting in a geography. Advertisers and advertising agencies who purchase Nielsen's local radio ratings data pay for a complete view of the market, not a view concocted by Nielsen to punish local radio stations for attempting to exercise their right to choose in a free market.

165.    As one example, Cumulus owns one local radio station in Los Angeles, CA, but no longer purchases local radio ratings data in that geography. Cumulus is excluded from Nielsen's Los Angeles, CA, summary-level data, which is one of the largest markets in the country. Purchasers of summary-level data, including California purchasers, are unable to see Cumulus's local radio station in a ranking of Los Angeles, CA stations, despite Nielsen proclaiming that it is an unbiased and accurate reporter of local radio stations. Such an exclusion results in advertisers and advertising agents not purchasing advertising inventory from Cumulus even if that advertising inventory best met their needs.

<u>**Claims for Relief**</u>

**FIRST CLAIM FOR RELIEF**

**(Monopolization of Local Radio Ratings Data Markets in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 — Tying)**

166.    Cumulus repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

167.    Nielsen possesses market power in all 80 Local Radio Ratings Data Markets in which Cumulus operates and Nielsen provides local radio ratings data. In 75 of those

markets Nielsen is the only provider of local radio ratings data. In the remaining five markets, the only competitor is Eastlan, a small company primarily operating in areas in which Nielsen does not provide ratings.

168.    Even in these five Local Radio Ratings Data Markets where both Nielsen and Eastlan provide local radio ratings data, Nielsen receives the vast majority of the revenue paid for the provision of local radio ratings data, and the vast majority of advertising revenue transacted using local radio ratings is transacted using Nielsen data.

169.    Additionally, Nielsen has the power to control prices and/or exclude competition in these relevant markets and has done so with respect to its own customers, as described above. This constitutes direct evidence of Nielsen's market power in the Local Radio Ratings Data Markets.

170.    Nielsen has willfully maintained its market power in the 80 Local Radio Ratings Data Markets by means of exclusionary and anticompetitive conduct.

171.    Nielsen's national radio ratings data constitutes the "tying product" in a distinct and well-defined product market, separate from the market for local radio ratings data.

172.    Nielsen has monopoly power in the National Radio Ratings Data Market, as it is the sole provider of national radio ratings data in the United States for all industries. Additionally, Nielsen has the power to control prices and/or exclude competition in this relevant market and has done so by unilaterally raising the price of its Nationwide product by approximately 36% to Cumulus in 2022. This constitutes direct evidence of Nielsen's monopoly power.

173.    Nielsen has unlawfully used its power in the National Radio Ratings Data Market to coerce local radio stations affiliated with networks into purchasing Nielsen's local radio ratings data—a separate and distinct product in a separate market—as the "tied" product.

174.    Nielsen's coercion deprives customers of the ability to freely choose alternatives, including Eastlan, even if such alternatives are likely to be cheaper and superior for those customers.

175.    Nielsen's anticompetitive actions are intended to help it maintain its market power in the Local Radio Ratings Data Markets.

176.    There are no legitimate pro-competitive or business justifications for Nielsen's conduct. Even if such justifications existed, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive justifications.

177.    Nielsen's acts and practices are anticompetitive in nature and tendency and constitute an unfair method of competition in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

178.    Nielsen's conduct has had a substantial effect on interstate commerce.

179.    Cumulus will suffer injuries of the type that antitrust laws were intended to prevent, including but not limited to reduced choice, stifled innovation, increased prices and costs, reduced quality, and inhibition of the free flow of competition on the merits.

180.    Because of Nielsen's violation of Section 2 of the Sherman Act, Cumulus seeks appropriate equitable relief to enjoin Nielsen from continuing to engage in anticompetitive behavior, the Tying Policy, and to remedy the harms that Nielsen's illegal tying has caused.

## SECOND CLAIM FOR RELIEF

### (Monopolization of Local Radio Ratings Data Markets in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 — Anticompetitive Product Re-Design)

181.    Cumulus repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

182.    Nielsen possesses market power in all 80 Local Radio Ratings Data Markets. Nielsen is the only provider of local radio ratings data in 75 Local Radio Ratings Data Markets, and in other markets, the only competitor is Eastlan, a small company primarily operating in areas in which Nielsen does not provide ratings.

