**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CUMULUS MEDIA NEW HOLDINGS INC., <br><br> *Plaintiff*, <br><br> v. <br><br> THE NIELSEN COMPANY (US) LLC, <br><br> *Defendant*. | Civil Action No.: 25-cv-08581 <br><br> **DECLARATION OF COLLIN R. JONES IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

I, Collin R. Jones, hereby declare as follows:

1. I am over the age of eighteen and competent to make this declaration. I am submitting this declaration in support of Cumulus Media New Holdings Inc.'s ("Cumulus") motion for preliminary injunction. I have personal knowledge of the facts asserted and, if called upon as a witness, could testify to them competently under oath.

2. I am the Executive Vice President, Corporate Strategy & Development for Cumulus, and the President of Westwood One, Inc. ("Westwood One"). In these roles, I oversee strategic initiatives, investor relations and corporate development for Cumulus, and lead Westwood One, the Cumulus Podcast Network, and our daily deals and e-commerce platform, IncentRev/Sweet Deals. I joined Cumulus Media in 2011 and served as Director, Corporate Strategy & Development and Senior Vice President, Corporate Strategy & Development before taking on my current roles. Before joining Cumulus Media, I worked at Macquarie Capital and Argentum Group. I attended Duke University and have a bachelor's degree in economics.

3. As the President of Westwood One, I oversee all functions of Westwood One, including sales, operations, and programming.

4.      During the past year, I have been the main contact for Cumulus and Westwood One in negotiating with Nielsen to purchase national radio ratings data and local radio ratings data (*i.e.*, data that measure radio listening not including podcasting, Spotify, or Sirius Radio).  I was also involved in the negotiations with Nielsen to purchase national radio ratings data and local radio ratings data in the last contracting cycle, which culminated in the signing of the current contract that expires ▓▓▓▓▓▓▓▓▓▓ .

## Background

*A. Nationwide Product*

5.      Westwood One, a subsidiary of Cumulus, is a national network that produces national radio programming and distributes our content through affiliate agreements with local radio stations ("affiliate" or "affiliated" stations).  We syndicate our programming or otherwise provide services to 9,500 local radio stations including both Cumulus-owned local radio stations and local radio stations not owned by Cumulus, in exchange for advertising inventory (*i.e.,* radio commercial time). We also act as a sales agent for content or service partners, who create programming and/or provide services that are exchanged for advertising inventory on local stations, which we monetize on their behalf.  Additionally, we purchase advertising inventory from both third-party local radio stations and Cumulus's local radio stations.  We then aggregate and package the advertising inventory from these three sources for sale to national advertisers, generally through their advertising agencies.

6.      National radio ratings data measure broadcast radio listening across the United States, showing how Westwood One's programming and packages of advertising inventory perform against their competitors in audience size, demographic reach and time spent listening, among other metrics.

7. Nielsen is the only provider of national radio ratings data in the United States[1]. It refers to its product, which is sold to national networks such as Westwood One, as the "Nationwide" product. Nationwide includes data from all geographies in the United States Nielsen measures for its local radio ratings data products, in addition to a few geographies that Nielsen no longer measures for its local radio ratings data products.

8. Eastlan, a local radio ratings data provider, does not currently provide national radio ratings data. I am not aware of advertisers and advertising agencies accepting Eastlan data in the buying or selling of advertising inventory to or from national networks. Further, in my experience, national advertisers and advertising agencies use national radio ratings data analyzed by software company Act 1, which only accepts Nielsen data. National advertisers and advertising agencies also frequently use media-buying platform Mediaocean, which also only accepts Nielsen's local radio ratings data and national radio ratings data. My understanding is that if Eastlan sought to provide national radio ratings data, it would need to develop the ability to do so, and it would need to convince advertisers, advertising agencies, Act 1, and Mediaocean to accept its data.

9. In my experience, local radio stations purchase local radio ratings data while national networks purchase national radio ratings data. In my experience, local radio stations would not purchase national radio ratings data, as they provide information they do not need and are generally more expensive than purchasing local radio ratings data for a specific geography. Nielsen also sells both products as standalone products and there are purchasers who will purchase only one or the other.

