UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CUMULUS MEDIA NEW HOLDINGS INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>THE NIELSEN COMPANY (US) LLC,<br><br>*Defendant*. | Civil Action No.: 25-cv-08581 |

# Expert Declaration of Harold Furchtgott-Roth

**October 16, 2025**

1

**Table of Contents**

| | | |
|---|---|---|
| I. | Introduction. | 3 |
| II. | Summary of Preliminary Findings | 4 |
| III. | Principles of Market Definition | 5 |
| IV. | The Economics of Tying | 6 |
| V. | Preliminary Finding that Nielsen Has Market Power Over Local Radio Ratings Data | 7 |
| VI. | Preliminary Finding that Nielsen Has Market Power Over National Radio Ratings Data | 10 |
| VII. | Preliminary Findings that Nielsen's Recent Actions Are Evidence of the Exercise of Market Power and Anticompetitive Conduct | 12 |
| | A. Preliminary Findings on Nielsen's Tying Arrangements | 12 |
| | B. Preliminary Findings on Nielsen's Subscriber First Policy | 15 |

### I. Introduction

1. I am an economist with a Ph.D. in economics from Stanford University and an S.B. in economics from the Massachusetts Institute of Technology. I have served as a commissioner of the Federal Communications Commission where I was a regulator of the broadcast industry including the radio industry, among other industries. I have served as chief economist of the House Commerce Committee. I have worked as a consulting economist on matters related to the broadcast industry over a period spanning five decades. I have consulted on many different antitrust matters, including in the broadcast industry. I am the author or coauthor of five books including *Cable TV: Regulation or Competition?* (Brookings 1996) and *A New Look at Communications Law* (Edward Elgar, anticipated 2026) which examines, among other topics, antitrust in communications markets. For more than a decade at Brooklyn Law School, I have taught communications law including lectures on rapidly changing video markets including those for local broadcasting. I have taught law and economics at the University of Baltimore for the past three years, and I am scheduled to teach antitrust law at the University of Baltimore Law School in the Spring of 2026. I am a senior fellow at the Hudson Institute and founder of the Center for the Economics of the Internet, where I conduct research on a wide range of topics, including media platforms. For more than 20 years, I have had an economic consulting firm. I have written and testified on a wide range of topics, including those related to the broadcast industry. My CV is attached as Appendix A.

2. I have been asked by counsel for Plaintiff, Cumulus Media New Holdings Inc., ("Cumulus") to evaluate The Nielsen Company (US) LLC's ("Nielsen") alleged conduct described in the Complaint and whether that conduct harms competition, forecloses potential competitors, and entrenches Nielsen's market power in the Local Radio Ratings Data Markets and National Radio Ratings Data Market.

3. Specifically, I have been asked by counsel to address the following topics:
    a. Whether there are separate markets for local radio ratings data and for national radio ratings data;

    b. Whether Nielsen has market power in each of the local radio ratings data markets and in the national radio ratings data market; and

    c. Whether Nielsen's recent actions, including its new policy of requiring Cumulus, and similar firms operating radio stations in multiple local markets, to purchase Nielsen ratings data in each of the local markets where it operates radio stations and where Nielsen provides ratings in order to be able to purchase Nielsen's comprehensive national radio ratings data, are anticompetitive.

4. The opinions I offer in this Declaration are necessarily preliminary. I have reviewed a limited set of documents, but because discovery has not commenced in this matter, I have not had access to a comprehensive set of documents. My analysis relies on the information in the Complaint, other documents I have reviewed, my professional training, and my professional experience over the past several decades. I understand Cumulus will seek discovery to validate the facts alleged in the Complaint. I will update my opinions to reflect information gathered through the discovery process as it becomes available.

## II.   Summary of Preliminary Findings

5. Assuming the facts alleged in the Complaint are correct, and drawing on my professional training, research as an economist, and experience in the media industry, I preliminarily find the following:

    a. Each of the local radio ratings data markets is a separate antitrust market, and Nielsen exercises market power in the local radio ratings data markets where it provides ratings data;

    b. The national radio ratings data market is a separate antitrust market, and Nielsen exercises market power in the national radio ratings market; and

    c. Nielsen's recent actions are evidence of the exercise of market power and anticompetitive conduct.

6. Given that there has been no discovery in this proceeding, these findings are necessarily preliminary. As I have access to more information, I may modify these findings.

