**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CUMULUS MEDIA NEW HOLDINGS INC., | |
| *Plaintiff*, | Civil Action No.: 25-cv-08581 (JAV) |
| v. | |
| THE NIELSEN COMPANY (US) LLC, | |
| *Defendant*. | |

**PLAINTIFF'S PRE-HEARING BRIEF IN SUPPORT OF**
**MOTION FOR A PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ............................................................................................................... iii

PRELIMINARY STATEMENT ........................................................................................................ 1

KEY FACTS ...................................................................................................................................... 4

LEGAL STANDARD ........................................................................................................................ 9

ARGUMENT .................................................................................................................................... 11

     I.     THE TYING POLICY WILL CAUSE IRREPARABLE HARM TO
            CUMULUS. ............................................................................................................ 11

           A.     Nielsen's Tying Policy Threatens to ███████ ███████. ........................ 11

           B.     The Tying Policy Irreparably Harms Competition and Customers. ......... 17

     II.    CUMULUS IS LIKELY TO SUCCEED ON THE MERITS OF ITS
          CLAIMS. ................................................................................................................ 18

     III.   BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST FAVOR
           AN INJUNCTION. ............................................................................................... 23

     IV.   CUMULUS'S REQUESTED RELIEF PRESERVES THE STATUS QUO
           AND PROTECTS ITS VIABILITY ..................................................................... 25

    CONCLUSION ...................................................................................................................... 27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Mfrs. Mut. Ins. Co. v. Am. Broad.-Paramount Theatres, Inc.*,
  388 F.2d 272 (2d Cir. 1967)..................................................................................22

*Barnstead Broad. Corp. v. Offshore Broad. Corp.*,
  865 F. Supp. 2 (D.D.C. 1994) ..............................................................................24

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
  781 F.3d 264 (6th Cir. 2015) ................................................................................11

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
  No. 1:13CV664, 2014 WL 11516553 (S.D. Ohio March 21, 2014),
  *aff'd*, 781 F.3d 264 (6th Cir. 2015)......................................................................10

*Consol. Gold Fields PLC v. Minorco, S.A.*,
  871 F.2d 252 (2d Cir. 1989), *amended on other grounds*,
  890 F.2d 569 (2d Cir. 1989)..................................................................................18

*Eastman Kodak Co. v. Image Tech. Services, Inc.*,
  504 U.S. 451 (1992)..............................................................................................19

*F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*,
  597 F.2d 814 (2d Cir. 1979)..................................................................................18

*Fed. Trade Comm'n v. IQVIA Holdings Inc.*,
  710 F. Supp. 3d 329 (S.D.N.Y. 2024)...................................................................25

*fuboTV Inc. v. Walt Disney Co.*,
  745 F. Supp. 3d 109 (S.D.N.Y. 2024), *appeal dismissed*,
  No. 24-2210, 2025 WL 523263 (2d Cir. Jan. 8, 2025) ....................................16, 17

*Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*,
  No. 20-CV-181, 2020 WL 915824 (S.D.N.Y. Feb. 26, 2020)......................9, 10, 18

*Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*,
  922 F. Supp. 2d 435 (S.D.N.Y. 2013), *aff'd*, 764 F.3d 210 (2d Cir. 2014) ............23

*In re Google Digit. Advert. Antitrust Litig.*,
  627 F. Supp. 3d 346 (S.D.N.Y. 2022)...................................................................20

*Grumman Corp. v. LTV Corp.*,
  527 F. Supp. 86 (E.D.N.Y. 1981), *aff'd*, 665 F.2d 10 (2d Cir. 1981)....................25

*Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*,
   476 F.2d 687 (2d Cir. 1973)..............................................................................25

*Jacobson & Co. v. Armstrong Cork Co.*,
   548 F.2d 438 (2d Cir. 1977)..............................................................................17

*JBR, Inc. v. Keurig Green Mountain, Inc.*,
   618 F. App'x 31 (2d Cir. 2015) ....................................................................15, 16

*Mastrio v. Sebelius*,
   768 F.3d 116 (2d Cir. 2014)................................................................................9

*Mullins v. City of New York*,
   626 F.3d 47 (2d Cir. 2010)................................................................................11

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
   992 F.2d 430 (2d Cir. 1993)..............................................................................16

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004)..............................................................................17

*Reuters Ltd. v. United Press Int'l, Inc.*,
   903 F.2d 904 (2d Cir. 1990)..............................................................................17

*Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*,
   754 F. Supp. 2d 616 (S.D.N.Y. 2010)................................................................17

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of New York, Inc.*,
   749 F.2d 124 (2d Cir. 1984)..............................................................................16

*St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*,
   131 F.4th 102 (2d Cir. 2025) ............................................................................16

*N.Y. ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015)........................................................................11, 17

*Snecma v. Turbine Eng. Comp. Techs. Corp.*,
   531 F. Supp. 2d 354 (N.D.N.Y. 2008) ..............................................................24

*Texaco Inc. v. Pennzoil Co.*,
   784 F.2d 1133 (2d Cir. 1986), *rev'd on other grounds*, 481 U.S. 1 (1987)............................16

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
   60 F.3d 27 (2d Cir. 1995)..................................................................................17

*Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n.*,
   641 F. Supp. 1179 (S.D.N.Y. 1986)..............................................................22, 23

*trueEX, LLC v. MarkitSERV Ltd.*,
266 F. Supp. 3d 705 (S.D.N.Y. 2017)...................................................................25

*Tucker Anthony Realty Corp. v. Schlesinger*,
888 F.2d 969 (2d Cir. 1989).................................................................................16

*United States v. Glaxo Grp. Ltd.*,
410 U.S. 52 (1973)................................................................................................26

*United States v. Visa, Inc.*,
788 F. Supp. 3d 585 (S.D.N.Y. 2025).............................................................22, 23

*Velesaca v. Decker*,
458 F. Supp. 3d 224 (S.D.N.Y. 2020)..................................................................10

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ...............................................................................22

*Williamson v. Maciol*,
839 F. App'x 633 (2d Cir. 2021) ............................................................................9

**Other Authorities**

Cumulus Media, Cumulus Media Reports Operating Results for the Third Quarter
2025 (Oct. 30, 2025), available at: https://www.cumulusmedia.com/wp-
content/uploads/2025/10/CMLS-Q3-2025-Earnings-Release-FINAL-
ajh219zb0Mg.pdf ...................................................................................................7

Press Release, Sen. Ed. Markey, Senators Markey and Cruz Reintroduce Bill to
Keep AM Radio in new Vehicles (Jan. 29, 2025), available at:
https://www.markey.senate.gov/news/press-releases/senators-markey-and-
cruz-reintroduce-bill-to-keep-am-radio-in-new-vehicles .....................................24

