# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

CUMULUS MEDIA NEW HOLDINGS
INC.,

               *Plaintiff*,

    v.

THE NIELSEN COMPANY (US) LLC,

               *Defendant*.

Civil Action No.: 25-cv-08581 (JAV)


**PLAINTIFF'S POST-HEARING PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW GRANTING ITS
MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ...................................................................................................................1

PLAINTIFF'S PROPOSED FINDINGS OF FACT.........................................................2

I.     INDUSTRY BACKGROUND .................................................................................2

     A.     Broadcast Radio Industry.........................................................................2

           1.     National Networks ........................................................................ 3

           2.     Local Radio Stations .................................................................... 3

           3.     Common-Ownership Local Radio Stations ............................... 4

           4.     Radio Advertising ........................................................................ 4

     B.     Radio Ratings Data .................................................................................6

           1.     National Radio Ratings ................................................................ 8

           2.     Local Radio Ratings.................................................................... 10

           3.     Nielsen's Market Power in Both Markets.................................. 14

II.     THE PARTIES.........................................................................................................15

     A.     Cumulus Media New Holdings...............................................................15

     B.     Nielsen ......................................................................................................16

III.     NIELSEN'S ANTICOMPETITIVE POLICIES....................................................17

     A.     Subscriber First Policy...........................................................................18

     B.     Tying Policy.............................................................................................19

IV.     NIELSEN FORCES ITS TYING POLICY ON CUMULUS.............................25

     A.     Before The Tying Policy.........................................................................25

     B.     Implementation of The Tying Policy.....................................................27

           1.     The Explicit Tying Offers........................................................... 27

           2.     The Constructive Tying Offers .................................................. 30

V.      HARM THAT WOULD OCCUR ABSENT AN INJUNCTION ....................................35

        A.      Under the Tying Policy, Cumulus Has No Workable Options.............................35

        B.      Cumulus's Financial Condition ........................................................................35

        C.      Loss of Market Share, Goodwill, and Customers ..................................................43

        D.      Harm to Competition ........................................................................................45

PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW ................................................................51

I.      JURISDICTION AND VENUE ARE PROPER ..................................................................51

II.     PRELIMINARY INJUNCTION STANDARD....................................................................52

        A.      The Status Quo..................................................................................................52

        B.      The Mandatory Injunction Standard Is Not Applicable, But Cumulus
                Meets It Anyway ...............................................................................................54

III.    THE TYING POLICY IRREPARABLY HARMS CUMULUS AND
        COMPETITION ..................................................................................................................55

        A.      The Tying Policy Irreparably Harms Cumulus.....................................................55

        B.      The Tying Policy Irreparably Harms Competition ................................................60

IV.     CUMULUS IS LIKELY TO SUCCEED ON THE MERITS ...........................................66

        A.      Cumulus Is Likely To Succeed On Its Section 2 Tying Claim............................66

                1.      Nielsen Does Not Dispute That The Relevant Markets Are Well-
                        Defined................................................................................................ 66

                2.      Nielsen Admits That It Exercises Market Power in the Relevant
                        Markets ................................................................................................ 67

                3.      Nielsen Has Engaged in Illegal Tying in Violation of Section 2 of
                        the Sherman Act.................................................................................. 69

                a.      The Tying Policy and Nielsen's Offers Are Explicit Ties.............................. 69

                b.      Nielsen's Offers Are Also Constructive Ties ................................................ 71

                4.      The Tying Policy Causes Anticompetitive Effects In The Industry ......... 76

                5.      The Tying Policy Involves A Substantial Amount of Interstate
                        Commerce ............................................................................................ 77

6.    There Is No Evidence To Support Nielsen's Purported
Procompetitive Justification..................................................................... 78

7.    The Duty-to-Deal Doctrine Does Not Apply ............................................ 81

B.    Cumulus Is Likely To Succeed On Its Section 2 Course of Conduct Claim .........82

C.    Cumulus Is Likely To Succeed On Its Unfair Competition Law claim.................83

V.    THE BALANCE OF HARDSHIPS FAVOR AN INJUNCTION ...................................83

VI.   AN INJUNCTION SERVES THE PUBLIC INTEREST .................................................86

VII.  CUMULUS'S REQUESTED RELIEF PRESERVES THE STATUS QUO AND
PROTECTS ITS VIABILITY ...........................................................................................87

CONCLUSION........................................................................................................................90

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. FTC*,
   1 F.4th 102 (2d Cir. 2021) ...................................................................78, 79

*Advanced Comput. Servs. of Mich. v. MAI Sys. Corp.*,
   845 F. Supp. 356 (E.D. Va. 1994) ...............................................................72

*Am. Mfrs. Mut. Ins. Co. v. Am. Broad. Paramount Theatres, Inc.*,
   388 F.2d 272 (2d Cir. 1967)...................................................................71, 72

*Baker's Aid v. Hussmann Foodservice Co.*,
   830 F.2d 13 (2d Cir. 1987).............................................................................56

*Barnstead Broad. Corp. v. Offshore Broad. Corp.*,
   865 F. Supp. 2 (D.D.C. 1994) ...................................................................86, 87

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979).........................................................................66

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962).......................................................................................67

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977).......................................................................................82

*Cascade Health Solutions v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008) ........................................................................76

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) ..................................................................................83

*Chabner v. United Omaha Life Ins. Co.*,
   225 F.3d 1042 (9th Cir. 2000) ......................................................................83

*Chloe v. Queen Bee of Beverly Hills, LLC*,
   616 F.3d 158 (2d Cir. 2010)..........................................................................51

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
   781 F.3d 264 (6th Cir. 2015) ........................................................................55

*Consol. Gold Fields PLC v. Minorco, S.A.*,
   871 F.2d 252 (2d Cir. 1989), *amended on other grounds*, 890 F.2d 569 (2d
   Cir. 1989) .......................................................................................................61

iv

*Cramer v. Devon Grp., Inc.*,
No. 90 CIV. 7748 (PKL), 1990 WL 210306 (S.D.N.Y. Dec. 12, 1990) ...............................58

*Crimpers Promotions Inc. v. Home Box Off., Inc.*,
724 F.2d 290 (2d Cir. 1983) ...........................................................................................85

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*,
96 F.4th 351 (2d Cir. 2024)............................................................................................89

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
111 F.4th 337 (4th Cir. 2024) ........................................................................................82

*Eastman Kodak Co. v. Image Tech. Services, Inc.*,
504 U.S. 451 (1992).........................................................................................................78

*Elrod v. Burns*,
427 U.S. 347 (1976)..........................................................................................................2

*F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*,
597 F.2d 814 (2d Cir. 1979)............................................................................................61

*FTC v. IQVIA Holdings Inc.*,
710 F. Supp. 3d 329 (S.D.N.Y. 2024).............................................................................86

*fuboTV Inc. v. Walt Disney Co.*,
745 F. Supp. 3d 109 (S.D.N.Y. 2024), *appeal dismissed*, No. 24-2210, 2025
WL 523263 (2d Cir. Jan. 8, 2025) ......................................................................56, 61, 66, 86

*Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*,
No. 20-CV-181, 2020 WL 915824 (S.D.N.Y. Feb. 26, 2020)....................................52, 54, 66

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*,
386 F.3d 485 (2d Cir. 2004)............................................................................................68

*Giambalvo v. Suffolk Cnty., N.Y.*,
155 F.4th 163 (2d Cir. 2025) ............................................................................................2

*Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*,
922 F. Supp. 2d 435 (S.D.N.Y. 2013), *aff'd*, 764 F.3d 210 (2d Cir. 2014) ............................83

*Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*,
880 F.2d 1514 (2d Cir. 1989)......................................................................................70, 77

*Grumman Corp. v. LTV Corp.*,
527 F. Supp. 86 (E.D.N.Y. 1981), *aff'd*, 665 F.2d 10 (2d Cir. 1981).....................................87

*Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*,
476 F.2d 687 (2d Cir. 1973)............................................................................................87

*Hamilton Chapter of Alpha Delta Phi v. Hamilton Coll.*,
    128 F.3d 59 (2d Cir. 1997) ................................................................. 52

*Image Tech. Servs. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ........................................................... 81

*In re Google Digit. Advert. Antitrust Litig.*,
    627 F. Supp. 3d 346 (S.D.N.Y. 2022) ............................................... 76

*In re Google Play Store Antitrust Litig.*,
    147 F.4th 917 (9th Cir. 2025) ........................................................... 88

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) ............................................... 68

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    729 F. Supp. 3d 298 (E.D.N.Y. 2024) ............................................... 78

*Jacobson & Co. v. Armstrong Cork Co.*,
    548 F.2d 438 (2d Cir. 1977) ............................................................. 60

*JBR, Inc. v. Keurig Green Mountain, Inc.*,
    618 F. App'x 31 (2d Cir. 2015) ........................................................ 58

*Mastrio v. Sebelius*,
    768 F.3d 116 (2d Cir. 2014) ............................................................. 52

*Maxon Hyundai Mazda v. Carfax, Inc.*,
    No. 13-CV-2680, 2014 WL 4988268 (S.D.N.Y. Sep. 29, 2014) ........... 68

*Mullins v. N.Y.C.*,
    626 F.3d 47 (2d Cir. 2010) ............................................................... 55

*Nat'l Soc. of Prof'l Engineers v. United States*,
    435 U.S. 679 (1978) ......................................................................... 90

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
    992 F.2d 430 (2d Cir. 1993) ............................................................. 56

*New York v. Actavis, PLC*,
    No. 14 CIV. 7473, 2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014) ......... 68

*N.Y. ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015) ................................................... *passim*

*Ortho Diagnostic Systems v. Abbott Laboratories*,
    920 F. Supp. 455 (S.D.N.Y. 1996) ................................................... 64

*Otter Tail Power Co. v. United States,*
 410 U.S. 366 (1973) ......................................................................................89

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.,*
 555 U.S. 438 (2009) ......................................................................................81

*Paschall v. Kansas City Star Co.,*
 695 F.2d 322 (8th Cir. 1982) ..................................................................87, 89

*Regeneron Pharm., Inc. v. Novartis Pharma AG,*
 96 F.4th 327 (2d Cir. 2024) .........................................................................67

*Register.com Inc. v. Verio, Inc.,*
 356 F.3d 393 (2d Cir. 2004) ........................................................................59

*Reiss v. Audible, Inc.,*
 No. 1:24-CV-05923, 2025 WL 1654643 (S.D.N.Y. June 11, 2025) .....................82

*Reuters, Ltd. v. United Press Int'l Inc.,*
 903 F.2d 904 (2d Cir. 1990) ....................................................................59, 60

*Rex Med. L.P. v. Angiotech Pharm. (US), Inc.,*
 754 F. Supp. 2d 616 (S.D.N.Y. 2010) ............................................................60

*Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n,*
 736 F.2d 441 (8th Cir. 1984) .......................................................................88

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of N.Y., Inc.,*
 749 F.2d 124 (2d Cir. 1984) ........................................................................56

*SG Cowen Sec. Corp. v. Messih,*
 224 F.3d 79 (2d Cir. 2000) ..........................................................................86

*Snecma v. Turbine Eng. Comp. Techs. Corp.,*
 531 F. Supp. 2d 354 (N.D.N.Y. 2008) ...........................................................85

*Sperry Int'l Trade, Inc. v. Gov't of Israel,*
 670 F.2d 8 (2d Cir. 1982) ...........................................................................56

*St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.,*
 131 F.4th 102 (2d Cir. 2025) .......................................................................59

*Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.,*
 815 F.2d 1407 (11th Cir. 1987) ....................................................................71

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.,*
 60 F.3d 27 (2d Cir. 1995) ...........................................................................55

*Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n.,*
    641 F. Supp. 1179 (S.D.N.Y. 1986)...................................................72

*trueEX, LLC v. MarkitSERV Ltd.,*
    266 F. Supp. 3d 705 (S.D.N.Y. 2017)...........................................59, 87

*Tucker Anthony Realty Corp. v. Schlesinger,*
    888 F.2d 969 (2d Cir. 1989).......................................................56

*United States v. Columbia Pictures Indus., Inc.,*
    507 F. Supp. 412 (S.D.N.Y. 1980) ..............................................87

*United States v. Glaxo Grp. Ltd.,*
    410 U.S. 52 (1973).................................................................88

*United States v. Google LLC,*
    747 F. Supp. 3d 1 (D.D.C. 2024)..................................................78

*United States v. Grinnell Corp.,*
    384 U.S. 563 (1966)...............................................................66

*Velesaca v. Decker,*
    458 F. Supp. 3d 224 (S.D.N.Y. 2020)............................................53

*Williamson v. Maciol,*
    839 F. App'x 633 (2d Cir. 2021) ................................................53

*Yang v. Kosinski,*
    960 F.3d 119 (2d Cir. 2020).......................................................84

*Zurn Constructors, Inc. v. B.F. Goodrich Co.,*
    685 F. Supp. 1172 (D. Kan. 1988)................................................89

**Statutes**

15 U.S.C. § 2 (Sherman Act § 2) ............................................... *passim*

15 U.S.C. § 15 ...........................................................................51

15 U.S.C. § 16 ...........................................................................52

15 U.S.C. § 26 ...........................................................................51

28 U.S.C § 1331 .........................................................................51

28 U.S.C. §1337 .........................................................................51

28 U.S.C. § 1367 .........................................................................51

28 U.S.C. § 1391 ...................................................................................................................51

28 U.S.C. § 2201 ...................................................................................................................51

28 U.S.C. § 2202 ...................................................................................................................51

Cal. Bus. & Prof. Code § 17200 ......................................................................................51, 83

**Other Authorities**

Press Release, Sen. Ed. Markey, Senators Markey and Cruz Reintroduce Bill to
    Keep AM Radio in new Vehicles (Jan. 29, 2025), available at:
    https://www.markey.senate.gov/news/press-releases/senators-markey-and-
    cruz-reintroduce-bill-to-keep-am-radio-in-new-vehicles .......................................................86

## **INTRODUCTION**

Now that this Court has received direct testimony from the parties' witnesses and economic experts, declarations and testimony from third parties, as well as hundreds of exhibits, the critical facts are no longer in dispute. The record establishes that The Nielsen Company (US) LLC ("Nielsen") is the only source for an indispensable national ratings product (its Nationwide product) for Cumulus Media New Holding's ("Cumulus") national network; that Nielsen conditioned access to that product on the forced purchase of separate expensive local ratings products; and that absent injunctive relief, Nielsen's conduct will imminently and irreparably damage Cumulus and impair competition in numerous local markets.

The evidence is clear and uncontested that Nielsen is the only provider of national radio ratings data in the United States. Without comprehensive national ratings data, a national network cannot effectively compete for advertising business or generate revenue. Against that backdrop, Nielsen implemented a policy expressly tying the purchase of local ratings products to the ability to purchase comprehensive national ratings data (the "Tying Policy"). Nielsen's ordinary-course documents show that it understood—and intended—that this Tying Policy would leave Cumulus with no realistic choice but to purchase local ratings products it would otherwise decline.

When Cumulus objected on the grounds that the policy was illegal, Nielsen did not abandon it—instead, it offered ██████████████████ alternatives at prices so far above both historical and market pricing that those offers functioned as constructive ties, designed to coerce acceptance of the original tied offers. Nielsen has not challenged market power or market definition in this case, and it "took [the] consequences on board" of not cross-examining any of

1

Cumulus's witnesses or its economic expert.  Tr. 235:11–13.[1]  On this record, the "likelihood of success" factor sharply favors Cumulus.

The harm to Cumulus from Nielsen's conduct is immediate and severe.  Cumulus's Nielsen contract is ██████████████████████.  Cumulus must reduce that expense ████████ ██████████████████████—but Nielsen's anticompetitive behavior makes that cost reduction impossible.  The uncontroverted testimony of Collin Jones, Cumulus's Executive Vice President of Corporate Strategy & Development and President of Westwood One, establishes the clear chain of events that will occur if Cumulus is unable to reduce its Nielsen expense, forced to pay significantly more for less value, or continues to face uncertainty about access to Nielsen's Nationwide product.  The record is devoid of any evidence of any concrete harm to Nielsen if the requested injunction is granted, and the Court received substantial evidence that injunctive relief would serve the public interest. In light of the clear evidence, this Court should preliminarily enjoin Nielsen's anticompetitive tying conduct.

## PLAINTIFF'S PROPOSED FINDINGS OF FACT

I.    **INDUSTRY BACKGROUND**

A.    **Broadcast Radio Industry**

1.  The radio broadcast industry includes both national networks, which provide radio programming that is distributed across the United States, and local radio stations, which serve a

---

[1] This means any statements made in the declarations of Collin Jones (Executive Vice President of Corporate Strategy & Development at Cumulus and President of Westwood One), Dave Milner (Co-President of Cumulus Operations), and opinions expressed by Cumulus's economic expert, Dr. Harold Furchtgott-Roth (economist and former FCC Commissioner), including their deposition testimony, are unrebutted.  And the Second Circuit has instructed that such uncontroverted facts set forth in sworn testimony "must be taken as true" at the preliminary injunction stage. *Giambalvo v. Suffolk Cnty., N.Y.*, 155 F.4th 163, 186 (2d Cir. 2025) (citing *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976) (noting that "uncontroverted affidavits" are to be taken as true)).

specific region.  PX-277 (Furchtgott-Roth Expert Report) ¶ 19; PX-301-1 (Milner Decl.) ¶ 3; PX-289 (Compl.) ¶ 40.[2]

### 1.    *National Networks*

2.    National networks are large-scale content producers and distributors, providing syndicated radio programming to affiliated radio stations across the country.  PX-277 (Furchtgott-Roth Expert Report) ¶ 24; *see also* PX-300-1 (Jones Decl.) ¶ 5.

3.    National networks partner with local radio stations through affiliate agreements, under which national networks provide local radio stations with programming in exchange for advertising inventory.  PX-277 (Furchtgott-Roth Expert Report) ¶¶ 24–25; *see also* PX-300-1 (Jones Decl.) ¶ 5.  This programming includes talk shows, entertainment programs, news programming, and sports programs.  PX-289 (Compl.) ¶ 44; PX-277 (Furchtgott-Roth Expert Report) ¶ 24.

4.    There are several national networks operating in the broadcast radio space, including Audacy Inc.'s ("Audacy") Audio Network, iHeartMedia Inc.'s ("iHeartMedia") Premiere Networks, Compass, National Public Radio, and Cumulus's Westwood One.  PX-277 (Furchtgott-Roth Expert Report) ¶ 24; PX-281 (Jones Dep. Tr.) 49:24–50:11; PX-289 (Compl.) ¶ 44.

### 2.    *Local Radio Stations*

5.    Local radio stations provide daily programming for audiences in specific regions.  PX-277 (Furchtgott-Roth Expert Report) ¶ 20; PX-301-1 (Milner Decl.) ¶ 3; PX-289 (Compl.) ¶ 41.

---

[2] As the Court is aware, Nielsen has repeatedly represented that it will accept all factual allegations in the Complaint.  *See* Dec. 2 Hr'g Tr. 3:21–4:3.  *See also* 55:18–24 (Orszag) ("Q. Mr. Orszag, for purposes of the work you did in this case, did you accept the facts alleged in the complaint as true?  A. Yes, I did.  Q. Are there any facts in the complaint that you did not accept as true for purposes of your work in the case?  A. I have not committed to memory every fact in the complaint, but there is none that I am aware of sitting here today.").  Cumulus still cites to record evidence throughout this document.

Local radio stations serve an important function, often serving as Emergency Alert System stations. Shutting them down would reduce the ability to reach the community in times of emergency, such as issuing flood or storm warnings. PX-301-1 (Milner Decl.) ¶ 17.

6. There are 275 geographic areas, referred to as "Radio Markets," in which local radio stations operate. PX-289 (Compl.) ¶ 43. Local radio stations broadcast original content that is designed to match the interest and demographics of listeners in the region. PX-277 (Furchtgott-Roth Expert Report) ¶ 20; PX-301-1 (Milner Decl.) ¶ 3. Local stations may also broadcast syndicated programming provided by a national network. PX-277 (Furchtgott-Roth Expert Report) ¶ 21; PX-301-1 (Milner Decl.) ¶ 3.

### 3. Common-Ownership Local Radio Stations

7. Some broadcasters own and operate both national networks and local radio stations. PX-277 (Furchtgott-Roth Expert Report) ¶ 26.