183.    Even in these five Local Radio Ratings Data Markets where both Nielsen and Eastlan provide local radio ratings data, Nielsen receives the vast majority of the revenue paid for the provision of local radio ratings data, and the vast majority of advertising revenue transacted using local radio ratings is transacted using Nielsen data.

184.    Additionally, Nielsen has the power to control prices and/or exclude competition in these relevant markets and has done so with respect to its own customers, as described above. This constitutes direct evidence of Nielsen's market power in the Local Radio Ratings Data Markets.

185.    Nielsen has willfully maintained its market power in the 80 Local Radio Ratings Data Markets by means of exclusionary and anticompetitive conduct.

186.    By implementing the Subscriber First Policy, Nielsen changed the design of its summary-level local radio ratings data, such that local radio stations must subscribe to Nielsen's local radio ratings data if they wish to appear in the summary-level local radio ratings data.

187.    This change degraded the quality of its product for advertisers, advertising agencies, and local radio stations who purchase this summary-level data, including Cumulus. Purchasers of the data cannot rely on the rankings of the radio stations in the data, as they exclude those stations that did not purchase Nielsen's overpriced local radio ratings data.

188.    The Subscriber First Policy also discourages local radio stations from purchasing local radio ratings data from Eastlan and any other potential competitors, as they would not appear in Nielsen's summary-level data purchased by anyone in that geography, making it more difficult for them to sell advertising inventory. Less competition has resulted in Nielsen charging supracompetitive prices for its radio ratings data.

189.    There are no legitimate pro-competitive or business justifications for Nielsen's conduct. Even if such justifications existed, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive justifications.

190.    Nielsen's acts and practices are anticompetitive in nature and tendency and constitute an unfair method of competition in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

191.    Nielsen's conduct has had a substantial effect on interstate commerce.

192.    Cumulus has suffered, and will continue to suffer, injuries of the type that antitrust laws were intended to prevent, including but not limited to reduced choice, stifled innovation, increased prices and costs, reduced quality and support, and inhibition of the free flow of competition on the merits.

193.    Because of Nielsen's violation of Section 2 of the Sherman Act, Cumulus seeks appropriate equitable relief to enjoin Nielsen from continuing to engage in anticompetitive behavior and to remedy the harms that Nielsen's illegal tying has caused.

194.    Cumulus seeks an award of treble damages or, in the alternative, disgorgement of Nielsen's ill-gotten gains.

### THIRD CLAIM FOR RELIEF

### (Monopolization of Local Radio Ratings Data Markets in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

195.    Cumulus repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

196.    Nielsen possesses market power in all 80 Local Radio Ratings Data Markets in which Cumulus owns radio stations and Nielsen provides data. Nielsen is the only provider of local radio ratings data in 75 Local Radio Ratings Data Markets, and in other markets, the only competitor is Eastlan, a small company primarily operating in areas in which Nielsen does not provide ratings.

197.    Even in these five Local Radio Ratings Data Markets where both Nielsen and Eastlan provide local radio ratings data, Nielsen receives the vast majority of the revenue paid for the provision of local radio ratings data, and the vast majority of advertising revenue transacted using local radio ratings is transacted using Nielsen data.

198.    Additionally, Nielsen has the power to control prices and/or exclude competition in these relevant markets and has done so with respect to its own customers, as described above. This constitutes direct evidence of Nielsen's market power in the Local Radio Ratings Data Markets.

199.    Nielsen has willfully maintained its market power in the 80 Local Radio Ratings Data Markets by a series of exclusionary and anticompetitive conduct.

200.    Nielsen has required local radio stations to subscribe to local radio ratings data if they wish to appear in the summary-level local radio ratings data through its Subscriber First Policy.

201.    Cumulus lost advertising revenue in geographies such as Memphis, TN, because of this policy.

202.    Cumulus has also been forced to subscribe to local radio ratings data in numerous markets because of the Subscriber First Policy, which has increased and would continue to increase Cumulus's costs.

203.    This policy also discourages local radio stations from purchasing local radio ratings data from Eastlan and any other potential competitors, as they would not appear in Nielsen's summary-level data purchased by anyone in that geography, making it more difficult for them to sell advertising inventory.