---

[1] While Ipsos provides national radio ratings for live, play-by-play sports, it does not provide data outside of that limited context, and does not provide national radio ratings data, as defined herein.

B. *Nielsen's National Radio Ratings Data is Essential for Building a National Advertising Campaign*

10. Westwood One sells advertising inventory to national advertisers, most often through advertising agencies.

11. Westwood One relies on Nielsen's national radio ratings data as a verified way to demonstrate our audience reach or other relevant characteristics to advertisers and advertising agencies. If we want to sell advertising inventory, we must provide advertisers and advertising agencies with analyses using national radio ratings data to support our proposal on which advertising inventory or packages of advertising inventory would best support their objectives, how long the campaigns should run, and the price they should pay.

12. Westwood One has worked hard to establish strong, long-standing relationships with hundreds of advertisers and advertising agencies. For example, Westwood One has long-standing relationships that date back many years with Publicis Groupe, Omnicom, and WPP, some of the largest advertising agencies in the country. Similarly, Westwood One has long-standing relationships with some of the largest advertisers in the country, including Procter & Gamble, Progressive, Lowe's, and Verizon, among others. Westwood One has dedicated considerable time and resources over decades to creating, growing, and maintaining these relationships.

13. Westwood One has also developed relationships with content partners, such as the National Football League ("NFL"), Mark Levin, and the Bob and Tom Show. Westwood One licenses the rights to exclusively produce the radio broadcasts of the NFL primetime games, playoffs and the Super Bowl. ███████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

4

███████████████████████████████████████████

████████████████████████████

## Relationship with Nielsen

 A. *State of Industry*

  14. Over the past decade, the national network business has been contracting, with shrinking audiences, declining profit margins, and a shrinking pool of advertisers.

  15. While the radio broadcasting industry has faced difficulties, Nielsen has raised the price of national radio ratings data. For instance, in 2022, during our last negotiation, Nielsen unilaterally increased the price of Nationwide by nearly 36%. There was no change to the product or improvement in its quality in connection with this price hike.

  16. Because Nielsen is the sole provider of national radio ratings data, Westwood One has no alternative but to accept Nielsen's inflated and unreasonable pricing.

 B. *Nielsen's Tying Policy*

  17. On September 4, 2024, Nielsen announced a new policy (the "Tying Policy"): that it would no longer sell its comprehensive national radio ratings product, Nationwide, to national networks that share ownership with local radio stations, unless the shared-ownership local radio stations all subscribe to Nielsen's local radio ratings data where they and Nielsen have a presence.

  18. This Tying Policy was announced in an email from Nick Freeling, VP, Policy of Nielsen, to me, with the subject line: "Nielsen Reporting Policy Update Regarding Network-Owned, Non-Subscribing Radio Stations." The content of the email was as follows:

> Beginning September 12, 2024 (the first day of the Fall 2024 survey period), if a network or any other type of sales entity owns, manages, operates, or has a sales or operating agreement or other similar business relationship with a local station in a Nielsen-measured market that does not currently subscribe to the local market in that Metro, Nielsen Audio will no longer provide DMA or Metro data in Nielsen's National Regional Database (NRD), Act One, or via any Software Solution Provider (SSP) for that specific market to

the network or such other applicable entities. This policy will take effect at the time of contract renewals or for new contracts.

19. My understanding is that this policy does not solely impact Cumulus and was not intended to solely impact Cumulus.

*C. Application of the Tying Policy to Cumulus*

20. In June and July 2025, Nielsen confirmed that Nielsen's Tying Policy would be applied to Cumulus and Westwood One after Cumulus's current contract with Nielsen expired (*i.e.* ██████████████). Under the Tying Policy, when Nielsen issues its national radio ratings data for the Spring of 2026, Westwood One will lose access to the Nationwide product (*i.e.*, the comprehensive and usable national radio ratings data) if Cumulus does not agree to subscribe to local radio ratings data in all the geographies where it owns local stations and Nielsen provides local radio ratings data. Not only would the Tying Policy require Cumulus to purchase local radio ratings data for geographies where it would prefer to purchase Eastlan data, it would also compel Cumulus to no longer purchase Eastlan data in certain geographies such as Memphis, TN, and re-purchase Nielsen data.