### III. Principles of Market Definition

7. *Market definition* represents an important step in assessing the competitive effects of a given economic conduct. For an economist, the purpose of market definition is to identify the boundaries of competition by determining which products or services, and in which geographic area(s), consumers or customers regard as sufficiently close substitutes to constrain the behavior of the producers of those products or services.[1] This specification helps identify market participants, and focuses on customer choice, or the customers' ability to select alternative products if faced with price increases or quality decreases. In particular, market definition identifies the sets of products and geographies where product substitution by customers would prevent firms that sell in a market from profitably raising prices or otherwise reducing competitive intensity. Market definition represents an important tool to help understand whether certain conduct may eliminate or lessen competition.

8. The market definition section of the Merger Guidelines is generally viewed by economists as setting forth a proper economic method of determining relevant markets.[2] This framework is applied in both merger and non-merger cases. To an economist, a relevant antitrust market consists of two elements:[3]

    a. A *product* element, i.e., the set of goods (or services) that, based on characteristics, intended use, and price sensitivity, are considered reasonably interchangeable by consumers or customers;[4] and

---

[1] Hubbard, R. Glenn, and Anthony P. O'Brien, *Microeconomics*, 7th Edition, 2018, Pearson ("Hubbard and O'Brien (2019)"), p. 527 ("A market consists of all firms making products that consumers view as close substitutes.").

[2] Scheffman, David, Coate, Malcolm, and Louis Silvia, "Twenty Years of Merger Guidelines Enforcement at the FTC: An Economic Perspective," *Antitrust Law Journal*, 2003, Vol. 71(1): 277-318, p. 284 ("The [Merger] Guidelines are fundamentally grounded in economics. Economists inside and outside the agencies have contributed significantly to the development and implementation of the Guidelines' analysis of mergers.").

[3] Federal antitrust agencies have adopted market definition concepts from economics. See, U.S. Department of Justice and the Federal Trade Commission, "Merger Guidelines," December 18, 2023 ("2023 Merger Guidelines"), available at https://www.ftc.gov/system/files/ftc_gov/pdf/2023_merger_guidelines_final_12.18.2023.pdf

[4] 2023 Merger Guidelines, p. 40 ("The outer boundaries of a relevant product market are determined by the 'reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'").

    b. A *geographic* element, i.e., the regional area (or areas) in which firms compete to sell their goods (or services) and consumers or customers are willing or able to reasonably substitute alternative suppliers of the good (or service).[5]

9. A correctly-defined relevant antitrust market is one in which "a hypothetical profit-maximizing firm, not prevented by regulation from worsening terms, that was the only present and future seller of a group of products ('hypothetical monopolist') likely would undertake at least a small but significant and non-transitory increase in price ('SSNIP') or other worsening of terms ('SSNIPT') for at least one product in the group."[6]

10. Defining the relevant antitrust market in this case may include an evaluation of the options that Cumulus and other customers have for purchasing local and national radio ratings data. As discussed in more detail in **Section VII.A**, it is clear that, under Nielsen's tying arrangement, Cumulus and other customers of local radio ratings data do not have alternatives to Nielsen's products.

## IV. The Economics of Tying

11. My understanding is that Nielsen has a new policy requiring Cumulus to purchase Nielsen's local radio ratings data in each of the local geographies where it operates radio stations in order to be able to purchase Nielsen's comprehensive national radio ratings data.[7] This policy is a form of economic conduct known as "tying." Tying refers to a practice in which a company (in this case Nielsen) conditions the purchase of a product (in this case, Nielsen's comprehensive national radio ratings data), referred to as the "tying product," on the purchase of another, separate product (in this case, Nielsen's

---

[5] 2023 Merger Guidelines, p. 45 ("A market's geography depends on the limits that distance puts on some customers' willingness or ability to substitute to some products, or some suppliers' willingness or ability to serve some customers.").

[6] 2023 Merger Guidelines, p. 41.

[7] Complaint, Demand for Jury Trial, *Cumulus Media New Holdings Inc., vs. The Nielsen Company (US) LLC*, October 16, 2025 ("Complaint"), ¶¶ 7-8.

local radio ratings data), referred to as the "tied product."[8] In other words, customers who want to purchase the tying product must also buy the tied product from the same seller.