## <u>PRELIMINARY STATEMENT</u>

This case marks a critical inflection point for Cumulus—and for the broadcast radio industry as a whole.  For years, Nielsen has had a monopoly over local and national radio ratings data.  A small competitor, Eastlan, has tried to gain traction in certain local geographies, but Nielsen has thwarted any significant competitive threat to its lucrative local radio ratings business.  Now, as Cumulus is positioned to expand its use of Eastlan, Nielsen has struck again.  It implemented its Tying Policy to try to prevent radio broadcasters from using anyone but Nielsen for local radio ratings data. Under the Tying Policy, Nielsen will not sell Nationwide, its comprehensive national radio ratings data, to networks whose local stations do not buy Nielsen's local radio ratings data.  Without the Nationwide product, Cumulus's national network (called Westwood One), cannot effectively sell advertising on its nationally syndicated radio shows. ███████████████████████████████████████████ ████████████████████████

On the other hand, if Cumulus is forced to buy Nielsen's local radio ratings data in every geography so that Westwood One can continue buying Nationwide, the high cost of the forced package of local data will ███████████████████████.  The broadcast radio industry is in decline, with sharply falling revenue.  As a result, Cumulus is ████████████ ████████████ and ████████████████████████████ Nielsen's products are Cumulus's ████████████████, and Cumulus must reduce that cost by switching to Eastlan's data in targeted local geographies.  If Nielsen's Tying Policy prevents that, Cumulus's ████████████████████████████████████.

At the initial status conference on October 29, 2025, Nielsen's counsel dismissed ████████████████████.  While ████████████████████████, Nielsen likened the dispute to a customer demanding the ██████████████████████████████

███████████████████████████.  Ex. 27, Hr'g Tr. 8:3–6.  But Nielsen's Tying Policy is no

package discount.  ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████  But under the explicit terms of Nielsen's Tying Policy, Nielsen will not sell

its Nationwide product *at all* unless Cumulus also buys its local radio ratings data.  In fact, unlike

McDonald's, Nielsen will not even provide Cumulus with individual prices for local radio ratings

data in specific geographies.  Under Nielsen's anticompetitive Tying Policy, Cumulus—and every

other broadcaster subject to the Tying Policy—are now, for the first time, forced to buy an

expensive, mandatory package of local ratings data or forfeit access to the Nationwide product

altogether.  Nielsen knows it has broadcasters over a barrel—forfeiting the indispensable

Nationwide product is not a viable option.

Nielsen does not dispute Cumulus's robust factual allegations "around what the supposed

tying policy was, or what market definition is, or market power," and has made clear that "all of

these really intense antitrust issues are not going to be matters of factual dispute at the [preliminary

injunction] stage."  *Id.* at 24:1–4.  Thus, Cumulus is likely to succeed on the merits of its antitrust

claims.  Nielsen instead hopes to escape an injunction by asserting a purported lack of irreparable

harm to Cumulus.  At this stage, that is the primary dispute between the parties—whether Cumulus

will be irreparably harmed if Nielsen is allowed to enact its Tying Policy and condition access to

its Nationwide product on the purchase of a package of expensive local products.

At the preliminary injunction hearing, Cumulus will show it faces imminent irreparable

harm as a direct result of Nielsen's tying conduct.  If Cumulus cannot buy Nielsen's indispensable

Nationwide product, it will be unable to sell advertising inventory to advertisers and advertising

agencies, resulting in a loss of revenue, goodwill, market share, and ongoing business relationships

that ██████████████████████████. Such harms are unquestionably irreparable. The evidence will also establish that Cumulus is not Nielsen's only victim. Other broadcasters state that Nielsen's policies are designed to coerce them to purchase its local radio ratings data. Ex. 2, Declaration of ████████████ (██████████████████████████████████), ¶¶5–6; Ex. 2, Declaration of ████████████ (██████████████████████████), ¶5. Nielsen's Tying Policy also irreparably harms competition because it prevents Cumulus from freely choosing between Nielsen and Eastlan in local markets, and impedes Eastlan's ability to compete by offering lower prices and better products to the broadcast radio industry.

Cumulus requests a preliminary injunction that prevents Nielsen from implementing its anticompetitive Tying Policy and conditioning access to its Nationwide product on the purchase of other, prohibitively expensive products. Cumulus seeks only to return to the status quo prior to the imposition of this new policy, when Cumulus could and did drop products and geographies as needed during negotiations. There are two ways the Court could structure such relief, as described further herein: (1) the Court could enjoin Nielsen's newly created Tying Policy (along with any de facto or constructive tying); or (2) the Court could adopt Cumulus's proposal—that Nielsen provide Nationwide and local radio ratings data in markets Cumulus selects at the current contract rates during the pendency of this litigation. Each of these proposals would avoid the immediate irreparable harm the Tying Policy imposes and preserves competition by allowing Cumulus to purchase other ratings data from Eastlan while this case proceeds. Absent such relief, Cumulus cannot vindicate its legal rights; ██████████████████████████████████████████ ██████████████████.

**KEY FACTS**[1]

Cumulus owns local broadcast radio stations across the country and also owns a national network, Westwood One.  Cumulus's local radio stations broadcast programming within a local geography, whereas Westwood One produces and syndicates national programming for broadcast across the United States.  ECF No. 1 ("Complaint" or "Compl.") ¶¶40–41, 44.

Both local radio stations and national networks generate revenue by selling advertising inventory, *i.e.*, radio commercial spots, during their programming to advertisers.  *Id.* ¶¶49, 51–54.

Defendant Nielsen sells local radio ratings data and national radio ratings data.  Jones Decl., ECF No. 9 ¶9; Milner Decl., ECF No. 10 ¶¶10–11, 25.  Radio ratings data help show how radio programs perform against their competitors in audience size and demographic reach.  Compl. ¶¶62, 74; Jones Decl., ECF No. 9 ¶6; Milner Decl., ECF No. 10 ¶9.  Radio broadcasters, national networks, and advertisers use radio ratings data to determine the shows and radio stations on which to place ads, the price to pay (or be paid) for those ads, and the effectiveness of ads placed.  Compl. ¶74; Jones Decl., ECF No. 9 ¶6; Milner Decl., ECF No. 10 ¶¶16–17.

Nielsen is the only provider of national radio ratings data, and is the predominant provider of local radio ratings data.  Compl. ¶¶85–87; Furchtgott-Roth Decl., ECF No. 21 ¶25; Milner Decl., ECF No. 10 ¶11; Ex. 2, ▮▮▮ Decl., ¶3; Ex. 2, Declaration of Jeff Small (Chief Executive Officer of Strategic Media Inc.) ¶¶3–4; Ex. 2, Declaration of ▮▮▮▮ (▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮) ¶10.  Nielsen's comprehensive national radio ratings data is known as "Nationwide."  Compl. ¶8.

---

[1] Cumulus respectfully incorporates by reference all factual allegations contained in the complaint and its motion for preliminary injunction (including supporting declarations), *see* ECF Nos. 1, 8–10, 21.  Nielsen has stated that it accepts the complaint's factual allegations as true and takes Cumulus's declarations at face value for purposes of this preliminary injunction proceeding.  *See* Ex. 27, Hr'g Tr. 25:5–7; 26:6–9.