8. These companies, including iHeartMedia, Cumulus, and Audacy, provide both national network programming and local radio broadcasting. PX-277 (Furchtgott-Roth Expert Report) ¶ 26; PX-289 (Compl.) ¶ 46.

### 4. Radio Advertising

9. Both national networks and local radio stations generate revenue by selling advertising inventory (i.e., radio commercial time) to advertisers and advertising agencies. PX-277 (Furchtgott-Roth Expert Report) ¶ 34; PX-300 (Jones Suppl. Decl.) ¶ 5; PX-289 (Compl.) ¶¶ 48–49.

10. A local radio station that broadcasts its own original content may sell its own advertising inventory directly to advertisers or through advertising agencies. PX-277 (Furchtgott-Roth Expert Report) ¶ 34; PX-301 (Milner Supp. Decl.) n.6. A local radio station that broadcasts

syndicated national programming typically splits the advertising inventory with the national network.  PX-301-1 (Milner Decl.) ¶ 7; PX-277 (Furchtgott-Roth Expert Report) ¶ 34.

11. National brands may purchase a national network's advertising inventory (a "network buy") to reach a broad audience.  PX-276 (Furchtgott-Roth Decl.) ¶ 16; PX-289 (Compl.) ¶ 51. National brands may also buy advertising inventory from a local radio station (a "national spot buy") to target a specific local region.  PX-276 (Furchtgott-Roth Decl.) ¶ 16; PX-289 (Compl.) ¶ 52.

12. Local brands and multi-regional businesses also purchase advertising inventory from local radio stations, though many also hire advertising agencies to purchase local advertising inventory on their behalf.  PX-289 (Compl.) ¶ 59.

13. In addition to selling advertising inventory they receive from local radio stations in return for providing programming, national networks may also purchase advertising inventory from local radio stations and then re-sell the advertising inventory for profit, or serve as a sales agent for local stations and sell advertising inventory on their behalf.  PX-300 (Jones Suppl. Decl.) ¶ 5; PX-289 ¶ 45.

14. Advertising agencies act as intermediaries in the buying and selling of advertising inventory, assisting national and local advertisers determine what advertising inventory to purchase, how that inventory should be priced, and the advertising campaign's length.  PX-289 (Compl.) ¶ 54; *see also* PX-301-1 (Milner Decl.) ¶ 8.  National brands typically make network buys and national spot buys through advertising agencies.  PX-300 (Jones Suppl. Decl.) ¶ 5; PX-281 (Jones Dep. Tr.) 27:2–6.

15. In larger geographies, more than half of advertising inventory is purchased through advertising agencies.  *See* PX-301-1 (Milner Decl.) ¶ 8.

16. National networks often have longstanding relationships with advertising agencies. *See* PX-300-1 (Jones Decl.) ¶ 12.

17. Advertisers and advertising agencies use media-buying platforms, including Mediaocean, Strata, and AdVantage, which incorporate radio ratings data into their platforms, to compare and purchase advertising inventory in one place. PX-289 (Compl.) ¶ 57. These media-buying platforms facilitate the sale of advertising inventory, allowing advertisers to make purchases based on national radio ratings data and local radio ratings data. *Id*. Mediaocean is typically used by national advertisers and the largest advertising agencies, and only accepts national and local radio ratings data from Nielsen. Tr. 321:1–5 (Gould); PX-289 (Compl.) ¶ 58. Strata and AdVantage are typically used by regional or local advertisers and advertising agencies. PX-289 (Compl.) ¶ 58. National advertisers and advertising agencies also use Act 1 to parse Nationwide data, and Act 1 only accepts Nielsen data. PX-300-1 (Jones Decl.) ¶ 8 ("Further, in my experience, national advertisers and advertising agencies use national radio ratings data analyzed by software company Act 1, which only accepts Nielsen data.").

**B.  Radio Ratings Data**

18. Radio ratings data measure the characteristics of the audience listening to a particular broadcast. PX-277 (Furchtgott-Roth Expert Report) ¶ 28; PX-301-1 (Milner Decl.) ¶ 9. Radio ratings data typically reflect audience size and demographic, the "reach" of the broadcast— meaning the number of unique listeners—and time spent listening to a broadcast. PX-300-1 (Jones Decl.) ¶ 35; PX-277 (Furchtgott-Roth Expert Report) ¶ 28; PX-281 (Jones Dep. Tr.) 107:12–108:5.

19. There are two separate radio ratings data products: local radio ratings data and national radio ratings data. Tr. 277:10–21 (Gould) ("Nielsen produces two separate products. They produce a product that is often known as the nationwide product that … measures all of the population of the United States. … and that is used primarily by networks, so companies that have syndicated

radio shows or Monday Night Football, or those sorts of things, where they are seeking to sell to the representation of a national audience. The other part of their business is in a local market measurement. … and that's the measurement of listening habits in Buffalo, Poughkeepsie, and Yakima); PX-277 (Furchtgott-Roth Expert Report) ¶¶ 30, 39–41, 49; *see* PX-300-1 (Jones Decl.) ¶ 9; *see* PX-301-1 (Milner Decl.) ¶ 10.

20. National radio ratings dating and local radio ratings data are not substitutes.  PX-277 (Furchtgott-Roth Expert Report) ¶¶ 39–41, 49; PX-300-1 (Jones Decl.) ¶ 9; PX-301-1 (Milner Decl.) ¶ 10; PX-285 (Furchtgott-Roth Dep. Tr.) 161:13–15.

21. Advertisers and advertising agencies that purchase national advertising inventory are looking to assess performance of a radio broadcast across the nation, and will rely on national radio ratings data for that purpose.  PX-277 (Furchtgott-Roth Expert Report) ¶¶ 30, 41.

22. Advertisers and advertising agencies that purchase local advertising inventory are only seeking to assess performance in a particular region, and will rely on local radio ratings data for that purpose.  PX-277 (Furchtgott-Roth Expert Report) ¶¶ 30, 41.

23. As a result, local radio stations seeking to sell to local advertisers and agencies purchase local radio ratings data while national networks purchase national radio ratings data.  PX-277 (Furchtgott-Roth Expert Report) ¶ 41.

24. 

PX-279 (Tunkel Dep. Tr.) 29:20–30:3, 30:18–20.

PX-277 (Furchtgott-Roth Expert Report) ¶ 41; PX-279 (Tunkel Dep. Tr.) 37:24–38:7

███████████████████████████████████████

███████████████████████████████████████

█████████████████

      *1.*      *National Radio Ratings*

25. National radio ratings data measure a radio program's performance across the United States.  Tr. 212:25–213:17 (Tunkel); PX-277 (Furchtgott-Roth Expert Report) ¶ 41; PX-285 (Furchtgott-Roth Dep. Tr.) 15:12–16.

26. Nielsen is the sole provider of national radio ratings data in the United States.  PX-277 (Furchtgott-Roth Expert Report) ¶¶ 46–48; PX-300-1 (Jones Decl.) ¶ 7; PX-266 (Small Decl.) ¶ 3; PX-281 (Jones Dep. Tr.) 311:12–16; PX-285 (Furchtgott-Roth Dep. Tr.) 118:2–5 ("A lot of times the consumer can just go elsewhere. There is no elsewhere to go if you want the national ratings data. You have to deal with Nielsen.").

27. Nielsen calls its national radio ratings data "Nationwide."  PX-277 (Furchtgott-Roth Expert Report) ¶ 46; PX-274 (Tunkel Decl.) ¶ 5; ECF No. 91 at 4; PX-300-1 (Jones Decl.) ¶ 7; PX-278 ¶ 15.  Nielsen's Nationwide product is published biannually.  PX-277 (Furchtgott-Roth Expert Report) ¶ 46; PX-274 (Tunkel Decl.) ¶ 5; ECF No. 91 at 4; PX-300-1 (Jones Decl.) ¶ 7; PX-278 ¶ 15. ███████████████████████████████████████

████████████████████████████████████████

████ Tr. 213:8–12 (Tunkel); PX-279 (Tunkel Dep. Tr.) 28:3–10, 30:4–13, 83:8–11; ECF No. 91 at 4, ██████████████████████████████████ *see* PX-168 ██████

████████████████████████████████████████

████████████████████████████████████

28. Nationwide data is accessed by advertisers, advertising agencies, and broadcasters through a third-party software called Act 1, which allows users to download and analyze the Nationwide data. Tr. 213:8–12 (Tunkel); PX-300-1 (Jones Decl.) ¶ 8.

29. National networks must provide national radio ratings data to advertisers and advertising agencies in order to sell advertising inventory. *See* PX-300-1 (Jones Decl.) ¶ 35. These data inform national networks' proposals for selling advertising inventory, including the inventory or packages of inventory that best support their objectives, how long the campaigns should run, and the price the advertiser should pay. PX-300-1 (Jones Decl.) ¶ 11; PX-277 (Furchtgott-Roth Expert Report) ¶ 35.

30. Prior to purchasing advertising inventory, advertisers and advertising agencies often require that national networks respond to a Request for Proposal ("RFP"), in which the networks set forth their proposed packages of inventory that best support the advertisers' stated objectives, how long the campaigns should run, and the price the advertiser should pay. PX-300-1 (Jones Decl.) ¶ 35; PX-289 (Compl.) ¶ 76. Those RFP responses often require the national networks to submit national radio ratings data to support their proposals. *See* PX-300 (Jones Suppl. Decl.) ¶ 35; PX-289 (Compl.) ¶¶ 78, 134.

31. National radio ratings data are also used for post-buy assessments of the audience size and listener demographic for advertisements aired during specific radio programming. PX-289 (Compl.) ¶ 77. This post-buy analysis is particularly important where a national network may be contractually obligated to compensate an advertiser or advertising agency when an advertising campaign does not perform as well as expected. *Id.*

32. Some advertisers and advertising agencies purchase national radio ratings data themselves. *Id.* ¶ 19. But many advertisers and advertising agencies require that national networks

submit this data when proposing an advertising campaign or performing a post-buy assessment of an advertising campaign.  PX-300 (Jones Suppl. Decl.) ¶ 17; PX-289 (Compl.) ¶¶ 75-77.

33. In fact, an advertiser or advertising agency may be unable or unwilling to buy advertising inventory from a national network without proof of the reach of a particular advertising campaign using Nielsen's Nationwide product.  *See* PX-277 (Furchtgott-Roth Expert Report) ¶ 65 ("Local radio ratings data alone are not a viable option because Nationwide data are indispensable for Westwood One to sell advertising[.]")*; see also* PX-300-1 (Jones Decl.) ¶ 35; PX-289 (Compl.) ¶ 69. According to Jeffrey Small, CEO of advertising agency Strategic Media Inc.: "It would be impossible to serve our clients without Nielsen's national radio ratings data."  PX-266 (Small Decl.) ¶ 4.

### 2.    *Local Radio Ratings*

34. Local radio ratings data measure a radio program's performance within a specific region.  PX-277 (Furchtgott-Roth Expert Report) ¶ 40; PX-301-1 (Milner Decl.) ¶ 9; PX-285 (Furchtgott-Roth Dep. Tr.) 15:19–24.  This data is used to assess the audience size, demographic reach, and time spent listening to programming within a specific radio market.  PX-277 (Furchtgott-Roth Expert Report) ¶ 40; PX-289 (Compl.) ¶ 62.

35. Nielsen and Eastlan Ratings ("Eastlan") are the only providers of local radio ratings data.  Tr. 281:19–282:3 (Gould) (Eastlan's CEO testifying he does not know of any other entities "that offer local radio ratings data"); Tr. 60:14-16 (Orszag) ("Q.  As of today, Eastlan is Nielsen's only rival for the sale of local radio ratings data, correct? A. That is correct."); PX-277 (Furchtgott-Roth Expert Report) ¶ 49; *see also* PX-301-1 (Milner Decl.) ¶ 11.

36. While there are other companies that provide information about radio listeners, only two have the ability to provide the standard accepted metrics that are used to sell advertising inventory—Nielsen and Eastlan.  Tr. 283:3–7 (Gould).  No other company—not Xperi nor Edison

Research—provides the same metrics needed for selling radio advertising. *See* Tr. 283:3–24 (Gould); *see also* Tr. 60:21–61:2 (Orszag) ("A. Do you know the last time when Nielsen faced a competitor other than least [sic] Eastlan for local radio ratings data? A. That's not an analysis I've conducted. That would be part of a market definition, market power analysis, and that's outside the scope of my work here. Q. So you don't know? A. One way or the other, I do not know."). Nielsen collects radio ratings data in some geographies using the Portable People Meter ("PPM"), a small device that detects inaudible codes in the radio broadcasts a participant listens to, and through diary measurements, which require participants to self-report their radio listening history in a "diary." PX-277 (Furchtgott-Roth Expert Report) ¶ 29; Tr. (Tunkel) 148:13–22, 209:19–212:20.

37. Nielsen provides local radio ratings data in 242 Radio Markets. PX-277 (Furchtgott-Roth Expert Report) ¶ 23. Local radio ratings data collected via PPM is released in 13 reports per year. Tr. 148:24–149:10 (Tunkel); PX-274 (Tunkel Decl.) ¶ 5; PX-278 (Orszag Decl.) ¶ 15. Local radio ratings data collected using the diary method is provided either twice per year for smaller markets, or monthly for larger markets using Continuous Diary Measurement ("CDM"). Tr. 148:24–149:10 (Tunkel); PX-274 (Tunkel Decl.) ¶ 5; PX-281 (Jones Dep. Tr.) 220:16-20.

38. Nielsen's local radio ratings data are provided as a report showing either summary-level or respondent-level data. PX-289 (Compl.) ¶ 64; PX-301-1 (Milner Decl.) ¶ 15; PX-278 (Orszag Decl.) ¶ 15. Summary-level data provides a broad overview of a station's audience. PX-289 (Compl.) ¶ 64; PX-301-1 (Milner Decl.) ¶ 15. This data is less expensive and more commonly used. PX-277 (Furchtgott-Roth Expert Report) ¶ 74; PX-301-1 (Milner Decl.) ¶ 15. Respondent-level data provides more specific information about a station's audience and can be as narrow as the audience in a particular zip code. PX-301-1 (Milner Decl.) ¶ 15.

39. Advertising agencies, advertisers, and even some local radio stations typically purchase summary-level data because it is less expensive. *Id.*

40. Nielsen offers a peripheral service known as Tapscan, a software platform that allows users to analyze local radio ratings data they purchase by creating reports that can be provided to advertisers and advertising agencies through media-buying platforms like Strata or Mediaocean. PX-289 (Compl.) ¶ 65; PX-278 (Orszag Decl.) ¶ 16.

41. Tapscan is currently compatible only with local radio ratings data from Nielsen, though it previously accepted Eastlan data. PX-289 (Compl.) ¶ 65.

42. Eastlan's local radio ratings data are available in 67 rated radio markets in the United States. Tr. 302:16–18 (Gould); PX-278 (Orszag Decl.) ¶ 18; PX-267 (Gould Decl.) ¶ 4. Eastlan competes primarily in smaller markets where Nielsen does not operate, but has been growing into larger markets and competing directly with Nielsen. PX-267 (Gould Decl.) ¶¶ 3, 11; PX-301-1 (Milner Decl.) ¶ 11; PX-067 at 1–2. Eastlan has the willingness to quickly enter new markets when there is sufficient demand. Tr. 286:8–287:6 (Gould); PX-267 (Gould Decl.) ¶ 13. In order to effectively enter and remain in a new market, Eastlan must work with a broadcaster with sufficient revenues to invest in Eastlan and pay its established rates. Tr. 286:8–287:21 (Gould). It is critical to Eastlan's success to have multiple subscribers in a market. *Id.*

43. Eastlan collects local radio ratings data using surveys conducted online or by phone. PX-267 (Gould Decl.) ¶ 7. Eastlan's local radio ratings data are generally cheaper than Nielsen's. Tr. 309:17 (Gould) ("What we are is less expensive"); PX-267 (Gould Decl.) ¶¶ 6–8; PX-301-1 (Milner Decl.) ¶ 14; PX-289 (Compl.) ¶ 156, PX-291 at 10, ECF No. 91 at 5; *see also* Tr. 62:16–64:7 (Orszag). Eastlan's data also draw from larger, more representative sample audiences. PX-267 (Gould Decl.) ¶¶ 6–8; PX-301-1 (Milner Decl.) ¶ 14; PX-289 (Compl.) ¶ 156. Eastlan also

releases its data more frequently than Nielsen does in smaller markets, measuring data continuously and reporting data monthly. PX-267 (Gould Decl.) ¶ 9. Eastlan's data, in contrast to Nielsen's, does not exclude any stations from its data reporting. PX-267 (Gould Decl.) ¶ 10.

44. Eastlan is a direct competitor to Nielsen in local radio ratings data markets. PX-277 (Furchtgott-Roth Expert Report) ¶ 49, Ex. 4. As of today, Eastlan and Nielsen compete in five local radio ratings data markets in which Cumulus owns a radio station. Tr. 93:14–18 (Orszag); PX-277 (Furchtgott-Roth Expert Report) ¶ 50; PX-287 (Orszag Dep. Tr.) 39:16–24. Eastlan is a potential competitor in the remaining local radio ratings data markets. Tr. 93:19–21 (Orszag); PX-277 (Furchtgott-Roth Expert Report) ¶ 51 (describing "the credible *threat*" of Eastlan's entry "[e]ven in the local areas in which [Nielsen] currently is the only provider of radio ratings data") (emphasis in original); PX-285 (Furchtgott-Roth Dep. Tr.) 22:10–22.

45. Recently, Nielsen became concerned with Eastlan's potential growth and with losing sales to Eastlan. Tr. 61:23–62:3, 65:8–23 (Orszag); PX-016 at 2 ("



" PX-118 (NIELSENCMLS00006009). In response, Rich Tunkel, who leads Nielsen Audio,

" PX-118 (NIELSENCMLS00006009).

46. Eastlan is an increasing competitive threat to Nielsen, entering more of Nielsen's markets—as Nielsen's expert testified, "in some sense previously they [Eastlan] weren't going head-to-head that often with Nielsen. They were focusing on smaller markets where Nielsen was

focusing on bigger markets. And in recent years, Eastlan's been coming in and focusing directly on those larger markets [Nielsen is in] and been entering and succeeding." Tr. 114:13–18 (Orszag).

47. Although Eastlan competes with Nielsen in the markets for local radio ratings data, it accounts for ▮▮▮▮▮▮▮▮▮▮ of sales in those markets. Tr. 329:16-330:16 (Gould). Last year, Eastlan's annual revenue was ▮▮▮▮▮▮. Tr. 329:22–330:16 (Gould). Eastlan estimates the total revenue in the local radio ratings data industry is $300 million. Tr. 272:23–24 (Gould) ("the ratio ratings industry is about a $300 million space").

48. Eastlan has not reached its objective that the revenue of its entire company be equal to the published salary of Nielsen's Chief Executive Officer. Tr. 302:19–25 (Gould).

### 3.    *Nielsen's Market Power in Both Markets*

49. Each local radio ratings data geography is a separate and distinct antitrust market. Tr. 56:10–13 (Orszag) (Defendant's expert noting he is not offering an opinion on market power); *see also* Tr. 55:25–56:2 (Orszag) (Defendant's expert noting he is not challenging Cumulus's market definition); PX-277 (Furchtgott-Roth Expert Report) ¶ 42; PX-278 (Orszag Dec.) ¶ 33 ("▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

50. Nielsen has market power in 80 local radio ratings data markets in which Cumulus operates a local radio station. PX-277 (Furchtgott-Roth Expert Report) ¶ 50. Only in five of these markets does Eastlan have a presence, but Nielsen still is the dominant provider. *Id.*

51. Eastlan does not operate in the market for national radio ratings data and it does not have a product comparable to Nationwide. PX-267 (Gould Decl.) ¶ 21. Eastlan's CEO estimated that it would take one year to develop such a product if it had a customer base for such a product. Tr. 310:23–311:1 (Gould) (noting Eastlan could develop a "nationwide-like product" in one year if it had a customer or customers willing to cover the cost of collecting the data).

52. Even if Eastlan developed a potential alternative to Nielsen's Nationwide product, it would face pushback from advertisers and advertising agencies for the foreseeable future.  Tr. 326:15–19 (Gould).   Eastlan would also have to overcome resistance from advertisers and advertising agencies that view themselves as "Nielsen-only shops," PX-267 (Gould Decl.) ¶ 16, because Nielsen is considered the "currency with advertisers and agencies" and is "how advertising is primarily traded."  Tr. 318:14-24 (Gould).