204.    In its latest effort to maintain its market power in the Local Radio Ratings Data Markets, Nielsen has announced the Tying Policy, which prevents local radio stations from purchasing local radio ratings data from Eastlan and any other potential competitors, if the shared-ownership national network seeks to purchase the Nationwide product.

205.    There are no legitimate pro-competitive or business justifications for Nielsen's conduct. Even if such justifications existed, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive justifications.

206.    Nielsen's acts and practices are anticompetitive in nature and tendency and constitute an unfair method of competition in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

207.    Nielsen's conduct has had a substantial effect on interstate commerce.

208.    Cumulus has suffered, and will continue to suffer, injuries of the type that antitrust laws were intended to prevent, including but not limited to reduced choice, stifled innovation, increased prices and costs, reduced quality and support, and inhibition of the free flow of competition on the merits.

209.    Because of Nielsen's violation of Section 2 of the Sherman Act, Cumulus seeks appropriate equitable relief to enjoin Nielsen from continuing to engage in anticompetitive behavior and to remedy the harms that Nielsen's illegal tying has caused.

210.    Cumulus seeks an award of treble damages or, in the alternative, disgorgement of Nielsen's ill-gotten gains.

## FOURTH CLAIM FOR RELIEF

### (Monopolization of National Radio Ratings Data Market Under Section 2 of the Sherman Act, 15 U.S.C. § 2)

211.    Cumulus repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

212.    As described above, Nielsen is the only provider of national radio ratings data and possesses monopoly power in that market.

213.    Nielsen's actions in preventing Eastlan and potential competitors from gaining scale and expertise in the Local Radio Ratings Data Markets have also prevented Eastlan from being able to enter the National Radio Ratings Data Market.

214.    There are no legitimate pro-competitive or business justifications for Nielsen's conduct. Even if such justifications existed, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive justifications.

215.    Nielsen's acts and practices are anticompetitive in nature and tendency and constitute an unfair method of competition in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

216.    Nielsen's conduct has had a substantial effect on interstate commerce.

217.    Cumulus has suffered, and will continue to suffer, injuries of the type that antitrust laws were intended to prevent, including but not limited to reduced choice, stifled innovation, increased prices and costs, reduced quality and support, and inhibition of the free flow of competition on the merits.

218.    Because of Nielsen's monopolization in violation of Section 2 of the Sherman Act, Cumulus seeks appropriate equitable relief to enjoin Nielsen from continuing to engage in anticompetitive behavior and to remedy the harms that Nielsen's monopolization has caused.

219.    Cumulus seeks an award of treble damages or, in the alternative, disgorgement of Nielsen's ill-gotten gains.

**FIFTH CLAIM FOR RELIEF**

**(Violation of Unfair Competition, Cal. Bus. & Prof. Code § 17200 et seq.)**

220.    Cumulus repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

221.    California's Unfair Competition Law ("UCL") prohibits any business act or practice that is "unlawful," or "unfair," or "fraudulent," as well as any "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

222.    Cumulus owns 22 radio stations in California, in five different geographies (Fresno, CA, Los Angeles, CA, Oxnard-Ventura, CA, San Francisco, CA, and Stockton/Modesto, CA).

223.    Cumulus has standing to bring this claim because it has been deprived of money and property sufficient to qualify as injury in fact, such economic injury being the direct result of Nielsen's unfair business practices described herein.

224.    Nielsen's conduct in imposing the Tying Policy and Subscriber First Policy violates the Sherman Act and thus constitutes unlawful conduct under § 17200. Nielsen is illegally attempting to force Cumulus to purchase local radio ratings data in California geographies including San Francisco, CA. In addition, Nielsen removed Cumulus's Los Angeles, CA, shared-ownership radio station as part of its anticompetitive and unfair Subscriber First Policy, resulting in harm to Cumulus. These policies also coerce other California local radio stations to purchase Nielsen local radio ratings data instead of Eastlan data.

225.    Nielsen's conduct is also "unfair" within the meaning of the UCL, as the ambit of the UCL is broader than the Sherman Act, because it violates the spirit of the antitrust laws and significantly threatens or harms competition, including by impeding Eastlan and other potential competitors from entering the market. Any harm to competition from Nielsen's conduct outweighs any benefits. For the same reasons stated above, wrongful acts occurred within the state of California and impacted California residents.