21. On July 25, 2025, I spoke with Rich Tunkel, Managing Director for Nielsen Audio, to better understand Nielsen's Tying Policy. During this call, Mr. Tunkel stated that if Cumulus's local radio stations do not purchase the local radio ratings data for their geographies, Nielsen would not sell Westwood One the comprehensive national radio ratings data (*i.e.*, Nationwide) it has sold in the past. Instead, the national radio ratings data available to Westwood One, according to Mr. Tunkel, "would be Swiss cheese" and "have holes." This is because the national radio ratings data available to Cumulus would exclude all stations (not just Cumulus stations) in the geographies where Cumulus can, but does not, purchase local radio ratings data. He admitted that such national

radio ratings data product would not be the "real" or a "useful" product. He also agreed that Nielsen was tying Nationwide and local ratings data products together.

22. Counsel for Cumulus sent a letter on August 18, 2025 to Nielsen explaining why the Tying Policy was anticompetitive.

23. On September 15, 2025, Mr. Tunkel called me, stating that Cumulus could purchase the Nationwide product for almost 10 times what we currently pay for Nationwide. The amount he proposed is also significantly higher than what I understand national networks without shared-ownership local radio stations typically pay Nielsen for Nationwide as a standalone product.

24. Mr. Tunkel also stated Cumulus could purchase the Nationwide product and local radio ratings data in 32 geographies, but the price he proposed eliminated itself as an option.

25. I view both of these options as priced to coerce Cumulus to purchase Nationwide and local radio ratings for all geographies Nielsen measures and in which Cumulus owns a local radio station.

26. During our September 15, 2025 conversation, Mr. Tunkel never stated that the Tying Policy no longer applied to Cumulus.

27. I have also repeatedly asked Mr. Tunkel for a breakdown of the price of local radio ratings data by geography since July 2025. Mr. Tunkel still has not provided me with this information, merely stating that the prices of local radio ratings data will depend on the amount and price of other Nielsen products we purchase.

### Nielsen's Tying Policy Will Cause Significant and Irreparable Harm to Westwood One and Cumulus

*A. Cumulus's Difficult Position*

28. Cumulus's financial results have been substantially pressured by macro-economic and secular trends that have affected the entire radio industry, including most notably a severe and

continued reduction in national radio advertising revenue.  As our most recent 10-K indicates, the Adjusted EBITDA for all of Cumulus for the year ended December 31, 2024 was slightly less than $83 million (a decline of 9% year-over-year), with a book operating loss of $239 million.  For 2025, Cumulus's reporting equity research analysts have published a consensus estimate of Adjusted EBITDA for the year of $55.4 million, a further year-over-year decline of 33%.  For context, in 2022, Cumulus's Adjusted EBITDA was $166 million.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

29.     Nielsen is attempting to force Cumulus to purchase both Nationwide and local radio ratings data at an inflated and unaffordable price, which will prevent Cumulus from purchasing Eastlan's local radio ratings data and benefiting from Eastlan's lower prices.

30.     If Cumulus does not accede to Nielsen's Tying Policy, Cumulus will no longer receive the Nationwide product (*i.e.*, comprehensive national radio ratings data), which will create imminent and irreparable damage to Westwood One and Cumulus.

   B.  *There Will Be An Almost Immediate Impact*

31.     After the potential for Westwood One to lose full access to the Nationwide product becomes public, there will likely be immediate irreversible consequences based on the reactions of advertisers, advertising agencies, content partners and other partners for whom we act as a sales agent.