12. From an economic perspective, tying is considered anticompetitive when a firm uses its market power in the tying product to coerce customers into purchasing a tied product in an otherwise more competitive market, and this tying adversely affects competition.[9] For example, competition is harmed if forcing customers to purchase one seller's product means competing sellers lose the opportunity to make sales.

13. By reducing competition, and the potential for competition, in the tied market, anticompetitive tying can harm consumers or customers. Less competition can lead to higher prices, lower quality, and less innovation because the tying firm has less incentive to compete on price or by improving the product it sells.[10] Reducing competition in the tied product market can also enable the tying firm to acquire, to extend, or to entrench market power in the market for the tied product.[11]

## V.    Preliminary Finding that Nielsen Has Market Power Over Local Radio Ratings Data

14. Nielsen's local radio ratings data measures audience characteristics—such as audience size—for broadcast radio stations in local geographic markets and shows how individual radio stations perform against their local competitors along those characteristics (see **Exhibit 1** for an example of Nielsen's

---

[8]   Besanko, David, and Ronald R. Braeutigam, *Microeconomics*, Fourth Edition, John Wiley & Sons, Inc., 2010 ("Besanko and Braeutigam (2010)"), p. 512 ("**Tying** (also called **tie-in sales**) refers to a sales practice that allows a customer to buy one product (the "tying" product) only if she agrees to buy another product (the "tied" product) as well." Emphasis in original). See also, Whinston, Michael D., "Tying, Foreclosure, and Exclusion," *American Economic Review*, 1990, Vol. 80(4): 837-859 ("Whinston (1990)"), p. 837 ("A firm engages in tying when it makes the sale (or price) of one of its products conditional upon the purchaser also buying some other product from it.").

[9]   Whinston (1990), p. 837 ("[T]ying provides a mechanism whereby a firm with monopoly power in one market can use the leverage provided by this power to foreclose sales in, and thereby monopolize, a second market.").

[10]  Hubbard and O'Brien (2019), p. 530 ("The more intense the level of competition among firms, the better a market works. If a market is a monopoly, then, compared with the situation in which the market is perfectly competitive, the price of the good or service is higher, output is lower, and consumer surplus and economic efficiency are reduced.").

[11]  Besanko and Braeutigam (2010), p. 513 ("Tying often enables a firm to extend its market power from the tying product to the tied product […]. Without the tie-in sale, the firm could probably not make any extranormal return in the [tied] market […].").

local radio ratings data). Local radio ratings are one of the ratings services offered by Nielsen.[12] Nielsen also offers national radio ratings data. Radio ratings data are but one form of a wide range of media ratings offered by Nielsen.[13]

15. Nielsen offers contracts to Cumulus, and to other radio station owners, to provide local radio ratings data for local broadcast radio markets in the United States.[14] It is my understanding that Nielsen offers a separable product of just local radio ratings data, and Cumulus and other radio station owners demand a separable set of information with just local radio station ratings.[15]

16. Local radio stations, such as those owned by Cumulus, use local radio ratings data for a variety of purposes including assessing the audience size and listener demographics for specific programming. Based on local ratings information, a radio station can assess the audience delivery of specific programs through a post-buy analysis and can make programming decisions. Local radio stations also use this information to price specific advertising time spots ("avails") to advertising agencies, current advertisers, and potential advertisers.[16] Although advertisements placed on local radio stations are usually from local advertisers, occasionally regional and national advertisers will place advertisement on local stations for specific local marketing and promotions.[17] Advertisements on local radio stations from national advertisers may be national spot buys (purchases from national advertisers only in specific markets) or network buys (purchases for a large percentage of or all local U.S. radio markets).[18]

---

[12] Nielsen, "Audio Measurement," available at https://www.nielsen.com/solutions/audience-measurement/audio/ ("Nielsen measures all things audio–broadcast radio, streaming, and podcasting–in all corners of the country and across all platforms.").

[13] Nielsen, "Audience Measurement," available at https://www.nielsen.com/solutions/audience-measurement/.

[14] Complaint, ¶¶ 62-64.

[15] Complaint, ¶ 82.

[16] Complaint, ¶ 66.

[17] Complaint, ¶¶ 52-53.

[18] Complaint, ¶¶ 51-52.