Another company, Eastlan Audio, is a competing provider of local radio ratings data. Compl. ¶¶156, 158; Milner Decl., ECF No. 10 ¶14; Ex. 2, Declaration of Michael Gould (Chief Executive Officer of Eastlan), ¶5. Eastlan offers lower prices, and larger and more representative data samples. Compl. ¶¶156, 158; Ex. 2, Gould Decl., ¶6–7. Eastlan possesses the ability and willingness to quickly enter a market, and has been gaining traction in a number of local geographies. Compl. ¶130; *see also* Ex. 4, CUMULUS_0000012; Ex. 5, CUMULUS_0001015; Ex. 6, CUMULUS_0001024; Ex. 7, CUMULUS_0000778; Ex. 2, Gould Decl., ¶¶12–13.

As Nielsen's own documents show, Nielsen earns more than ███ of its audio ratings revenue from sales of local radio ratings data. Ex. 8, NIELSENCMLS00006374. Eastlan's growth created a direct threat to Nielsen. Ex. 1, Expert Report of Harold Furchtgott-Roth ¶51. For example, one customer expressly told Nielsen ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ Ex. 9, NIELSENCMLS00006009. In response, Rich Tunkel, Managing Director for Nielsen Audio, directed his team to execute on ██████ ████████████████████████████████████████████████████████ *Id.*

In response to the growing threat from Eastlan, Nielsen could have competed lawfully by lowering prices or improving product quality or service in an effort to retain business. Instead, it sought to unlawfully exclude Eastlan. On September 4, 2024, Nielsen announced a new policy (the "Tying Policy") stating that a national network with shared-ownership local radio stations would not receive Nielsen's comprehensive national radio ratings data, the Nationwide product, unless all of its shared-ownership local radio stations purchase Nielsen's local radio ratings data in their Local Radio Ratings Data Markets. *See* Jones Decl., ECF No. 9 ¶¶17–18; *see also* Compl.

¶120.

Nielsen made clear this policy applied to Cumulus and Westwood One in June and July 2025.  Jones Decl., ECF No. 9 ¶20.  During a phone call with Cumulus, Rich Tunkel—the head of Nielsen's Audio division—agreed that Nielsen was tying the two products together, and confirmed that Nielsen would not sell Nationwide product unless Cumulus acceded to the Tying Policy.  *Id.* ¶21; Compl. ¶8.  Instead, if Cumulus chose not to subscribe to Nielsen's local data in all Cumulus's geographies, any national radio ratings data available to Cumulus would not be the "real" Nationwide product; it would "have holes," be "Swiss cheese" and would not be "useful."  Jones Decl., ECF No. 9 ¶21; Compl. ¶8; Ex. 25, Tunkel Dep. 166:1–5; Ex. 26, Jones Dep. 239:4–7; Supplemental Declaration of Collin Jones, ¶22.

Nielsen's ordinary course documents make clear that the Tying Policy was created to ███████████████████████████████████████████████████████████████████████ ███████████████  Ex. 10, NIELSENCMLS00006375 at -379 ████████████████████ ███████████████; Ex. 11, NIELSENCMLS00006364 (███████████████████████ ████████████████████████████████████████████████████); Ex. 10, NIELSENCMLS00006375 at -376 and -381 (██████████████████████████████ ██████████████████████████████████████████████████████████████).

After Cumulus threatened litigation over Nielsen's anticompetitive behavior, Nielsen tried to disguise its unlawful policy.  It purported to offer Nationwide to Cumulus as a standalone product—*but for essentially 10 times what Cumulus currently pays.*  Jones Decl., ECF No. 9 ¶23; Compl. ¶¶12, 124; Ex. 1, Furchtgott-Roth Rep. ¶65.  In other words, Nielsen would now only sell Nationwide to Cumulus for ████████████████████████████████ even though Cumulus had been purchasing Nationwide for ████████.  ██████████████████

███████████████████████████████████████████████████████████

█████. *See* Compl. ¶¶13, 124; Ex. 10, NIELSENCMLS00006375 at -379; Ex. 25, Tunkel Dep. 50:23–51:4. That proposal does not change the anticompetitive effect of the Tying Policy: the punitive offer for Nationwide is so high that no rational company could accept it; Cumulus would still have to separately buy local radio ratings data, and the overall cost would mean Cumulus was better off just acceding to the Tying Policy and buying all its ratings data from Nielsen. Thus, Nielsen's offer still coerces Cumulus to purchase Nielsen's local radio ratings data to access Nationwide, and amounts to constructive tying. *See* Furchtgott-Roth Decl., ECF. No. 21 ¶34; Ex. 3, Furchtgott-Roth Rep. ¶65.

Any gap in access to Nationwide (Nielsen's comprehensive national radio ratings data) ███████████████████████████████████████████. Ex. 26, Jones Dep. 310:18–311:10 ████ ████████████████████████████████████████████████████████; Ex. 12, CUMULUS_0001887. Without Nationwide, Westwood One will be unable to sell advertising inventory. Jones Decl., ECF. No. 9 ¶38, Compl. ¶¶133–134; Ex. 26, Jones Dep. 80:4–81:3. It will lose revenue, market share and goodwill with advertisers, advertising agencies, content and service providers, and local stations that broadcast Westwood One's programming. Jones Decl., ECF. No. 9 ¶¶34–50.

Cumulus is already █████████████████████████. Its stock is trading at around ten cents per share, its debt is trading at highly distressed levels, and the amount of debt, $876 million, is almost 500 times its market capitalization. Jones Suppl. Decl., ¶6.[2] It is cash-flow negative, ████████████████████████████████████████████████████████

---

[2] Cumulus Media, Cumulus Media Reports Operating Results for the Third Quarter 2025 (Oct. 30, 2025), available at: https://www.cumulusmedia.com/wp-content/uploads/2025/10/CMLS-Q3-2025-Earnings-Release-FINAL-ajh219zb0Mg.pdf.



████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ Jones Suppl. Decl., ¶10; Ex. 26, Jones Dep. 262:3–5.

████████████████████████████████████████████████

██████████████████████ *Id.*  Even Nielsen acknowledges █████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ Ex. 25, Tunkel

Dep. 127:14–24.

  Cumulus has been cutting costs for many years, reducing staff by approximately ████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████. Jones Suppl. Decl., ¶8; Supplemental Declaration of Dave Milner,

¶17.  But its declining revenue means that Cumulus must cut even more costs and find new revenue

sources ██████.  Nielsen data is Cumulus's ████████████████████.  Jones Suppl. Decl., ¶9;

Ex. 26, Jones Dep. 290:11–12.  Cumulus needs to reduce its Nielsen services where those services

cost more than they generate in revenue, and replace that data with less-expensive Eastlan data.

*See* Milner Suppl. Decl., ¶¶8–13; Ex. 13, CUMULUS_0000877.  Such savings will allow Cumulus

to stem its negative cash flow, and further invest in digital marketing services—the tools, tactics

and campaigns that help advertisers reach customers through digital formats including display ads,

paid search ads and ads on digital platforms.  Jones Suppl. Decl., ¶7; Milner Suppl. Decl., ¶18.