53. Eastlan would not only need to convince advertisers and advertising agencies to accept Eastlan's national radio ratings data in purchasing advertising inventory and performing post-buy assessments, but also would need to convince Act 1 and Mediaocean to accept its data into their systems.  PX-300-1 (Jones Decl.) ¶ 8.

## II.    THE PARTIES

### A.    <u>Cumulus Media New Holdings</u>

54. Cumulus is a media company, comprised of entities owning and/or operating 395 radio stations across the United States, and thousands of affiliates.  PX-277 (Furchtgott-Roth Expert Report) ¶¶ 8, 9; PX-278 (Orszag Decl.) ¶ 17; PX-301-1 (Milner Decl.) ¶ 5; PX-281 (Jones Dep. Tr.) 26:3–27:9; PX-289 (Compl.) ¶ 26.

55. Cumulus also owns and operates a national network, Westwood One, which produces and syndicates national radio programming for broadcast across the United States.  PX-277 (Furchtgott-Roth Expert Report) ¶ 9; PX-300-1 (Jones Decl.) ¶ 5; PX-289 (Compl.) ¶ 26. These shows include NFL broadcasts, Fox News broadcasts, or the Daly Download with Carson Daly PX-300-1 (Jones Decl.) ¶¶ 13, 33.

56. Westwood One provides programming and services to 9,500 local stations, including both Cumulus-owned stations and stations not owned by Cumulus, in exchange for advertising

inventory.  PX-277 (Furchtgott-Roth Expert Report) ¶ 9; PX-300-1 (Jones Decl.) ¶ 5; PX-281 (Jones Dep. Tr.) 26:3–27:9; PX-289 (Compl.) ¶ 46.  Westwood One also acts as a sales agent for content and service partners that create programming and provide services in exchange for advertising inventory.  PX-300-1 (Jones Decl.) ¶ 5; PX-281 (Jones Dep. Tr.) 26:3–27:9; PX-289 (Compl.) ¶ 28.  Additionally, Westwood One purchases advertising inventory from local radio stations for resale to advertisers and advertising agencies.  PX-300-1 (Jones Decl.) ¶ 5; PX-281 (Jones Dep. Tr.) 26:20–27:6; PX-289 (Compl.) ¶¶ 10, 28.

57. Westwood One requires national radio ratings data to operate.  PX-300-1 (Jones Decl.) ¶¶ 10–13, 31–45; PX-281 (Jones Dep. Tr.) 76:16–22.  Because Nielsen's Nationwide product is the only option for national radio ratings data, Westwood One needs this product to effectively buy and sell advertising inventory.  *See* PX-300-1 (Jones Decl.) ¶ 37; PX-281 (Jones Dep. Tr.) 77:5–12.  Specifically, without Nationwide, Westwood One will be unable to provide radio ratings data to respond to RFPs from advertisers and advertising agencies, conduct post-buy analyses, among other actions required to sell advertising inventory.  PX-300-1 (Jones Decl.) ¶ 35.

**B.    Nielsen**

58. Nielsen sells local radio ratings data in 242 distinct geographic areas as well as national radio ratings data.  PX-277 (Furchtgott-Roth Expert Report) ¶ 11; PX-300-1 (Jones Decl.) ¶ 9; PX-301-1 (Milner Decl.) ¶¶ 10–11, 25; PX-278 (Orszag Decl.) ¶ 15 (███████████████████ ████████████████████); ECF No. 62 at 4.

59. Nielsen is the only provider of national radio ratings data.  PX-277 (Furchtgott-Roth Expert Report) ¶ 46; PX-300-1 (Jones Decl.) ¶ 7; PX-281 (Jones Dep. Tr.) 311:12–16; PX-266 (Small Decl.) ¶ 3.  Nielsen is the dominant provider of local radio ratings data, facing competition from Eastlan in five local markets in which Cumulus operates a local radio station, and facing only

potential competition from Eastlan in the remaining geographies.  Tr. 60:14–61:2 (Orszag) (Eastlan as only competitor to Nielsen in local radio ratings data); Tr. 93:14–21 (Orszag) (Eastlan as current competitor to Nielsen in five local radio ratings data markets); PX-276 (Furchtgott-Roth Decl.) ¶ 25; PX-301-1 (Milner Decl.) ¶ 11; *see* PX-266 (Small Decl.) ¶¶ 3–4; PX-269 (Declaration of Third Party Broadcaster) ¶ 10; PX-289 (Compl.) ¶¶ 85–87.

60. Nielsen's dominance in the radio ratings space is such that Mr. Jones testified it is the 8,000-pound gorilla in the industry. PX-281 (Jones Dep. Tr.) 87:5–13.

61. Nielsen can unilaterally set prices in both the national radio ratings data and local radio ratings data markets.  *See* PX-300-1 (Jones Decl.) ¶ 15; PX-301-1 (Milner Decl.) ¶ 12.

62. █████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████ PX-279 (Tunkel Dep. Tr.) 9:10–20; *see also* PX-278 (Orszag Decl.) ¶ 16.

63. ███████████████████████████████████████████████████ Tr. 133:14–20 (Tunkel).

## III.    NIELSEN'S ANTICOMPETITIVE POLICIES

64. █████████████████████████████████████████████████████
████████████ PX-279 (Tunkel Dep. Tr.) 23:10-11; PX-16 (NIELSENCMLS00006228) at 2, 12–13, 21; PX-285 (Furchtgott-Roth Dep. Tr.) 81:21–82:2 ("At a very broad level, the American public is listening to less broadcast radio over time, and the demographics are heavily skewed towards people my age as being more likely to listen to broadcast radio than younger people. The decline in listenership translates into less advertising revenue as well."); PX-277 (Furchtgott-Roth Expert Report) ¶ 78–81; PX-278 (Orszag Expert Decl.) ¶ 19.  For example, in San Francisco, CA, the entire radio industry's revenues fell by approximately 31% (from $223 million to $154 million)

from 2018 to 2024.  PX-301-1 (Milner Decl.) ¶ 28.

65. Nielsen's prices for local radio ratings data have continued to increase.  PX-301-1 (Milner Decl.) ¶ 28. *See also* PX-279 (Tunkel Dep. Tr.) 75:8–12 (█████████████████████ ████████████████████████████).

66. Nielsen's value as compared to its price has decreased, and radio broadcasters have sought alternatives to Nielsen.  PX-301-1 (Milner Decl.) ¶ 20; PX-269 (Declaration of Third Party Broadcaster); PX-270 (Declaration of Third Party Broadcaster) ¶ 5 (third-party declarant noting Nielsen does not provide it "with significant value" in diary markets and therefore it has "considered unsubscribing from Nielsen's ratings data in certain Diary markets").

A.    **Subscriber First Policy**

67. In 2022, Nielsen applied its "Subscriber First Policy" to Cumulus, dictating that local radio stations must purchase respondent-level local radio ratings data for the geography in which they are located or else the stations will not appear in any of Nielsen's summary-level local radio ratings data.  PX-287 (Orszag Dep. Tr.) 92:21–94:6; PX-289 (Compl.) ¶ 9; PX-278 (Orszag Expert Decl.) ¶ 20; PX-277 (Furchtgott-Roth Expert Report) ¶ 74.

68. Advertisers and advertising agencies often only purchase summary-level data.  PX-289 ¶ 64.  Because of the Subscriber First Policy, to appear in the summary-level data purchased by advertisers and advertising agencies, local radio stations must subscribe to Nielsen's local radio ratings data.  PX-277 (Furchtgott-Roth Expert Report) ¶ 74; PX-289 (Compl.) ¶¶ 21, 22; PX-301-1 (Milner Decl.) ¶ 22; Tr. 66:13–17 (Orszag).  Nielsen's intent in introducing the Subscriber First Policy was to force local radio stations to subscribe to Nielsen's local radio ratings data and to prevent the stations from exploring Eastlan as an alternative source of local radio ratings data.  PX-289 (Compl.) ¶ 146; PX-277 (Furchtgott-Roth Expert Report) ¶¶ 74–77.

69. The effect of Nielsen's Subscriber First Policy has been that local radio stations that had switched to using Eastlan's local radio ratings data were forced to return to using Nielsen's local data, and that stations that were considering using Eastlan's data could no longer do so.  PX-267 (Gould Decl.) ¶ 23; PX-289 (Compl.) ¶ 21; Tr. 271:15–272:20 (Gould); PX-065 (CUMULUS_0001421) at 1.  Specifically, local radio stations feared that if they used Eastlan's local radio ratings data, they would not appear in Nielsen's summary-level data, which would result in significant lost revenue, as advertisers and advertising agencies typically use summary-level data to make purchasing decisions.  PX-267 (Gould Decl.) ¶ 23.

70. Because the Subscriber First Policy effectively blocks local radio stations from purchasing Eastlan's data, the Subscriber First Policy precludes competition in the local radio ratings data markets.  PX-277 (Furchtgott-Roth Expert Report) ¶¶ 75–77.

### B.    Tying Policy

71. The Tying Policy, also known as the Network Policy or the Challenged Policy, was implemented in September 2024.  PX-182 (CUMULUS 0001672).  It states "if a network or any other type of sales entity owns, manages, operates, or has a sales or operating agreement or other similar business relationship with a local station in a Nielsen-measured market that does not currently subscribe to the local market in that Metro, Nielsen Audio will no longer provide DMA or Metro data in Nielsen's National Regional Database (NRD), Act One, or via any Software Solution Provider (SSP) for that specific market to the network or such other applicable entities." *Id.*; *see also* Tr. 129:16-20 (Tunkel) ("Q. And again, as I think we've established, if a network owns or operates a station in a market but doesn't subscribe to that market's data, the nationwide report would exclude that market, correct? A. That's the new policy, that's right."); Tr. 83:12–16 (Orszag) ("Q. Mr. Orszag, we've talked about the fact that under the tying policy, Cumulus can't choose to drop Nielsen in certain local markets and still get the full national ratings data, right? A.

That is correct."); PX-277 (Furchtgott-Roth Expert Report) ¶ 52.

72. If a national network with common-ownership local radio stations chooses not to subscribe in all local markets where it owns, operates, or has sales relationships with such stations, it will not receive Nationwide; instead, it will only have access to national radio ratings data that is a "different product than they would get if they purchased the local data too" because that product will "exclude[e] any market in which [the subject Network] does not purchase the local data." Tr. 69:16–70:4 (Orszag); Tr. 129:16–130:11 (Tunkel); PX-279 (Tunkel Dep. Tr.) 193:16–20 ███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████; PX-285 (Furchtgott-Roth Dep. Tr.) 210:23–211:8 ("Q. Why is [the Tying Policy] anticompetitive? A. Because it's saying that in order to buy the tying product, in this case the national ratings data, then the vertically-integrated companies have to purchase local ratings data in each market in which they have -- in which they have a radio station. Otherwise, the national ratings data will be Swiss cheese, it will have holes in it for the markets in which they didn't purchase the local ratings data.").

73. National radio ratings data with "holes" would not be a useful product. Tr. 83:2–6 (Orszag) ("Q. Well, if both Mr. Jones and Mr. Tunkel, in this case, agree that the national radio ratings data that Nielsen would sell to Cumulus would not be a useful product, is it your testimony that you're disputing that in this case? A. One way or the other, I'm not."); PX-277 (Furchtgott-Roth Expert Report) ¶ 56. Westwood One cannot survive as the business it is today without access to Nationwide (Nielsen's comprehensive national radio ratings data). PX-300-1 (Jones Decl.) ¶¶ 41–46; PX-281 (Jones Dep. Tr.) 239:3–7 ("And that was the offer where it became clear that there was going to be a Swiss cheese nationwide product that wasn't going to be usable. So that was

never an offer that we could even consider.").

74. Nielsen implemented the Tying Policy to "."  PX-003
(NIELSENCMLS00006364)    at    1;    *see    also*    Tr.    167:21–25    (Tunkel),    PX-005
(NIELSENCMLS00006366) at 2 ("

"); PX-123 (NIELSENCMLS00006375) (

75. Nielsen's Tying Policy expressly ties the purchase of national radio ratings data to the
purchase of local radio ratings data.  PX-285 (Furchtgott-Roth Dep. Tr.) 111:11–16 ("They're
tying access to the national radio ratings data to the purchase of the local radio ratings data. There's
a tying arrangement there. And that's specific in the September policy statement.").  *See also* Tr.
57:4-8 (Orszag) ("Q. And you're not disputing the existence of tying in this case, correct? A. I am
not disputing that question. It's not something I've analyzed as of today. I am assuming it to be
the case and then analyzing that conduct."); Tr. 57:9–12 (Orszag) ("Q. For your work in this case,
you assumed that the September 2024 written policy that's referred to in the complaint as the tying
policy is tying, correct? A. For purposes of my analysis, that is correct.").

76. The Tying Policy directly applies to 12 Nielsen subscribers: iHeartMedia and Premiere,
Cumulus and Westwood One, Audacy, SBS and Aire Network, Entravision and Entravision
Network, TelevisaUnivision and TelevisaUnivision Network, Salem Radio and Salem Radio
Network, ESPN/Disney and Good Karma, La Nueva Network and Costa Media, Urban One and
Reach Media, Educational Media Foundation, and WFMT-FM/Windows on the World.  PX-274

(Tunkel Decl.) ¶ 8; PX. 278 (Orszag Decl.) ¶ 39 n.52. These 12 subscribers ███████████ ███████████      *See* PX-005 (NIELSENCMLS00006366) at 3; PX-253 (iHeartMedia website) at 2; PX-254 (Cumulus website) at 1; PX-255 (Salem Media website) at 1; PX-256 (Spanish Broadcasting website) at 1–3; PX-257 (Entravision website) at 2; PX-258 (Televisa Univision website) at 1; PX-259 (Nueva Network website) at 1; PX-260 (Urban One website) at 4; PX-261 (Educational Media Foundation website) at 1; PX-262 (Window to the World Communications website) at 1; *see also* PX-285 (Furchtgott-Roth Dep. Tr.) 109:17–24 ("But for the dozen or so entities that are vertically integrated into both national radio and local radio, they are now insisting on purchasing all of the markets in which that vertically-integrated company has local radio stations. They're insisting they buy all of the local radio ratings markets in order to have access to the national data."). They also represent tens of thousands more stations who are their network affiliates. *See e.g.*, PX-057 (Cumulus 2024 10-K) at 4 (Cumulus alone has more than 9,500 affiliated stations).

77. ████████████████████████████████████████████████████

*See* PX-005 (NIELSENCMLS00006366) at 3; PX-253 (iHeartMedia website) at 2; PX-254 (Cumulus website) at 1; PX-255 (Salem Media website) at 1; PX-256 (Spanish Broadcasting website) at 1–3; PX-257 (Entravision website) at 2; PX-258 (Televisa Univision website) at 1; PX-259 (Nueva Network website) at 1; PX-260 (Urban One website) at 4; PX-261 (Educational Media Foundation website) at 1; PX-262 (Window to the World Communications website) at 1. For example, in New Orleans, LA, 17 of the 25 total stations are owned by one of these 12 subscribers, and 92% of the revenue is generated by these 17 stations. Tr. 95:22-98:10 (Orszag); PX-287 (Orszag Dep. Tr.) 81:24–82:3, 84:19–85:6; PX-283 (document titled "Local Radio Snapshots-Top 50 Markets").

78. In many of the Top 100 radio markets, the 12 subscribers subject to the Tying Policy comprise over 75% of the radio advertising revenue, including in Houston-Galveston, TX, Stockton, CA, Harrisburg-Lebanon-Carlisle, PA, Memphis, TN, Indianapolis, IN, Los Angeles, CA, Detroit, MI, and San Francisco, CA.  PX-283 (document titled "Local Radio Snapshots-Top 50 Markets"); PX-284 (document titled "Local Radio Snapshots-Snapshots 51-100").

79. Nielsen claims that the Tying Policy is intended to prevent unlicensed data sharing and free-riding.  Tr. 161:11–16 (Tunkel).

80. Under Cumulus's current contract with Nielsen, sharing this data is a breach of contract.  PX-001 (CUMULUS_0002237) at 3 ("For the avoidance of doubt, Westwood One LLC is not permitted to disclose any Nielsen information to any Cumulus affiliate which does not have a license to the same Nielsen information.").

81. Mr. Tunkel, head of Nielsen Audio, testified that he has no evidence Cumulus has ever breached this provision.  Tr. 162:25–163:2 (Tunkel) ("Q.  And you have no evidence that Cumulus ever violated Section 3.1, correct?  A. No."); PX-279 (Tunkel Dep. Tr.) 239:1–240:5.

82. Cumulus's executives similarly have attested they are unaware of any breach.  PX-300-1 (Jones Decl.) ¶¶ 52–54 (Mr. Jones stating that Westwood One has abided by its contractual restrictions); PX-301-1 (Milner Decl.) ¶¶ 34–35 (Mr. Milner stating that Westwood One has abided by its contractual restrictions).

83. ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Tr. 172:6–173:21 (Tunkel); 79:13–16 (Orszag); *see also* Tr. 78:11–18 (Orszag).

84. ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

Tr. 161:13–16 (Tunkel); PX-279 (Tunkel Dep. Tr.) 239:1–240:5.

85. Nielsen's expert admitted that contractual provisions to prevent national networks from sharing Nationwide data with common-ownership local stations "would tend to minimize or tend to attenuate . . . the free riding issue that would arise as an economic issue." Tr. 78:3–5 (Orszag).

86. Nielsen also claims that its Tying Policy is intended to prevent what it calls "free-riding." Tr. 164:19–25 (Tunkel). ████████████████████

████████████████████████████████ PX-278 (Orszag Expert Decl.) ¶ 11. █████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████ PX-278 (Orszag Decl.) ¶ 63.

87. Nielsen has produced no evidence of its cost structure for the production of its local radio ratings or Nationwide products to support its assertion. Tr. 132:12–14, 228:25–229:12 (Tunkel); PX-279 (Tunkel Dep. Tr.) 36:24–37:22; *see also* Tr. 104:14–105:14 (Orszag).

88. Nielsen claims that companies that own both national networks and local stations that buy national radio ratings data but do not buy Nielsen's local radio ratings data for all their local stations are "free riding" by "benefitting from a product that they are not paying for," Tr. 71:19–21 (Orszag), and that there is a free-riding problem "if somebody is benefiting from the national product and not helping to contribute to the creation of that product by purchasing that local data[.]" Tr. 78:7–10 (Orszag).

89. Nielsen has customers that do not own local stations and who only purchase Nationwide. Tr. 163:18–20 (Tunkel). ████████████████████████

████████████████████████████████████████████████████████████

24

███████████████████████████████████████████ Tr. 164:221–25

(Tunkel). ██████████████████████████████████████████████████

████████████████████ PX-279 (Tunkel Dep. Tr.) 50:23–51. ████████████

███████████████████████████████████████████████████████████

██████████ PX-001 (CUMULUS_0002237) at 105; PX-005 (NIELSENCMLS00006366) at 5.

90. ███████████████████████████████████████████████

██████████ Tr. 171:18–172:7 (Tunkel); PX-005 (NIELSENCMLS00006366) at 5.

## IV.  NIELSEN FORCES ITS TYING POLICY ON CUMULUS

### A.  <u>Before The Tying Policy</u>

91. Prior to implementation of the Tying Policy, Cumulus was allowed to pick and choose the local markets it would purchase in its contract with Nielsen while still receiving Nationwide (the complete national radio ratings data product).  Tr. 125:8–21 (Tunkel); PX-302 (Jones Third Decl.) ¶¶ 13, 16; PX-277 (Furchtgott-Roth Expert Report) ¶ 53.

92. In 2022, Cumulus dropped its subscription to local radio ratings data in Memphis, TN, Tr. 125:16–18 (Tunkel), Los Angeles, CA, and five additional diary markets. PX-301-1 (Milner Decl.) ¶ 12.  Cumulus still received Nationwide (the comprehensive national radio ratings data product).  PX-001 (CUMULUS_0002237) at 102.

93. ███████████████████████████████████████████

██████████████████████████████████████████████████████████ PX-302 (Jones Third Decl.) ¶¶ 13–14; PX-189 (CUMULUS 0002342). █████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████ PX-001 (CUMULUS_0002237) at 7, ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ ” PX-189

(CUMULUS_0002342) at 1–2.