226.    Nielsen's Subscriber Only policy is "unfair" within the meaning of the UCL, as Nielsen's conduct harms California purchasers of local radio ratings data by falsely promising them accurate and reliable rankings.

227.    UCL § 17203 provides that "[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction."

228.    Cumulus seeks injunctive relief under § 17203 enjoining Nielsen from ongoing anticompetitive and otherwise unlawful, unfair, and fraudulent business practices. Such conduct is an actual and imminent threat to Cumulus, including, but not limited to, lost business, lost goodwill, and reputational harm. Unless Nielsen is restrained by a preliminary and permanent injunction, Cumulus will suffer severe, irreparable harm in lost business and lost goodwill.

## SIXTH CLAIM FOR RELIEF

### (Declaratory Judgment)

229.    Cumulus repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

230.    Under 28 U.S.C. §§2201 and 2202, this Court has jurisdiction to declare the rights and other legal relations of the parties in dispute.

231.    Nielsen's Tying Policy conditions the purchase of its national radio ratings data on the purchase of local radio ratings data, in violation of the Sherman Act.

232.    Cumulus seeks a Declaratory Judgment that Nielsen's Tying Policy, and any de facto or constructive tie implementing the Tying Policy, is anticompetitive and an illegal attempt to maintain Nielsen's monopolies in the Local Radio Ratings Data Markets.

233.    An actual controversy exists between Cumulus and Nielsen because Nielsen has imposed this Tying Policy on Cumulus.

234.    Cumulus's interest in declaratory relief is direct, substantial, quantifiable, and immediate.

235.    Declaratory Judgment is appropriate in the manner requested herein by Cumulus.

**<u>Prayer for Relief</u>**

236.    Wherefore, Cumulus prays for judgment as follows:

237.    A permanent injunction prohibiting Nielsen, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with them, from continued violations of the antitrust laws or the UCL.

238.    A judgment in favor of Cumulus that Nielsen has violated the Sherman Act 15 U.S.C. § 2 via its monopolization of the Local Radio Ratings Data Market via its Tying Policy.

239.    A judgment in favor of Cumulus that Nielsen has violated the Sherman Act 15 U.S.C. § 2 via its monopolization of the Local Radio Ratings Data Market via its Anticompetitive Product Re-Design.

240.    A judgment in favor of Cumulus that Nielsen has violated the Sherman Act 15 U.S.C. § 2 via its monopolization of the Local Radio Ratings Data Market.

241.    A judgment in favor of Cumulus that Nielsen has violated the Sherman Act 15 U.S.C. § 2 via its monopolization of the National Radio Ratings Data Market.

242.    A judgment in favor of Cumulus that Nielsen has violated Unfair Competition, Cal. Bus. & Prof. Code § 17200 et seq.

243.    A declaration that Nielsen's Tying Policy, and any de facto or constructive tie implementing the policy, is unlawful and anticompetitive.

244.    An order awarding treble damages, along with reasonable attorney's fees, prejudgment interest, and post-judgment interest, for Nielsen's violation of the antitrust laws.

245.    Any and all other legal and equitable relief as may be available under law and which the court may deem proper.

## **Jury Demand**

246.    Cumulus hereby demands a jury trial on all claims and issues presented in this Complaint so triable.

Dated: October 16, 2025

Respectfully submitted,

*/s/ Claude G. Szyfer*
Claude G. Szyfer
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, N.Y. 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
claude.szyfer@hoganlovells.com


Jennifer Fleury (*pro hac vice forthcoming*)
Charles Loughlin (*pro hac vice forthcoming*)
Jamie Lee (*pro hac vice forthcoming*)
Alisa Lu (*pro hac vice forthcoming*)
Ashley Ifeadike (*pro hac vice forthcoming*)
Tianyu Dong (*pro hac vice forthcoming*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
jennifer.fleury@hoganlovells.com
chuck.loughlin@hoganlovells.com
jamie.lee@hoganlovells.com
alisa.lu@hoganlovells.com
ashley.ifeadike@hoganlovells.com
tianyujohn.dong@hoganlovells.com


*Counsel for Plaintiff*
*Cumulus Media New Holdings Inc.*