32.     With respect to advertisers and advertising agencies, many advertising schedules are built on an annual basis, with contracts signed in late 2025 that cover the entirety of 2026.  If those advertisers and advertising agencies believe that we will be unable to provide the same national radio ratings data that we have provided to them in the past in support of our proposals, it is all but certain they will shift some of the share of their advertising inventory purchases to

8

competitors who do not have the same issue, or altogether refrain from purchasing advertising inventory from national networks. This will result in an immediate decrease in Westwood One's market share starting in early 2026. These advertisers might even shift advertising to other media (such as digital media), and Westwood One could lose its relationships with these advertisers altogether. In addition, ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████

33. Additionally, we have agreements with content partners (such as ███████ ████████████████) and partners for whom we act as a sales agent (██████████████) that expire at the end of 2025, and with whom we are currently in extension negotiations. If those parties believe that we will be unable to monetize a portion of their inventory because we will not have access to the Nationwide product, they will not want to renew with us and instead will choose to sign with a competitor national network. Once that change has been made, they will have a new contract with a competitor that will make it very difficult for us to re-establish that relationship with them. Since Westwood One operates with high fixed costs and on very thin margins, even a handful of these losses could result in the business operating at a material loss, threatening its viability.

    *C. Westwood One Will Lose Advertisers and Market Share*

34. The national radio advertising industry is intensely competitive. As such, even a minor reduction in the quality of our proposals, lacking the data advertisers and advertising agencies expect, will inevitably and immediately lead to a reduced ability to sell advertising inventory and cause significant financial harm.

9

35. National radio ratings data aggregate key metrics—such as reach, frequency, and gross impressions—across a network's affiliated local radio stations. Missing data from even one or two major geographies can substantially lower the network's overall figures for those key metrics. When responding to a Request for Proposal ("RFP"), a national network with missing data from major markets will appear to be less popular than its competitors. Since advertising agencies evaluate proposed schedules based on the figures provided in Nielsen's ratings, networks with missing data will be at a substantial competitive disadvantage, and their shows and programs will be less appealing and marketable to advertisers and advertising agencies.

36. These artificially deflated metrics are one of the reasons why Westwood One risks losing a significant portion of its market share and revenue. These skewed metrics are likely to deter national advertising agencies, which make up approximately ■ of Westwood One's client base, from purchasing advertising inventory from Westwood One.

37. As an example, an advertiser may seek, in industry terms, 10 national ratings points against a women 25-54 age demographic (or in layman's terms, that 10% of all women ages 25-54 across the United States listen to the advertisement). With the complete national radio ratings data, we may be able to deliver with our advertising inventory 5 national ratings points (*i.e.*, showing that we will be able to reach 5% of this demographic with our programming), which (if all else is equal) might entitle us to a 50% share of the buy (*i.e.*, they will buy 50% of the advertising inventory they need from us). With incomplete national radio ratings data, we will be unable to make this showing and the advertiser may not purchase our advertising inventory, or may purchase less than they otherwise would. We stand to lose tens of millions, if not hundreds of millions, of dollars in advertising revenue as a result.

38.     Additionally, many advertising agencies have specific targeting requirements for metro survey areas ("MSAs"), where population density is highest. If a Cumulus-owned station does not subscribe to Nielsen's local reports, Westwood One will lack access to MSA data in those geographies, making it unable to sell advertising slots to national advertisers targeting those geographies. Certain advertisers and/or advertising agencies even require local radio ratings data for a certain geography or geographies. For example, one of our advertisers requires we provide local radio ratings data for the San Francisco, CA, and Los Angeles, CA, geographies. Missing data from these geographies would result in the advertiser disqualifying us from consideration.

39.     Once Westwood One loses market share to competing networks, regaining it will prove extremely challenging. Advertisers and advertising agencies likely have established strong working relationships with Westwood One's competitors, making them less inclined to switch back.

40.     The lack of Nationwide data, and the reduced ability to sell our advertising inventory that causes, will also impact our programming. We attract programming content partners by sharing revenue, and lower revenues will likely lead to long-time partners ending their relationships with us. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ If we are unable to ███████████████████████████████████ may choose to partner with a different radio network. If we lose programming, we will also lose the audiences for that programming and face reduced market share as a result.

11

*D. Nielsen's Tying Policy Will Tarnish Westwood One's Reputation and Its Relationship with Advertisers, Content Partners, and Affiliates*

41. Having incomplete national radio ratings data would severely damage Westwood One's reputation, as it would create a misleading perception that Westwood One is no longer capable of reaching the breadth and depth of audiences that it has in the past. Westwood One's reputation as a network able to reliably reach a substantial breadth and depth of audience is critical to Westwood One's continued success with RFPs as well as with respect to recruiting and retaining content partners.