17. In addition to their own use of Nielsen for ratings and rankings, local advertising agencies and local advertisers also ask local radio ratings to assess the demographic and audience reach and pricing of advertising inventory offered by local radio stations.[19]

18. Without local radio ratings data, local radio stations, such as Cumulus's radio stations, would be far less efficient because radio stations would have little information to assess the popularity of programming or an analytical basis to value advertising avails. Advertisers and advertising agencies would not have a clear basis to purchase advertising from one radio station instead of another. No ready substitute is available for local radio ratings data in a specific market. Other sources of ratings information, such as national radio ratings data, do not provide the same information as local radio ratings data and are not a reasonable substitute for local radio ratings data. Nor are local radio ratings data from one local geographic market indicative of ratings in another local geographic market.

19. There are 275 local markets for radio ratings data in the United States, 243 of which have ratings provided by Nielsen.[20] See **Exhibit 2**.

20. Nielsen is not the only provider of local radio ratings data. Another company, Eastlan, also provides local radio ratings data, but typically in smaller-sized markets and not in as many markets as Nielsen. My understanding is that Eastlan is primarily present in geographic markets where Nielsen does not operate. I also understand that Eastlan is entering additional geographic markets and could credibly enter other geographic markets, including those served by Cumulus. In **Exhibit 3**, I present a list of local radio markets and indicate, based on currently available information, which have radio ratings by Nielsen only, which have radio ratings by Eastlan only, and which have radio ratings by both companies.

---

[19]   Complaint, ¶ 66.

[20]   The local markets for which radio ratings are available changes over time as Nielsen and Eastlan add and remove coverage of individual geographies. See, e.g., InsideRadio, "Nielsen Cancels Radio Ratings Service in Seven Markets," available at https://www.insideradio.com/free/nielsen-cancels-radio-ratings-service-in-seven-markets/article_d209058a-cecc-11ed-8436-335ddd1edfa7.html.

21. In **Exhibit 4**, I present the information in Exhibit 3 just for the local geographic areas in which Cumulus owns a radio station in a market rated by Nielsen. As can be seen, in 75 of the 80 geographic areas where Cumulus owns local radio stations, Nielsen is the only provider of local radio ratings data.[21] In 5 of the 80 geographic areas, both Nielsen and Eastlan provide local radio ratings data. Nielsen therefore has 100 percent market share in over 90 percent of the local radio ratings markets where Cumulus owns a station and Nielsen provides ratings. Moreover, I understand that in the five markets in which both Nielsen and Eastlan operate, Nielsen accounts for the vast majority of the revenue associated with the provision of local radio ratings data.[22] This is strong evidence that Nielsen has market power over local radio ratings data.

22. Although Nielsen is a dominant provider of local radio ratings data, Eastlan provides competitive market pressure in the local markets in which it competes with Nielsen, and presumably even in other markets in which there is a credible threat of Eastlan's entry. Relative to the national radio ratings data market, discussed below, local radio ratings services are more competitively provided as a result of the presence, or potential entry, of Eastlan.

### VI. Preliminary Finding that Nielsen Has Market Power Over National Radio Ratings Data

23. Nielsen's national radio ratings data measures nationwide listening and includes radio ratings across the United States. National radio ratings data are used for a variety of purposes by national radio networks such as Westwood One. These purposes include: assessing the audience size and demographics of programming; and marketing and pricing advertising avails to advertising agencies, current advertisers, and potential advertisers.[23] Westwood One often provides national ratings data to

---

[21] It is my understanding that Cumulus considers "Oxnard-Ventura, CA / Santa Barbara, CA" to be one market, whereas Nielsen splits these into two separate markets (i.e., "Oxnard-Ventura, CA" and "Santa Barbara, CA"). Similarly, Cumulus considers "Modesto, CA / Stockton, CA" as a single market, whereas Nielsen splits these into two separate markets (i.e., "Modesto, CA" and "Stockton, CA").

[22] Complaint, ¶ 98.

[23] Complaint, ¶ 74.

advertising agencies, current advertisers, and potential advertisers as an integral part of selling advertising.[24]

24. I understand that comprehensive national radio ratings data is essential for national networks to sell advertising inventory and that national radio networks such as Westwood One cannot sell advertising inventory and would face significant obstacles in operating their business without comprehensive national radio ratings data.[25] No ready substitute is available for national radio ratings data. Other sources of ratings information, such as local radio ratings data, do not provide the same information as national radio ratings data.