Expanding its investments in digital marketing services is Cumulus's core growth strategy to

generate additional revenue to offset broadcast radio revenue declines.  Milner Suppl. Decl., ¶¶19–

20.

**LEGAL STANDARD**

The purpose of a preliminary injunction is to preserve the "status quo," which is "the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (quotations and citation omitted). In other words, "status quo" does not simply mean maintaining current conditions; it means putting the parties in the position they were in without the alleged anticompetitive conduct. "The 'status quo' in preliminary-injunction parlance is really a 'status quo ante,'" which "shuts out defendants seeking shelter under a current 'status quo' precipitated by their wrongdoing." *Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, No. 20-CV-181, 2020 WL 915824, at *8 (S.D.N.Y. Feb. 26, 2020) (citation omitted). Thus, "[p]reserving the status quo is not confined to ordering the parties to do nothing: it may require parties to take action[.]" *Mastrio*, 768 F.3d at 120–21. "Where a defendant has altered the status quo, exposing a plaintiff to irreparable harm, the prohibitory standard properly applies, and may require that the defendant take action to restore the status quo pending a decision on the merits." *Williamson v. Maciol*, 839 F. App'x 633, 635 (2d Cir. 2021).

Here, Cumulus's contract with Nielsen is ██████████████, and Cumulus is negotiating with Nielsen for a new contract. Thus, maintaining the status quo means putting Cumulus in the position it has always been in when negotiating with Nielsen: knowing the price for Nationwide and the per-market prices for local radio ratings data in each geographic area, so that Cumulus can select which Nielsen products it will buy without being constrained by Nielsen's Tying Policy (or any constructive tying), and allowing Cumulus to purchase products and services on a market-by-market basis as it did before the adoption of the Tying Policy. Cumulus's proposed preliminary injunction puts Cumulus in that "status quo ante" position.

As discussed further in Section IV, under Cumulus's requested relief, the Court would require that Nielsen immediately negotiate with Cumulus in good faith, without any express or

constructive tying, during the pendency of the litigation.  One way to accomplish that is to require Nielsen to negotiate with Cumulus on reasonable, market-based terms, consistent with past practices.  Another option is to allow Cumulus to select which products and geographies it will extend at the previous rates, as it just did in the parties' limited contract extension last month.  Ex. 14, CUMULUS_0001726.  Either form of relief would restore the status quo ante, before the adoption of Nielsen's Tying Policy.  *See Gen. Mills,* 2020 WL 915824, at *8; *Collins Inkjet Corp. v. Eastman Kodak Co*., No. 1:13CV664, 2014 WL 11516553, at *17 (S.D. Ohio March 21, 2014) (preliminary injunction requiring defendant to offer prices existing before unlawful tying conduct), *aff'd*, 781 F.3d 264 (6th Cir. 2015).

By contrast, Nielsen's proposal that Cumulus simply accept an extension of its full current contract would perpetuate the anticompetitive harm of Nielsen's Tying Policy by preventing Cumulus from choosing to invest in lower priced products offered by Eastlan. Ex. 1, Furchtgott-Roth Rep. ¶69.  A preliminary injunction that prevents Nielsen from implementing its anticompetitive policy will maintain the status quo ante.  *See Velesaca v. Decker*, 458 F. Supp. 3d 224, 239–40 (S.D.N.Y. 2020). In *Velesaca*—a case cited by Nielsen in its October 27, 2025 submission to the Court, ECF. No. 39 at 3—the court found that the plaintiff was seeking a traditional injunction—not a mandatory one—because even though the injunction would require defendant "to affirmatively change its behavior, this change [was] in essence an injunction *against an aberration* from [prior] policy (and the APA), rather than an injunction mandating some new form of court-conjured behavior."  *Id.*  Here, too, Cumulus is seeking a preliminary injunction "against an aberration" from Nielsen's prior practice of providing Cumulus the price for Nationwide data and the prices for local radio ratings data in each geographic area, and allowing Cumulus to pick and choose which Nielsen products it will buy without being constrained by

10

Nielsen's Tying Policy.

In the Second Circuit, a "party seeking a preliminary injunction must ordinarily establish (1) 'irreparable harm'; (2) 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party'; and (3) 'that a preliminary injunction is in the public interest.'" *N.Y. ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (citation omitted). Every single factor points sharply in Cumulus's favor.

## ARGUMENT

## I. THE TYING POLICY WILL CAUSE IRREPARABLE HARM TO CUMULUS.

"[A] *threat* of irreparable harm" and "the 'risk' of deterrence . . . satisf[ies] the irreparable harm standard" in the Second Circuit. *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010); *see also Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 280 (6th Cir. 2015) ("[the plaintiff] need not suffer harm in order to justify a preliminary injunction, so long as there is a realistic prospect of harm in the immediate future."). Here, there is more than a threat of irreparable harm—Cumulus faces ███████████████████ if it cannot get the Tying Policy blocked.

### A. Nielsen's Tying Policy Threatens to ██████ ███████.

There is no real dispute that the broadcast radio industry has been in serious decline as audiences shift their listening from traditional radio to podcasts, digital streaming and other audio formats. Ex. 1, Furchtgott-Roth Rep. ¶¶78–79; Ex. 25, Tunkel Dep. 22:25–23:11; Ex. 15, NIELSENCMLS00006255, at -258. Nielsen's own documents ████████████████ ████████████████████████████ *See, e.g.*, Ex. 16, NIELSENCMLS00006228 at -229 and -239–240.

There is also no real dispute about the █████████████████████████

11

The evidence in this case demonstrates that:

- Cumulus's stock trades at around 10 cents and its market capitalization is now about $1.75 million.  Cumulus's stock was delisted from NASDAQ because it no longer meets NASDAQ's equity requirements.  Jones Suppl. Decl., ¶6; Ex. 1, Furchtgott-Roth Rep. ¶82.

- Cumulus is burdened with massive debt ($876 million), amounting to almost 500 times its market capitalization.  Jones Suppl. Decl., ¶6.[3]

- Cumulus's debt is trading at highly distressed levels.  *Id.*

- As of the third quarter 2025, Cumulus's net revenues declined 9% year-to-date compared to the same period in 2024.  *Id.*

- Cumulus's cash flow is negative, meaning it is losing money, ███████████ ██████████████████████████████████████████████—but ███████ ████████████████████████████████████████████████.  Ex. 1, Furchtgott-Roth Rep. ¶83.

Given Cumulus's ████████████ and ███████████████, Cumulus has been aggressively cutting costs for the past several years.  It has reduced staffing ██████████████ ████████████████████████████████████████████████████████████ ████████████ Suppl. Decl., ¶8; Ex. 26, Jones Dep. 292:6–22.  ███████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████ Jones Suppl. Decl., ¶10.

---

[3] *See supra* n.3.

██████████████████████████████████████████. *Id.* ¶9. ██████████████████████

███████████████████████████████████████████████████████████

████ *Id.* ¶10; Ex. 1, Furchtgott-Roth Rep. ¶92.