94. Mr. Tunkel was not involved in these negotiations, and has no direct knowledge of Nielsen and Cumulus's contracting history prior to 2025. Tr. 126:23–127:15 (Tunkel); PX-279 (Tunkel Dep. Tr.) 62:2–6; 71:23–72:1.

95. ████████████████████████████████████████████████

████████████████████████████████████████████ PX-001

(CUMULUS_0002237) at 7. ████████████████████████████████████

*Id.* at 18–105.

96. Market-by-market pricing is necessary for subscribers to determine if the price of Nielsen's ratings in a specific local market costs more than the revenue it would bring in, or if subscribers should switch to Eastlan's lower cost offering. *See* Tr. 102:2–13 (Orszag); *see also* PX-301 (Milner Suppl. Decl.) ¶¶ 6–7.

97. Cumulus used market-by-market pricing to conclude that ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ Tr. 176:7–23 (Tunkel); PX-005 (NIELSENCMLS00006366) at 7; *see also* PX-301 (Milner Suppl. Decl.) ¶¶ 6–7.

98. Cumulus's 2023-2025 contract ████████████████████████████

████████████████████████████████████████████████████████

████████ PX-044 (CUMULUS_0002431) at 2; PX-001 (CUMULUS_0002237) at 17. ████

████████████████████████████████████ (CUMULUS_0002237) at 17.

**B.**    **Implementation of The Tying Policy**

99.    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

100.    ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

101.    Cumulus simultaneously conducted its own analyses and determined that in a majority of local radio markets, the cost of Nielsen's local radio ratings data was higher than the value Cumulus would receive in revenue.  PX-301 (Milner Suppl. Decl.) ¶ 7.  Cumulus determined that it wanted to obtain current pricing for Nielsen's local radio ratings data in ██ geographies to assess whether to retain or drop those geographies, and drop Nielsen's local products for the remaining local markets.  PX-300-1 (Jones Decl.) ¶ 24; DX18 (CUMULUS_0001487) at -89–90.

*1.    The Explicit Tying Offers*

102.    ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████ PX-277 (Furchtgott-Roth Expert Report) ¶ 55 ("Under these proposals, Cumulus could not purchase the Nationwide product without also purchasing local ratings data for *all* local markets rated by Nielsen in which Cumulus has a local radio station, including those local markets (such as Memphis, TN) in which Cumulus had already stopped purchasing Nielsen's radio ratings data in favor of Eastlan."), *id.* ¶ 57 ("Given the critical role of comprehensive national radio ratings data in attracting national advertisers and building national advertising campaigns, a proposal that provides only incomplete 'national' radio ratings data makes no economic or business sense for Cumulus and its advertisers. As a result, with its July 24 offer, Nielsen, the sole provider of comprehensive national radio ratings data in the United States, would force Cumulus to purchase

███████████████████████████████████████████████████

███████████████████████████ This is a textbook example of anticompetitive economic tying, as Nielsen leverages its monopoly power over comprehensive national radio ratings data (the 'tying' product) to exercise and expand its market power over the more competitive local radio ratings data (the 'tied' product).").

103.     █████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

104.

105.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████

106.    ████████████████████████████████████

███████████████████████████████████████████████

████████

2.    *The Constructive Tying Offers*

107.    ████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

108.    ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

109.    ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

110.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████

111.    ██████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

112.     These three offers were priced such that the Tying Offer was the only commercially reasonable offer when comparing prices on a product-by-product basis.  *See* Tr. 57:18–58:6 (Orszag) ("Q. And as an economist, Mr. Orszag, you're familiar with the economic concept of de facto tying or constructive tying, correct? A. Yes, I am. Q. And de facto tying or constructive tying is the idea that while a tie may not be required by the contract, it is functionally a tie when given the situation in the economics the customer has no other functional choice that would make sense, correct? A. That is a correct description of a de facto tie. Q. And de facto tying or constructive tying is a generally accepted proposition in antitrust economics, right? A. That is correct, and one needs to then analyze that question in forming one's opinion about that."); PX-277 (Furchtgott-Roth Expert Report) ¶ 65 ("█████████████████████████████████████ ████████████████).

113.     ████████████████████████████████████████ ██████████████████████████████ PX-275 (Tunkel Decl. Ex. A) at 2.  This offer was effectively the same as the Tying Offer, and would ████████████ ███████████████████████████████████████████ PX-300 (Jones Suppl. Decl.) ¶ 35; *see also* Tr. 188:9–18 (Tunkel); PX-277 (Furchtgott-Roth Expert Report) ¶ 70 (██████████████████████████████████ ███████████████████████████████████████████ ██████████████████████).

114.     Less than one week later, and after Cumulus filed its Complaint, ██████████████ ████████

████████████████████████████████████████████████████████████████

████████████████████████ PX-275 (Tunkel Decl. Ex. A) at 2. ██████████████████████

████████████████████████████████████████████████████████████████

████████████████████ PX-300 (Jones Suppl. Decl.) ¶ 37.  As a result, this offer ████████████

████████████████████████████████████████████████████████████████

PX-277 (Furchtgott-Roth Expert Report) ¶ 70.  And as discussed *infra*, Cumulus cannot afford this offer.  *See* Section V.B.

115.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ PX-100 (NIELSENCMLS00001438) at 1–2. ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ Tr. 193:18–195:10 (Tunkel).

116.    Cumulus has asked Nielsen for market-by-market pricing at least five times in 2025, starting in August 2025.  Tr. 160:8–161:10 (Tunkel) (testifying Cumulus asked him for individual market-by-market pricing "around" five times); Tr. 127:19–23 (Tunkel) ("Q. Cumulus has asked for market-by-market pricing during the current negotiation, correct? A. Yes. Q. Do you recall how many times? A. I don't recall the number of times."); PX-228 at 1, PX-041 at 1, PX-020 at 1. ████████████████████████████████████████

████████████████████████████ PX-279 (Tunkel Dep. Tr.) 174:10–15; 243:20–24.

117.    ████████████████████████████████████████████████ PX-189 (CUMULUS 0002342) at 1–2.

## V.    HARM THAT WOULD OCCUR ABSENT AN INJUNCTION

### A.    Under the Tying Policy, Cumulus Has No Workable Options

118.    Under Nielsen's Tying Policy, Cumulus faces two alternatives: (a) accept the Tying Policy and purchase both Nationwide ratings and local radio ratings data for all geographies where Cumulus and Nielsen operate; or (b) decline the Tying Policy and lose access to Nationwide ratings and other Nielsen products. PX-300-1 (Jones Decl.) ¶¶ 17–21; PX-281 (Jones Dep. Tr.) 16:18–18:4, 130:1–24, 310:13–311:17.

119.    If Cumulus accepts the Tying Policy, it will be forced into purchasing ratings data in local markets that it does not want and ███████████ PX-300-1 (Jones Decl.) ¶¶ 17–21, 29, 37; PX-302 (Jones Third Decl.) ¶ 10; PX-281 (Jones Dep. Tr.) 130:1–24, 175:25–178:6, 251:15–252:4.

120.    If Cumulus declines the Tying Policy, it will lose access to Nationwide ratings and Nielsen's local radio ratings data in certain geographies. PX-300-1 (Jones Decl.) ¶ 20; PX-300 (Jones Suppl. Decl.) ¶ 31.  Loss of access to ratings data would materially impair Cumulus's ability to compete for advertisers and maintain relationships with customers. PX-300-1 (Jones Decl.) 30–50; PX-281 (Jones Dep. Tr.) 79:24–80:9, 310:17–311:10.

### B.    Cumulus's Financial Condition

121.    Cumulus is in a precarious financial condition.  PX-300 (Jones Suppl. Decl.) ¶ 6; PX-281 (Jones Dep. Tr.) 80:20–21, 226:17–19; 266:13–15, 303:16–19.

122.    Mr. Tunkel, head of Nielsen Audio, has stated "███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████" PX-279 (Tunkel Dep. Tr.) 127:12–24; *see also* Tr. 131:5–132:8 (Tunkel).

123.    Consumers and advertisers have been transitioning away from broadcast radio and toward digital platforms, and Cumulus, a broadcaster, has faced declining revenue as a result.  PX-300 (Jones Suppl. Decl.) ¶¶ 5-6.

124.    Recently, the company's financial condition has drastically declined.  *Id.*  ████████
████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ PX-300-1 (Jones Decl.) ¶¶ 6, 10, 28; PX-082 at 2.  ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████ PX-300-1 (Jones Decl.) ¶ 28.

125.    In May 2025, Cumulus was delisted from NASDAQ because the company could no longer meet NASDAQ's stockholders' equity requirement of at least $10 million.  PX-300 (Jones Suppl. Decl.) ¶ 3. Cumulus's stock is currently trading at around ten cents per share, and its total market capitalization is about $1.75 million.  PX-300 (Jones Suppl. Decl.) ¶ 6.

126.    Cumulus's most recent 10-Q includes "incremental language in the liquidity section … designed to flag for investors that if certain scenarios occur differently than what our latest projections show, that could lead to a material effect on our business and our financials and our liquidity." PX-281 (Jones Dep. Tr.) 104:17–25.

127.    ███████████████████████████████████████████████████████████

███████████████████████████████████████ PX-300 (Jones Suppl. Decl.) ¶ 6.

████████████████████████████████████████████████████████████████████

██████████ PX-281 (Jones Dep. Tr.) 265:7–9; *see also* PX-040 (CUMULUS_0002164).

128.    Cumulus added language in its Q3 2025 Form 10-Q filing addressing the additional risk associated with its maturing debt. *See* DX-9 at 27 ("[I]t is possible that our ability to access the capital and credit markets could be limited at a time when we would like, or need, to do so, which could have an adverse impact on our ability to refinance maturing debt on terms or at times acceptable to us, or at all, and/or react to changing economic and business conditions.").

129.    While Cumulus has engaged in cost-cutting, ███████████████████ ████████████████████████████████████████████ PX-281 (Jones Dep. Tr.) at 287:3– 288:4.

130.    ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

████████████ PX-300 (Jones Supp. Decl.) ¶ 8. ████████████████████

████████████████████████████████████████████████

PX-281 (Jones Dep. Tr.) 285:1–3. ████████████████████

████████████████████████████████████ *Id*. at 287:3– 288:4.

131.    Since 2019, Cumulus has ████████████████████████

██████████████████████████████████████ PX-300 (Jones Suppl. Decl.) ¶ 8. The company has saved over ████████ in the past year alone from these reductions, totaling over ████████ in annualized fixed cost reductions since 2019, or about ████ of its fixed cost base. *Id*.; PX-302 (Jones Third Decl.) ¶¶ 3–4.

132.    Cumulus has ████████████████████████████████

███████████████████████████████ PX-300 (Jones Suppl. Decl.) ¶ 8; PX-302 (Jones Third Decl.) ¶ 5. ███████████████████████████████████████

████████████████████████████████████████████████████████

███████████████ PX-302 (Jones Third Decl.) ¶ 5.

133.    Many remaining categories of costs have a positive net value contribution, meaning that additional cuts in those areas would likely reduce revenues, making the financial picture worse, not better.  PX-281 (Jones Dep. Tr.) 292:11–15.

134.    Cutting budgets for content creation, for example, could affect advertising revenues.  PX-302 (Jones Third Decl.) ¶ 9.

135.    Cumulus's expense base has already been materially reduced. PX-302 (Jones Third Decl.) ¶ 9. But despite aggressive cost-cutting, Cumulus (and the industry writ large) continues to face declining revenues and ████████████. PX-302 (Jones Third Decl.) ¶¶ 8–9. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

*Id*. ████████████████████████████████████████████

████████████████████████████████████ *Id.*; PX-300 (Jones Suppl. Decl.) ¶¶ 6, 12.

136.    Reducing the cost of Nielsen data is necessary for the financial viability of the company. PX-300 (Jones Suppl. Decl.) ¶ 9.  Cumulus's geography-by-geography analysis showed that there are 46 geographies where Cumulus would achieve better financial results if it did not purchase Nielsen in those geographies because Nielsen's prices are significantly higher than the advertising revenue Nielsen's ratings data generate in those geographies.  PX-301 (Milner Suppl. Decl.) ¶ 6.  Cumulus would ultimately be better off by about ████████████ without Nielsen data in

those geographies. *Id.*

137. ████████████████████████████████████████████

████████████████████████████ PX-300 (Jones Suppl. Decl.) ¶¶ 12–14. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ *Id.* ¶¶12–13;

PX-302 (Jones Third Decl.) ¶ 10; *see also* PX-281 (Jones Dep. Tr.) 265:7–15.

138. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████ *Id.*; PX-281 (Jones Dep. Tr.) 262:18–263:9. ████████

████████████ *Id.* ¶ 10. ████████████████████████

████████████████████████████████████████████

████████████████████████████████ PX-300 (Jones Suppl. Decl.) ¶

12; *see also* PX-281 (Jones Dep. Tr.) 265:3–6. ████████

████████████████████████████████████████████

████████████████ PX-300 (Jones Suppl. Decl.) ¶ 10.

139. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ PX-300 (Jones Suppl. Decl.) ¶¶ 6, 10, 11, 13, 14; Pl.'s Opening Demonstrative at 9;

*see also* PX-281 (Jones Dep. Tr.) 79:20–81:3.

140. ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ PX-300 (Jones Suppl. Decl.) ¶¶ 10–11; *see also* Pl.'s

Opening Demonstrative at 9.

141. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████ *Id*. at ¶ 9 ██████████████████████

████████████████████████████████████████████

██████ PX-281 (Jones Dep. Tr.) 288:21–289:1.

142. ████████████████████████████████████████████

██████████████████████████ PX-300 (Jones Suppl. Decl.) ¶¶ 9-11, and 14.

143.     Nielsen's Tying Policy prevents Cumulus from switching to Eastlan for much of

its local radio ratings data.  PX-300 (Jones Suppl. Decl.) ¶¶ 16–18.  By moving to Eastlan, Cumulus

would be able to reduce its expenses significantly, preserving its ability to maintain cash, and avoid

████████████████████████████████████████████

█████████████████████ *Id*. at ¶¶ 9, 16–18; Pl.'s Opening Demonstrative at 9; *see also* PX-

301 (Milner Suppl. Decl.) ¶ 6.

144.     If Cumulus cannot switch to Eastlan, and must continue to buy Nielsen's local radio

ratings data to ensure access to Nationwide, it will be unable to reduce its expenses in the amount

it needs.  PX-300 (Jones Suppl. Decl.) ¶¶ 9, 29; *see also* PX-301 (Milner Suppl. Decl.) ¶ 6.

145.    Alternatively, if Cumulus is unable to buy Nationwide from Nielsen, its revenues will decline as a majority of advertisers refuse to purchase advertising inventory or cancel existing orders from Westwood One.  PX-300-1 (Jones Decl.) ¶ 20, 30–41; PX-300 (Jones Decl.) ¶¶ 31–34; PX-281 (Jones Dep. Tr.) 80:1–15, 103:9–104:3, 310:11–311:17; *see also* PX-285 (Furchtgott-Roth Dep. Tr.) 166:9–17 ("I think some advertisers would drop Westwood One. I think some of the syndicated programming would drop Westwood One, and the advertising it could sell would be at a discount because they wouldn't have nationwide ratings data. A lot of the nationwide advertising market is done through advertising agencies, a lot of which requires ratings data.").

146.    A significant amount of Cumulus's revenue would be impacted.  *See* PX-281 (Jones Dep. Tr.) (noting Westwood One's revenue and podcasting revenue constitutes about █████████ out of █████████ million of Cumulus's total revenue.).

147.    The Tying Policy effectively guarantees ████████████████████████ ██████, regardless of whether Cumulus is forced to buy Nielsen's local radio ratings data in all its geographies or if Westwood One is unable to purchase the Nationwide Product.  PX-300 (Jones Suppl. Decl.) ¶¶ 31–34; *see also* PX-276 (Furchtgott-Roth Expert Report) ¶ 71.

148.    ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████  PX-300 (Jones Suppl. Decl.) ¶ 34; *see also* PX-281 (Jones Dep. Tr.) 301:15–18.  ████████████████████████ ██████████████████████████████████████  PX-300 (Jones Suppl. Decl.) ¶ 34.

149.    ████████████████████████████████████████

███████████████ PX-300 (Jones Suppl. Decl.) ¶ 34.

150.    Although Nielsen acknowledged Cumulus's financial distress, Tr. 131:5–132:8 (Tunkel), its proposed solution was to encourage Cumulus to continue with layoffs and shut down unprofitable stations, (ECF No. 91 at 4–5). ████████████

████████████████████████████ *See* PX-302 (Jones Third Decl.) ¶¶ 3–6.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

*Id*. at ¶¶ 3-6, 9; PX-281 (Jones Dep. Tr.) 292:6–22.

151.    ████████████████████████████████

████████████████████████████████████████

████████████████████████ PX-281 (Jones Dep. Tr.) 309:23–310:3; PX-042 (CUMULUS_0001887). If Westwood One cannot provide advertisers and advertising agencies with advertising proposals supported by the Nationwide data that buyers need and demand, it will lose advertising revenue, ████████████████████████████████████

████████████████████████████████ PX-300 (Jones Suppl. Decl.) ¶¶ 11–14; *see also* Pl.'s Opening Demonstrative at 9.  Cumulus also would lose trusted relationships, which cannot be easily regained.  PX-300 (Jones Suppl. Decl.) ¶ 33.  When advertisers are not satisfied with Cumulus's service, they stop transacting with Cumulus and move their business to other networks or stop buying from network radio altogether.  *Id.*

152.    Any decline in Westwood One's revenue will have a substantial impact on Cumulus's overall business because ████████████████████████████████

████████████████████████████████ PX-300 (Jones Suppl.

Decl.) ¶ 34; *see also* PX-281 (Jones Dep. Tr.) 80:10-15 (███████████████████
███████████████████████████).

153.    Loss of access to Nationwide would also harm Cumulus's local radio stations.  PX-301 (Milner Suppl. Decl.) ¶¶ 22–25.  In addition to the increased financial strain on Cumulus's local radio stations, the loss of Nationwide would likely require local radio stations to syndicate from networks other than Westwood One, which will both increase costs to Cumulus that Cumulus can ill afford and harm Cumulus's ability to syndicate popular programming.  *Id.* ¶¶ 24–25

154.    Cumulus's local radio stations similarly rely on local radio ratings data to operate effectively.  PX-281 (Jones Dep. Tr.) 74:10–23; PX-301-1 (Milner Suppl. Decl.) ¶¶10–11.  In some markets, Cumulus would seek to purchase Nielsen's local radio ratings data.  PX-301-1 (Milner Suppl. Decl.) ¶¶ 27–28. Loss of this ability to purchase Nielsen's local radio ratings in selected markets will further financially harm Cumulus.  *Id.*

### C.    Loss of Market Share, Goodwill, and Customers

155.    Westwood One and Cumulus rely on Nationwide to demonstrate audience reach and other relevant characteristics to advertisers and advertising agencies. Without access to such data, Westwood One would be unable to provide the analyses required by advertisers and agencies, which is essential to maintaining longstanding relationships with advertisers, advertising agencies, syndication partners, and content partners, as well as its market share. PX-300-1 (Jones Decl.) ¶¶ 11, 30–45; PX-277 (Furchtgott-Roth Expert Report) ¶¶ 32, 35, 56, 57, 61.

156.    Specifically, if Westwood One is forced to operate without Nationwide data, it would not be able to communicate to advertisers and advertising agencies the value of its advertising inventory, which will result in a decline in its competitive position and its market share. PX-300-1 (Jones Decl.) ¶¶ 35, 36.  If Westwood One is unable to sell its advertising inventory,

including advertising inventory sold on behalf of content partners, Westwood One will lose programming from content partners, who will turn to national networks that they believe can sell their advertising inventory. *Id*. ¶¶ 33, 40. Crucially, if advertisers, advertising agencies, and content partners are no longer willing to work with Westwood One, its market share and revenue will decline, further limiting Westwood One's ability to compete. *Id*. ¶¶ 36, 39, 10, 42–44, 46.

157.    Many advertising schedules are built on an annual basis, with contracts signed in late 2025 that cover the entirety of 2026. PX-300-1 (Jones Decl.) ¶ 32.  If advertisers and advertising agencies believe that Westwood One will be unable to provide the same national radio ratings data that it has provided in the past, they are all but certain to shift some or all of their advertising inventory purchases to competitors or refrain from purchasing advertising inventory from Westwood One, resulting in an immediate decrease in Westwood One's market share. PX-300-1 (Jones Decl.) ¶ 32; *see* PX-277 (Furchtgott-Roth Expert Report) ¶ 56.