42. This reputational damage would be difficult to reverse, even if Nielsen's Tying Policy were later rescinded. Advertisers have multiple options when choosing advertising inventory to purchase. If Westwood One is unable to deliver evidence that it has achieved the reach and impressions expected because of the lack of comprehensive national radio ratings data, advertising agencies will shift shares of their buys to other networks and/or forms of advertising or even reduce their spend to zero.

43. Similarly, Westwood One's inability to compile an advertising schedule with accurate audience metrics would erode the trust and relationships we have built with our long-term advertising agency customers. These agencies rely on our data and expertise to help them execute their advertising campaigns effectively. Once this trust is lost, it cannot easily be restored, as these advertising agencies will no longer view us as a reliable and dependable partner. Even close partners, who might otherwise reach out directly for proposals, may begin to look for other networks.

44. The Tying Policy will also erode our goodwill with content and service partners, who have always viewed Westwood One as a reliable platform to monetize their offerings. This includes existing content partners who recently signed a contract with us, such as ████

12

██████████████████████████████████████  ██████████████ is currently distributed to over ███ radio stations across the country, including radio stations not owned by Cumulus in ███████████████████████████████████. ██████████ ███████████████████████████████████████████████████████████ ████████████████████████████ Under Nielsen's Tying Policy, Westwood One would now be unable to monetize ████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████.

45.     The Tying Policy will also impact our relationships with the thousands of affiliates in our affiliate network.  These affiliates broadcast our programming or buy our services in exchange for advertising inventory.  But if Nielsen refuses to provide Nationwide data for certain geographies, Westwood One would be unable to accurately monetize the inventory of affiliates in those geographies, and these affiliates may question our effectiveness and viability and choose to carry the programming or buy the services of a competing national network.  For example, if data from San Francisco, CA, are excluded from our national radio ratings data, the 35 non-Cumulus affiliate radio stations to whom we currently sell programming and/or services or from whom we buy advertising inventory in San Francisco, CA, may no longer do business with us, and may replace our programming or services with programming or services from another network, and may choose to end their partnership with Westwood One.

   E. *Nielsen's Tying Policy Will Cause Harm to Westwood One and Cumulus*

46.     Westwood One cannot survive as the business it is today without access to comprehensive national ratings data because advertisers – already fewer in number – demand

credible, national metrics to allocate their budgets. Without that data, Westwood One's ability to compete for this shrinking pool of radio advertisers would be severely impaired, and a sharp decline in Westwood One's market share would directly result in a substantial and immediate decrease in its revenue.

47. A significant revenue loss, even over a short period, could result in the business operating at a material loss, threatening its viability.

48. Even if Cumulus were ultimately to prevail after a protracted litigation, Westwood One may still be compelled to suspend or significantly scale back certain of its operations during the course of the litigation to reduce costs and mitigate risk.

49. The impact of an immediate and significant revenue reduction would be irreversible, as it jeopardizes the very survival of Westwood One. Even if the network manages to endure, the inevitable mitigation measures would likely lead to losses of some of the network's programming, negatively impacting the network's reach, impressions, and other key metrics that national advertising agencies prioritize during the RFP process.

50. Cumulus would also feel the effects of Nielsen's Tying Policy, because Westwood One is a subsidiary of Cumulus, which operates on thin margins. In addition, Westwood One syndicates much of its content to Cumulus-owned local radio stations, and any reduced programming from Westwood One would also cause irreparable harm to these local radio stations.

**Nielsen's Supposed Concerns are Unfounded**

51. I understand that Nielsen has claimed that its new Tying Policy is designed to prevent a situation in which network subscribers might share Nielsen's data with network-owned local radio stations that do not have their own subscriptions to the same information.

52.     ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████

53.     To my knowledge, Westwood One has abided by the contractual restrictions set forth in the current agreement.

54.     To my knowledge, employees at Cumulus's local radio stations cannot access Nationwide data, which are offered through the Act 1 portal.

55.     In all our conversations to date, Nielsen has provided no other justification for the Tying Policy.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. I executed this declaration on the 16th of October, 2025 in Chattahoochee Hills, GA.

Executed: October 16, 2025

_____
Collin R. Jones