25. Nielsen faces some competition for the provision of national ratings of audio services other than broadcast radio.[26] But Nielsen is and, with its radio predecessor Arbitron,[27] has been for many decades, the only provider of national radio ratings data.[28] Nielsen therefore has a 100 percent market share in the market for provision of national radio ratings data. This is strong evidence that Nielsen has market power over national radio ratings data.

26. The inability of customers, like Cumulus, to switch away from Nielsen facilitates Nielsen's ability to increase price and reduce quality. Nielsen charges substantial sums to Westwood One for its national radio ratings data. Nielsen has substantially raised prices in the National Radio Ratings Data Market.[29] For example, based on the 2023 Service Agreement between Cumulus/Westwood One and Nielsen,

---

[24] Complaint, ¶ 75.

[25] Complaint, ¶ 78.

[26] For example, Nielsen identifies Triton Digital as a competitor in the market for streaming audio and podcast measurement. See, Nielsen, "Form 10-K For the Fiscal Year Ended December 31, 2021," available at https://www.sec.gov/Archives/edgar/data/1492633/000156459022007612/nlsnnv-10k_20211231.htm, p. 10.

[27] Nielsen completed the acquisition of Arbitron in September 2013. See, Sisario, Ben, "Nielsen Deal for Arbitron Is Complete," available at https://www.nytimes.com/2013/10/01/business/media/nielsen-completes-1-26-billion-purchase-of-arbitron.html.

[28] Cohen, Ed, "How Would Audio Measurement Change if Nielsen Faced Stiffer Competition?" available at https://barrettmedia.com/2024/11/11/how-would-audio-measurement-change-if-nielsen-faced-stiffer-competition/ ("Nielsen […] has a *de facto* monopoly on audio measurement for radio"); Stewart, Duncan, "Radio: Revenue, Reach, and Resilience," available at https://www.deloitte.com/us/en/insights/industry/technology/technology-media-and-telecom-predictions/radio-revenue.html ("In the United States, AM/FM radio listening activity is measured by Nielsen.").

[29] Complaint, ¶ 105.

Nielsen increased the price it charged for its Nielsen Audio Nationwide product by about 36 percent relative to the 2022 price.[30] This is consistent with Nielsen using its market power to increase prices.

## VII. Preliminary Findings that Nielsen's Recent Actions Are Evidence of the Exercise of Market Power and Anticompetitive Conduct

27. Based on the information discussed in the Complaint, Nielsen appears to have engaged in at least two forms of anticompetitive conduct: tying and its Subscriber First Policy.

### A. Preliminary Findings on Nielsen's Tying Arrangements

#### 1. Nielsen's Initial Tying Policy Harms Competition for Local Radio Ratings Data

28. As explained in **Section IV** above, tying is a form of market conduct in which a seller sells two different products or services in two separate markets. In one market, the seller is a monopolist or exercises substantial market power. In the second, more competitive market, the seller also sells a product or service. Tying is an arrangement in which the seller ties the sale of the first monopoly product ("tying" product) to the purchase of the second, more competitively provided product ("tied" product).[31] Tying is anticompetitive when it harms competition in the tied market.

29. In this proceeding, Nielsen sells two different products—national radio ratings data and local radio ratings data—in separate markets. It is my understanding that, until September 2024, Nielsen did not condition the sale of comprehensive national radio ratings data on purchasing the local radio ratings data: Cumulus could purchase comprehensive national radio ratings data separately from local radio

---

[30] Based on the November 2017 agreement between Cumulus/Westwood One and Nielsen, the 2022 price of the Nielsen Audio Nationwide product was ▮▮▮▮▮ (2017 Cumulus/Westwood One – Nielsen Service Agreement, p. 93). Based on the 2023 Cumulus/Westwood One – Nielsen Service Agreement, the 2023-2025 average price of the Nielsen Audio Nationwide product was ▮▮▮▮▮ (2023 Cumulus/Westwood One – Nielsen Agreement, p. 105), which represents a 35.80 percent price increase from 2022 (i.e., (▮▮▮▮▮ - ▮▮▮▮▮) / ▮▮▮▮▮).

[31] Besanko and Braeutigam (2010), p. 512 ("**Tying** (also called **tie-in sales**) refers to a sales practice that allows a customer to buy one product (the "tying" product) only if she agrees to buy another product (the "tied" product) as well." Emphasis in original). See also, Whinston (1990), p. 837 ("A firm engages in tying when it makes the sale (or price) of one of its products conditional upon the purchaser also buying some other product from it.").

ratings data, and Cumulus could purchase local radio ratings data in specific markets that Cumulus selected.