Cumulus's ███████████████████████████████. Jones Suppl. Decl., ¶9; Ex. 26, Jones Dep. 290:11–12. The current contract costs about $███████████, an amount that Cumulus

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████ Jones Suppl. Decl., ¶9; Ex. 1, Furchtgott-Roth Rep. ¶92. To accomplish this, Cumulus has repeatedly asked ███████████

███████████████████████████████████████████████████████████

████████ so that Cumulus can choose which Nielsen products to buy, as Cumulus has been able to do in all prior negotiations with Nielsen. Ex. 1, Furchtgott-Roth Rep. ¶89. If Nielsen negotiates in good faith—without express or constructive tying—and charges Cumulus rates similar to its current contract (even with reasonable increases, and with or without the current contract's ████ "volume discount"), Cumulus will be able to select a package of products that it can afford, reduce expenses, and █████████████████████.

Nielsen's Tying Policy has newly prevented Cumulus from picking and choosing the local radio ratings data it wants to buy. In fact, Nielsen refuses to tell Cumulus the prices it would charge for local radio ratings data in individual geographies. Compl. ¶125; Ex. 25, Tunkel Dep. 243:23–24 (███████████████████████████████████). And as noted above, Nielsen has refused to sell its indispensable Nationwide product without actually or constructively tying it to overpriced local radio ratings data.

Because of Nielsen's anticompetitive Tying Policy, Cumulus is stuck.  If it cannot buy the Nationwide product, Westwood One cannot sell advertising.  *See, e.g.*, Ex. 2, ████ Decl., ¶¶3–5; Ex. 2, Small Decl., ¶¶3–5; Ex. 2, ████ Decl., ¶¶9–10.  If Westwood One cannot sell advertising, Cumulus ███████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████.  On the other hand, if Cumulus succumbs to the Tying Policy and ████████████████████ for local radio ratings data, ████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████.  Jones Suppl. Decl., ¶14; Ex. 1, Furchtgott-Roth Rep. ¶82.  If Cumulus continues to pay the current contract and █████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████.  Ex. 26, Jones Dep. 255:15–256:8; Jones Suppl. Decl., ¶¶30, 35(a), 37.

Cumulus faces declining advertising revenues and shrinking margins.  It has cut expenses dramatically, but it has already reduced its staff by ████████████████████████████ ████████████████, and ████████████████████████████.  Jones Suppl. Decl., ¶8. Cumulus is ████████████████████████████████████████████████ ████████████████████████.  In many geographies, the cost of Nielsen's local radio ratings data exceeds the advertising revenue those stations earn through having Nielsen data.  Continued purchasing of Nielsen data by those stations thus makes no business sense.  Ex. 1, Furchtgott-Roth Rep. ¶85.  But the Tying Policy prevents Cumulus from reducing the cost of Nielsen data by dropping Nielsen's local data in geographies where it makes sense to do so.  If Cumulus cannot

reduce its Nielsen expense, its ███████████████████████████. ███████████
███████████████████████████████. *Id.* ¶95.  That would harm its

ratings, as listeners move to other stations, further risking those stations' competitive viability. █

████████████████████████████████████████████████████████
████████████████████████  Milner Suppl. Decl., ¶17.  Such harms

are unquestionably irreparable.  Ex. 1, Furchtgott-Roth Rep. ¶¶90, 98.

    The █████████████ also prevents Cumulus from making necessary investments

in digital marketing services that could help improve its revenues ████████████████
████████████████████████████████████████████████████████

█████████████████  Jones Suppl. Decl., ¶41; Milner Suppl. Decl., ¶¶18–20; Ex. 1,

Furchtgott-Roth Rep. ¶¶95.

    Contrary to Nielsen's assertions, this is not a matter that can be left to a damages claim that

Cumulus could try to collect years from now after a full trial on the merits.  Ex. 27, Hr'g Tr., 9:21–

24.  On its current schedule, without its expected cost reductions, ███████████████████
███████████████████████████████  Ex. 26, Jones Dep. 255:24–

256:14.  And contracts with advertisers—the source of Cumulus's revenues—are being negotiated

now.  If advertisers believe Westwood One will not have Nielsen's Nationwide product, they will

leave, reducing projected revenues.  Ex. 2, ██████ Decl., ¶¶3–5; Ex. 2, Small Decl., ¶¶3–5; Ex. 2,

████ Decl., ¶¶9–10. ████████████████████████████████████████
██████████████████████████████████████████████████████████████.[4]

---

[4] These circumstances are thus readily distinguishable from *JBR, Inc. v. Keurig Green Mountain, Inc.* cited by Nielsen in its October 27, 2025 submission.  ECF No. 39 at 2.  There, the plaintiff's "own sales projections" indicated that its expected sales were going "to be higher" than the prior fiscal year such that the alleged loss of sales was "speculative and remote" and the court noted that customers "that declined to do business had never previously done business with [the plaintiff],

"The caselaw in this Circuit is clear that money is not a remedy for the total collapse or likely insolvency of a business." *fuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 149–50 (S.D.N.Y. 2024), *appeal dismissed,* No. 24-2210, 2025 WL 523263 (2d Cir. Jan. 8, 2025); *see also Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp*., 992 F.2d 430, 436 (2d Cir. 1993) ("money damages are inadequate compensation" for a threat to "continued existence" of business); *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989) (bankruptcy is a damage that cannot be rectified by financial compensation); *Texaco Inc. v. Pennzoil Co.*, 784 F.2d 1133, 1153 (2d Cir. 1986), *rev'd on other grounds*, 481 U.S. 1 (1987) ("irrevocable destruction of his business, resulting in bankruptcy or liquidation, a reversal will not undo the injury, which cannot be measured in damages and would in no event be recoverable"); *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of New York, Inc.,* 749 F.2d 124, 126 (2d Cir. 1984) ("The loss of . . . an ongoing business representing many years of effort and the livelihood of its . . . owners, constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages.").