158.    Once Westwood One loses market share to competing networks, regaining it is extremely challenging, as advertisers and advertising agencies are likely to establish working relationships with Westwood One's competitors and become less inclined to switch back. PX-300-1 (Jones Decl.) ¶ 39; *see* PX-277 (Furchtgott-Roth Expert Report) ¶ 56.

159.    Not being able to purchase Nationwide would also severely damage Westwood One's reputation, as it would create a perception that Westwood One is no longer capable of reaching the breadth and depth of audiences that it has in the past. Westwood One's reputation as a network able to reliably reach a substantial breadth and depth of audience is critical to its continued success with advertisers and advertising agencies as well as with recruiting and retaining content partners. PX-300-1 (Jones Decl.) ¶ 41; *see* PX-277 (Furchtgott-Roth Expert Report) ¶ 56.

160.    The loss of market share, goodwill, and customer relationships is not speculative or

remote; it is immediate, concrete, and devastating. PX-300-1 (Jones Decl.) ¶¶ 34, 38, 41–45; *see* PX-277 (Furchtgott-Roth Expert Report) ¶¶ 56, 61.

        **D.**    <u>**Harm to Competition**</u>

     161.    The Tying Policy harms competition.  PX-285 (Furchtgott-Roth Dep. Tr.) 210:16–21 (the September 2024 Tying Policy is "anticompetitive on its face"), 157:2–13 ("[T]he tying policy creates an additional barrier to entry" that "make[s] it very difficult for a local radio station to switch away from Nielsen to Eastlan. But [Eastlan is] a potential entrant. They could enter, but these policies of Nielsen made that much more difficult.").

     162.    Cumulus's expert and former FCC Chairman Dr. Harold Furchtgott-Roth found that "[c]ompetition is harmed because if Cumulus and other companies subject to the [T]ying [P]olicy are forced to purchase Nielsen local radio ratings data, they will likely not purchase local radio ratings data from Eastlan, or any other provider, even if Eastlan (or other provider) represented the best choice."  PX-276 (Furchtgott-Roth Decl.) ¶ 31; PX-277 (Furchtgott-Roth Expert Report) ¶ 58.  He noted that the Tying Policy "has the effect of preventing Eastlan from being purchased in more and larger local markets, gaining acceptance among advertisers and advertising agencies, and becoming a robust competitor to Nielsen."  PX-277 (Furchtgott-Roth Expert Report) ¶ 59.

     163.    ███████████████████████████████████████████
██████████████████████████████████ Tr. 168:8–23 (Tunkel); PX-279 (Tunkel Dep. Tr.) 15:2–12; 83:20–84:21.

     164.    Eastlan has heard from broadcasters that they would prefer Eastlan in certain markets but are worried that they will be unable to purchase Nationwide if they no longer purchase Nielsen's local radio ratings data in that market because of the new Tying Policy.  PX-267 (Gould

Decl.) ¶ 21. The Tying Policy is "limiting" to Eastlan because it "makes it difficult for "broadcasters" to make some of the choices … at a time when money is tough and return on investment becomes even more critical." Tr. 278:24–279:4 (Gould). *See also* Tr. 92:8–22 (Orszag) (stating he has no "basis to dispute" "one way or the other" Eastlan's view that "the policy will make it more difficult to switch to Eastlan in certain local markets.").

165.    That the 12 broadcasters subject to the Tying Policy cannot freely purchase Eastlan's local radio ratings data also makes it difficult for Eastlan to sell its local radio ratings data to smaller broadcasters, because these smaller broadcasters tend to follow the actions of larger broadcasters such as iHeart, Audacy, and Cumulus who are subject to the Tying Policy. Tr. 276:6–280:6 (Gould); *see also* Tr. 288:4–288:7 (Gould) ("So not having access to those three companies [iHeart, Audacy, and Cumulus], because the tying policy is certainly part of it, makes it difficult to grow in local markets and makes us less likely to target a market like that."); PX-277 (Furchtgott-Roth Expert Report) ¶¶ 58–62. This results in harm to competition. *See* Tr. 87:19–88:1 (Orszag) ("[A]s a matter of economic theory," Nielsen's expert agrees that tying harms competition "if a rival is diminished in its ability to compete . . . even when a rival is not completely excluded from the market.")

166.    If a broadcaster is forced to buy Nielsen local radio ratings data as a result of the Tying Policy, it will not buy data from Eastlan because Eastlan is an alternative to Nielsen. Tr. 285:22–286:7 (Gould); PX-287 (Orszag Dep. Tr.) 42:22–43:4 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

167.     Few companies buy both Eastlan and Nielsen data.  *Id.*; *see also* PX-285 (Furchtgott-Roth Dep. Tr.) 128:5–23 ("No one's going to buy multiple sets of ratings data. They're very expensive. They're hundreds of thousands of dollars per local market, and I've seen nothing in the record to indicate that there's any kind of common practice of buying both sets. It's an either/or situation."); PX-285 (Furchtgott-Roth Dep. Tr.) 128:5–13 ("A lot of stations are just barely hanging on, and the cost of radio ratings data in a market, it tends to be at least ███████ or more from Nielsen. If you're a radio station and your total advertising revenue for the year is ███████ or more, you're not likely to be buying one set much less two sets. You have to have a certain size of revenue to be able to afford to buy ratings data."); PX-287 (Orszag Dep. Tr.) 42:11–16 ("████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████").

168.     While Eastlan can theoretically enter any local market with just one customer, the Tying Policy effectively prevents many potential customers in larger markets from using Eastlan, including those largest customers who are most likely to be able to afford local radio ratings data. Tr. 292:15–18 (Gould) ("You've got the large three companies that are tied up with the [T]ying [P]olicy that they can't access. So my opportunity to come into this market is with those smaller companies, and the return on investment isn't there for them."); *see also* Tr. 94:11–16 (Orszag) ("Q. OK. It's not enough for there to be radio stations unaffected by the tying policy, there have to be customers, right? Meaning radio stations who are willing to subscribe to Eastlan's data for Eastlan to enter, right? A. That is correct."); PX-277 (Furchtgott-Roth Expert Report) ¶ 59 (opining that if "Cumulus, and other radio companies, purchased Eastlan data across many larger markets, however, the Eastlan data could gain broader acceptance with advertisers and advertising

agencies" and "Eastlan data would be more valuable and more able to compete with Nielsen more broadly"); PX-287 (Orszag Dep. Tr.) 47:25–48:3 ("██████████████████████████████████████████████████████████████████████████████████"), 104:14–24 (██████████████████████████████████████████████████████████████), 105:2–15 (██████████████████████████████████████████).

169.    For example, in New Orleans, LA, where iHeart, Audacy, and Cumulus (which are subject to the Tying Policy) comprise 92% of the radio advertising revenue in the market, "it's very unlikely that any of these ones that are not among those three would come [to Eastlan] because the advertising revenue isn't there to support it."  Tr. 292:23–294:2 (Gould); PX-283 at 51; *see also* PX-287 (Orszag Dep. Tr.) 76:17–22 ("█████████████████████████████████████████████████████████████████████████████████████"), 88:3–89:16 (████████████████████████████████████████████).

170.    Eastlan frequently assesses whether it can enter a market by determining whether most of the stations in that market are owned by broadcasters subject to the Tying Policy.  *See* Tr. 294:1–7 (Gould).   And there are many other markets such as Cleveland, OH and Houston-Galveston, TX, where these 12 broadcasters own a majority of the radio stations.  PX-283 at 7, 38; *see also* Tr. 101:9–12 (Orszag) ("Each of the radio station groups that are not subject to the tying policy have less than $1 million in total revenue in New Orleans in 2024, correct? A. That is correct."); PX-285 (Furchtgott-Roth Dep. Tr.) 126:12–17 (noting "there are some markets . . . where there's hardly any advertising revenue left after you take iHeart and Cumulus and Audacy and the other vertically-integrated firms out of the market").

171.    Absent the Tying Policy, Cumulus would choose to not purchase Nielsen's local radio ratings data in 46 geographies, and explore purchasing Eastlan's data in some or all of those geographies.  PX-301 (Milner Suppl. Decl.) ¶ 6.  Two of these geographies include San Francisco, CA, and Los Angeles, CA.  PX-055 (showing Los Angeles as a market Cumulus has already dropped and San Francisco as a market Cumulus would like to drop).  Cumulus previously stopped purchasing local radio ratings data from Nielsen in Los Angeles, CA, and would prefer not to be forced to repurchase this data from Nielsen.  PX-301 (Milner Suppl. Decl.) ¶ 5.  Given the option, Cumulus would also prefer to obtain local radio ratings data in San Francisco, CA, from Eastlan. *Id*.

172.    The reduction in competition caused by Nielsen's Tying Policy allows Nielsen to charge higher prices for local radio ratings data, face less pressure to innovate, and provide lower quality products. Nielsen has already failed to make meaningful improvements to its products and has experienced data and service quality issues, including loss of accreditation in several markets and service interruptions. PX-277 (Furchtgott-Roth Expert Report) ¶¶ 60–62; Tr. 59:22–60:1 (Orszag) (testifying that "harm to competition occurs in situations where there is either a reduction in output or an increase in quality adjusted price due to the conduct at issue.")

173.    The Tying Policy also harms competition in the market for national radio ratings data. PX-277 (Furchtgott-Roth Expert Report) ¶¶ 71–73.

174.    Nielsen's Tying Policy prevents other competitors from achieving the scale and industry acceptance needed to develop a viable alternative to Nielsen's Nationwide product. PX-267 (Gould Decl.) ¶¶ 24–25.

175.    In addition, prior to the Tying Policy, Nielsen provided all clients with the same comprehensive national radio ratings data. After the Tying Policy, the quality and completeness

of national ratings data now varies by client: some clients will continue to receive comprehensive data, while others—specifically those who do not subscribe to Nielsen's local ratings in all markets—will receive only a fragmented version with missing markets. PX-277 (Furchtgott-Roth Expert Report) ¶¶ 72–73. As a result, Nielsen will maintain multiple versions of national radio ratings data, which will weaken the overall quality and reliability of the data and will lead to inconsistent information across networks. *Id.*

176.    Nielsen's Subscriber First Policy has also harmed competition. PX-277 (Furchtgott-Roth Expert Report) ¶¶ 74–77. As a result of the Subscriber First Policy, Nielsen's only competitor in providing local radio ratings data, Eastlan, lost existing clients and potential clients. Tr. 271:22–272:7 (Gould). Indeed, the Subscriber First Policy created "fear among some of the clients who had been with us for multiple years about fear of loss on their end, so they made a decision to leave Eastlan and go back to Nielsen." Tr. 271:22–24 (Gould). In fact, Eastlan "had a couple of [strong prospects] as well who made sort of an eleventh-hour decision to switch when the information came out about the subscriber-first policy." Tr. 272:5–7 (Gould); *see also* PX-267 (Gould Decl.) ¶ 23.

177.    Eastlan lost approximately five or six existing customers as result of Subscriber First Policy, as well as a number of other prospects that chose not to engage with Eastlan after the Subscriber First Policy was announced. Tr. 272:17–20 (Gould). Eastlan faces the negative impact of Nielsen's Subscriber First Policy with customers to this day citing the Subscriber First Policy as the reason they cannot engage with Eastlan. Tr. 272:14–24 (Gould).

178.    Eastlan would have expanded into more markets or had more customers in its existing markets if Nielsen had not enacted the Subscriber First Policy. *See* Tr. 276:24–277:2 (Gould).

## PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW

### I.  JURISDICTION AND VENUE ARE PROPER

179.    This Court has jurisdiction over the federal antitrust claims Cumulus alleges under 15 U.S.C. §§ 15, 26 and 28 U.S.C § 1331 (federal question), §1337 (statutes regulating commerce or antitrust), §§ 2201 and 2202 (declaratory judgment).

180.    This Court also has supplemental jurisdiction over Cumulus's state law claims arising under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* pursuant to 28 U.S.C. § 1367 because the facts alleged support antitrust claims under bother federal and California law.

181.    This Court has personal jurisdiction over Nielsen because, on information and belief, Nielsen: (1) purposefully has availed itself of the rights and benefits of the laws of the State of New York, (2) either directly or through intermediaries has conducted, transacted, or solicited business in the State of New York and in this Judicial District, (3) maintains an office in the State of New York and in this Judicial District such that it is continuously and systematically present in New York, or (4) maintains registered agents for service of process in the State of New York and in this Judicial District. *See, e.g.*, *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010) (finding jurisdiction "appropriate in New York" because the defendant "developed and served a market for its products there")

182.    Venue is proper in this Judicial District under 28 U.S.C. § 1391 because Nielsen maintains at least one regular and established place of business in the Judicial District, located at 675 6th Ave New York, NY 10010. Further, Nielsen's anticompetitive conduct has taken place in — and negatively affected the continuous flow of interstate trade and commerce in — the United States.

183.    Antitrust jurisdiction over a defendant is available where the defendant's conduct

either (1) "directly interferes with the flow of goods in the stream of commerce" or (2) "has a substantial effect on interstate commerce." *Hamilton Chapter of Alpha Delta Phi v. Hamilton Coll.*, 128 F.3d 59, 66–67 (2d Cir. 1997) (citation omitted).

## II.    PRELIMINARY INJUNCTION STANDARD

184.    A party may obtain injunctive relief against "threatened loss or damage by a violation of the antitrust laws" under Section 16 of the Clayton Act. *N.Y. ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (quotations and citation omitted). In the Second Circuit, a "party seeking a preliminary injunction must ordinarily establish (1) 'irreparable harm'; (2) 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party'; and (3) 'that a preliminary injunction is in the public interest." *Id.* (citation omitted).

### A.    **The Status Quo**

185.    Preliminary injunctions can be used to preserve the "status quo," which is "the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (quotations and citation omitted).  "In other words, "[t]he 'status quo' in preliminary-injunction parlance is really a 'status quo ante[,]'" which "shuts out defendants seeking shelter under a current 'status quo' precipitated by their wrongdoing." *Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, No. 20-CV-181, 2020 WL 915824, at *8 (S.D.N.Y. Feb. 26, 2020) (citation omitted).  "Preserving the status quo is not confined to ordering the parties to do nothing: it may require parties to take action[.]" *Mastrio*, 768 F.3d at 120–21.

186.    The evidence in this case shows that preserving the status quo means preserving Cumulus's ability to pick and choose which Nielsen products it will buy for its local radio stations (while still receiving Nationwide), as it always had the right to do *before* Nielsen's Tying Policy

stripped away that free choice.  PX-302 (Jones Third Decl.) ¶¶ 13, 16; Tr. 125:8–21 (Tunkel); PX-277 (Furchtgott-Roth Expert Report) ¶ 53.  For example, Cumulus dropped its subscription to local radio ratings data in Memphis, TN, Tr. 125:16–18 (Tunkel), and Los Angeles, CA, in 2022, PX-301 (Milner Suppl. Decl.) ¶ 5, and Cumulus still received Nationwide (the comprehensive national radio ratings data product).  PX-001 (CUMULUS_0002237) at 102.  ███████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ PX-302 (Jones Third Decl.)

¶¶ 13–14; PX-189.  ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ PX-189

(CUMULUS_0002342) at 1–2.

     187.  ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████ Tr. 194:5–195:7 (Tunkel) (emphasis added).

     188.    Where Nielsen "has altered the status quo" and "expos[ed] a plaintiff [Cumulus] to irreparable harm, the prohibitory standard properly applies, and may require that [Nielsen] take action to restore the status quo pending a decision on the merits."  *Williamson v. Maciol*, 839 F. App'x 633, 635 (2d Cir. 2021).  A case previously cited by Nielsen, *Velesaca v. Decker*, demonstrates this point.  ECF No. 39 at 3.  In *Velesaca*, the court found that the plaintiff was

seeking a traditional injunction—not a mandatory one—because even though the injunction would require defendant "to affirmatively change its behavior, this change [was] in essence an injunction *against an aberration* from [prior] policy (and the APA), rather than an injunction mandating some new form of court-conjured behavior." 458 F. Supp. 3d 224, 239–40 (S.D.N.Y. 2020). Here, too, Cumulus is seeking a preliminary injunction "against an aberration" from Nielsen's prior practice of providing Cumulus the price for Nationwide data and the prices for local radio ratings data in each geographic area, and allowing Cumulus to pick and choose which Nielsen products it will buy without being constrained by Nielsen's Tying Policy.

189.    Because Nielsen cannot "seek[] shelter under a current 'status quo' precipitated by [its] wrongdoing" *Gen. Mills, Inc.*, 2020 WL 915824, at *8 (citation omitted), "tak[ing] the products that are in that contract, the prices that are set in that contract, [and] the terms that are set in that contract . . . into the future" is not the proper status quo. Oct. 29 H'rg Tr. 7:12–19. Instead, the status quo is the arrangement that existed between the parties before implementation of Nielsen's Tying Policy. *See Gen. Mills, Inc.*, 2020 WL 915824, at *8 (citation omitted). Thus, maintaining the status quo means putting Cumulus in the position it has always been in when negotiating with Nielsen: knowing the price for Nationwide and the per-market prices for local radio ratings data in each geographic area, so that Cumulus can select which Nielsen products it will buy without being constrained by Nielsen's Tying Policy (or any constructive tying), and allowing Cumulus to purchase products and services on a market-by-market basis as it did before the adoption of the Tying Policy. Cumulus's proposed preliminary injunction puts Cumulus in that "status quo ante" position.

### B. The Mandatory Injunction Standard Is Not Applicable, But Cumulus Meets It Anyway

190.    Nielsen has argued that Cumulus is seeking a mandatory injunction because it is

seeking to alter the status quo but, as discussed above, that is incorrect.  Cumulus is simply seeking to return to the "last actual, peaceable uncontested status" of the contract negotiation process *before* the Tying Policy was put in place, which included market-by-market pricing and the option to pick and choose which Nielsen products Cumulus would buy for its local radio stations.  *See infra* ¶¶ 271–76.

191.    Even if the mandatory injunction standard were to apply, Cumulus satisfies it.  A mandatory injunction is warranted after "a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc*., 60 F.3d 27, 34 (2d Cir. 1995) (citation omitted).

192.    Nielsen does not dispute the terms of the Tying Policy or its market power over the provision of national and local radio ratings data (*see infra* ¶¶ 219, 221–22, 224), and there is ample evidence that "extreme or very serious damage [to Cumulus] will result from a denial of preliminary relief."  *See Tom Doherty Assocs., Inc*., 60 F.3d at 34.

## III.    THE TYING POLICY IRREPARABLY HARMS CUMULUS AND COMPETITION

193.    "[A] *threat* of irreparable harm" and "the 'risk' of deterrence . . . satisf[ies] the irreparable harm standard" in the Second Circuit.  *Mullins v. N.Y.C.*, 626 F.3d 47, 55 (2d Cir. 2010); *see also Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 280 (6th Cir. 2015) ("[the plaintiff] need not suffer harm in order to justify a preliminary injunction, so long as there is a realistic prospect of harm in the immediate future.").

### A.    The Tying Policy Irreparably Harms Cumulus

194.    The law is well-settled that a threat to a ███████████████████████—including the prospect of █████████████████████████████████—constitutes

irreparable harm warranting preliminary injunctive relief. *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989) (████████ is a damage that cannot be rectified by financial compensation); *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp*., 992 F.2d 430, 436 (2d Cir. 1993) ("money damages are inadequate compensation" for a threat to ██████ █████████████); *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 n.3 (2d Cir. 1987) (noting that █████████████████ "would clearly constitute irreparable harm"); *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of N.Y., Inc*., 749 F.2d 124, 125–26 (2d Cir. 1984) (████████████████ representing many years of effort and the livelihood of its . . . owners constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages."); *Sperry Int'l Trade, Inc. v. Gov't of Israel*, 670 F.2d 8, 12 (2d Cir. 1982) (explaining that if ████████████████ ███████████ that justifies injunctive relief); *fuboTV Inc. v. Walt Disney Co*., 745 F. Supp. 3d 109, 149-50 (S.D.N.Y. 2024) ("█████████████████████ ███████████████."), *appeal dismissed*, No. 24-2210, 2025 WL 523263 (2d Cir. Jan. 8, 2025).