30. Beginning in September 2024, Nielsen changed its policy and specifically tied the availability of comprehensive national radio ratings data to Cumulus's purchase of local radio ratings data in each of the markets where Cumulus has a radio station.[32] For example, as explained in the Complaint, if Cumulus's local radio station in Los Angeles chose not to purchase Nielsen's local radio ratings data for the Los Angeles area, then Nielsen would not include any ratings data on any radio station operating in the Los Angeles area in the "national" ratings data sold to Cumulus's national network, Westwood One.[33] But "national" radio ratings data that are missing data for some geographies are not a substitute for comprehensive national ratings data. As admitted by a Nielsen executive, national radio ratings data that "have holes" would not represent a "real" or "useful" product since the lack of comprehensive data would prevent national networks (such as Westwood One) from accurately and reliably evaluating radio shows and effectively engaging with advertisers and advertising agencies.[34] As a result, there are no available alternatives for Nielsen's comprehensive national radio ratings data for station owners or advertisers. Thus, under the tying policy Cumulus would be forced to purchase local radio ratings data in order to purchase the essential comprehensive national radio ratings data. Therefore, in this proceeding, comprehensive national radio ratings data is the "tying" product, and local radio ratings data is the "tied" product.

31. I preliminarily find that Nielsen's policy of tying the purchase of comprehensive national radio ratings data to the purchase of local radio ratings data in each market where Cumulus operates is anticompetitive. The tying policy harms not only Cumulus, by forcing it to purchase local radio ratings

---

[32] Complaint, ¶¶ 7, 120.

[33] Complaint, ¶ 9.

[34] Complaint, ¶ 128 ("As a Nielsen executive admitted, national radio ratings data without data from local radio geographies where Cumulus owns local radio stations would be 'Swiss cheese' and not 'useful.'"). See also, Complaint, ¶ 78 ("National radio ratings data are essential in every step of selling advertising inventory for a national network. Without complete national radio ratings data, national networks cannot effectively evaluate shows, package inventory, respond to RFPs, engage with advertisers or advertising agencies, be awarded business, or perform post-buy analyses for purchasers of advertising inventory.").

data from Nielsen in each market it owns a radio station, but it also harms competition for the provision of radio ratings data in local radio markets. Competition is harmed because if Cumulus and other companies subject to the tying policy are forced to purchase Nielsen local radio ratings data, they will likely not purchase local radio ratings data from Eastlan, or any other provider, even if Eastlan (or other provider) represented the best choice for Cumulus or for other businesses seeking to purchase local radio ratings data. Competition is further harmed because Eastlan and other potential competitors for local radio ratings data are deprived of sales in their current local markets and deterred from entering new markets.

32. The tying arrangement also enables Nielsen to exercise greater market power in the market for local radio ratings data. The tying policy discourages Cumulus and other companies from declining to purchase any local radio ratings data in markets where the price of the data as offered by Nielsen is greater than the value of the data to the local radio station or other business. Cumulus and other companies subject to the tying policy are now forced to purchase local radio ratings data in all local markets as determined by Nielsen. The tying arrangement can therefore be viewed as an effort by Nielsen to exercise and to expand its market power in each local radio ratings data market.

33. The reduction in competition, as well as the diminished threat of potential competition, stemming from Nielsen's tying policy not only would lead to higher prices,[35] but would also result in a lower incentive for Nielsen to innovate and invest in the quality of the service it provides.[36] According to the Complaint, Nielsen has already failed to make meaningful innovations, updates, or requested improvements to its products and services/support.[37] By further shielding Nielsen from competition and, as a result, by further increasing Nielsen's market power in local radio rating data markets, the tying policy would

---

[35] Hubbard and O'Brien (2019), p. 530 ("The more intense the level of competition among firms, the better a market works. If a market is a monopoly, then, compared with the situation in which the market is perfectly competitive, the price of the good or service is higher […].").

[36] Arrow, Kenneth, "Economic Welfare and the Allocation of Resources for Invention," available at https://www.nber.org/system/files/chapters/c2144/c2144.pdf, p. 619 ("[T]he incentive to invent is less under monopolistic than under competitive conditions […].").