And even short of ▇▇▇▇▇▇▇, the loss of market share, goodwill, reputational harm, or a loss of customers, as here, are also all irreparable. The Second Circuit has made clear

---

and [the plaintiff] provided no evidence suggesting that the loss of these opportunities could have a meaningful impact on its business[,]" and the evidence of the threat to continued business was "sparse." 618 F. App'x 31, 34 (2d Cir. 2015). Here, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇ *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.* is likewise distinguishable. ECF No. 39 at 2. The Second Circuit affirmed the district court's finding that the counter-claimant's theory of reputational harm was "speculative, conclusory, and unsupported by facts in the record" because the evidence did not show that "current and future [counter-claimant] employees came to think less of [counter-claimant] as a result of [the claimant's] actions. 131 F.4th 102, 108 (2d Cir. 2025) (citation omitted). Here, the evidence shows that Cumulus's prospective reputational harm is the direct result of Nielsen's Tying Policy and being unable to offer Nationwide data that advertisers and content and service providers demand.

that injunctive relief is appropriate in such circumstances because it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *see also Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907–08 (2d Cir. 1990); *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 444 (2d Cir. 1977).[5]

### B.    The Tying Policy Irreparably Harms Competition and Customers.

Nielsen's Tying Policy also harms competition and customers—further examples of irreparable harm.  *See* Ex. 10, NIELSENCMLS_00006375 at -379 and -381; Ex. 2, Gould Decl., ¶¶20–21, 24; Ex. 1, Furchtgott-Roth Rep. ¶71.  Nielsen does not dispute that Cumulus and other customers have already suffered the consequences of Nielsen's anticompetitive conduct with higher prices, reduced quality, reduced choice, and less innovation.  Compl. ¶¶154–165; Ex. 27, Hr'g Tr. 23:22–24 ("we will take all of the factual allegations in their complaint as pled, we will take as true for the PI stage").  Such harm to competition is irreparable because Nielsen's anticompetitive behavior "greatly increase[s] the risk that consumers will be vulnerable to price increases, decreased quality, and decreased options in the market."  *fuboTV Inc.*, 745 F. Supp. 3d at 150; *see also Schneiderman*, 787 F.3d at 660–61 (policy that precluded generic drugs from competing with brand name drugs could cause "permanent damage to competition" and was an

---

[5] In its October 27, 2025 submission, ECF No. 39 at 2–3, Nielsen relied on *Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, but that case supports Cumulus's irreparable harm argument.  In *Rex Med*, the court found irreparable harm to a distributor when it would be deprived of "the opportunity to sell an entire line of merchandise" and "incur[red] injury to its goodwill and reputation as a dependable distributor" because customers may "refuse to return to [the distributor], because of [the distributor's] lack of dependability in supplying its product."  754 F. Supp. 2d 616, 622–23 (S.D.N.Y. 2010).  "Where the availability of a product is essential to the life of the business *or* increases business of the plaintiff beyond sales of that product . . . the damages caused by loss of the product will be far more difficult to quantify" and "[i]n such cases, injunctive relief is appropriate."  *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 38 (2d Cir. 1995).

irreparable harm); *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 257–58 (2d Cir. 1989) (finding irreparable harm where competition in the relevant market would be reduced because this type of "threatened injury is precisely the type that the antitrust laws were designed to protect against") (citation omitted), *amended on other grounds*, 890 F.2d 569 (2d Cir. 1989).  Likewise, there is irreparable harm to customers when price competition is eliminated, leading to higher prices and profits "at the expense of a large segment of the . . . public."  *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 819 (2d Cir. 1979).

This harm to competition provides an additional reason the Court should reject Nielsen's proposal to extend Cumulus's current ██████████ to preserve the status quo; Nielsen's proposal merely maintains its monopoly by preventing Cumulus from switching to Eastlan in local geographies.  Ex. 1, Furchtgott-Roth Rep. ¶¶58, 64–65.  Instead, under Nielsen's proposal, Cumulus would be stuck with Nielsen data in all the local geographies it has now—exactly the purpose of Nielsen's anticompetitive Tying Policy.  A preliminary injunction that locks Cumulus into unwanted Nielsen products (and prevents it from investing in Eastlan) would entrench Nielsen's dominance and exacerbate the competitive injury.  *See Gen. Mills, Inc.*, 2020 WL 915824, at *8.

## II.    CUMULUS IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

Nielsen has told the Court that at this preliminary stage, Nielsen is accepting the factual allegations of the complaint as true, is not contesting market definition or Nielsen's market power, and is not contesting any of the "facts around what the supposed tying policy was," or any facts concerning "antitrust issues."  Ex. 27, Hr'g Tr. 24:1–4.  Nielsen's concessions make sense—it is a consummate monopolist who engaged in an explicit illegal tying policy to "command" specific purchases from its customers.  Ex. 11, NIELSENCMLS00006364.  Based on these concessions alone, Cumulus is likely to succeed on the merits of its antitrust claims.

Nielsen's September 2024 written Tying Policy expressly ties the sale of Nielsen's Nationwide product to the customer's purchase of local radio ratings data.  Ex. 18, NIELSENCMLS00006004.  And Nielsen's own documents show that the Tying Policy was created ████████████████████████████████████████████████.  Ex. 10, NIELSENCMLS00006375, at -379.  ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ Ex. 2, ██████ Decl., ¶¶5, 9–11.  To prevent customers switching to Eastlan, and thereby ensure that Nielsen's ██████████████, Nielsen enacted the Tying Policy:

- An internal email explains that ███████████████████████████████

  █████████████████████████████████████████████████████

  ███████████████ Ex. 11, NIELSENCMLS00006364 (emphasis added).

- A Nielsen [slide deck] introducing the Tying Policy expressly describes its purpose: ███████████████████████████████████ Ex. 10, NIELSENCMLS00006375, at -379;

- The same slide deck notes that Nielsen's revenue is ███████████████████ and so the Tying Policy was designed to ██████████████████ *Id.*

This is textbook tying in violation of Section 2 of the Sherman Act.  Nielsen is "exploit[ing] [] its control over the tying product [i.e., Nielsen's nationwide radio ratings data] to force [Cumulus and other radio stations] into the purchase of a tied product [i.e., Nielsen's local radio ratings data] that [Cumulus] either did not want at all, or might have preferred to purchase [from Eastlan] on different terms.'"  *Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451, 464 n.9 (1992) (citation omitted); *see* Ex. 1, Furchtgott-Roth Rep. ¶43.  Such coercion goes "'beyond persuasion

and conditions [Cumulus's] purchase of one product on the purchase of another product.'" *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 368–70 (S.D.N.Y. 2022) (citation omitted).

Nielsen is not contesting any of the "facts around what the supposed tying policy was." Ex. 27, Hr'g Tr. 24:1–4. Instead, Nielsen seems to be planning to point the Court to the various offers it made to Cumulus in the summer and fall of 2025 to create confusion and suggest there is no tying. *See* Ex. 19, NIELSENCMLS00003772. But those offers do not help Nielsen. Nielsen's first offers, in June and July 2025 (Offers 1, 2, and 3), represent express tying under the written Tying Policy. Nielsen offered to sell ███████████████████████████████████ ███████ *only if* Cumulus bought ██████████████████████████████████ Ex. 20, NIELSENCMLS00000280; Ex. 21, NIELSENCMLS00000275; Ex. 18, NIELSENCMLS00006004; Ex. 1, Furchtgott-Roth Rep. ¶52. By contrast, if Cumulus bought less than all the local data, Nielsen would only sell Cumulus the "Swiss cheese," not "useful" version of its national radio ratings data. Jones Decl., ECF No. 9 ¶21; Ex. 21, NIELSENCMLS00000275; Ex. 25, Tunkel Dep. 166:1–5; Jones Suppl. Decl., ¶22.