195.    The record demonstrates that, absent injunctive relief, Cumulus faces not merely a risk, but the ████████████████████ ██████████████████ Cumulus's financial condition is █████ ████████, as evidenced by a market capitalization of approximately $1.75 million against $876 million in outstanding debt. PX-300 (Jones Suppl. Decl.) ¶ 6.  Its stock has been delisted from NASDAQ, and ████████████████████ ██████████████████ *Id.*; PX-279 (Tunkel Dep. Tr.) 127:12-21 (████████ ████████████████████

██████████).

196. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ PX-300 (Jones Suppl. Decl.) ¶ 10. Despite aggressive cost-cutting measures—

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████ *Id.* ¶ 8–9; PX-302

(Jones Third Decl.) ¶ 9.

197.    Cumulus's independent financial auditors have assessed Cumulus's financial

outlook and explained that they will evaluate the company's EBITDA and revenues, and if

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ *Id.* ¶¶ 6, 11; *see also* PX-281 (Jones Dep. Tr.) 79:20–81:3.

198.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ These savings were to be achieved by

dropping Nielsen's local ratings data in uneconomic markets and replacing them with lower-cost

alternatives such as Eastlan, or by forgoing ratings in certain markets altogether. *Supra* ¶¶ 136–

142; PX-301 (Milner Suppl. Decl.) ¶ 6; PX-285 (Furchtgott-Roth Dep. Tr.) 66:12–20 ("Q. What did Mr. Walker and Mr. Milner tell you about the challenges that Cumulus was facing? A. . . . They described sort of the declining radio, broadcast radio market and the steps they were trying to do to reduce cost, the steps they were trying to do to be a more profitable company. And part of that was finding ways to reduce costs for ratings data.").

199.    Nielsen's Tying Policy, however, renders these savings impossible. Under the policy, Cumulus is required to purchase Nielsen's local ratings data in every market where it owns a station in order to access the indispensable Nationwide product. As a result, Cumulus's largest fixed cost is Nielsen data—over ███████ annually—and it cannot be reduced per Nielsen's new policy, even as Cumulus's revenues continue to decline. *Supra* ¶¶ 118–19, 143.

200.    The consequences of failing to achieve these cost reductions are immediate and catastrophic.  PX-300 (Jones Suppl. Decl.) ¶¶ 10-11.[3] *Supra* ¶ 135–40.

201.    ████████████████████ the loss of market share, goodwill, and customer

---

[3] These circumstances are readily distinguishable from *JBR, Inc. v. Keurig Green Mountain, Inc.* cited by Nielsen. ECF No. 39 at 2. There, the plaintiff's "own sales projections" indicated that its expected sales were going "to be higher" than the prior fiscal year such that the alleged loss of sales was "speculative and remote" and the court noted that customers "that declined to do business had never previously done business with [the plaintiff], and [the plaintiff] provided no evidence suggesting that the loss of these opportunities could have a meaningful impact on its business[,]" and the evidence of the threat to continued business was "sparse." 618 F. App'x 31, 34 (2d Cir. 2015). Here, there is ample evidence of ███████████ That is why *Cramer v. Devon Grp., Inc.*, ECF No. 62 at 15, does not help Nielsen. There, plaintiff's damages were for past injuries so any damage "ha[d] been done." No. 90 CIV. 7748 (PKL) 1990 WL 210306, at *4 (S.D.N.Y. Dec. 12, 1990). Unlike here, there was insufficient evidence the conduct would "push [plaintiff] over the edge." *Id.*

relationships constitutes irreparable harm.  *See Register.com Inc. v. Verio, Inc*., 356 F.3d 393, 404 (2d Cir. 2004); *see also Reuters, Ltd. v. United Press Int'l Inc*., 903 F.2d 904, 907–08 (2d Cir. 1990) ("Yet even a speculative loss may cause immediate irreparable harm to UPI's good will. It is self-evident that newspapers that are furnished with stories and photographs by wire service rely on the services' continuing dependability.").

202.    Injunctive relief is particularly appropriate in cases like this, where it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Register.com, Inc.*, 356 F.3d at 404 (finding that defendant's solicitations of plaintiff's customers caused irreparable harm) (quotations and citation omitted).

203.    The record demonstrates that, without access to Nationwide, Westwood One will lose the ability to provide advertisers and agencies with the ratings data they require, resulting in the loss of longstanding relationships and market share that cannot be recovered by monetary damages. Once lost, these relationships and goodwill are extremely difficult to restore, particularly in a declining industry with shrinking margins. The loss of Nationwide would also undermine Cumulus's ability to attract and retain content partners, further eroding its competitive position and ████████████████████████ *Supra* ¶¶ 155–60; PX-300-1 (Jones Decl.) ¶¶ 33, 40.[4]

204.    The Second Circuit has recognized each of these harms as irreparable.  *See trueEX,*

---

[4] *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, on which Nielsen relies, is inapposite.  ECF No. 39 at 2.  The Second Circuit affirmed the district court's finding that the counter-claimant's theory of reputational harm was "speculative, conclusory, and unsupported by facts in the record" because the evidence did not show that "current and future [counter-claimant] employees came to think less of [counter-claimant] as a result of [the claimant's] actions.  131 F.4th 102, 108 (2d Cir. 2025) (citation omitted).  Here, the evidence shows that Cumulus's prospective reputational harm is the direct result of Nielsen's Tying Policy and being unable to offer Nationwide data that advertisers and content and service providers demand.

*LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 728–29 (S.D.N.Y. 2017) (granting a preliminary injunction where the court found irreparable harm to the plaintiff's "good will and business reputation . . . possibly resulting in a permanent loss of business" where customers suggested they would stop doing business with the plaintiff if it could no longer provide its services); *Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 622–23 (S.D.N.Y. 2010) (finding irreparable harm to a distributor when it would be deprived of "the opportunity to sell an entire line of merchandise" and "incur[red] injury to its goodwill and reputation as a dependable distributor" because customers may "refuse to return to [the distributor], because of [the distributor's] lack of dependability in supplying its product") (citation omitted); *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 444 (2d Cir. 1977) (irreparable harm existed where a contractor would lose access to products from a supplier and the loss of the products would "jeopardize [the contractor's] good will and create a risk of 'immeasurable harm' should [the contractor's] customers and potential customers turn to competitors who do sell [the supplier's] products") (citation omitted); *Reuters Ltd.*, 903 F.2d  at 908 ("interruption [in supply of foreign newspictures] however short the time in a newspaper's coverage of the news causes it to lose readership" and injures reputation and good will, and "an injury of this sort is nearly impossible to value" and thus constitutes irreparable harm).

205.    The harm to Cumulus is not speculative or remote; it is immediate, concrete, and devastating. The law does not require Cumulus to wait for the final blow. The threat is present and real. The record demonstrates that, absent injunctive relief, ███████████████████ ████████████████████████████████████████████████ but also irreparable harm to its relationships, reputation, and ability to compete in the marketplace.

## B.    <u>The Tying Policy Irreparably Harms Competition</u>

206.    Harm to competition is equally irreparable, as anticompetitive behavior like Nielsen's "greatly increase[s] the risk that consumers will be vulnerable to price increases, decreased quality, and decreased options in the market." *fuboTV Inc*., 745 F. Supp. 3d at 150; *see also Schneiderman*, 787 F.3d at 660–61 (policy that precluded generic drugs from competing with brand name drugs could cause "permanent damage to competition" and was an irreparable harm); *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 257–58 (2d Cir. 1989) (finding irreparable harm where competition in the relevant market would be reduced because this type of "threatened injury is precisely the type that the antitrust laws were designed to protect against"), *amended on other grounds*, 890 F.2d 569 (2d Cir. 1989).

207.    Likewise, customers are irreparably harmed when price competition is eliminated, leading to higher prices and profits "at the expense of a large segment of the . . . public." *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc*., 597 F.2d 814, 819 (2d Cir. 1979). And Nielsen's expert agrees that "harm to competition occurs in situations where there is either a reduction in output or an increase in quality adjusted price due to the conduct at issue." Tr. 59:22–60:1 (Orszag).

208.    The Tying Policy inflicts irreparable harm not only on Cumulus, but also on competition itself by requiring customers like Cumulus to purchase Nielsen's local radio ratings data instead of purchasing Eastlan's data of comparable quality at a lower price (*infra* ¶ 213), and distorting the structure of the radio ratings markets and foreclosing meaningful rivalry. Conditioning access to the monopoly Nationwide product on the purchase of local radio ratings data impedes Eastlan and other rivals from competing for the business of the largest and most influential radio groups. *Supra* ¶ 168–69; Tr. 276:24–277:2 (Gould); PX-267 (Gould Decl.) ¶ 21; PX-276 (Furchtgott-Roth Decl.) ¶ 31.

209.    "[A]s a matter of economic theory," Nielsen's expert agrees that tying harms

competition "if a rival is diminished in its ability to compete . . . even when a rival is not completely excluded from the market." Tr. 87:19–88:1 (Orszag). The testimony of Mr. Gould, CEO of Eastlan, Nielsen's only competitor, is especially probative on this point. Mr. Gould explained that the Tying Policy impacts the three largest broadcasters—iHeart, Audacy, and Cumulus. Tr. 277:9–278:5 (Gould). Without the ability to access these companies, Eastlan cannot meaningfully compete or change industry practices. Tr. 277:9–278:5 (Gould) 278:20–24 ("[Y]ou really can't change best practices or standard practices in the industry. So the tying policy is certainly limiting."). As ███████████████████, foreclosure of a lead or sponsoring customer is significant. PX-287 (Orszag Dep. Tr.) 104:14–24 (████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████); PX-287 (Orszag Dep. Tr.) 105:2–15 (████████████
██████████████████████████), 105:24–106:13 ("██████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████").

210.    The harm to competition is not hypothetical. Eastlan's expansion will be severely curtailed if Nielsen enforces its new policy, as the policy makes it more difficult for companies to switch to Eastlan in certain local markets and raises concerns about markets being excluded from the national radio ratings data they must continue purchasing from Nielsen. Tr. 277:9–278:5 (Gould) 287:22–288:12 ("So not having access to [iHeart, Cumulus, and Audacy], because the

tying policy is certainly part of it, makes it difficult to grow in local markets and makes us less likely to target a market like that," and "[i]f we see a market that has those three companies in there, we would be less likely to … open that market … [and] would be more focused on something that didn't have those three companies.").

211.    The competitive harm is not limited to iHeart, Audacy and Cumulus.  The rest of the industry largely follows the actions of these major players. The Tying Policy thus forecloses Eastlan from being purchased in more and larger local markets, gaining acceptance among advertisers and agencies, and becoming a robust competitor to Nielsen.  Tr. 279:10–23 (Gould) ("[t]he other ones that are involved in that, numbers 4 through 12, if you will, are largely going to follow the actions that they see with what the big three do. So the influence on 4 to 12 is there, but it's very unlikely that they would be the ones . . . [i]t's got to be one of those leaders."); PX-285 (Furchtgott-Roth Dep. Tr.) 211:13–212:2 ("No, [the Tying Policy] doesn't affect only Cumulus. It affects all vertically-integrated companies. It also affects the non-vertically integrated companies that will suffer from the loss of competitive alternatives in the local ratings market, and it will affect advertisers because they'll have less efficient alternatives available for ratings data in a local market. The higher prices for local ratings data and ultimately the American consumer suffers because with sort of a shrinking ratings data, alternatives will have less efficient, less innovation in local ratings data."); *see also* PX-285 (Furchtgott-Roth Dep. Tr.) 212:21–213:13 ("Q. Does Nielsen's tying policy impede Eastlan's ability to become a more significant competitor in the local radio ratings data markets? . . . A. It does because potential buyers of the Eastlan data are being tied into buying the Nielsen data because to get the national data, they have to buy the local Nielsen data. And this can have a ripple effect outside of these companies because they -- it means that Eastlan is less likely to enter markets because they're not going to be able to sell to a large

customer such as iHeart and Audacy or Cumulus. And that means that it's less likely to be able to enter markets for other market participants as well.").

212.    Nielsen's argument that there is no irreparable harm because Eastlan is not "totally foreclosed" from the market is both legally and factually incorrect. Antitrust law does not require total foreclosure; substantial foreclosure that hinders a rival's ability to compete is sufficient.  *See Ortho Diagnostic Systems v. Abbott Laboratories*, 920 F. Supp. 455, 472 (S.D.N.Y. 1996); *see also* PX-238 (FTC Statement on Tying) at 1 ("a monopolist may use forced buying or tie in sales to gain sales in other markets where it is not dominant and to make it more difficult for rivals in those markets to obtain sales"). The record demonstrates that the tying policy forecloses Eastlan from competing for business of the largest broadcasters, and that as a result, many markets are not economically viable for Eastlan to serve at scale.  *See* Tr. 287:22–288:12 (Gould); PX-285 (Furchtgott-Roth Dep. Tr.) 122:22–123:3 ("I don't think [Mr. Orszag's] foreclosure analysis is right. I think he's framed it wrong. The issue is not whether all competitors are excluded from the tied markets, but whether there's harm to competition in each local markets [sic]. I don't think his analysis addresses that."); 213:17–214:3 ("Eastlan doesn't have to exit the market in order for competition to be harmed. Tying doesn't -- anticompetitive tying doesn't mean that competitors are excluded entirely from the tied market. It just means that the competition is harmed, there are barriers to entry and they're less likely to be able to attract some of the customers in the market. And that's precisely what's happening with the tying policy that affects the vertically-integrated firms.").

213.    In markets such as New Orleans, iHeart, Audacy and Cumulus—all subject to the tying policy—account for 92% of radio advertising revenue. If those companies accede to the tying policy, Eastlan cannot compete for the business of customers comprising 92% of the revenue in

that market. The remaining stations lack the return on investment to justify purchasing Eastlan's product.  Tr. 292:10–293:6 (Gould) ("[I]t's very unlikely that any of these ones that are not among those three would come because the advertising revenue isn't there to support it.").

214.    The Tying Policy thus deprives Eastlan of the scale, reputation, and acceptance necessary to become a true competitive alternative. Purchasing a second set of local radio ratings data from Eastlan, in addition to Nielsen's, is not financially feasible for radio station owners. The policy deprives Eastlan and other potential competitors of sales and shields Nielsen from actual and potential competition in the local radio ratings data markets.  *See* PX-267 (Gould Decl.) ¶¶ 16, 18–21, 24; *see also* Tr. 292:10–29316–293:27 (Gould) ("You've got the large three companies [iHeart, Audacy, and Cumulus] that are tied up with the tying policy that they can't access. So my opportunity to come into this market is with those smaller companies, and the return on investment isn't there for them. … I would tell him he's nuts to buy from us. So this does amplify the point really well of—yes, we could go into this market with one person. It's very unlikely that any of these ones that are not among those three would come because the advertising revenue isn't there to support it.").

215.    The result is higher prices, reduced innovation, and less accurate ratings for the entire industry. The Tying Policy allows Nielsen to charge supracompetitive prices for local radio ratings data, while facing reduced or no pressure to innovate and invest in product quality. The Tying Policy deprives customers of a lower-cost option, reduces Nielsen's incentive to lower prices or improve quality, and constrains Eastlan's capacity to establish and expand its presence into additional local geographies. *Supra* ¶¶ 165, 172; PX-267 (Gould Decl.) ¶ 17; *see also* Tr. 288:4–288:7 (Gould) ("So not having access to those three companies [iHeart, Audacy, and Cumulus], because the tying policy is certainly part of it, makes it difficult to grow in local markets

and makes us less likely to target a market like that."); PX-277 (Furchtgott-Roth Expert Report) ¶¶ 58–62.

216.    The harm to competition is not speculative or theoretical; it is present, ongoing, and severe. Here, the record demonstrates that Nielsen's Tying Policy has already distorted the market, foreclosed meaningful competition, and a preliminary injunction that requires Cumulus to buy unwanted products or prevents Cumulus from investing in Eastlan would entrench Nielsen's dominance to the detriment of broadcasters, advertisers, and the public at large. *See fuboTV Inc.*, 745 F. Supp. 3d at 150 (finding sufficient showing of irreparable harm where alleged anticompetitive conduct "increase[d] the risk" of "price increases, decreased quality, and decreased options in the market"); *Gen. Mills, Inc.*, 2020 WL 915824, at *8. Such an immediate, concrete, and devastating threat to competition is sufficient to establish irreparable harm. *See Schneiderman*, 787 F.3d at 660–61.

## IV.    CUMULUS IS LIKELY TO SUCCEED ON THE MERITS

### A.    <u>Cumulus Is Likely To Succeed On Its Section 2 Tying Claim</u>

217.    Section 2 of the Sherman Act forbids Nielsen from using anticompetitive conduct to maintain or protect its market power in a relevant market. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). To establish a Section 2 violation, a plaintiff must show "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.*; *see also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir. 1979) ("Even if that power has been legitimately acquired, the monopolist may not wield it to prevent or impede competition.").

### 1.    <u>*Nielsen Does Not Dispute That The Relevant Markets Are Well-Defined*</u>

218.    Cumulus's definition of the relevant antitrust markets—the markets for local radio

ratings data and national radio ratings data—is uncontested by Nielsen.  *See* Tr. 249:4–12 (The Court: "Are defendants challenging the market definition?  MR. BELL: No, we're not."); Tr. 55:25–56:2: (Orszag) ("Q. Now, Mr. Orszag, you are not offering an opinion on market definition, correct? A. That is correct.").  Nielsen also does not dispute the fact that national radio ratings data and local radio ratings data are separate products.  Tr. 56:3–9 (Orszag) ("Q. You're not offering an opinion on whether national radio ratings data and local radio ratings data are separate products, correct? A. That is correct. Q. And you're not disputing the allegation in the complaint that they are separate products, correct? A. One way or the other, I've not analyzed that question.").  "Courts also often look to 'practical indicia' of market boundaries to identify whether two products are economic substitutes and compete within the same antitrust market." *Regeneron Pharm., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). "These indicia can include 'industry or public recognition of the [ ]market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.'" *Regeneron Pharm., Inc.*, 96 F.4th at 339 (citation omitted).  Nationwide and Nielsen's local radio ratings data products are used differently by industry participants, recognized as different products by the industry, are accessed through different platforms, have distinct customers, and have separate prices.  PX-300-1 (Jones Decl.) ¶ 9; PX-301-1 (Milner Decl.) ¶ 10; PX-277 (Furchtgott-Roth Expert Report) ¶¶ 39–41; PX-285 (Furchtgott-Roth Dep. Tr.) 161:13–15.

    *2.*    <u>*Nielsen Admits That It Exercises Market Power in the Relevant Markets*</u>

    219.    Nielsen's status as a monopolist in the national radio ratings data market is unchallenged by Nielsen.  Tr. 56:10–13 (Orszag) (Nielsen's expert is not disputing Nielsen possesses market power in the relevant markets); PX-278 (Orszag Decl.) ¶ 25, PX-277 (Furchtgott-

Roth Expert Report) ¶¶ 46, 49. Nielsen also does not dispute its market power in the local radio ratings data markets at issue in this case. Tr. 56:10–13 (Orszag); *see also* Oct. 29 Hr'g Tr. 24:1–4 (MR. LIPTON: "So all the facts around what the supposed tying policy was, or what market definition is, or market power, all of these really intense antitrust issues are not going to be matters of factual dispute at the PI stage."). Cumulus has shown that Nielsen possesses market power both "directly through evidence of control over prices" and "the exclusion of competition," and indirectly, by showing Nielsen has a "large percentage share of the relevant market" in all of the relevant markets. *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 500 (2d Cir. 2004) (citation omitted); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 225 (S.D.N.Y. 2019).

220. As direct evidence of its market power, Nielsen unilaterally sets prices and has the power to implement policies such as Subscriber First and the Tying Policy to exclude competitors. *Supra* ¶ 61; PX-277 (Furchtgott-Roth Expert Report) ¶ 48. In addition, the Court can "infer [Nielsen's] monopoly power from a high market share after considering relevant market characteristics, which include "the strength of competition," "barriers to entry," and "the nature of the anticompetitive conduct." *Barr Labs. Inc.*, 386 F.3d at 501(citation omitted). "[A] share above 70% is usually strong evidence of monopoly power." *New York v. Actavis, PLC*, No. 14 CIV. 7473, 2014 WL 7015198, at *36 (S.D.N.Y. Dec. 11, 2014) (citation omitted); *see also Maxon Hyundai Mazda v. Carfax, Inc.*, No. 13-CV-2680, 2014 WL 4988268, at *15 (S.D.N.Y. Sep. 29, 2014) (finding that complaint plausibly alleged defendant's monopoly power based on allegation that the defendant's market share in the relevant market was 90%). Because Nielsen is the only provider of national radio ratings data, it possesses monopoly power. PX-300-1 (Jones Decl.) ¶ 7; PX-277 (Furchtgott-Roth Expert Report) ¶¶ 46, 49; PX-281 (Jones Dep. Tr.) 311:12–16.