[37] Complaint, ¶¶ 158-161.

reduce the pressure for Nielsen to innovate and to improve the quality of its products. Given the importance of local radio ratings for the pricing and allocation of advertising, discussed in **Section V** above, Nielsen's tying policy would harm local radio stations (such as Cumulus and other participants in local radio markets), content partners, local advertisers, and local advertising agencies in the form of less efficient pricing of advertising and less efficient placement of programming. Furthermore, harm to local radio stations is likely to lead to a worse experience for radio listeners because radio stations that pay higher prices for lower quality radio ratings data (i.e., ratings that provide inaccurate and/or incomplete information) may provide a worse product to listeners.

### 2. Nielsen's Alternative, De Facto Tying Policy Harms Competition for Local Radio Ratings Data

34. As described in the Complaint, Nielsen's recently proposed alternative is that Cumulus can buy the comprehensive national radio ratings data at a price almost ten times what it currently pays for Nationwide.[38] By charging such a high price for the Nationwide product, Nielsen is essentially forcing Cumulus into a "de facto" tie because it does not provide Cumulus with an economically rational option to avoid the tie.[39] Providing a supposed "alternative" to the tie that it knows Cumulus will never choose does not change the economic harms to Cumulus and competition from Nielsen's conduct.

### B.  Preliminary Findings on Nielsen's Subscriber First Policy

35. In addition to tying, the Complaint alleges that:

> …in 2022, Nielsen forced upon Cumulus its Subscriber First Policy, where it would exclude all non-subscribing local stations from the local radio summary-level data, which is usually the only type of data purchased by advertising agencies. As a result, Cumulus was required to

---

[38] Complaint, ¶ 12.

[39] Economides, Nicholas, "Tying, Bundling, and Loyalty/Requirement rebates," in *Research Handbook on the Economics of Antitrust Law*, edited by Einer R. Elhauge, Edward Elgar Publishing, 2013 ("Economides (2013)"), p. 122 ("In some cases in a requirement tie, the available prices outside the bundle (the à la carte prices) are so high that there are no à la carte sales, so that bundling under a requirement tie is de facto tying."). As defined in the article, a "requirement tie" is "an agreement to sell the tying product only if the buyer buys all or most of its requirements of the tied product from that seller." See, Economides (2013), p. 121.

purchase local radio ratings data from Nielsen for a geography if its local radio stations wished to appear in any summary-level data for that geography.[40]

36. Nielsen's Subscriber First Policy had the effect of changing the design of its product. A change in product design can be anticompetitive when it is not justified by efficiency or quality improvement and simply results in strategically disadvantaging competitors (both actual and potential). This is exactly the case for Nielsen's Subscriber First Policy.

37. First, the change introduced by the policy did not lead to any improvement in the service provided by Nielsen but, in fact, deteriorated the quality of the local radio summary-level data. By no longer including data for stations that did not purchase local radio ratings data from Nielsen, the policy resulted in a deterioration of the accuracy and completeness of the summary-level data thereby making it less useful to customers.

38. Second, Nielsen's policy introduced a barrier to Eastlan as well as other potential competitors in the local radio ratings data markets. In particular, by forcing some local radio stations to purchase local radio ratings data from Nielsen as a result of the threat of excluding them from the summary-level data, the policy made it harder for competitors, like Eastlan, to compete in the market for local radio ratings data. By foreclosing sales to Eastlan, the Subscriber First Policy has the same adverse effects as the tying policy, including depriving customers of a cheaper local radio ratings data product,[41] reducing the incentive for Nielsen to lower the price or improve the quality of its local radio ratings data, and reducing Eastlan's ability to expand the number of local markets it operates in. The Subscriber First Policy can therefore also be viewed as an effort by Nielsen to exercise and to expand its market power in each local radio ratings data market.

---

[40] Complaint, ¶ 143.

[41] Complaint, ¶ 157. See also, InsideRadio, "Beyond Nielsen, Stations Find Other Options," available at https://www.insideradio.com/free/beyond-nielsen-stations-find-other-options/article_b16d0b3c-7245-11e5-b6cc-a7f90f1add3e.html ("The service claims 450 station subscribers and costs significantly less than a Nielsen subscription, according to Eastlan CEO Mike Gould.").

October 16, 2025

_____
Harold Furchtgott-Roth

17