On September 15, 2025, after Cumulus threatened litigation over Nielsen's anticompetitive Tying Policy, Nielsen resorted to *de facto*, constructive tying to try to hide its anticompetitive behavior. Nielsen offered three new proposals (Offers 4, 5, and 6). The first, Offer 4, proposed to sell ████████████████████████, but at $██████, a price almost ***ten times*** the █████ ██████ that Cumulus currently pays. Compl. ¶123; Ex. 19, NIELSENCMLS00003772; Ex. 25, Tunkel Dep. 171:9–12 █████████████████████████████████████ ███████████████████████████████████████████████████ ██████████; Ex. 26, Jones Dep. 241:2–20; Ex. 1, Furchtgott-Roth Rep. ¶65. Rich Tunkel

admitted that there are ███████████████████████████████████████

████████████████████████████████ Ex. 25, Tunkel Dep. 46:14–47:7.

Indeed, Nielsen's documents show ████████████████████████████████

██████████████████ Ex. 10, NIELSENCMLS00006375 at -379, and ████████████

████████████████████████████████ Ex. 25, Tunkel

Dep. 50:23–51:4.  Nielsen's ██████ offer made no economic sense—and it was perceived by

Cumulus as a straightforward attempt to coerce the purchase of a different package.  Ex. 26, Jones

Dep. 199:13–25, 240:24–241:24 (███████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████).  Cumulus

would still have to buy local radio ratings data, and the high price of Nationwide would leave it

unable to do so—except as part of one of Nielsen's other exorbitant offers.  Ex. 1, Furchtgott-Roth

Rep. ¶69.

  In Offer 5, Nielsen offered to sell ████████████████████████████████

██████—but again at a price ███ higher than what Cumulus pays now—and ██████

██████ Ex. 19, NIELSENCMLS00003772; Ex. 25, Tunkel Dep. 188:16–23 (acknowledging

that ██████████████████████████).  That offer makes no economic sense;

Cumulus would still have to buy Nationwide separately and would be better off accepting

Nielsen's Offer 6 (a ██████████ package offer), discussed below.  And with Offer 5, Nielsen

again refused to untie the products, which would have enabled Cumulus to decide which products

were now too expensive and go with Eastlan instead.

  As part of Offer 6, Nielsen offered to sell ████████████████████ for █

████████████████ Ex. 19, NIELSENCMLS00003772.  Nielsen's proposed price

represents a ████ increase over what Cumulus pays now for the same products, and was so high that if Cumulus accepted it, it would be unable to afford to buy Eastlan data for the remaining geographies—exactly the point of Nielsen's constructive tying. Jones Suppl. Decl., ¶35. Indeed, Nielsen's ████████ package offer means that, with a ██████ price of ████████ (as set forth in Nielsen's Offer 4, above), the ██████████████ are priced collectively at ████████ Ex. 1, Furchtgott-Roth Rep. ¶65. Unless Eastlan could sell the same ████████ for less than ████ ████ (and it cannot) Nielsen's offer anticompetitively leverages its market power in its monopoly product (████████) to foreclose Eastlan from competing for the ██████████. *Id.* Such foreclosure is the hallmark of anticompetitive conduct. *Id.* ¶69; *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 612 (S.D.N.Y. 2025) (defendant's conduct illegal when not "merely offer[ing] discounts that encouraged volume shopping" but instead "prevent[ing] customers from buying or switching to rival suppliers when those suppliers offer better prices") (cleaned up).

None of Nielsen's offers eliminates the Tying Policy's "distinctly anticompetitive bent." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 468–74, 485 (7th Cir. 2020) (reversing the district court's grant of summary judgment after concluding that a jury could find Comcast improperly forced customers to buy its ad rep services using its monopoly in the Interconnect services market). Each of Nielsen's offers operate to unlawfully coerce Cumulus into buying products it does not want and excludes competition from Eastlan. *See Am. Mfrs. Mut. Ins. Co. v. Am. Broad.- Paramount Theatres, Inc.*, 388 F.2d 272, 283 (2d Cir. 1967) (pricing that "has the effect of conditioning the sale of the single product to the sale of the entire package" amounts to unlawful constructive tying).[6]

---

[6] This case is unlike *Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n.*, which Nielsen cited in its October 27, 2025 submission to the Court. *See* ECF No. 39 at 2. There, the plaintiff could "easily avoid the irreparable harm" by accepting defendant's offer to negotiate a

Nielsen suggested in its October 27, 2025 submission that its coercive Tying Policy merely represents a package or "volume" discount.  ECF No. 39 at 2, n.1.  But the contract itself specifies that any "volume discount" is only ███.    Ex. 22, CUMULUS_0002431 at -432; Ex. 23, CUMULUS_0002237 at -253.  Even if Nielsen increased its current contract prices for local radio ratings data by ███, the price would come nowhere near the exorbitant prices proposed under Nielsen's constructive tying offers.   Nielsen's policy reflects unlawful tying, not a volume discount.   Ex. 1, Furchtgott-Roth Rep. ¶69; *see Visa,* 788 F. Supp. 3d at 612 (discounts "prevent[ing] customers from buying or switching to rival suppliers when those suppliers offer better prices" unlawful) (cleaned up).

## III.    BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST FAVOR AN INJUNCTION.

The balance of hardships and the public interest also favor an injunction.  "[T]he balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided."   *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) (citation omitted), *aff'd*, 764 F.3d 210 (2d Cir. 2014).

As discussed above, without the preliminary injunction, Cumulus ████████████ ████████.  Its requested relief stops Nielsen's anticompetitive behavior ████████████ ████████████████.  By contrast, Nielsen faces no hardship.  Having to negotiate reasonable prices without tying, or being required to provide products at current contract rates



non-exclusive license on "commercially reasonable terms;" such a license would allow the plaintiff to continue "manufactur[ing] a complete set of baseball trading cards" and "permit others to compete directly[.]"  641 F. Supp. 1179, 1191–92 (S.D.N.Y. 1986).  Since the imposition of its Tying Policy, far from commercially reasonable, all of Nielsen's offers to Cumulus have been coercively priced package deals.  Unlike the defendant in *Topps*, Nielsen's offers would ████ ████████████████████████████ and prevent Eastlan from fairly competing.

during the pendency of the litigation, does not harm Nielsen. To the contrary, either of Cumulus's proposals would provide Nielsen with millions in annual revenue, on top of its "billions" of dollars in overall revenue. Ex. 17, CUMULUS_0002530; Ex. 26, Jones Dep. 304:12–18. Thus, the balance of hardships favors Cumulus—not Nielsen. Indeed, Nielsen's own cited case from its October 27 submission, *Snecma v. Turbine Eng. Comp. Techs. Corp.*, supports this point (ECF No. 39 at 2). In *Snecma*, the court denied a preliminary injunction because it found it was "relatively easy for [the plaintiff] to absorb" any financial hardships from not granting the preliminary injunction, so the balance of hardships did not weigh in the plaintiff's favor. *See Snecma v. Turbine Eng. Comp. Techs. Corp.*, 531 F. Supp. 2d 354, 359 (N.D.N.Y. 2008). The opposite is true here: Cumulus ███████████████████ caused by the continuation of the Tying Policy or continuing to pay Nielsen for products that do not bring in revenue in excess of their cost, whereas Nielsen would affirmatively benefit from Cumulus's proposals.