3.     *Nielsen Has Engaged in Illegal Tying in Violation of Section 2 of the Sherman Act*

   a.     The Tying Policy and Nielsen's Offers Are Explicit Ties

221.    Nielsen's expert admits that tying occurs when "a monopolist may use forced buying or tie in sales to gain sales in other markets where it is not dominant and to make it more difficult for rivals in those markets to obtain sales" (PX-238 (FTC Statement on Tying) at 1; Tr. 59:5–13(Orszag)), and it is undisputed that Nielsen's written Tying Policy amounts to tying: Mr. Tunkel of Nielsen acknowledged that "if a network owns or operates a station in a market but doesn't subscribe to that market's data, the nationwide report would exclude that market[.]"  Tr. 129:16–20 (Tunkel); *see also* PX-277 (Furchtgott-Roth Expert Report) ¶ 52; Tr. 57:4–17 (Orszag) ("Q. And you're not disputing the existence of tying in this case, correct? A. I am not disputing that question. It's not something I've analyzed as of today. I am assuming it to be the case and then analyzing that conduct. Q. For your work in this case, you assumed that the September 2024 written policy that's referred to in the complaint as the tying policy is tying, correct? A. For purposes of my analysis, that is correct. Q. And for purposes of your work in this case, you are assuming that the offers sent to Cumulus by Nielsen between June of 2025 and October of 2025 are also tying, correct? A. I'm making that assumption to conduct my analysis, that is correct.").

222.    Nielsen's expert likewise agrees that "[i]f the seller offering the tied products has sufficient market power in the tying product, these arrangements can violate the antitrust laws," (PX-238 (FTC Statement on Tying) at 1; Tr. 59:13–15 (Orszag)), and it is undisputed that Nielsen is a monopolist that possesses substantial market power in the provision of national radio ratings data. *See* Tr. 56:10–13, 57:4–17 (Orszag); PX-278 (Orszag Decl.) ¶ 25; PX-277 (Furchtgott-Roth Expert Report) ¶¶ 46–49.

223.    Cumulus has demonstrated Nielsen's conduct constitutes illegal tying in violation

of Section 2 of the Sherman Act because it has established there is (1) "a tying and a tied product"; (2) evidence of "actual coercion" by Nielsen to force Cumulus "to accept the tied product"; (3) Nielsen possesses "sufficient economic power" in the market for national radio ratings data "to coerce [Cumulus's] acceptance of the tied product"; (4) "anticompetitive effects" in the market for local radio ratings data; and (5) "the involvement of a 'not insubstantial' amount of interstate commerce" in the market for local radio ratings data. *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1516–17 (2d Cir. 1989) (citation omitted).

224.    Nielsen does not challenge the fact that it is a monopolist in the market for national radio ratings data and possesses substantial market power.  *See* Tr. 56:10–13 (Orszag).  There is also no dispute that the Tying Policy explicitly coerces Cumulus to buy local radio ratings data for all markets in order to get access to Nielsen's Nationwide data.  Tr. 57:4–8 (Orszag) ("Q. And you're not disputing the existence of tying in this case, correct? A. I am not disputing that question. It's not something I've analyzed as of today. I am assuming it to be the case and then analyzing that conduct.").

225.    

PX-300 (Jones Suppl. Decl.) ¶¶ 21, 24(a); PX-277 (Furchtgott-Roth Expert Report) ¶ 54(ii); PX-007 (NIELSENCMLS00000280); PX-275 (Tunkel Decl. Ex. A) at 2–3; *see*  PX-279 (Tunkel Dep. Tr.) 132:24–133:10.

PX-300 (Jones Suppl. Decl.) ¶ 21.



PX-300 (Jones Suppl. Decl.) at 94; PX-277 (Furchtgott-Roth Expert Report) ¶ 55.

226. ██████████████████████████████████████████

████████████████████████ Tr. 184:13–20 (Tunkel); PX-300 (Jones Suppl. Decl.)

¶ 24(b), ██████████████████ PX-277 (Furchtgott-Roth Expert Report) ¶ 54(iii); PX-

281 (Jones Dep. Tr.) 237:25–239:17. ████████████████████████████

██████████████████████████████████ PX-300

(Jones Suppl. Decl.) ¶ 24; PX-277 (Furchtgott-Roth Expert Report) ¶ 54. █████████

████████████████████████████████████████████

█████████████████████████ PX-277 (Furchtgott-Roth

Expert Report) ¶ 55.

227. ██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████ PX-300 (Jones Suppl. Decl.) ¶ 24(c); PX-277 (Furchtgott-Roth

Expert Report) ¶ 54(i); PX-281 (Jones Dep. Tr.) 237:25–239:17; *see* Tr. 181:24–182:1 (Tunkel).

b.    Nielsen's Offers Are Also Constructive Ties

228.    Constructive tying leaves customers with no practical choice but to purchase the

tied product, and is just as coercive as express tying. *See Am. Mfrs. Mut. Ins. Co. v. Am. Broad.*

*Paramount Theatres, Inc.*, 388 F.2d 272, 283 (2d Cir. 1967) (pricing with "the effect of

conditioning the sale of the single product to the sale of the entire package" amounts to unlawful

constructive tying); *see also Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407,

1418 (11th Cir. 1987) ("coercion may be established by showing that the facts and circumstances

surrounding the transaction as a practical matter forced the buyer into purchasing the tied product")
(citation omitted); *Advanced Comput. Servs. of Mich. v. MAI Sys. Corp.*, 845 F. Supp. 356, 368
(E.D. Va. 1994) (even in "the absence of an explicit agreement requiring the purchase as a
condition of the sale, courts will accept proof suggesting any kind of coercion by the seller or
unwillingness to take the second product by the buyer") (citation omitted).[5]

229.    Every Nielsen offer unlawfully coerces Cumulus into buying Nielsen's local radio
ratings data it does not want and excludes competition from Eastlan because they all "ha[ve] the
effect of conditioning the sale of the single product to the sale of the entire package[.]" *Am. Mfrs.
Mut. Ins. Co.*, 388 F.2d at 283 (2d Cir. 1967). While Nielsen claims it has made over eight offers,
each offer was intended to push Cumulus towards purchasing the Tying Offer, or another offer
that compelled the purchase of Nielsen's local radio ratings data in all markets where it and
Cumulus have a presence.   PX-285 (Furchtgott-Roth Dep. Tr.) 215:22–24 (regarding all of the
offers, "[t]hey're all either direct tying policies or de facto tying policies. They reflect the tying
policy").

230.    For example,  so that the only real option for
Cumulus was to succumb to the Tying Offer of Nationwide and all local markets that Nielsen

---

[5] This case is unlike Nielsen's previously-cited case, *Topps Chewing Gum, Inc. v. Major League
Baseball Players Ass'n.   See* ECF No. 39 at 2.   There, the plaintiff could "easily avoid the
irreparable harm" by accepting defendant's offer to negotiate a non-exclusive license on
"commercially [sic] reasonable terms;" such a license would allow the plaintiff to continue
"manufactur[ing] a complete set of baseball trading cards" and "permit others to compete
directly[.]"   641 F. Supp. 1179, 1191–92 (S.D.N.Y. 1986).   Since the imposition of its Tying
Policy, far from commercially reasonable, all of Nielsen's offers to Cumulus have been coercively
priced package deals.   Unlike the defendant in *Topps*, Nielsen's offers would destroy Cumulus's
ability to operate as a business and prevent Eastlan from fairly competing.

proposed in June 2025.  PX-300 (Jones Suppl. Decl.) ¶ 25; PX-285 (Furchtgott-Roth Dep. Tr.) 145:22–24 ███████████████████████████ is just a de facto tie. It makes no sense."), 176:11–177:6 (similar); PX-278 (Orszag Expert Decl.) ¶ 50 ████████

████████████████████████████████████████

███████████████████████);  *see also* PX-287 (Orszag Dep. Tr.) 115:13–21 ("████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████")

231.  ███████████████████████████████

████████████████████████████████████████

███████████████████  PX-275 (Tunkel Decl. Ex. A) at 2; PX 300 (Jones Suppl. Decl.) ¶ 35(b).  ████████████████████████████████

██████  PX-300 (Jones Suppl. Decl.) ¶ 35(b); PX-277 (Furchtgott-Roth Expert Report) ¶ 65(ii) n.122.  Again, the offer effectively forces Cumulus to succumb to the ██████████

██████████████████████  PX-277 (Furchtgott-Roth Expert Report) ¶ 65(ii).

232.  ███████████████████████████████

████████████████████████████████████████

███████████  PX-300 (Jones Suppl. Decl.) ¶ 35(c).  ████████████████

████████████████████████████████████████

████████  *Id.*  ████████████████████████

███████████████████████████████████████████████. PX-277 (Furchtgott-Roth Expert

Report) ¶ 65(iii).

233.    These three offers were priced in such a way that the Tying Offer was the only

commercially reasonable offer when comparing prices on a product-by-product basis.  PX-277

(Furchtgott-Roth Expert Report) ¶ 65(iii) (Cumulus's expert, Dr. Harold Furchtgott-Roth, opining

that "Nielsen does not provide Cumulus with an economically rational option to avoid the tie");

*see also* Tr. 57:18–58:6 (Orszag) ("Q. And as an economist, Mr. Orszag, you're familiar with the

economic concept of de facto tying or constructive tying, correct? A. Yes, I am. Q. And de facto

tying or constructive tying is the idea that while a tie may not be required by the contract, it is

functionally a tie when given the situation in the economics the customer has no other functional

choice that would make sense, correct? A. That is a correct description of a de facto tie. Q. And de

facto tying or constructive tying is a generally accepted proposition in antitrust economics, right?

A. That is correct, and one needs to then analyze that question in forming one's opinion about

that.").

234.    ████████████████████████████████████████████████

████████████████████████████████████████ PX-275 (Tunkel

Decl. Ex. A) at 2.  ██████████████████████████████

████████████████████████████████████████████████

████████    PX-300 (Jones Suppl. Decl.) ¶ 35(d); *see also* Tr. 188:9–18 (Tunkel); PX-277

(Furchtgott-Roth Expert Report) ¶ 70 (Cumulus's expert, Dr. Harold Furchtgott-Roth, opining that

this offer ████████████████████████████████████████

████████████████████████████ "therefore does not undo the anticompetitive effect of the

prior offers").

235. ████████████████████████████████████████████

████████████████████████████████████████████ PX-275 at

2.  But this offer would have ████████████████████████████████

██████████████████████████████ PX-300 (Jones Suppl. Decl.)

¶ 37.  According to Cumulus's expert, Dr. Harold Furchtgott-Roth, this offer similarly █████

███████████████████████████ or "undo the anticompetitive effect of the prior offers."

PX-277 (Furchtgott-Roth Expert Report) ¶ 70. ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

236.    Nielsen tries to excuse its illegal tying practices by suggesting that Cumulus is

receiving ████████████████████ for purchasing Nationwide and multiple local markets

as part of a "bundled price."  ECF No. 62 at 20–21. ████████████████████

████████████████████████████████████████████████

████████████ PX-001 (CUMULUS_0002237) at 17.  It does not change the fact that Nielsen

is engaged in illegal tying and foreclosing competition.  ███████████████████

████████████████ the prices Cumulus would pay Nielsen do not even remotely approximate

the prices Nielsen has offered.  *Supra* ¶ 103–05, 109–11, 113–14 (prices Nielsen has offered); PX-

001 (CUMULUS_0002237) at 17 ████████████████████████).

237. ████████████████████████████████████████████

████████████ PX-287 (Orszag Dep. Tr.) 18:9–23, but Nielsen's unlawful tying conditions

access to an essential product on the purchase of another, leaving customers, like Cumulus, with

no real alternative.  *See supra* ¶¶ 75, 102, 112, 118–20; *see also* PX-277 (Furchtgott-Roth Expert

Report) ¶¶ 63–70 (Cumulus's expert, Dr. Harold Furchtgott-Roth, opining that Nielsen's offers are not a bundled discount because they make "it unprofitable for Cumulus to forego Nielsen's tying" and it "foreclose[s] competition"); PX-285 (Furchtgott-Roth Dep. Tr.) 100:17–22 ("Well, bundling could be anticompetitive if it has the effect of discouraging entry into a market or has the effect of harming competition in a market. That would be one example of where bundling would be anticompetitive.").

238.    Nielsen's conduct is textbook tying, not bundled discounting.  PX-238 (FTC Statement on Tying) at 1 ("[A] monopolist may use forced buying or tie in sales to gain sales in other markets where it is not dominant and to make it more difficult for rivals in those markets to obtain sales. This may limit consumer choice for buyers wanting to purchase one ('tying') product by forcing them to also buy a second ('tied') product as well.  Typically, the tied product may be a less desirable one that the buyer might not purchase unless required to do so or may prefer to get from a different seller."); *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 900 (9th Cir. 2008) ("[o]ne difference between traditional tying by contract and tying via package discounts is that the traditional tying contract typically forces the buyer to accept both products").  "Using monopoly power to boost sales through consumer coercion—as opposed to persuasion—[] constitutes improper conduct."  *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d. 346, 380 n.20 (S.D.N.Y. 2022) (citation omitted).

### 4.    *The Tying Policy Causes Anticompetitive Effects In The Industry*

239.    Evidence that Nielsen's Tying Policy both controls prices and excludes competition is proof of anticompetitive effects as a matter of law.  *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d at 379.  Nielsen's expert agreed that the Tying Policy would have anticompetitive effects if (1) there are separate markets for national radio ratings data and local radio ratings data, which Nielsen concedes in this case, *supra* ¶¶ 19–24; Oct. 29 Hr'g Tr. 24:1–4; (2) Nielsen has

substantial market power in the market for national radio ratings data (the tying product market), which Nielsen also concedes in this case, *supra* ¶¶ 59–61; Oct. 29 Hr'g Tr. 24:1–4; (3) Eastlan is the only actual or potential competitor in the local radio ratings data markets, which Nielsen also concedes, *supra* ¶ 35–36, 42, 44; Oct. 29 Hr'g Tr. 24:1–4; (4) Cumulus has determined that it would like to switch to Eastlan for local radio ratings data but cannot because of the Tying Policy, PX-301 (Milner Suppl. Decl.) ¶ 5; and (5) local radio stations will not switch to Eastlan, either, Tr. 279:24–280:6 (Gould) ("Q. Does the tying policy affect your ability to compete your business from entities who are not subject to the tying policies of broadcasters that don't have a national network? A. Yeah, sure. I think largely for that same reason, with influence coming from top down. This is an industry that has long looked to what happens in the biggest markets to determine what happens in the rest of the country, by and large, particularly on business practices."); PX-285 (Furchtgott-Roth Dep. Tr.) 212:21–213:13 ("Q. Does Nielsen's tying policy impede Eastlan's ability to become a more significant competitor in the local radio ratings data markets? . . . A. "It does because potential buyers of the Eastlan data are being tied into buying the Nielsen data because to get the national data, they have to buy the local Nielsen data. And this can have a ripple effect outside of these companies because they -- it means that Eastlan is less likely to enter markets because they're not going to be able to sell to a large customers such as iHeart and Audacy or Cumulus. And that means that it's less likely to be able to enter markets for other market participants as well."). Each of those conditions is either uncontested by Nielsen, or supported by the evidence.

### 5.    *The Tying Policy Involves A Substantial Amount of Interstate Commerce*

240.    Nielsen has not disputed that the Tying Policy affects a "not insubstantial" amount of interstate commerce.  The baseline for "not insubstantial" is $600,000, which would "clearly meet[] any test of substantiality."  *Gonzalez*, 880 F.2d at 1518 (quotations and citations omitted).

This criterion is easily met, as Nielsen is attempting to force Cumulus to spend ██████████ purchasing Nielsen's local radio ratings data in markets where it would have otherwise chosen to subscribe to Eastlan.  PX-301 (Milner Supp. Decl.) ¶ 6.  In addition, Cumulus is only one of 12 networks subject to this policy.  PX-274 (Tunkel Decl.) ¶ 8.

241.    Cumulus has thus demonstrated Nielsen has engaged in illegal tying by "exploit[ing] [] its control over the tying product [i.e., Nielsen's nationwide radio ratings data] to force [Cumulus and other radio stations] into the purchase of a tied product [i.e., Nielsen's local radio ratings data] that [Cumulus] either did not want at all, or might have preferred to purchase [from Eastlan] on different terms.'"  *Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451, 464 n.9 (1992) (citation omitted).

> ### 6.    *There Is No Evidence To Support Nielsen's Purported Procompetitive Justification*

242.    Because Cumulus establishes a *prima facie* case of anticompetitive effects from illegal tying, Nielsen has the burden to show procompetitive justifications for the conduct. *See Actavis*, 787 F.3d at 652; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 729 F. Supp. 3d 298, 326–27 (E.D.N.Y. 2024); *United States v. Google LLC*, 747 F. Supp. 3d 1, 106 (D.D.C. 2024).  But Nielsen's pre-textual "procompetitive justification" for its Tying Policy has not been borne out by the evidence, *supra* ¶¶ 79–87, or even set forth by Nielsen.  *See* ECF No. 62 (Nielsen's Pre-Hearing brief citing no caselaw or facts on procompetitive justification); ECF No. 91 (same in Nielsen's reply brief); Opening Slide Deck (no argument on procompetitive justification).

243.    Even if Nielsen had established a procompetitive justification, Cumulus can either "rebut those justifications" by showing they are pretextual, *Actavis*, 787 F.3d at 652, or "that a less restrictive alternative exists that achieves the same legitimate competitive benefits." *1-800*

*Contacts, Inc. v. FTC*, 1 F.4th 102, 120–21 (2d Cir. 2021) (citations omitted).  Cumulus has established both.

244.    Nielsen claims that it enacted the Tying Policy to prevent unlicensed data sharing and free riding.  Tr. 161:11–16 (Tunkel).  But there is no evidence to support either justification.

██████████████████████████████████████████████████████████████████████████

PX-001 (CUMULUS_0002237) at 3, and Mr. Tunkel testified that he has no evidence Cumulus has ever breached this provision.  Tr. 162:10–163:9 (Tunkel) ("And you have no evidence that Cumulus ever violated Section 3.1, correct?  A. No."); PX-279 (Tunkel Dep. Tr.) 239:1–240:5.  In fact, when Cumulus wanted to share Nielsen's data with an unlicensed Cumulus affiliate, it sought express permission from Nielsen, to which Nielsen agreed.  Tr. 162:10–163:9 (Tunkel); PX-279 (Tunkel Dep. Tr.) 239:1–240:5.

245.    Nielsen's expert admitted that Nielsen's contractual provision that prevents national networks from sharing Nationwide data with common-ownership local stations "would tend to minimize or tend to attenuate . . . the free riding issue that would arise as an economic issue."  Tr. 78:3–5 (Orszag).

246.    ████████████████████████████████████████████████████████

████████████████████████████████████████████ Tr. 172:6–173:20 (Tunkel); Tr. 78:11–18, 79:13–16 (Orszag).

247.    Cumulus has thus shown that Nielsen's contractual provision is "a less restrictive alternative . . . that achieves the same legitimate competitive benefits" as the Tying Policy.  *See 1-800 Contacts*, 1 F.4th at 120–21.

248.    Nielsen also claims that its Tying Policy is intended to prevent what it calls "free-riding," by which Nielsen means that customers get the benefit of Nationwide without covering

the costs of creating Nationwide by purchasing local data.  Tr. 161:11–16 (Tunkel).  But Nielsen has not offered any evidence regarding the costs associated with developing its Nationwide data product nor has it provided evidence that existing purchases of local data do not cover its costs. *Supra* ¶¶ 86–87; PX-287 (Orszag Dep. Tr.) 190:9–192:8, 199:22–201:8.

249.    Moreover, Nielsen has customers who do not own local stations and who only purchase Nationwide.  Tr. 163:18–20 (Tunkel).



PX-279 (Tunkel Dep. Tr.) 50:23–51; PX-285 (Furchtgott-Roth Dep. Tr.) 131:5–132:4, ████████████████ PX-001 (CUMULUS_0002237) at 105.