As to the public interest, broadcast radio provides critical information for communities, and is particularly effective at reaching individuals with limited or no internet access with public service announcements, public safety and weather alerts, news broadcasts, and more.[7] The Tying Policy, unless enjoined, would force Cumulus ████████████ local radio stations that provide this critical information. Milner Suppl. Decl., ¶17. Preserving the viability of broadcast radio stations and preventing Nielsen from unfairly profiting "from its own wrongdoing" are squarely in the public interest. *Cf. Barnstead Broad. Corp. v. Offshore Broad. Corp.*, 865 F. Supp. 2, 8 (D.D.C. 1994) (public interest is served by the presence of more television stations). A

---

[7] According to Senator Markey: "AM radio is a lifeline for people across the country for news, sports, and especially emergency information." *See* Press Release, Sen. Ed. Markey, Senators Markey and Cruz Reintroduce Bill to Keep AM Radio in new Vehicles (Jan. 29, 2025), available at: https://www.markey.senate.gov/news/press-releases/senators-markey-and-cruz-reintroduce-bill-to-keep-am-radio-in-new-vehicles.

preliminary injunction here would also be in the public interest because "[t]he public has an interest in enforcement of the antitrust laws and in the preservation of competition." *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 726 (S.D.N.Y. 2017) (cleaned up); *see also Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687, 698–99 (2d Cir. 1973).

"The equities thus weigh in favor of injunctive relief" where Cumulus has shown "the substantial harm to competition that . . . is likely to arise[.]" *Fed. Trade Comm'n v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 400 (S.D.N.Y. 2024). Moreover, because Cumulus will be able to show a likelihood of success in demonstrating that Nielsen's monopolistic conduct, including its Tying Policy, violates Section 2 of the Sherman Act, "the threatened injury to the public interest weighs heavily" in favor of a preliminary injunction. *Grumman Corp. v. LTV Corp.*, 527 F. Supp. 86, 105 (E.D.N.Y. 1981), *aff'd*, 665 F.2d 10 (2d Cir. 1981).

## IV.    CUMULUS'S REQUESTED RELIEF PRESERVES THE STATUS QUO AND PROTECTS ITS VIABILITY.

At the October 27, 2025 status conference, Nielsen's counsel suggested that appropriate preliminary relief would be to simply extend the current contract for Nationwide and all local geographies during the pendency of the litigation. Ex. 27, Hr'g Tr. 7:11–16. That proposal works well for Nielsen because it keeps Cumulus paying a huge sum to Nielsen—$███████████—while the litigation proceeds for the next several years, and prevents Cumulus from switching to Eastlan during that time period. Simply put, Nielsen's proposal perpetuates Nielsen's market power, rewards it for adopting an anti-competitive policy, and severely imperils Cumulus's future. As noted above, ████████████████████████████████████████████████████ ███████████████████████████████████.

Cumulus's proposal—that Nielsen provide both Nationwide and local radio ratings data in geographies that make sense for Cumulus at the current contract rates—differs from Nielsen's in

only one key respect: it allows Cumulus to choose Eastlan in select markets, protecting competition and enabling Cumulus to cut costs now.  Alternatively, the Court could simply enjoin the Tying Policy (actual or de facto) and order Nielsen to immediately negotiate with Cumulus in good faith, without the Tying Policy, at reasonable rates, consistent with past practice.  Either formulation would prevent Nielsen from implementing its unlawful Tying Policy, and would therefore preserve the status quo ante, *i.e.,* the world before Nielsen's Tying Policy.  Indeed, in all prior negotiations before Nielsen enacted its Tying Policy, Cumulus was able to freely pick and choose which local products it would, and would not, buy from Nielsen. *See* Ex. 24, CUMULUS_0002347–350. Cumulus's proposed preliminary injunctive remedy thus puts the parties in that status quo position, allowing them to negotiate reasonable prices without any express or constructive tying during the pendency of the litigation.

Such an order is well within this Court's discretion.  It "cure[s] the ill effects of [Nielsen's] illegal conduct" and "assure[s] the public [including Cumulus and other radio broadcasters] from its continuance" by requiring Nielsen to sell its Nationwide product and local radio ratings data at commercially reasonable rates to Cumulus—a "recognized antitrust remed[y]."  *United States v. Glaxo Grp. Ltd.*, 410 U.S. 52, 64 (1973) (citations omitted).  And it provides no harm to Nielsen, who will be paid for its data at current, or other reasonable rates.

This is a pivotal moment for the broadcast radio industry and for Cumulus.  With the requested relief, ████████████████ while this litigation proceeds.  Without it, Cumulus will be irreparably harmed and Eastlan will be prevented from providing a competitive alternative to Nielsen.  Such competition is important to radio broadcasters across the country, who desperately need an alternative to Nielsen's high prices.

## **CONCLUSION**

For the foregoing reasons, Cumulus asks this Court to grant Cumulus's motion and issue a preliminary injunction:

- enjoining Nielsen from imposing any tie or constructive tie in connection with the provision of national radio ratings data, including the required purchase of local radio ratings data, in any negotiation regarding these products;

- requiring Nielsen to provide Cumulus with Nationwide and local radio ratings data in markets selected by Cumulus, at current contract rates, or alternatively, requiring Nielsen to immediately negotiate with Cumulus in good faith, without the Tying Policy, at reasonable rates, consistent with past practice; and

- prohibiting Nielsen from engaging in any retaliatory conduct in connection with this litigation.

Dated: November 24, 2025
     Richmond, VT

Respectfully submitted,

*/s/ Jennifer Fleury*

Jennifer Fleury (*pro hac vice admitted*)
Charles Loughlin (*pro hac vice admitted*)
Jamie Lee (*pro hac vice admitted*)
Alisa Lu (*pro hac vice admitted*)
Ashley Ifeadike (*pro hac vice admitted*)
Tianyu Dong (*pro hac vice admitted*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
jennifer.fleury@hoganlovells.com
chuck.loughlin@hoganlovells.com
jamie.lee@hoganlovells.com
alisa.lu@hoganlovells.com
ashley.ifeadike@hoganlovells.com
tianyujohn.dong@hoganlovells.com

Claude G. Szyfer
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, N.Y. 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
claude.szyfer@hoganlovells.com

*Counsel for Plaintiff*
*Cumulus Media New Holdings Inc.*

## <u>WORD COUNT CERTIFICATION</u>

I hereby certify that this Memorandum of Law complies with Local Rule 7.1(c) of the United States District Court for the Southern District of New York. This certificate certifies that the document complies with the word count limit. Compliance relied on the word count of the word-processing system used to prepare the document. The total number of the words in this Memorandum, exclusive of the caption, table of contents, table of authorities, and signature block is 8,707 words.

Dated:   November 24, 2025
       Richmond, VT

*/s/ Jennifer Fleury*
Jennifer Fleury