250.    If Nielsen is really concerned that not all Nationwide customers contribute to the cost of its creation, Nielsen could raise the price of Nationwide to those networks without any local stations.  Those stations do not buy any local data to support the cost of Nationwide and yet they are charged far less for Nationwide than Cumulus.  *Supra* ¶¶ 89, 249.  Charging more to these customers would be less restrictive on competition than the Tying Policy.

251.    Nielsen's argument that the Tying Policy ensures that networks pay for the cost of Nationwide by purchasing local radio ratings data is belied by the testimony of Rich Tunkel, Director of Nielsen Audio.  ████████████████

████████████████

████████████████ Tr. 184: 21–185:6 (Tunkel).  ████████████████

serves to prevent Cumulus from using Eastlan in those markets, making it harder for Eastlan to grow, demonstrating that the "free-riding" justification is merely a pretext for Nielsen's unlawful conduct.  *Supra* ¶ 103.

252.    ███████████████████████████████████████████

██████████████████████████ PX-278 (Orszag Decl.) ¶ 12, but he conducted no analysis of

Nielsen's prices or costs to support this justification, Tr. 106:5–10 (Orszag).  He also admitted that

price discrimination can occur without tying, Tr. 105:25–106:1 (Orszag), meaning that the Tying

Policy is not needed to achieve any supposed benefits from any price discrimination.

253.    Instead, the actual purpose of Nielsen's Tying Policy is clear.  ████████████



█████████████████████████████████████████████ PX-016

(NIELSENCMLS00006228) at 2, 23; PX-118 (NIELSENCMLS00006009).

254.    ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████ *See, e.g.*, *Actavis*, 787 F.3d at 658 (finding documents noting they needed

to protect their revenue streams that resulted in a tie to be evidence of pretext); *see also Image

Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1213-14 (9th Cir. 1997) (finding as here, that

the defendant only adopted its anticompetitive policy after a competitor won a contract and

customers preferred the competitor were evidence of pretext).

       *7.*    <u>*The Duty-to-Deal Doctrine Does Not Apply*</u>

255.    In its opening argument, Nielsen attempted to deflect attention from its unlawful

tying by arguing that "businesses are free to choose the parties with whom they will deal as well

as the prices, terms, and conditions of that dealing."  Tr. 41:14–16 (Nielsen's opening argument).

But Nielsen's cited case makes clear this principle applies to dealings with *competitors*; not

customers.  *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450–51 (2009) ("if

a firm has no antitrust duty to deal with its competitors at wholesale, it certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous. . . . [A] firm . . . has no obligation to deal under terms and conditions favorable to its competitors").[6]  Likewise, Nielsen argued "there is no such thing as an antitrust claim that prices are too high."  Tr. 41:20–21 (Nielsen's opening argument).  But Cumulus is bringing a claim against Nielsen's unlawful tying, not its high prices.  And tying is a textbook antitrust violation.  *See* PX-238 (FTC Statement on Tying) at 1.

**B.**      **Cumulus Is Likely To Succeed On Its Section 2 Course of Conduct Claim**

256.     Nielsen's Tying Policy is just the most recent example of Nielsen's exclusionary conduct that violates Section 2 of the Sherman Act.  Since the implementation of Nielsen's Subscriber First Policy, Nielsen has instituted various policies to exclude Eastlan.  *Supra* ¶ 68. "[A]ggregation is appropriate" when individual acts are all "part of the same scheme to perpetuate dominance or drive [a competitor] from the market."  *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024).  Together, Nielsen's actions collectively have anticompetitive effects, and themselves constitute a violation of Section 2.  *See Reiss v. Audible, Inc.*, No. 1:24-CV-05923, 2025 WL 1654643, at *7 (S.D.N.Y. June 11, 2025) (finding different instances of anticompetitive conduct, "which do not fit neatly into 'court-made subcategories . . . of conduct'" collectively had anticompetitive effect).[7]

---

[6] Although Nielsen did not argue that Cumulus failed to plead antitrust injury in its opening argument, Cumulus previously explained that *Brunswick* does not apply because the alleged injuries there stemmed from *increased* competition, whereas Cumulus has shown that it is injured because Nielsen's unlawful Tying Policy *reduces* competition from Eastlan and prevents radio stations from freely choosing where they want to purchase local radio ratings data.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977); *see also* PX-293 (Plaintiff's Reply Brief) at 9.  That is exactly "the type of injury that the antitrust laws were intended to prevent[.]" *Brunswick Corp.*, 429 U.S. at 489.

### C.    Cumulus Is Likely To Succeed On Its Unfair Competition Law claim

257.    Nielsen's Tying Policy is both "unlawful" and "unfair" under California's Unfair Competition law ("UCL").[8]    *See* Cal. Bus. & Prof. Code § 17200; *see also id.* § 17203 ("Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction.").

258.    Nielsen's Tying Policy is "unlawful" under the UCL if it violates any other law. *See Chabner v. United Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000). Thus, Nielsen's violations of Section 2 of the Sherman Act for unlawfully monopolizing both the National Radio Ratings Data Market and Local Radio Ratings Data Markets also establish a violation of the UCL.

259.    Nielsen's Tying Policy is also "unfair" under the UCL because it "violates the policy or spirit of" the antitrust laws and significantly harms competition. *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999). Here, networks like Westwood One need Nielsen's Nationwide product to operate their business.  As a result, Nielsen's Tying Policy is "unfair" because it forces local radio stations, such as Cumulus's local radio stations in California, to subscribe to Nielsen's overpriced local radio ratings data to maintain access to Nielsen's Nationwide product—and thereby prevents Eastlan from fair competition. *Supra* ¶¶ 74, 75, 161–62.

## V.    THE BALANCE OF HARDSHIPS FAVOR AN INJUNCTION

260.    "[T]he balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Goldman, Sachs & Co.*

---

[7] Nielsen has not contested Cumulus's claim that Nielsen's course of conduct is anticompetitive. PX-290 (Plaintiff's PI Brief) at 19.

[8] Nielsen has also not contested Cumulus's claim that Nielsen's actions violate the UCL.  PX-290 (Plaintiff's PI Brief) at 19–20.

*v. Golden Empire Schs. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) (citation omitted),

*aff'd*, 764 F.3d 210 (2d Cir. 2014).

261.     *Supra* ¶ 139–40; PX-285 (Furchtgott-Roth Dep. Tr.) 189:7–11

Its requested

relief stops Nielsen's anticompetitive behavior while protecting Cumulus's ability to survive.

262.    By contrast, Nielsen will suffer no harm from the issuance of Cumulus's requested

preliminary injunction.  Nielsen claims it will be harmed by an injunction because "

"

ECF No. 91 at 8.  But no one is proposing                    To the contrary,

Cumulus merely requests that the Court enjoin Nielsen's use of the Tying Policy, and has presented

two common-sense proposals for how such an injunction can be implemented, consistent with how

the parties

See supra* ¶ 115.  Either of Cumulus's proposals could be implemented without

oversight by the Court if Nielsen negotiates in good faith and consistent with prior practices.  *See*

*infra* ¶¶ 274–76.

263.    In any event, Nielsen having to face the consequences of its anticompetitive

conduct is not harm to Nielsen.  Indeed, the cost of an injunction "is a cost that [Nielsen] chose to

bear" when it enacted an unlawful policy.  *Yang v. Kosinski*, 960 F.3d 119, 136 (2d Cir. 2020)

(affirming preliminary injunction and noting that "the balance struck by the District Court between various competing interests promotes, rather than undermines, the public interest.").  Moreover, Cumulus and the other affected broadcasters are the intended victims of Nielsen's policy.  Under Nielsen's view of the law, the very market participants injured by Nielsen's conduct would have no recourse.  ECF No. 62 at 24.  That is not—and has never been—the law.  *See Crimpers Promotions Inc. v. Home Box Off., Inc.*, 724 F.2d 290, 296 (2d Cir. 1983) (emphasizing Sherman Act's "central interest in protecting the economic freedom of participants in the relevant market") (citation omitted).

264.    There is also no support for Nielsen's speculation that granting Cumulus's requested relief will cause a ████████████████████████████████████████ ████████████████████████████████████ ECF No. 91 at 8.  ████████████████ ████████████████████████████ Tr. 133:14–20 (Tunkel), and Nielsen has offered no evidence of its cost structure for the production of its local radio ratings or Nationwide products to determine the impact, if any, on its business.  Tr. 132:12–14 (Tunkel); Tr. 104:14–105:14 (Orszag); PX-279 (Tunkel Dep. Tr.) 36:24–37:22.

265.    The balance of hardships favors Cumulus—not Nielsen.  Accepting either of Cumulus's proposals for injunctive relief would provide Nielsen with ██████ in annual revenue. PX-300-4 (Jones Suppl. Decl.).  Nielsen's previously cited case, *Snecma v. Turbine Eng. Comp. Techs. Corp.*, supports this point (ECF No. 39 at 2).  In *Snecma*, the court denied a preliminary injunction because it found it was "relatively easy for [the plaintiff] to absorb" any financial hardships from not granting the preliminary injunction, so the balance of hardships did not weigh in the plaintiff's favor.  531 F. Supp. 2d 354, 359 (N.D.N.Y. 2008).  The opposite is true here: Cumulus cannot absorb the financial hardship caused by the continuation of the Tying Policy or

continuing to pay Nielsen for products that do not bring in revenue in excess of their cost, whereas Nielsen would affirmatively benefit from Cumulus's proposals.[9]

266.    As discussed above, because there is also evidence that "substantial harm to competition . . . is likely to arise," *supra* ¶¶ 161–78, the hardships further weigh in favor of an injunction.  *See FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 400 (S.D.N.Y. 2024) (noting that "to the extent the transaction will generate any procompetitive benefits . . . they cannot overcome the substantial harm to competition that the [plaintiff] has shown is likely to arise").

## VI.    AN INJUNCTION SERVES THE PUBLIC INTEREST

267.    The Court must ensure that "the public interest would not be disserved by the issuance of a preliminary injunction."  *fuboTV Inc.*, 745 F. Supp. 3d at 151 (citation omitted).

268.    Here, broadcast radio provides critical information for communities, and is particularly effective at reaching individuals with limited or no internet access with public service announcements, public safety and weather alerts, news broadcasts, and more.  Preventing the destabilization of a national communications provider is squarely in the public interest.[10]  *Cf. Barnstead Broad. Corp. v. Offshore Broad. Corp.*, 865 F. Supp. 2, 8 (D.D.C. 1994) (public interest is served by the presence of more television stations).

269.    Preventing Nielsen from profiting "from its own wrongdoing" is also in the public

---

[9] For this reason, *SG Cowen Sec. Corp. v. Messih*, does not help Nielsen.  There, the preliminary injunction would have prevented the defendant "from working as an investment banker," causing substantial lost business.  224 F.3d 79, 84 (2d Cir. 2000).  By contrast, here, Nielsen will still net millions of dollars in annual revenue.

[10] Members of Congress have also introduced legislation to ensure that broadcast radio continues to remain accessible because "AM radio is a lifeline for people across the country for news, sports, and especially emergency information." *See* Press Release, Sen. Ed. Markey, Senators Markey and Cruz Reintroduce Bill to Keep AM Radio in new Vehicles (Jan. 29, 2025), available at: https://www.markey.senate.gov/news/press-releases/senators-markey-and-cruz-reintroduce-bill-to-keep-am-radio-in-new-vehicles.

interest.  *Barnstead Broad. Corp.*, 865 F. Supp. at 8.  "'[I]njunctive relief serves as [the] most effective weapon in the enforcement' of [the antitrust] laws[.]"  *Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687, 699 (2d Cir. 1973).  Nielsen's argument that "allowing the parties the freedom to contract without judicial intervention would serve 'a well-recognized 'public interest in enforcing contracts,'" ECF No. 91 at 10, fails to acknowledge that "[t]he public has an interest in enforcement of the antitrust laws and in the preservation of competition.'" *trueEX, LLC*, 266 F. Supp. 3d at 726; *see also United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412, 434 (S.D.N.Y. 1980) ("Far more important than the interests of either the defendants or the existing industry . . . is the public's interest in enforcement of the antitrust laws and in the preservation of competition."). And the evidence shows that Nielsen's anticompetitive policies harm competition. *Supra* ¶¶ 176–78.

270.    Because Cumulus has shown a likelihood of success in demonstrating that Nielsen's monopolistic conduct, including its Tying Policy, violates Section 2 of the Sherman Act, as well as the UCL, and harms competition, "the threatened injury to the public interest weighs heavily" in favor of a preliminary injunction.  *Grumman Corp. v. LTV Corp.*, 527 F. Supp. 86, 105 (E.D.N.Y. 1981), *aff'd*, 665 F.2d 10 (2d Cir. 1981).

## VII.    CUMULUS'S REQUESTED RELIEF PRESERVES THE STATUS QUO AND PROTECTS ITS VIABILITY

271.    "The Supreme Court has consistently recognized that the purpose of relief in an antitrust case is so far as practicable, to cure the ill effects of the illegal conduct, and assure the public freedom from its continuance." *Paschall v. Kansas City Star Co.*, 695 F.2d 322, 335 (8th Cir. 1982) (cleaned up).  "The district court has both the duty and the authority to fashion relief that terminates the illegal acts of monopolization, that ensures that they do not recur and that eliminates their consequences." *Id.* (citations omitted).

272.    Here, Cumulus's requested relief "cure[s] the ill effects of [Nielsen's] illegal conduct, and assure[s] the public freedom from its continuance." *United States v. Glaxo Grp. Ltd.*, 410 U.S. 52, 64 (1973) (citation omitted).  An order requiring Nielsen to provide Cumulus both Nationwide and local radio ratings data products in geographies that make sense for Cumulus at the current contract rates—or alternatively—to negotiate with Cumulus in good faith at reasonable rates without the Tying Policy and consistent with past practice, is neither extreme nor unprecedented, as Nielsen suggests.  ECF No. 91 at 1.

273.    An order requiring reasonable rates is consistent with injunctive relief ordered in other antitrust cases and cases more broadly.  *See, e.g.*, *Glaxo Grp. Ltd.*, 410 U.S. at 64 (reversing district court's refusal to order "[m]andatory selling on specified terms . . . at reasonable charges [because they] are recognized antitrust remedies"); *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 951 (9th Cir. 2025) (affirming district court's decision to mandate a "reasonable fee" at "the right price level to ensure the pro-competitive function of the app-store distribution remedy[]"); *Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n*, 736 F.2d 441, 445 (8th Cir. 1984) ("it was clearly within the district court's authority as a court of equity to fashion a remedial decree which would go beyond a mere proscription against the invalid tying arrangement and which would fit the exigencies of this particular case" because "'it is desirable, in the interests of the court and of both litigants, that the decree [in an antitrust case] be as specific as possible, not only in the core of its relief, but in its outward limits, so that parties may know their duties and unintended contempts may not occur'" and further explaining that "it was incumbent upon the district court to fashion an order which would . . . effectively open to competition the market that had been closed by the cemeteries' illegal restraints [*i.e.,* illegal tying]" and permitting a cemetery to "charge a fee based on its actual labor costs" as a "fair accommodation" because "the

anticompetitive effect of charging . . . similar costs should be minimal"); *Paschall*, 695 F.2d at 335 (affirming the district court's entry of "a broader permanent injunction" that "provide[d] sufficient supervision to effectively enforce its decree" because "those caught violating the [Sherman] Act must expect some fencing in") (quoting *Otter Tail Power Co. v. United States,* 410 U.S. 366, 381 (1973)); *Zurn Constructors, Inc. v. B.F. Goodrich Co.*, 685 F. Supp. 1172, 1186–87 (D. Kan. 1988) ("we will take the liberty of modifying the 1982 contract's quantity terms for the remainder of 1988" and further ordering the defendant to "supply a minimum of six (6) and a maximum of eight (8) standard railcars of PVC compound per month, dependent upon [the] plaintiff's needs" in light of a product shortage and further ordered "both parties [to] negotiate prices in good faith.").

274.    Nielsen's proposal—████████████████████████████ ████████████████████████████████████ Oct. 29 Hr'g Tr. 7:11–16—is improper.[11]   That proposal keeps Cumulus paying a huge sum to Nielsen that Cumulus cannot afford—████████████████—while the litigation proceeds for several years, and prevents Cumulus from switching to Eastlan during that time period.   Nielsen's proposal therefore perpetuates Nielsen's market power, rewards it for adopting an anti-competitive policy that harms competition and forecloses opportunities for a willing and able competitor, like Eastlan, and imperils Cumulus's future.

275.    By contrast, Cumulus's proposal that Nielsen provide both Nationwide and local radio ratings data in selected geographies at the current contract rates differs from Nielsen's

---

[11] Nielsen's previously-cited case, *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, ECF No. 62 at 9, supports Cumulus's position.  There, the Second Circuit reiterated that "we are inclined to 'shut[] out defendants seeking shelter under a current 'status quo' precipitated by their [own] []doing" because "such a status quo could not be viewed as either 'peaceable' or 'uncontested.'"  96 F.4th 351, 357 n.5 (2d Cir. 2024) (citations omitted).

proposal in only one key respect: it allows Cumulus to choose Eastlan in select markets, protecting competition and enabling Cumulus to cut costs.  Alternatively, the Court could also order Nielsen to immediately negotiate with Cumulus in good faith, without the Tying Policy, at reasonable rates, consistent with past practice.  Either formulation would prevent Nielsen from implementing its unlawful Tying Policy, and would therefore preserve the status quo ante, *i.e.,* the world before Nielsen's Tying Policy where Cumulus was free to pick and choose the local data it wanted without imperiling its access to Nationwide.

276.    Cumulus's request to enjoin Nielsen from implementing its Tying Policy is "a reasonable method of eliminating the consequences of [Nielsen's] illegal conduct."  *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 698 (1978).  It can be implemented in at least one of two ways, both of which are reasonable and consistent with case law.  *Supra* ¶ 272.  The Court could require Nielsen to provide Cumulus both Nationwide and local radio ratings data products in selected geographies at the current contract rates.  Alternatively, the Court could require Nielsen to immediately negotiate with Cumulus in good faith, at reasonable rates without the Tying Policy and consistent with past practice.  Either approach would avoid the harms from Nielsen's Tying Policy and be easily administrable.  Indeed, the first approach requires no court oversight at all. The second also requires no oversight, assuming Nielsen negotiates in good faith.  *Supra* ¶ 272.

### CONCLUSION

277.    The evidence demonstrates that Cumulus has suffered irreparable harm and will continue to do so absent an injunction; that it will likely succeed on the merits of its Section 2 and UCL claims; that the balance of hardships decidedly tips in Cumulus's favor; and the public interest would be served by an injunction.  The Court therefore should grant Cumulus's motion.

278.    Nielsen should be enjoined from imposing any tie or constructive tie in connection with the provision of national radio ratings data, including the required purchase of local radio

ratings data, in any negotiation regarding these products; Nielsen should be ordered to provide Cumulus with Nationwide and local radio ratings data in markets selected by Cumulus, at current contract rates, or alternatively, Nielsen should be ordered to immediately negotiate with Cumulus in good faith, without the Tying Policy, at reasonable rates, consistent with past practice; and Nielsen should be prohibited from engaging in any retaliatory conduct in connection with this litigation, pending a trial on the merits and resolution of this action.

Dated: December 18, 2025

Respectfully submitted,

*/s/ Jennifer Fleury*

Jennifer Fleury (*pro hac vice admitted*)
Charles Loughlin (*pro hac vice admitted*)
Jamie Lee (*pro hac vice admitted*)
Alisa Lu (*pro hac vice admitted*)
Ashley Ifeadike (*pro hac vice admitted*)
Tianyu Dong (*pro hac vice admitted*)
Jonathan Sussler (*pro hac vice admitted*)
Cori Ast (*pro hac vice admitted*)
Ilana Kattan (*pro hac vice admitted*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
jennifer.fleury@hoganlovells.com
chuck.loughlin@hoganlovells.com
jamie.lee@hoganlovells.com
alisa.lu@hoganlovells.com
ashley.ifeadike@hoganlovells.com
tianyujohn.dong@hoganlovells.com
jonathan.sussler@hoganlovells.com
cori.ast@hoganlovells.com
ilana.kattan@hoganlovells.com

Claude G. Szyfer
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, N.Y. 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
claude.szyfer@hoganlovells.com

*Counsel for Plaintiff*
*Cumulus Media New Holdings Inc.*