**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- X:

CUMULUS MEDIA NEW HOLDINGS
INC.,

                Plaintiff,

      -against-

THE NIELSEN COMPANY (US) LLC,

         Defendant.

-------------------------------------------------- X

Case No.: 1:25-cv-08581 (JAV)

**DEFENDANT NIELSEN'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

GIBSON, DUNN & CRUTCHER LLP

Jefferson E. Bell
Kathryn N. Salvaggio
200 Park Avenue
New York, NY 10166
Telephone:    (212) 351-4000

Josh Lipton (admitted *pro hac vice*)
1700 M Street, N.W.
Washington, D.C.  20036-5306
Telephone:    (202) 955-8500

Samuel Liversidge (admitted *pro hac vice*)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:    (213) 229-7000

Scott K. Hvidt (admitted *pro hac vice*)
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone:    (214) 698-3100

*Attorneys for The Nielsen Company (US), LLC*

**TABLE OF CONTENTS**

DEFENDANT'S PROPOSED FINDINGS OF FACT ................................................................ 5

I.      NIELSEN'S AUDIO BUSINESS ............................................................................................ 5

II.     NIELSEN'S NETWORK POLICY ........................................................................................ 9

III.    ALTERNATIVES TO NIELSEN DATA ............................................................................ 16

IV.     CUMULUS'S BUSINESS ................................................................................................... 20

V.      THE 2023 CONTRACT BETWEEN CUMULUS AND NIELSEN ................................... 21

VI.     NEGOTIATION OF A NEW CONTRACT ........................................................................ 23

VII.    THREAT OF FINANCIAL RUIN ....................................................................................... 37

VIII.   CUMULUS'S CLAIM OF REPUTATIONAL HARM ...................................................... 44

IX.     CUMULUS'S CLAIM OF REDUCED MARKET SHARE ............................................... 46

X.      CUMULUS'S CLAIM OF HARM TO COMPETITION ................................................... 47

XI.     THE REQUESTED RELIEF ............................................................................................... 51

DEFENDANT'S PROPOSED CONCLUSIONS OF LAW .......................................................... 54

I.      THE PRELIMINARY INJUNCTION STANDARD .......................................................... 54

II.     CUMULUS HAS NOT DEMONSTRATED AN ACTUAL AND IMMINENT THREAT
OF IRREPARABLE HARM ......................................................................................................... 56

III.    CUMULUS IS UNLIKELY TO SUCCEED ON THE MERITS ....................................... 72

IV.     THE BALANCE OF EQUITIES FAVORS NIELSEN ...................................................... 86

V.      THE PUBLIC INTEREST DISFAVORS FORCING NIELSEN INTO A CONTRACT
AGAINST ITS WILL ................................................................................................................... 88

VI.     CUMULUS'S REQUESTED RELIEF IS INAPPROPRIATE AND UNLAWFUL ........ 89

CONCLUSION ............................................................................................................................. 96

## TABLE OF AUTHORITIES

### Cases

*Advance-Rumely Thresher Co. v. Jackson*,
   287 U.S. 283 (1932) ........................................................................88

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   836 F.3d 1171 (9th Cir. 2016)........................................................75

*In re Aluminum Warehousing Antitrust Litig.*,
   833 F.3d 151 (2d Cir. 2016)...........................................................84

*Apotheco Pharmacy Durham LLC v. Ahmed*,
   2024 WL 2925212 (S.D.N.Y. June 10, 2024) ................................57

*Arbitron Inc. v. Saga Communications Inc. et al.*,
   No. 3-cv-00923 (D. Del.)................................................................14

*Arcesium, LLC v. Advent Software, Inc.*,
   2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021)........................ 3, 85, 93

*Baker's Aid v. Hussmann Foodservice Co.*,
   830 F.2d 13 (2d Cir. 1987).............................................................69

*Balaklaw v. Lovell*,
   14 F.3d 793 (2d Cir. 1994)...............................................................3

*Bank of Am., N.A. v. Won Sam Yi*,
   294 F. Supp. 3d 62 (W.D.N.Y. 2018) .............................................87

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012)........................................................79

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) ............................................................ 3, 69, 84

*Caruso Mgmt. Co. Ltd. v. Int'l Council of Shopping Ctrs.*,
   2019 WL 1949801 (S.D.N.Y. Apr. 18, 2019) .................................66

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008)............................................. 78, 79, 85

*Christie-Spencer Corp. v. Hausman Realty Co.*,
   118 F. Supp. 2d 408 (S.D.N.Y. 2000).............................................55

*Citibank, N.A. v. Citytrust*,
   756 F.2d 273 (2d Cir. 1985)...................................................... 58, 72

*Convergen Energy WI, LLC v. L'Anse Warden Elec. Co., LLC*,
   2020 WL 5894079 (S.D.N.Y. Oct. 5, 2020)...................................58

*Cramer v. Devon Group., Inc.*,
   1990 WL 210306 (S.D.N.Y. Dec. 12, 1990) ..................................60

# TABLE OF AUTHORITIES
*(continued)*

<u>Page(s)</u>

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*,
    96 F.4th 351 (2d Cir. 2024)........................................................... 4, 54, 56

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ...........................................................................93

*Daniel v. Am. Bd. of Emergency Med.*,
    428 F.3d 408 (2d Cir. 2005)...............................................................80

*Danone, US, LLC v. Chobani, LLC*,
    362 F. Supp. 3d 109 (S.D.N.Y. 2019)................................................72

*Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*,
    833 F.3d 399 (3d Cir. 2016)...............................................................79

*DeVivo Assocs., Inc. v. Nationwide Mut. Ins. Co.*,
    2020 WL 2797244 (E.D.N.Y. May 29, 2020) ........................ 60, 69, 87

*Dexter 345 Inc. v. Cuomo*,
    663 F.3d 59 (2d Cir. 2011).................................................................66

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 ......................................................................................74

*Empower Energies, Inc. v. SolarBlue, LLC*,
    2016 WL 5338555 (S.D.N.Y. Sept. 23, 2016) ...................................88

*Expedia, Inc. v. United Airlines, Inc.*,
    2019 WL 1499269 (S.D.N.Y Apr. 5, 2019) ........................... 58, 71, 87

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009)...............................................................93

*Freedom Holdings, Inc. v. Spitzer*,
    408 F.3d 112 (2d Cir. 2005)..........................................................57, 72

*FTC v. RAG-Stiftung*,
    436 F. Supp. 3d 278 (D.D.C. 2020)....................................................88

*fuboTV Inc. v. Walt Disney Co.*,
    745 F. Supp. 3d 109 (S.D.N.Y. 2024)...............................5, 62, 63, 95

*Geminatio, Inc. v. Hustad*,
    2025 WL 1220233 (N.D.N.Y. Apr. 28, 2025) ................................57, 72

*Gladsky v. Sessa*,
    2007 WL 2769494 (E.D.N.Y. Sept. 21, 2007) ...................................87

*In re Google Digit. Advert. Antitrust Litig.*,
    627 F. Supp. 3d 346 (S.D.N.Y. 2022).................................................74

## TABLE OF AUTHORITIES
(*continued*)

Page(s)

*In re Google Digit. Advert. Antitrust Litig.*,
    721 F. Supp. 3d 230 (S.D.N.Y. 2024), *appeal dismissed*, No. 24-874, 2024
    WL 4491699 (2d Cir. Aug. 28, 2024)...............................................................73, 75

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007)...........................................................................2, 56

*Grand River Enters. Six Nations, Ltd. v. King*,
    783 F. Supp. 2d 516 (S.D.N.Y. 2011)...............................................................81

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
    58 F.Supp.2d 228 (S.D.N.Y. 1999) ..............................................................77, 85

*Hamilton Watch Co. v. Benrus Watch Co.*,
    206 F.2d 738 (2d Cir. 1953)............................................................................54

*Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*,
    351 F. Supp. 3d 1187 (D. Minn. 2018), *aff'd*, 962 F.3d 1015 (8th Cir. 2020)......................78

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016)........................................................................81, 85

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,
    596 F.2d 70 (2d Cir. 1979).......................................................................2, 57, 68

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984)..........................................................................................78

*JTH Tax, LLC v. Agnant*,
    62 F.4th 658 (2d Cir. 2023)........................................................................56, 72

*Juster Ass'c v. City of Rutland*,
    901 F.2d 266 (2d Cir. 1990).............................................................................81

*Kaufman v. Time Warner*,
    836 F.3d 137 (2d Cir. 2016).............................................................................73

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) (*en banc*) ............................................................79

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
    2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015), *amended*, 2015 WL 13122396
    (S.D.N.Y. Oct. 19, 2015).................................................................................84

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    454 F.3d 108 (2d Cir. 2006).............................................................................54

*Mastrio v. Sebelius*,
    768 F.3d 116 (2d Cir. 2014).............................................................................54

*In re Mylan N.V. Sec. Litig.*,
    666 F. Supp. 3d 266 (S.D.N.Y. 2023)...............................................................81

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
   883 F.3d 32 (2d Cir. 2018)..........................................................................................55, 86

*N. Pac. Ry. Co. v. U.S.*,
   356 U.S. 1 (1958) ................................................................................................................74

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
   992 F.2d 430 (2d Cir. 1993), Dkt. 8 ..............................................................................66, 67

*New Pac. Overseas Grp. (USA) Inc. v. Excal Int'l Dev. Corp.*,
   1999 WL 285493 (S.D.N.Y. May 6, 1999)......................................................................58, 70

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018) ............................................................................................................84

*Ortho Diagnostic Sys., Inc. v. Abbott Labs, Inc.*,
   920 F. Supp. 455 (S.D.N.Y. 1996) ................................................................................78, 79

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
   555 U.S. 438 (2009) ..........................................................................................79, 90, 93, 94

*Pennzoil Co. v. Texaco, Inc.*,
   481 U.S. 1 (1987)..........................................................................................................64, 65, 67

*Provepharm, Inc. v. Akorn, Inc.*,
   2019 WL 2443185 (E.D.N.Y. June 11, 2019)....................................................................73

*rel. Rodriguez v. DeBuono*,
   175 F.3d 227 (2d Cir. 1999)..............................................................................................56

*Roso-Lino v. Coca-Cola Bottling Co. of N. Y., Inc.*,
   Dkt. 60 ..............................................................................................................................67

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
   241 F.3d 232 (2d Cir. 2001)........................................................................................90, 91

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010)....................................................................................54, 57, 73

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015).........................................................................................56, 73

*SG Cowen Sec. Corp. v. Messih*,
   224 F.3d 79 (2d Cir. 2000)..................................................................................................86

*Smithy Braedon Co. v. Hadid*,
   825 F.2d 787 (4th Cir. 1987)..............................................................................................88

*Snecma v. Turbine Engine Comp. Techs. Corp.*,
   531 F. Supp. 2d 354 (N.D.N.Y. 2008) ...............................................................................71

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Sperry Int'l Trade, Inc. v. Gov't of Israel,*
   670 F.2d 8 (2d Cir. 1982) ......................................................................60

*Spinelli v. Nat'l Football League,*
   96 F. Supp. 3d 81 (S.D.N.Y. 2015) ......................................................85

*St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.,*
   131 F.4th 102 (2d Cir. 2025) ................................................................54

*T.C. v. N.Y. State Dep't of Health,*
   2022 WL 17689841 (S.D.N.Y. Dec. 15, 2022) ....................................90

*TGG Ultimate Holdings, Inc. v. Hollett,*
   2016 WL 8794465 (S.D.N.Y. Aug. 29, 2016)........................................70

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.,*
   60 F.3d 27 (2d Cir. 1995) ......................................................................55

*Topps Chewing Gum, Inc. v. MLB Players Ass'n,*
   641 F. Supp. 1179 (S.D.N.Y. 1986) ......................................................71

*Tucker Anthony Realty Corp. v. Schlesinger,*
   888 F.2d 969 (2d Cir. 1989)........................................................ 59, 65, 67

*United States v. Colgate & Co.,*
   250 U.S. 300 (1919) ..............................................................................95

*United States v. Trans-Missouri Freight Ass'n,*
   166 U.S. 290 (1897) ..............................................................................95

*Velesaca v. Decker,*
   458 F. Supp. 3d 224 (S.D.N.Y. 2020)....................................................55

*Verizon Commc'ns Inc. v. L. Offs. Of Curtis V. Trinko, LLP,*
   540 U.S. 398 (2004) ..........................................................................94, 95

*Viacom Int'l Inc. v. Tele-Commc'ns, Inc.,*
   1994 WL 561377 (S.D.N.Y. Oct. 12, 1994)...........................................80

*Viamedia, Inc. v. Comcast Corp.,*
   951 F.3d 429 (7th Cir. 2020)..................................................................74

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC,*
   257 F.3d 256 (2d Cir. 2001)...................................................................77

*WGH Commc'ns, Inc. v. Penachio Malara LLP,*
   2020 WL 8513509 (S.D.N.Y. Nov. 24, 2020)........................................89

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008)....................................................................................88

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

**Statutes**

Sherman Act ...........................................................................................................73, 78, 94, 95

**Rules**

Fed. R. Civ. P. 65(d)(1) ...........................................................................................................90

Rule 65 ................................................................................................................................3, 90

Rule 65(d).................................................................................................................................90

Plaintiff, Cumulus, a company earning $700 million in revenues wants to renew its contract with Nielsen but pay 50% less for the same services. ███████████████████ ███████████████████████████████████ Cumulus filed a lawsuit and demanded the Court order Nielsen to provide its services at an untenable price Nielsen never offered.  Cumulus did so despite the parties ███████████████████████ ████████████████. Once in litigation, Cumulus for the first time threatened that a contrary result would likely cause it to ███████ despite not disclosing that detail to investors even after it filed its injunction request.  Without any support, Cumulus seeks an unprecedented mandatory injunction to pay less for services offered.  This Court should not open the door to such improper and frivolous requests.  As expert economist for Nielsen, Jonathan Orszag testified, ████████ ███████████████████████████████████████████████ ████████████████████████████ PX-287 at 158:9-12 (Orszag Dep. Tr.).  The evidentiary hearing confirmed that the only equitable result is the denial of Cumulus's motion for a preliminary injunction.

As previously stated, for the limited purpose of the Court's resolution of Cumulus's motion for a preliminary injunction, PX-290 (Dkt. 8), PX-291 (Dkt. 60), Nielsen does not dispute Cumulus's factual allegations concerning market definition, market power, or the existence of a tie.  Nielsen is not contesting these factors because the Court need not reach them.  Cumulus's motion for a preliminary injunction should be denied in its entirety based on (1) Cumulus's failure to establish irreparable harm; (2) Cumulus's failure to establish likelihood of success on the merits; and (3) the inappropriate nature of Cumulus's requested relief.  Beyond this, Cumulus has failed to show that the balance of hardships tips in favor of its requested injunction, and cannot articulate how the public interest would benefit from Court-interference in standard contract negotiations.

First, Cumulus's failure to show irreparable harm is dispositive and requires denial of its motion for a preliminary injunction. *See infra* ¶¶ 157-192; *see Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 68 (2d Cir. 2007). Cumulus's theory of irreparable harm is a moving target. Cumulus's complaint and initial motion never mentioned ██████████ instead, Cumulus focused on the alleged harm to its reputation and market share that it would incur without access to Nielsen's full Nationwide report. PX-290 at 21-24 (Dkt. 8). The problem with Cumulus's original theory of harm was that any harm would be self-inflicted; ███████████████████ ████████████████████████████, Cumulus will receive Nationwide data. And if Cumulus's theory is that Nielsen's prices are too high, that claim is purely economic and therefore is not a basis for injunctive relief. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72-73 (2d Cir. 1979). Accordingly, ████████████████████████ and keep this litigation alive, Cumulus shifted its strategy—changing its story altogether—and is now suggesting that it faces irreparable harm because ███████████████████████ ████████████████████ Dec. 8, 2025 Hr'g Tr. 20:19-21 (Pl. Argument). It remains a mystery how a ████████████████████████████████████ Vague references by Cumulus to financial projections that were not identified in any evidence and whose assumptions have not been subject to scrutiny are not evidence of ██████████████ that could convert Cumulus's monetary claims into a basis for injunctive relief. Tellingly, Cumulus, a public company, has not disclosed to its investors that it ██████████████ if it has to pay the prices Nielsen is asking, despite reporting on its earnings during this litigation. *See* DX-1.

Second, while the Court need not reach this factor, Cumulus has failed to establish likelihood of success on the merits of its antitrust claim. *See infra* ¶¶ 193-218. The antitrust laws

"'were enacted for the protection of *competition*, not *competitors*.'"  *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)).  Yet Cumulus's primary complaint is alleged economic harm to itself from paying a higher price to Nielsen than it would like, which supposedly limits its ability to contract with Eastlan. Even if true, that is not harm to competition on a market-wide basis.  *See Arcesium, LLC v. Advent Software, Inc.*, 2021 WL 1225446, at *7 (S.D.N.Y. Mar. 31, 2021).  As Mr. Orszag explained, Cumulus's claim that Eastlan is foreclosed from entering new markets is belied by Eastlan's recent growth and its ability to enter a market with just one customer.  *See* Dec. 8, 2025 Hr'g Tr. 91:4-13, 113:4-20 (Orszag).  Indeed, all of Cumulus's business with Eastlan has come about since the September 2024 institution of Nielsen's Network Policy pertaining to national networks that own or are affiliated with local radio stations (the "Policy" or the "Network Policy"), the existence of which forms the basis for Cumulus's claims.  There is no imminent threat to competition here.  ███

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████  *See* PX-278, Table 1.  Further, ███████████

██████████████████████████████████████████████████████████████████████

████████.  *See* DX-3 at 137:20-138:7 (Tunkel Dep. Tr.).

     Finally, Cumulus's three-part proposed mandatory injunction is inappropriate in multiple respects.  *See infra* ¶¶ 229-243; DX-49 ¶¶ 1-3 (Dkt. 7-1); PX-291 at 27 (Dkt. 60).  Irrespective of any evidence in the record, this is a sufficient basis for denial of the requested relief.  Cumulus's requests that the Court "enjoin[]" Nielsen "from imposing any tie or constructive tie" and "prohibit[]" Nielsen from "engaging in any retaliatory conduct" amount to a command for Nielsen to obey the law, which is improper under Rule 65.  *Id.* ¶¶ 1, 3.  Further, Cumulus's requests are impermissibly vague, as Cumulus never defines "retaliatory conduct" in the context of this

litigation, and Cumulus's own expert, who has access to Cumulus's confidential information, is unable to identify a price point that constitutes a "constructive tie," PX-285 at 133:16-134:20 (Furchtgott-Roth Dep. Tr.). Nielsen cannot be expected to know when it proposes a price that Cumulus deems "constructive tying," which presumably would be any price Cumulus simply doesn't like.

And, Cumulus's remaining request—the thrust of its motion—is that the Court command Nielsen to "provide Cumulus with Nationwide and local radio ratings data in markets selected by Cumulus, at current contract rates, or alternatively, requir[e] Nielsen to immediately negotiate[.]" PX-291 at 27 (Dkt. 60). Putting aside that ███████████████████████████ ████████████, Cumulus in essence asks the Court to act as a central planning price-setter, forcing Nielsen to sell its services to Cumulus at a price below the price Nielsen is willing to sell. While Cumulus styles its motion as a request for a preliminary injunction, Cumulus seeks a mandatory injunction that "disrupt[s]" the status quo. *See Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356-58 (2d Cir. 2024). Cumulus is not seeking an extension of the current contract (the status quo, ████████████████); Cumulus is asking the Court to extend a *portion* of its current contract, at a fraction of the price, as evidenced by its decision to change its requested relief before the hearing. *Compare* DX-49 ¶ 2, *with* PX-291 at 27 (Dkt. 60) (removing reference to "currently existing contract terms").

At its core, Cumulus's request is for this Court to impose a new contract on Nielsen, without Nielsen's consent, for only services Cumulus selects, at a severely discounted price that Nielsen has never offered, ███████████████████████████. Tellingly, Cumulus offers no examples of courts that have entered anything close to the unprecedented injunction it seeks. And for good reason. An injunction of the type requested by Cumulus would subject a company

such as Nielsen to ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████.  In fact, the very caselaw on which Cumulus relies, PX-291 at 16, 17 (Dkt. 60), holds

that "antitrust precedent" counsels "courts [to] avoid involving themselves in re-ordering the

complexities of the ongoing contractual and business relationships among market participants."

*fuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 145 (S.D.N.Y. 2024), *appeal dismissed*, No.

24-2210, 2025 WL 523263 (2d Cir. Jan. 8, 2025) (refusing to grant injunctive relief that required

rewriting the parties' existing contracts).

Nielsen respectfully provides the following proposed findings of fact and conclusions of

law based on the record before the Court.[1]

## DEFENDANT'S PROPOSED FINDINGS OF FACT

**I.    NIELSEN'S AUDIO BUSINESS**

1.    The Nielsen Company (US), LLC ("Nielsen") produces audience ratings across multiple

entertainment media, including radio and podcasts.  PX-274 ¶ 4 (Tunkel Decl.).  Nielsen's

audio business, Nielsen Audio, collects and measures audience exposure to audio, like

radio and podcasts, and generates data reports.  *Id*. ¶¶ 1, 4-5; DX-3 at 9:21-11:15 (Tunkel

Dep. Tr.).  ████████████████████████████████████████████████  DX-3 at

11:12-15 (Tunkel Dep. Tr.).  █████████████████████████████

████████████████████████████████████████████████████████████████

████  *Id*. at 11:1-6.

---

[1] Nielsen respectfully requests that the Court omit from its Opinion Nielsen's proprietary and commercially sensitive pricing figures and contract negotiation terms, which this Court has allowed to remain under seal thus far in this action.  *See* Dkts. 55, 97, 111.

2.  Nielsen collects data on radio listening in two primary ways. First, in Portable People Meter (PPM) markets, a Nielsen-recruited panel of listeners carries a small device (or app) that passively detects inaudible codes which Nielsen embeds in live and streamed audio. Dec. 9, 2025 Hr'g Tr. 148:13-21 (Tunkel); PX-289 ¶ 71 (Compl.). Nielsen embeds these codes into radio broadcasts by shipping hardware to radio stations for installation either at radio studios or tower sites. Dec. 9, 2025 Hr'g Tr. 209:19-21; 211:25-212:3-9. Second, in Diary markets, Nielsen distributes hundreds of thousands of paper and electronic diaries to recruited respondents who then record their listening on a weekly basis for twelve-week periods. *See id*. at 211:3-17; PX-289 ¶ 72 (Compl.). Nielsen then validates, deduplicates, and weights collected observations to population and demographic benchmarks. Dec. 9, 2025 Hr'g Tr. 209:19-212:20 (Tunkel).

3.  In each individual local market, Nielsen compensates each respondent for reporting his or her listening data in both PPM and Diary markets. *Id*. at 211:6-7 (Tunkel).

4.  Nielsen collects data in over 200 individual markets or metros across the country, PX-24, using PPMs in some of the largest markets and Diary in the remainder, *see* PX-289 ¶¶ 71-72 (Compl.).

5.  Nielsen collects audio ratings data and designs panels at the local level only. *See* Dec. 9, 2025 Hr'g Tr. 212:22-213:20 (Tunkel); DX-3 at 13:11-23 (Tunkel Dep. Tr.). Nielsen publishes local reports, as well as a bi-annual "Nationwide" report. PX-274 ¶ 5 (Tunkel Decl.). ████████████████████████████████████████ ███████████████████████. DX-3 at 33:21-34:10 (Tunkel Dep. Tr.). Instead, to create the Nationwide report, Nielsen combines the local reports (using locally gathered data) and delivers the local reports in a comprehensive data set. PX-274 ¶ 5 (Tunkel Decl.); DX-3

at 12:19-13:23, 14:13-18, 33:25-34:4 (Tunkel Dep. Tr.). ████████████████████

███████████████████████████████████████████████. DX-3 at

34:7-10 (Tunkel Dep. Tr.). ████████████████████████████████████████████

████████ *Id.* at 34:11-15. In other words, Nielsen "assemble[s] the local data [bearing]

the costs associated with that, and then they bring all the local data together to create the

national product." Dec. 8, 2025 Hr'g Tr. 105:4-7 (Orszag).

6.    Nielsen's development of its ratings products requires considerable work and expense;

these costs are "large [and] they go up every year." Dec. 9, 2025 Hr'g Tr. 214:14-15

(Tunkel). Nielsen incurs costs at every stage of its process in generating ratings products,

including "[t]he price of a stamp, [which,] when you're sending out as many mailers as

[Nielsen is] sending, adds up." *Id.* at 214:15-16. Further, "[t]he price of getting people to

comply and participate in [Nielsen's] surveys is more difficult every single year, as people

have busy lives and competing priorities." *Id.* at 214:16-19. The "[p]olitical environment

can impact people's willingness to participate in surveys, and their skepticism to participate

in surveys, and [Nielsen] ha[s] to work very hard to overcome that skepticism." *Id.* at

214:19-22. As a result, "it gets more difficult . . . every single year, to get the same number

of people to participate in [Nielsen's] surveys at historic levels." *Id.* at 214:23-25.

7.    Dr. Harold Furchtgott-Roth, the expert for plaintiff, Cumulus Media New Holdings

("Cumulus") shares in the understanding that Nielsen does not collect audio ratings data

for its local market reports separately from the local ratings for its Nationwide report. PX-

285 at 165:15-21 (Furchtgott-Roth Dep. Tr.).

8.    █████████████████████████████████████████████████████████████████

██████. DX-3 at 98:15-18, 100:1-5, 123:24-124:7 (Tunkel Dep. Tr.).

9. ████████████████████████████████████████████████████████████

████████████████████." *Id.* at 36:15-20.

10. "There is no data for nationwide without the local reports." Dec. 9, 2025 Hr'g Tr. 213:18-

20 (Tunkel). ██████████████████████████████████████████████████████

███████████ *Id.* at 214:1-9.

11. ██████████████████████████████████ DX-3 at 36:3-5 (Tunkel Dep.

Tr.). ████████████████████████. *Id.* at 36:6-8. ████████████████████████

██████████████████ *Id.* at 36:9-11.

12. ████████████████████████████████████████████████████████████

█████████. Dec. 9, 2025 Hr'g Tr. 223:20-23 (Tunkel); DX-3 at 40:2-10, 42:24-43:3,

52:25-53:21 (Tunkel Dep. Tr.).

13. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████. Dec. 9, 2025 Hr'g Tr. 142:19-21; 222:1-

8 (Tunkel). ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ DX-3 at

180:2-15 (Tunkel Dep. Tr.).

14. ██████████████████████████████████████████. *Id.* at 155:8-17. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ *Id.* ████████████████████████████

██████████████████████████████████████ *Id.* at 155:18-

24. ███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████ *Id.* at 36:15-20.

15.  ██████████████████████████████████████████

████████████████████████████████████████ Dec. 9,

2025 Hr'g Tr. 151:14-23 (Tunkel); DX-3 at 51:13-53:21 (Tunkel Dep. Tr.). ████████

██████████████████████████████████████████████████

██████████████████████████ Dec. 8, 2025 Hr'g Tr. 126:16-17, 127:3-18

(Tunkel). █████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████ Dec. 9, 2025 Hr'g Tr. 223:25-224:9 (Tunkel).

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████ *Id.* at 223:17-224:9. ██████████████████████

██████████████████ DX-3 at 73:1-3 (Tunkel Dep. Tr.).

## II.    NIELSEN'S NETWORK POLICY

16.  Nielsen has had multiple problems with companies using Nielsen's audience measurement

data without paying for it. ████████████████████████████

██████████████████████████████████████████████████

[REDACTED] Dec. 9, 2025 Hr'g Tr. 206:16-207:9 (Tunkel); *see* DX-48. [REDACTED]

[REDACTED]

[REDACTED] *See* DX-3 at 105:6-17 (Tunkel Dep. Tr.). [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] Dec. 9, 2025 Hr'g Tr. 215:12-216:2 (Tunkel). [REDACTED]

[REDACTED] DX-3 at 105:14-17 (Tunkel Dep. Tr.). [REDACTED]

[REDACTED]

[REDACTED] *Id.* at 105:10-13.

17.    In September 2024, Nielsen announced its Network Policy (the "Policy").  *See* PX-289 ¶ 7 (Compl.); PX-45; PX-46; PX-47; DX-3 at 76:4-77:7 (Tunkel Dep. Tr.); Dec. 8, 2025 Hr'g Tr. 129:14-15 (Tunkel).  Under the Policy, if a national network owns or is affiliated with a local radio station, the Nationwide report that it receives will exclude any local markets for which the network does not purchase local ratings data.  PX-274 ¶ 6 (Tunkel Decl.); DX-3 at 77:4-7 (Tunkel Dep. Tr.). [REDACTED]

[REDACTED] . DX-3 at 77:4-7 (Tunkel Dep. Tr.); Dec. 8, 2025 Hr'g Tr. 69:23-70:4 (Orszag) (explaining that under the Policy, customers receive "nationwide excluding any market in which you do not purchase the local data").  The Policy applies only to customers that operate both a national network and local radio stations—it does not apply to customers that operate only a national network or only local radio stations.  Dec. 9, 2025 Hr'g Tr. 163:18-164:8 (Tunkel); PX-274 ¶ 6 (Tunkel Decl.);

10

DX-4 at 1. The Policy only applies to 12 of Nielsen's customers, PX-274 ¶ 8 (Tunkel Decl.), out of the "hundreds" of customers renewing their contracts in 2025, *see* DX-3 at 73:24-74:5 (Tunkel Dep. Tr.).

18.   Nielsen's customers have been widely supportive of the Policy and its underlying goal of combating free-riding. ███████████████████████████████████ ███████████████████ DX-3 at 105:14-17 (Tunkel Dep. Tr.), █████████████████████ ████████████████████████ *Id.* at 105:6-17.

19.   ███████████████████████████████████████████████████ ██████████████████████████████████████████ *Id.* at 63:25-64:2. The parties' current contract was negotiated in 2022, prior to the Policy taking effect. PX-264 ¶ 6 (Milner Decl.). Cumulus admits that at that time, there was not even a "de facto" tie in place. *See* DX-285 at 97:4-15 (Furchtgott-Roth Dep. Tr.). ████████████ ████████████████████████████████████████████████ DX-17 at 1, and Cumulus has refused.

20.   The Policy "helps to prevent free riding o[f] a firm benefiting from a product that they are not paying for." Dec. 8, 2025 Hr'g Tr. 71:20-21 (Orszag); PX-287 at 181:11-182:10 (Orszag Dep. Tr.). Specifically, the Policy aims to prevent national radio broadcast customers that either own or have a sales relationship with a local station, from purchasing the Nationwide report and either (1) making decisions for the local stations based on information from the report, or (2) sharing with their commonly owned and controlled individual local market stations the local data of which the Nationwide report consists, but without those local market stations paying for the use of such local data. Dec. 9, 2025 Hr'g Tr. 161:17-162:2, 217:21-218:7; PX-274 ¶ 7 (Tunkel Decl.); DX-3 at 82:5-16 (Tunkel Dep.

11

Tr.); PX-278 ¶ 11 (Orszag Decl,).  The goal is to avoid networks "free rid[ing] off the investments that Nielsen is making."  Dec. 8, 2025 Hr'g Tr. 76:17-20 (Orszag).  If customers "are not purchasing the local data and the local data is being aggregated up and together to create the national product, then they shouldn't benefit from that in those local markets."  *Id.* at 77:8-12; *see id.* at 76:13-16 (explaining that "if a firm is benefitting from something that it is not paying for," that is "a market failure," which "reduces investments and harms consumers"); PX-287 at 183:9-17 (Orszag Dep. Tr.) (███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████").

21.     Under the Policy, customers "can still get the nationwide product," but not "for the markets that they don't purchase the local data in, so they don't free ride on the local data that is being produced."  Dec. 8, 2025 Hr'g Tr. 69:13-19 (Orszag).  Nielsen has also implemented another policy to combat free riding dubbed the "Subscriber First" policy, which prevented local stations that did not purchase Nielsen's local data from using advertisers' access to the local data to their advantage without purchasing a subscription to the data.  *See id.* at 66:4-17.  ████████████████████████████████████████████████████

████████████████████████████████████████████████.  *See* DX-3-1 § 3.1; Dec. 9, 2025 Hr'g Tr. 162:3-24; 173:13-174:9 (Tunkel).  That contractual language does not "completely eliminate" the risk of free-riding "because the national product is created through the combination of all the local products."  Dec. 8, 2025 Hr'g Tr. 77:23-78:7 (Orszag).  If a customer "is benefiting from the national product and not helping contribute

to the creation of that product by purchasing that local data, then that creates at least some degree of a free riding problem." *Id.* at 78:7-10.

22. This is a particular concern for customers that operate both a network and local radio stations, like Cumulus, which shares expenses, infrastructure, personnel, office space, and other costs with Westwood One. DX-8 at 44:4-18 (Jones Dep. Tr.). Nielsen's concerns over impermissible data sharing are heightened in such cases because these companies have people that "wear two different hats," Dec. 9, 2025 Hr'g Tr. 216:3-15 (Tunkel), who, even if they "are not directly sharing that data, [] know it and [are] making recommendations off of that data, and [are] setting revenue expectations and strategies off of that data," *id*. at 217:18-218:7. "It is very common at the national level for advertisers to need to see the delivery by market. Even though they're buying the entire country, and they're buying a collection of thousands and thousands of radio stations, they want to see the delivery by market and sometimes by station. And that individual [who has done market-specific analysis using the Nationwide ratings] now has to have a conversation with the Memphis market manager and set their expectations about what revenue they can anticipate. They have direct knowledge of the audience that that station has delivered and what type of revenue they can expect to derive off of that audience . . . it [would be] very difficult for someone to completely sever their brain to keep one side of the business operating with data and the other side without." Dec. 9, 2025 Hr'g Tr. 216:16-217:13 (Tunkel). Collin Jones, who oversees teams that have access to either Nationwide or local ratings, DX-8 at 112:24-113:14, 116:11-14 (Jones Dep. Tr.), "doesn't have to share the ratings data with Memphis in order to understand the competitive marketplace, according to Nielsen and make decisions that are based on the size of their audience in Memphis,

relative to other stations.  He never has to share that data.  But he's making decisions and he's acting on it the way [Nielsen's] other paying customers are making decisions and acting on it, but they're paying for it."  Dec. 9, 2025 Hr'g Tr. 217:18-218:7 (Tunkel).

23.    Indeed, Nielsen's concerns regarding impermissible data sharing within clients that co-own network and local stations is well-founded.  Some of Nielsen's customers have engaged in impermissible data sharing.  *See e.g.*, DX-48 (*Arbitron Inc. v. Saga Communications Inc. et al.*, No. 3-cv-00923 (D. Del.) (action concerning unauthorized use of data)).  ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████.  Dec. 9, 2025 Hr'g Tr. 172:11-16 (Tunkel).  ██████████

██████████████████████████████, PX-5 at 3, ████████████████████

███████████████████████████████████████████████████

████████████████████████████████  Dec. 9, 2025 Hr'g Tr. 172:17-19 (Tunkel).  ███████████████████████████████████████████

███████████████████████████████████  *Id.* at 207:10-21.

24.    ███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████  DX-3 at 96:5-9 (Tunkel Dep. Tr.).  ████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████  *Id.* at 97:20-24.

25.    The Policy also serves the important purpose of aligning Nielsen's "revenue with [its] costs" and ensures "that the service can be provided in a sustainable way."  Dec. 9, 2025 Hr'g Tr.

214:1-9 (Tunkel).  Nielsen incurs costs to collect local data—the basis for both its local

and Nationwide reports.  *Id.* at 213:18-20.  The cost "adds up," between the price of mailing

and incentivizing participation in Nielsen's surveys.   *See Id.* at 214:10-25.   ██████

████████████████████████████████████████████████████████████████████

█████████████████████████████████ PX-5 at 7, ████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████ DX-3 at 98:9-22 (Tunkel Dep. Tr.).

26.  ███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ *Id.* at

79:6-19. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████ PX-300 ¶ 35(a); DX-47 at 3. ███████████

███████████████████████████ DX-3 at 79:18-19 (Tunkel Dep. Tr.). ██████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████ Dec. 9, 2025 Hr'g Tr. 204:17-22 (Tunkel).

27.  ███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

15

████████████████████████████████████████████████████

████████████████████████████████████████████  *Id.* at

218:13-23.

28.     Given that Eastlan "will enter a market with one station subscriber," Eastlan has
"opportunities to sell in every single market," where Cumulus does business.  Dec. 8, 2025
Hr'g Tr. 121:6-11 (Orszag); PX-278 ¶ 38 (Orszag Decl.) (identifying at least one radio
broadcaster in each local market where Cumulus does business, that is unaffected by
Nielsen's Policy).  And in 90 percent of local markets where Cumulus does business, at
least half of radio station owners are not affected by Nielsen's Policy.  Dec. 8, 2025 Hr'g
Tr. 120:9-20 (Orszag) (discussing Figure 1 from PX-278).

## III.     ALTERNATIVES TO NIELSEN DATA

29.     Nielsen is not the only company that collects and publishes radio audience data.  As of
today, Eastlan collects and publishes radio audience data in 67 markets at a low cost,
including markets that Nielsen does and does not serve.  Dec. 11, 2025 Hr'g Tr. 301:25-
302:2, 302:16-18 (Gould); DX-6.

30.     Eastlan operates in a handful of markets in which Nielsen collects local data, including
large markets like Memphis, Syracuse, Atlanta, Chicago, Cincinnati, Dallas, Houston, and
part of North Carolina.  DX-3 at 26:14-25 (Tunkel Dep. Tr.); DX-19; DX-20; DX-21; Dec.
11, 2025 Hr'g Tr. 315:21-24 (Gould).

31.     Merely looking at the number of markets where Eastlan has a presence can "mask
[Eastlan's] significant growth," as Eastlan has been moving into larger markets, leading to
"growth in industry influence and growth in revenue".  DX-6 at 1.  Nearly all of Eastlan's
growth in the past two years is in the top 125 U.S. radio markets.  PX-267 ¶ 11.  "[T]he

record evidence from Eastlan shows that they have continued to grow in larger and larger markets." Dec. 8, 2025 Hr'g Tr. 67:17-19 (Orszag). Eastlan is adding markets "reasonably well," adding 18 new markets this year and securing the business of multiple former Nielsen customers. Dec. 11, 2025 Hr'g Tr. 305:11-306:22 (Gould); *see also* DX-7 (Eastlan publicly touting its expansion to "Five More Markets"). ███████████████████████

███████████████████████████ DX-3 at 215:13-19 (Tunkel Dep. Tr.).

███████████████████████████████████████

██████████████████████ *Id.* at 215:20-216:8.

32.    Eastlan is able to enter new markets with just one subscriber. PX-267 ¶ 13 (Gould Decl.); Dec. 11, 2025 Hr'g Tr. 286:11-16 (Gould). With just one subscriber, Eastlan is able to cover its costs of entry and make a small contribution to its profits. *Id.* at 286:21-287:21. Due to Eastlan's "syndicated research" business model, in which "multiple subscribers" are "paying for the same research," once Eastlan enters a market, its low marginal costs after the first subscriber result in efficient growth. *Id.* at 304:116-21; PX-287 at 54:14-20 (Orszag Dep. Tr.). Eastlan's radio audience measurement services continue to gain acceptance with advertising agencies. Dec. 11, 2025 Hr'g Tr. 319:10-21 (Gould). One factor driving Eastlan's acceptance with advertising agencies has been Nielsen's Subscriber First Policy, because Eastlan's "data has the full story and Nielsen doesn't." *Id.* at 319:15-21. Eastlan "data is accepted into the software systems that the majority of [advertising] agencies in the country use," *id.* at 318:25-319:5, and that data is fully compatible with nearly all "major buying platforms," *id.* at 320:13-15. *See* DX-62 at 2; DX-59 at 1. Eastlan's radio audience measurement data is comparable to Nielsen's, such that local radio

station customers are able to switch from Nielsen to Eastlan as their chosen data provider. Dec. 11, 2025 Hr'g Tr. 321:13-322:6 (Gould).

33.    Eastlan is able to deliver radio audience measurement reports as quickly as two and a half months after it decides to enter into a new market, including in "huge" markets like Atlanta, Chicago, Houston, Dallas, and Cincinnati.  *Id.* at 315:21-316:6.

34.    Before Nielsen announced its Network Policy, Eastlan had no business with Cumulus.  *Id.* at 315:6-8.  Since Nielsen announced its Network Policy, however, Cumulus has signed up with Eastlan in at least seven markets, DX-19, DX-20, DX-21, including some "huge markets," Dec. 11, 2025 Hr'g Tr. 315:9-316:2 (Gould).

35.    On August 18, 2025, Cumulus signed a test contract with Eastlan for ratings services in five large markets.  DX-19.

36.    On September 18, 2025, Cumulus President Dave Milner pressured  Eastlan's CEO, Mike Gould, to create a Nationwide-like ratings product.   DX-60 at 2.  This conversation occurred three days after Nielsen provided Cumulus with three contract proposals—one of which was an offer for standalone Nationwide services.  DX-52.

37.    

DX-8 at 131:2-5 (Jones Dep. Tr.).

DX-61; *see* DX-22.

DX-22.

38.    In addition to Cumulus, since Nielsen announced its Network Policy, Eastlan has received increased interest from other large radio operators subject to the Policy, including particular

interest from the "C level" of those companies. Dec. 11, 2025 Hr'g Tr. 280:11-281:14 (Gould). Since the Policy was announced, interest in Eastlan's services is increasing among the three largest radio broadcast networks, iHeart, Cumulus, and Audacy. *See id.* at 280:11-281:14.

39. Throughout 2025, Cumulus and Eastlan have continued discussions to potentially contract for data in additional markets. DX-61; Dec 11, 2025 Hr'g Tr. 316:11-21 (Gould). Indeed, "there has been a tremendous amount of inquiry" into Eastlan's services from Cumulus. Dec 11, 2025 Hr'g Tr. 316:11-21 (Gould). Eastlan has "provided quotes for . . . nearly every market that [Cumulus] ha[s]." *Id.* In Eastlan's view, neither the Subscriber First nor Network Policy will prohibit Cumulus from shifting all of its business to Eastlan. *Id.* at 318:2-10. ████████████████████████████████████████████████ ████████████████████████████████████████████████████. Dec. 9, 2025 Hr'g Tr. 218:13-23 (Tunkel).

40. As referenced above, since the Network Policy was announced, Eastlan has also discussed the possibility of building a Nationwide-like product with Cumulus. DX-60.

41. Eastlan can build a Nationwide-like service, more innovative than Nielsen's Nationwide, relatively easily and in under a year for $5 million, with just one subscriber. Dec. 11, 2025 Hr'g Tr. 310:23-313:21 (Gould). Eastlan does not need any outside investment to build a Nationwide-like service—it has ample financial support to fund the cost of developing a Nationwide-like service. *Id.* at 312:10-12; 313:15-25. Nielsen is also powerless to "stop Eastlan from developing a nationwide-like product." *Id.* at 314:8-10.

42. ████████████████████████████████████████████████ ████████████████████████████████████████████████ DX-3 at

128:5-10 (Tunkel Dep. Tr.). 

 *Id*. at 149:24-150:10.

43.    Further, "there are a lot of radio stations that don't have either [Nielsen or Eastlan data]."

PX-285 at 152:17-153:16 (Furchtgott-Roth Dep. Tr.).

DX-3 at 217:2-

7 (Tunkel Dep. Tr.).

44.    

. *Id*. at 163:17-164:9.

. *Id*. at

163:22-25.    *Id*. at

164:2-9.  Although Eastlan has represented that its data is not accepted by Media Ocean,

Eastlan claims that its data is "fully compatible with all major buying and planning

software platforms," DX-62 at 2, including Strata/Freewheel, "[t]he most widely used

software package in the radio industry or in the advertising agency world," Dec. 11, 2025

Hr'g Tr. 320:13-25 (Gould).

## IV.    CUMULUS'S BUSINESS

45.    Cumulus is a national communications network and a "top level operating company" that

holds Cumulus Radio Corporation and Westwood One.  DX-8 at 37:7-38:3 (Jones Dep.

Tr.); Dec. 8, 2025 Hr'g Tr. 16:3-4 (Pl. Opening).  Cumulus operates 395 local radio stations

across the United States, PX-264 at ¶ 5 (Milner Decl.), in "roughly 80 different geographic

markets.  PX-285 at 24:12-21 (Furchtgott-Roth Dep. Tr.).  It "has a digital radio platform

and podcast platform as well."  *Id*.

46.    Westwood One is the "nationwide network" that Cumulus operates. *Id.* at 24:12-21.

Westwood One "syndicates programs that are distributed both to Cumulus[-owned] local

radio stations as well as other radio stations." *Id.*

47.    Cumulus sells radio and digital advertising as well as streaming and podcasts through these

operations. DX-8 at 26:3-27:9 (Jones Dep. Tr.). Cumulus's ownership relationship with

Westwood One "allows the company to offer advertising packages that include national

[advertising] inventory in its network programs, [and] local [advertising] inventory in

specific areas." PX-264 at ¶ 4 (Milner Decl.).

48.    Cumulus generates "somewhere . . . between 750 and 800 million of revenue." DX-8 at

44:19-45:7 (Jones Dep. Tr.). Of this, approximately $180 million is generated by

Westwood One. *Id.* Cumulus Radio generates revenue in approximately the high $500

millions, and the rest is made from "other ancillary businesses." *Id.* at 46:23-47:6.

## V.    THE 2023 CONTRACT BETWEEN CUMULUS AND NIELSEN

49.    ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████. PX-

91; Dec. 8, 2025 Hr'g Tr. 125:6-11 (Tunkel).

50.    ██████████████████████████████████████████████ DX-8 at 151:4-

20 (Jones Dep. Tr.).

51.    ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████. Dec. 9, 2025 Hr'g Tr. 141:25-142:18 (Tunkel). ███████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████

8, 2025 Hr'g Tr. 126:14-22 (Tunkel).

52.    █████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████ *Id.* at 127:24-128:10.

53.    █████████████████████████████████████████████

████████████████████████. PX-91. ███████████████

█████████████████████████████████████████████████

███████████. PX-189 at 1; *see* Dec. 9, 2025 Hr'g Tr. 221:5-222:8 (Tunkel). ██

█████████████████████████████████████████████████

DX-3 at 180:2-15 (Tunkel Dep. Tr.) (███████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████); Dec. 9, 2025 Hr'g Tr. 142:19-21 (Tunkel).

54.    █████████████████████████████████████████████

████████████████████████. *See* Dec. *Id.* 142:22:-143:10 . ████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████ DX-8 at 157:12-23 (Jones Dep. Tr.).

55.    █████████████████████████████████████████████

███████████████████████████. DX-3 at 65:18-19 (Tunkel Dep.

22



Tr.). ███████████████████████████████████████

██████████████████████████ *Id.* at 65:18-25.

56.    Cumulus agreed to the "current agreement," ████████████████████████

███████████████████████████████████████

███████████████████████ PX-1 § 2.8; PX-13 at 2.  This contract was negotiated

and signed prior to development of the Network Policy.   PX-91; PX-1; PX-289 ¶ 7

(Compl.).

57.    ███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████. PX-274 ¶ 10

(Tunkel Decl.). ████████████████████████████████

███████████████████████████████████████

PX-1 at 105.

██████, *see* DX-8 at 67:20-68:15 (Jones Dep. Tr.), ████████████████

███████████████████████████████████████

████████████████████, *see* DX-3 at 13:10-23 (Tunkel Dep. Tr.); Dec.

9 Hr'g Tr. 227:23-228:6 (Tunkel).

## VI.    NEGOTIATION OF A NEW CONTRACT

58.    Even before the parties began negotiating their potential 2026 contract, Cumulus was

angling to use a lawsuit to try to lower the price it pays Nielsen for its audience

measurement data.  *See* DX-8 at 184:18-186:4, 187:2-12, 189:22-190:8, 191:10-24 (Jones

Dep. Tr.); DX-8 at 567, 572.  Cumulus contemplated legal action against Nielsen as early

as March 4, 2025.  DX-8 at 184:18-186:4, 189:22-190:8; 191:10-24 (Jones Dep. Tr.); DX-

8 at 567, 572.  Cumulus then retained outside counsel to evaluate suing Nielsen in "late spring, summer-ish" 2025.  DX-8 at 127:8-20 (Jones Dep. Tr.).

59.    On or about March 4, 2025, the Cumulus board of directors discussed Cumulus's ongoing relationship with Nielsen.  *Id.* at 566-72.  The board presentation from the March 4, 2025, meeting referenced Cumulus's strategy, noting the need "to evaluate economics of exit[ing Nielsen], informed by our experience in Memphis . . . as well as with diary markets previously dropped" and a "[c]onsensual alternative solution based on Cumulus dropping Nielsen in [a] significant portion of markets (while maintaining full WWO service)."  *Id.* at 567.  A primary focus of the meeting was to "educate the board around Eastlan and the components of Eastlan."  DX-8 at 192:2-193:8 (Jones Dep. Tr.).  The presentation also discussed "[l]egal support," in relation to the "Nielsen Discussion Agenda."  DX-8 at 566-67.  The presentation includes a draft timeline with March entries redacted for attorney-client privilege, *id.* at 572, before discussions with Nielsen were scheduled to take place in April.  *Id.*

60.    ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████████.  DX-8 at 305:13-306:5 (Jones Dep. Tr.); DX-10 at 1.

61.    ███████████████████████████████████████████████████████
████████████████████████████████████████████████.  DX-8 at 306:6-10 (Jones Dep. Tr.).

62.    On May 29, 2025, ██████████████████████████████████████
███████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ . DX-10 at 1.

63.    In response to Ms. Berner's request, ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ *Id.*

64.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ DX-11 at 2.████

████████████████████████████████████████████████████

████████████████████████████ *Id.* ████████████████

████████████████████████████████████████████ . Dec.

8, 2025 Hr'g Tr. 132:23-133:13 (Tunkel).

65.    ████████████████████████████████████████████████████

████████████████████████████ . DX-52. ████████████

████████████████████████████████████████ . *Id.* ████

████████████████████████████████████████████████████

*Id.*; DX-47 at 2.

66.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ . PX-8 at 2. ████

████████████████████████████████████████████████████



*Id.*

*. Id.* at

2; Dec. 9, 2025 Hr'g Tr. 176:15-23 (Tunkel).

67.

PX-8 at 1.

*Id.*

68.

. DX-12 at 1-4.

DX-3 at 149:8-14; 150:15-19 (Tunkel Dep. Tr.),

DX-12 at 2; (2)

, DX-12 at 2-3; and (3)



██████████████████████████████████, DX-12 at 1-2. ████████

████████████████████████████████████████████

██████████████████████████████████ DX-12 at 1-4.

████████████████████████████████████████████

████████████████████████████████ *See* Dec. 8, 2025

Hr'g Tr. 101:24-102:13 (Orszag). ██████████████████

██████████████████████████. DX-3 at 167:3-18 (Tunkel Dep. Tr.);

Dec. 8, 2025 Hr'g Tr. 130:1-11 (Tunkel).

69.    ████████████████████████████████████

██████████████████████████████████████

██████. DX-12 at 1.

70.    ████████████████████████████████████

██████████████████████████████████████

████████████████████████████ DX-52. ████████

██████████████████████████████████████

██████████████████████████████████████

Dec. 9, 2025 Hr'g Tr 203:21-204:16.

71.    ████████████████████████████████████

██████████████████ DX-3 at 172:13-23 (Tunkel Dep. Tr.). ██████

██████████████████████████████████████

██████████████████████████████████████

*Id.* at 185:1-7. ████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ Dec. 9, 2025 Hr'g Tr. 186:14-187:2

(Tunkel). ██████████████████████████████████████

█████, DX-8 at 44:19-45:7 (Jones Dep. Tr.), ███████████████████████

███████████████████████████████████████████████

██████████████████████ DX-3 at 185:9-14 (Tunkel Dep. Tr.).

72.    ███████████████████████████████████████████████

████████████████████████ *Id.* at 36:12-23. ███████████████████

████████████████████████████████. Dec. 9, 2025 Hr'g Tr. 227:23-228:10

(Tunkel). ██████████████████████████████████████

███████████████████████████████████████████████

██████████████████ DX-3 at 155:4-156:7 (Tunkel Dep. Tr.).

73.    ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████. DX-52; Dec. 8, 2025 Hr'g Tr. 128:11-23 (Tunkel); Dec. 9,

2025 Hr'g Tr. 189:19-24; *see* DX-47 at 2-3. ████████████████████████

███████████████████████████████████████████████

█████████████████████████████████ Dec. 9, 2025 Hr'g Tr.

183:11-18 (Tunkel). ██████████████████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

*Id.* at 189:19-190:4.

74. ████████████████████████████████████████████████████

█████████████████████████████████████████ DX-3 at

171:19-172:2 (Tunkel Dep. Tr.). ████████████████████████

███████.  Dec. 9, 2025 Hr'g Tr. 189:19-190:4; 203:21-204:22 (Tunkel). ████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████.  DX-8 at 197:10-198:3 (Jones Dep. Tr.)

██████████████████████████████████████████████████████

████████████████████████████████ Dec. 9, 2025 Hr'g Tr. 204:17-22

(Tunkel).

75. ███████████████████████████████████████████.  DX-3 at

171:2-172:2 (Tunkel Dep. Tr.).

76. ████████████████████████████████████████████████████

█████████████████████████████████.  PX-48. ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████



. *Id.* at 5.

*Id.*

at 2.

. *Id.*

DX-8 at 224:13-225:2 (

*id.* at 225:12-226:9.

77. *See* DX-15, DX-16.

. *See* PX-48

at 8; DX-52.

78. PX-127.

*Id.* at

1-2.



██████. *Id.* at 2. ████████████████████████████████████

███████████████████████████████████. *See supra* ¶ 77.

79. ████████████████████████████████████████████████

████████████. DX-47 at 2-3. ████████████████████████

████████████████████████████████████████████████

███████████████████████████████ *Id.* at 2; DX-52. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████. DX-47 at 2-3; *see* DX-52. █████████████████████

███████ DX-47 at 2, DX-52.

80. ████████████████████████████████████████████████

███████████████████████ *Compare* PX-127 at 1-2 *with* DX-47 at 2.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████. DX-8 at 249:3-250:6 (Jones

Dep. Tr.); *compare* PX-127 at 1-2 *with* DX-47 at 2.

81. On October 16, 2025, rather than continue negotiations, Cumulus filed a lawsuit, PX-289

(Compl.), as well as a motion for a preliminary injunction, PX-290 (Dkt. 8). ███████████

████████████████████████████████████████████████

██████████████████████████████████████ Dec. 9, 2025

Hr'g Tr. 225:10-18 (Tunkel); DX-8 at 306:11-307:2 (Jones Dep. Tr.). Instead, Mr. Jones

told Mr. Tunkel that Cumulus had "made the determination, unless [it] can get the rate

down to X, [Cumulus is] okay with going without, which would mean [Cumulus] can

operate" without Nationwide ratings. Dec. 9, 2025 Hr'g Tr. 225:10-18 (Tunkel). Cumulus never conveyed that if it agreed to Nielsen's offer for the full Nationwide service and the 32 local markets (Nielsen's October 16, 2025 proposal), ███████████████████ *Id.* at 225:19-24. In fact, Cumulus did not, on its own accord, ███████████████████ ███████████████████████████████ DX-8 at 306:11-307:2 (Jones Dep. Tr.).

82. █████████████████████████████████████████

████████████████████████████████████████████

███████ Dec. 8, 2025 Hr'g Tr. 128:11-23 (Tunkel). ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ DX-17 at 2-3. ████████████████████████

████████. Dec. 8, 2025 Hr'g Tr. 128:11-23 (Tunkel).

83. █████████████████████████████████████████

████████████. *See* DX-8 at 218:14-219:3 (Jones Dep. Tr.) ████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████); *id.* at 198:5-19 (" ██████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████).

84. █████████████████████████████████████████.

*Compare* PX-127 at 1-2 ( ████████████████████████████ ) *with* DX-47

at 2 (█████████████████████████). ████████████████████

████████████████████████████████████████

███████████████ DX-3 at 192:11-19 (Tunkel Dep. Tr.). ██████████████

████████████████████████████████████████

████████████████" *Id.*

85.   ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████ DX-8 at 250:8-251:5; 228:25-229:25 (Jones Dep. Tr.).

████████████████████████████████████████

███████████████████████████████" *Id.* at 228:25-229:25.

86.   While the parties were in the midst of negotiating a new agreement, Cumulus was also engaging in negotiations with Eastlan for local audience measurement data.  DX-22; DX-23 (Cumulus internal communications from October 21, 2025, expressing concern that Eastlan would not be able to begin measuring certain local markets until December). █

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████. DX-17 at 2-3.

87.   ████████████████████████████████████████

███████████████████████. DX-17 at 1. ██████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████. Dec.

9, 2025 Hr'g Tr. 194:15-195:7 (Tunkel). ████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ *Id.* at 194:18-195:10. ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ *Id.* at 196:15-25.

88.    ████████████████████████████████████████████████████████

████████████████████████████████████████████. DX-17 at 1. ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ DX-3 at 198:6-15 (Tunkel Dep.

Tr.). ████████████████████████████████████████████████████████

DX-17 at 1.

89.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████. DX-18 at 1. ████████████████

████████████████████████████████████, *id.,* ████████████████



*See infra* ¶ 93.

DX-3 at 177:9-178:5 (Tunkel Dep. Tr.),

*id.* at 182:24-183:10,

, *see infra* ¶ 93.

90.

DX-24 at 3.

. *Id.* at 3-6; *see* DX-17 at 1.

. Dec. 9, 2025 Hr'g Tr. 224:14-18 (Tunkel).

*Id.* at 224:19-225:3.

*Id.*

91.

. DX-3 at 180:2-15 (Tunkel Dep. Tr.).



██████████████████████████. Dec. 8, 2025 Hr'g Tr. 126:14-22 (Tunkel). ████

███████████████████████████████████████ *Supra* ¶¶

12-15.

92.    ██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ Dec. 9, 2025 Hr'g Tr. 204:23-205:16

(Tunkel). ██████████████████████████████████████

████ *id.* at 212:21-213:20; DX-3 at 13:10-23 (Tunkel Dep. Tr.), ████████

██████████████████████████████, DX-3 at 97:25-98:22, 99:23-

100:5, 123:19-124:7 (Tunkel Dep. Tr.), ████████████████████

████████████████████████████████████████████████

████████████████████████████ Dec. 9, 2025 Hr'g Tr. 227:23-228:10

(Tunkel). ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████. *See id.* at 212:21-213:20; DX-3 at 13:10-23

(Tunkel Dep. Tr.).

93.    ██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████. DX-8 at 228:25-229:25 (Jones Dep.

Tr.). ████████████████████████████████████████

████████████████████████████████████████████████

██████████ PX-287 at 109:5-110:2 (Orszag Dep. Tr.).

**VII.    THREAT OF FINANCIAL RUIN**

94.    Cumulus now claims that it is facing an "existential threat" of ███████████ due to the Policy.  Dec. 8, 2025 Hr'g Tr. 23:5-6 (Pl. Opening); PX-291 (Dkt. 60) at 11-17.

95.    Cumulus never raised these concerns to Nielsen when negotiating the terms for a new contract.  DX-8 at 306:6-307:2 (Jones Dep. Tr.).  That is, Cumulus never told Nielsen ███ ████████████████████████████████████████████████████████ Dec. 9, 2025 Hr'g Tr. 225:10-18 (Tunkel).  ████████████████████████████████ ████████████████████████████████████████████," DX-3 at 128:5-10 (Tunkel) (discussing DX-10) (emphasis added), belying Cumulus's claim now that it would ███████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████ Dec. 9, 2025 Hr'g Tr. 192:2-14 (Tunkel) (emphasis added).

96.    In its preliminary injunction motion, Cumulus claimed a threat of irreparable harm "[i]f Westwood One was unable to use the Nationwide product to provide the analyses required by advertisers and advertising agencies."  PX-290 at 21 (Dkt. 8).  There is no evidence, however, that Cumulus is at any risk of not having access to Nielsen's Nationwide data.  The evidence of Nielsen's many offers to Cumulus—seven of which included the Nationwide service (*see supra* ¶¶ 67-88)—renders such a claim of harm implausible.

97.    Nowhere in its complaint or its initial motion and accompanying declarations, does Cumulus reference ███████████████  *See* PX-289 (Compl.); PX-290 (Dkt. 8).

98.    █████████████████████████████████████████████████ █████████████████████████████████████████████████

████████████████████████████████████████████ Oct. 29, 2025

Conf. Tr. 17:24-18:6. ██████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████ PX-40 (dated October 1, 2025); PX-290 at 29 (Dkt. 8) (dated October 16, 2025); *see* Oct. 29, 2025 Conf. Tr. 17:24-18:6.

99.   ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████ Dec. 8, 2025 Hr'g Tr. 20:10-13 (Pl. Opening). But the evidence does not support that claim.

100.   ████████████████████████████████████████

DX-8 at 607-611, ██████████████████ DX-9.

101.   In Cumulus's most recent earnings release, published on October 30, 2025, Cumulus's CEO, Mary Berner, stated to investors that she was "confident in [Cumulus's] ability to position the Company for long-term success." DX-1 at 1. Ms. Berner announced that Cumulus "continued to outperform" and "once again gained market share[.]" *Id.* Cumulus's latest earnings report revealed that Cumulus has $90.4 million in cash, earned $180.3 million in net revenue in the third quarter, and has only $23.9 million debt due next year. *Id.*

102.   Cumulus's latest 10-Q was published and certified as this litigation was pending on October 30, 2025. DX-9 at PDF pp. 31-24. In the 10-Q, Cumulus stated: "[w]e believe our business model, current cash reserves, and borrowings from time to time . . . will allow us

to manage our business and anticipated liquidity needs for at least the next twelve months."

*Id.* at PDF p. 9. ██████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████

103.  ████████████████████████████████████████████████  DX-

9, DX-34, DX-38, ████████████████████, DX-25.  And Cumulus did not file any

declaration from its CEO or CFO, each of whom signed Cumulus's latest 10-Q.  DX-9 at

PDF pp. 32-34.

104.  Cumulus's public financial statements, generated in the ordinary course of business, ██████

███████████████████████████████████████████████████████

PX-287 at 147:14-149:21 (Orszag Dep. Tr.).  ████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████  PX-285 at 180:14-181:1

(Furchtgott-Roth Dep. Tr.).

105.  ███████████████████████████████████████████████████████

████████████████████████████████  PX-285 at

185:12-19 (Furchtgott-Roth Dep. Tr.).

106.  Cumulus has been paying the prices that Nielsen charges "for many years."  Dec. 8, 2025

Hr'g Tr. 16:11-15 (Pl. Opening).  The difference between Cumulus's ████████ proposal

and Nielsen's ████████ response is ████████ or ████████████████ of Cumulus's

annual revenues or costs.  *See* DX-9 at PDF p. 5 (extrapolating revenue and expenses for

the full year); DX-8 at 44:19-45:7 (Jones Dep. Tr.) (revenue is between $750 and $800

million); *id.* at 288:8-290:18 (breaking down Cumulus's $700 million cost base).

107. ██████████████████████████████████████████████

██████████████████████████████████████ PX-272 ¶ 10 (Jones Supp.

Decl.). █████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ *Id.* ¶ 12. ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

108. ████████████████████████████████████████████

████████████████████████████████████████████████

███████  ██████  █  ██████  █████  █████  █████  █

██████████████████████ PX-272 ¶ 13 (Jones Supp. Decl.). ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ *Id.* █████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ *Id.*

109. ███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ *See* PX-300 (Jones Supp. Decl.

with exhibits). ███████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████ PX-272 ¶ 13 (Supp. Jones

Decl.) █████████████████████████████████

████████████████████████████████ PX-285 at 198:16-18 (Furchtgott-Roth

Dep. Tr.).[2]

110. ██████████████████████████████████████████████

██████████████████████████████████████████████████

████████ For example, the Federal Reserve has lowered interest rates twice ████████

████████████████████████████████████████ which would

lower the effective interest rates Cumulus pays on a number of its loans, improving

Cumulus's financial outlook. BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

"Federal    Reserve    Issues    FOMC    statement,"    Oct.    29,    2025,

https://www.federalreserve.gov/newsevents/pressreleases/monetary20251029a.htm;

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, "Federal Reserve Issues FOMC

statement,"    Dec.    10,    2025,

https://www.federalreserve.gov/newsevents/pressreleases/monetary20251210a.htm.

---

[2] If Cumulus purports to identify the supposed PwC analysis in connection with its proposed findings of fact, the Court should reject such an effort. Cumulus presented no evidence identifying such an analysis while the evidentiary record was open. And any effort to identify such an analysis at this stage would be highly prejudicial to Nielsen, because Nielsen and its expert have not had a fair opportunity to test such an analysis and present any responsive points to the Court.

Moreover, a myriad of other business actions will impact the financial outlook of this $700 million-revenue company.

111.    █████████████████████████████████████████████████████████

████████████████████████  PX-272 ¶ 15 (Jones Supp. Decl.); PX-287 at 154:23-155:2 (Orszag Dep. Tr.).  ███████████████████████████████████

███████████████████  *see e.g.*, PX-40.████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████  *see* Jeff Cox, "Divided Fed Approves Third Rate Cut This Year, Sees Slower Pace Ahead," CNBC, Dec. 10, 2025, https://www.cnbc.com/2025/12/10/fed-interest-rate-decision-december-2025-.html.  Every quarter point interest rate cut will ██████████████████████████████████████████████  PX-287 at 153:23-154:22 (Orszag Dep. Tr.).  As mentioned, the Federal Reserve has announced two quarter point interest rate cuts ██████████████████████████████████ ████████████████████  PX-272 ¶ 13 (Jones Supp. Decl.).

**VIII.    CUMULUS'S ADDITIONAL OPPORTUNITIES TO** ██████████████████

112.    There is no evidence ████████████████████████████████████

████  creates ██████████████████████████████  *See supra* ¶¶ 104-106.  But even if ███████████████████████████, Cumulus has "additional opportunities to cut costs" █████████████████  PX-272 ¶ 29 (Jones Supp. Decl.).  Cumulus can cut ████████████ in spending elsewhere, which is "an ongoing thing that [Cumulus] does in the ordinary course of business."  DX-8 at 284:19-285:5 (Jones Dep. Tr.); PX-271 ¶ 14 (noting options for cost-cutting).

113.    As Cumulus's Co-President of Operations, Dave Milner, stated in his declaration, "[i]f all of Cumulus's local radio stations are forced to subscribe to Nielsen's local radio ratings data," Cumulus could respond by "reduc[ing] operating costs." PX-264 ¶ 31 (Milner Decl.). These cost cuts could include ███████████████████████████████████████ ████████████████████████████████████████████████ *Id.*

114.    "The largest component of [Cumulus's] cost base is people." DX-8 at 288:8-11. (Jones Dep. Tr.). Cumulus spends approximately ████████████████ of its $700 million operating costs on people. *Id.* at 289:7-12.

115.    The second largest "cost bucket is . . . broadcaster rights that [Cumulus] pays to various different leagues for either national rights or local rights." *Id.* at 288:8-24. Cumulus spends about ███████████ on these rights. *Id.* at 289:13-15.

116.    ████████████ of Cumulus's cost base is comprised of "various different other types of leases," "costs related to telecom and utilities . . . satellites . . . benefits, things like that." *Id.* at 289:21-290:18.

117.    ██████████████████████████████████████████████ *Id.* at 291:10-22.

118.    ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████ PX-272 ¶ 8 (Jones Supp. Decl.). ████████████████
████████████████████████████████████████████████
███████████████████████████████ *See, e.g.*, Sophia Young, "Austin-

Based Endeavor Adds Midtown Site to Growing Nashville Land Portfolio," NASHVILLE BUSINESS JOURNAL, Dec. 5, 2025 ("Austin-based Endeavor Real Estate Group spent $10.5 million on a Midtown property ... [owned by] Cumulus Broadcasting Inc."), https://www.bizjournals.com/nashville/news/2025/12/05/endeavor-nashville-buy-music-row-gulch-develop.html.

119.    "[A]s part of [Cumulus's] cost-cutting initiatives," the company ████████████ ███████████████████████████ PX-272 ¶ 8 (Jones Supp. Decl.). ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ *Id.* ███████ ██████████████████████████████████████ DX-8 at 297:12-19 (Jones Dep. Tr.). ███████████████████████████████████ PX-271 ¶ 14 (Milner Supp. Decl.). ████████████████████████████████████████ ███████ PX-287 at 151:4-153:10 (Orszag Dep. Tr.).



120.    In addition, Cumulus can respond to adverse business developments by deferring proposed investments. For example, Mr. Jones declared that one of Cumulus's objectives in reducing its expenses is "to make the necessary investments to grow our digital business long-term." PX-272 ¶ 7 (Jones Supp. Decl.).

## IX.    CUMULUS'S CLAIM OF REPUTATIONAL HARM

121.    Cumulus claims that losing access to the Nationwide products would have "severe ramifications," including an "imminent threat" of "reputational harm." PX-289 ¶¶ 131, 228 (Compl.). But there is no evidence that Cumulus will "los[e] access to the Nationwide product," other than as a result of Cumulus's own business decisions. *Id.* ¶ 131. ████ ████████████████████████████████████████████████████████████

██████████████████████████████████ DX-3 at 128:5-10 (Tunkel) (discussing DX-10),

contradicting any concerns for reputational harm, much less imminent reputational harm.

████████████████████████████████████████████████████████

████████████████████████████████████████ Dec. 9, 2025 Hr'g Tr.

192:2-12 (Tunkel) (emphasis added).

122.    Cumulus rejected an offer to extend the current contract with Nielsen.  *Supra* ¶¶ 88-89.

████████████████████████████████████████████████████████

███████████████████████████████.  PX-274 ¶ 9 (Tunkel Decl.); DX-52; DX-3 at

181:11–182:3 (Tunkel Dep. Tr.). ████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████.  *See* supra ¶¶ 67-89.  ████████████████

████████████████████████████████████████████████████████

████████████.  Dec. 9, 2025 Hr'g Tr. 224:14-25 (Tunkel).

123.    At the same time, Cumulus has discussed partnering with Eastlan to utilize a "nationwide-like" product launched by Eastlan, which Eastlan could have operational in approximately a year.  Dec. 11, 2025 Hr'g Tr. 311:16-313:14 (Gould).  Eastlan claims that its product is comparable to Nielsen's, but at a lower price.  *Id.* at 309:11-17.  ████████████████████

███████████████████████████████████ DX-3 at 116:8-13 (Tunkel Dep. Tr.).  While Eastlan is willing to develop a Nationwide-like product, Cumulus has apparently discontinued those discussions, Dec. 11, 2025 Hr'g Tr. 313:5-14 (Gould), further underscoring that any harm to Cumulus from a lack of a Nationwide product would be self-inflicted.

124. Cumulus did not attempt to develop its argument of reputational harm at the evidentiary hearing before the Court.  *See* Dec. 8, 2025 Hr'g Tr. 15:12-33:2 (Pl. Opening).

## X.    CUMULUS'S CLAIM OF REDUCED MARKET SHARE

125. Cumulus states that "it needs" Nielsen's Nationwide service "to survive." Dec. 8, 2025 Hr'g Tr. 32:11-12 (Pl. Opening).  Cumulus represents that it "cannot sell to national advertisers . . . without the complete nationwide product." *Id.* at 25:24-25.

126. If Cumulus accepts one of Nielsen's open offers, Cumulus would continue to receive the Nationwide report and eliminate the alleged harm.  *See* DX-52.  Accordingly, any harm to Cumulus in this category would be self-inflicted.  ███████████████

███████████████████████████████

███████████  DX-3 at 128:5-10 (Tunkel) (discussing DX-10), ███████████

███████████████████  Dec. 9, 2025 Hr'g Tr. 192:2-12 (Tunkel) (emphasis added).  ███████████████

███████

127. If Cumulus were "operating with the same level of data, information . . . ratings that [it] ha[s] today . . . [it] would . . . be able to perform from a market share perspective consistently with the way [it] ha[s] historically." DX-8 at 276:6-21 (Jones Dep. Tr.).

128. Cumulus submitted one declaration from one advertiser—Jeffrey Small of Strategic Media Inc. (SMI)—stating that "it would be very challenging to justify buying advertising from a network that a client has worked with previously if the network has incomplete Nielsen's national ratings data." PX-266.  Cumulus does not state that SMI has ever purchased advertising from Cumulus in the past, nor that it plans to stop purchasing advertising from

Cumulus in the future if it loses the Nationwide service. Cumulus does not quantify the loss it would face if SMI stopped purchasing advertising from it.

129. If Cumulus no longer has access to Nielsen's Nationwide report, advertisers would not "entirely" drop Westwood One. PX-285 at 166:6-17 (Furchtgott-Roth Dep. Tr.).

130. Cumulus's expert has not analyzed how many advertisers would drop Westwood One if it lost access to Nielsen's Nationwide report. PX-285 at 166:6-20 (Furchtgott-Roth Dep. Tr.). Nor has Cumulus submitted any evidence suggesting that it would lose any advertisers if it switched to a Nationwide-like product developed with Eastlan.

131. Cumulus's expert does not know how much syndicated programming Westwood One would need to drop if it lost access to Nielsen's Nationwide data. *Id.* at 166:21-23.

132. Cumulus's expert cannot identify the discount Westwood One would need to offer its surviving advertisers if it lost access to Nielsen's Nationwide data. *Id.* at 166:25-167:3.

## XI.    CUMULUS'S CLAIM OF HARM TO COMPETITION

133. Eastlan claims that the Policy makes market penetration more difficult because it impacts the biggest players in radio—Cumulus, iHeart, and Audacy. Dec. 11, 2025 Hr'g Tr. 277:9-280:6 (Gould). However, since Nielsen announced the Policy, Cumulus, Audacy, and iHeart have reached out to Eastlan at an increased frequency and the conversations taking place now are "at a different level. It's at a C level instead of at a regional manager level or a research director level, and they are looking for solutions." *Id.* at 280:14-281:14. There is no evidence that Cumulus, let alone any network operator, was foreclosed from doing business with Eastlan. In fact, Cumulus both initiated and expanded its business with Eastlan after Nielsen announced the Policy. *See id.* at 314:21-315:12.

134.    In 2025—after the Policy was announced—Cumulus began using Eastlan's services in Memphis, Syracuse, Atlanta, Chicago, Cincinnati, Dallas and Houston.  DX-19; DX-20; DX-21.  Furthermore, Cumulus and Eastlan have discussed contracting for additional markets—Detroit, Indianapolis, Kansas City, Minneapolis, Nashville, Providence, Salt Lake City, San Francisco, and Washington D.C.  DX-61 at 1.  Cumulus has discussed coverage with Eastlan for  "nearly every market that they have."  Dec. 11, 2025 Hr'g Tr. 316:11-17 (Gould).  Even if Cumulus decided to resubscribe to Nielsen's Memphis data, it would have no effect on Eastlan, because Nielsen offered that "market for free. . . you can continue to do whatever else you'd like."  DX-3 at 137:24-138:7 (Tunkel Dep. Tr.).

135.    The Policy does not "foreclose[]" Eastlan from entering markets or inhibit "Eastlan's ability to compete" because "they have access to sufficient number of stations to sell their product."  Dec. 8, 2025 Hr'g Tr. 118:5-121:11 (Orszag); *see id.* at 91:4-92:7 (analysis of the data "shows that there is plenty of opportunities for [Eastlan] to have subscribers in which they are not affected by this network policy").

136.    "[T]he complaint and the Gould declaration make it clear that [Eastlan] will enter [a market] with one radio station owner.  One subscriber in a market, they will enter."  *Id.* at  91:4-13; *see* PX-289 ¶ 86 (Compl.) (stating Eastlan "has the ability, willingness, and incentive to enter a new geography with even a single local radio station purchasing its data"); PX-267 ¶ 13 (Gould Decl.).  Accordingly, the relevant statistic to evaluate whether Eastlan is capable of entering a market is whether there are stations willing to use Eastlan—not the market's available revenue.  Dec. 8, 2025 Hr'g Tr. 98:3-10 (Orszag).  There is nothing in the record indicating that Eastlan requires a major customer to enter a market; "they started their whole business focused on smaller markets."  *Id.* at 111:8-21.  In fact, Eastlan has

historically entered markets, such as Hot Spring, Arkansas, where the entire available revenue was less than one-third of the revenue generated by a single iHeart station in another market. *Id.* at 97:2-5; 98:11-99:20; PX-283 at 51.

137. The Policy at most applies to a fraction of Nielsen's customers, see Dkt. 62 at 21-22 (Def. Opp. To Pl. PI Mot.), and could not deprive Eastlan of "minimum viable scale," *see* PX-278 ¶ 24 (Orszag Decl.). Specifically, at least 50% of owners in 90 percent of the local markets in which Cumulus operates are not subject to the Policy. *Id.* ¶¶ 38-39; *see id.*, Table 1; Dec. 8, 2025 Hr'g Tr. 120:5-23 (Orszag).

138. Because most station owners are not subject to the policy and Eastlan can enter a market with even a single subscriber, *supra* ¶ 32, there are "always . . . stations that are available for Eastlan to sell its product, in every single one of Cumulus's markets," Dec. 8, 2025 Hr'g Tr. 120:5-23 (Orszag); *see id.* at 108:2-109:4 ("Eastlan has "available to them many different station groups and stations to sell their products."); PX-278 ¶ 36 (Orszag Decl.).

139. "[T]he empirical evidence . . . shows that [Eastlan has] not been constrained in their ability to enter markets as evidenced by the success they've had in recent years in their growth in those larger markets." Dec. 8, 2025 Hr'g Tr. 113:4-20 (Orszag). Eastlan entered "18 new markets" in the past year, five between September and December alone. Dec. 11, 2025 Hr'g Tr. 306:17-22 (Gould); *see also* DX-6 at 1 (Mr. Gould describing Eastlan's addition of dozens of markets); Dec. 8, 2025 Hr'g Tr. 52:12-18 (Def. Opening) (discussing DX-6); DX-2 (April 28, 2025 Eastlan Press Release: "Eastlan Acceptance Spreads"); DX-7 (Aug. 18, 2025 Eastlan Press Release: "Five More Markets Go Eastlan"). Even after the Policy was announced, Eastlan has experienced "growth and continued expansion," "convert[ing] customers in a number of markets from the Nielsen product to the Eastlan product," Dec.

8, 2025 Hr'g Tr. 67:5-68:3 (Orszag), and "grow[ing] into larger and larger markets," *id*. at 92:23-93:10.  Eastlan has already demonstrated its ability to enter even the largest radio markets in the country with ease, as it entered into Chicago, Atlanta, Dallas, and Houston in roughly two-and-a-half months.  Dec. 11, 2025 Hr'g Tr. 315:21-316:6 (Gould); *see id.* at 303:10-13 (Eastlan could "[a]bsolutely" "scale to add 100 markets and not have issues with creating the ratings or profitability").

140.  "Once Eastlan enters a market, it can grow efficiently because it has the low marginal costs after the first subscriber*," Id.* at 304:16-21.  Eastlan's "marginal cost is zero, or effectively zero, for serving an incremental customer" because they "have the data and [they're] just selling it again."  Dec. 8, 2025 Hr'g Tr. 107:23-108:14 (Orszag).  In light of "the nature of this market, there is no ability to raise rival's costs . . . . There is no ability to . . . raise their price of production, [or] raise their price of distribution."  *Id.* at 107:23-108:25; *see id.* at 91:4-92:1 (Nielsen cannot "drive up costs of production or distribution" because "[t]hose are already controlled and owned by Eastlan"); *id.* at 118:5-17 (observing that Nielsen cannot "raise rivals' costs or to harm the competitive process . . . given the nature of the product"); *id.* at 119:7-120:4 ("The critical element from an economic perspective is that . . . there is nothing that Nielsen can do to move the marginal costs of Eastlan.").

141.  In addition to its growth in local markets, Eastlan has the ability to enter the market with a Nationwide-like product in approximately one year, with an expenditure of approximately $5 million, with just one subscriber.  Dec. 11, 2025 Hr'g Tr. 310:23-312:12 (Gould).  Even according to Cumulus's expert, this threat of entry puts competitive pressure on Nielsen, in all of the markets in which Eastlan is capable of entering.  *See* PX-285 at 22:10-23:5 (Furchtgott-Roth Dep. Tr.) (Cumulus's expert stating that Nielsen is not a monopolist in

local markets, even where it has "one hundred percent of the market" because "it faces potential entry from Eastlan in a lot of markets, and that potential entry creates competitive pressure on Nielsen").

142.    None of Nielsen's policies prevent Cumulus, or any of its customers, from switching entirely to Eastlan.  Dec. 11, 2025 Hr'g Tr. 318:2-10 (Gould),  None of Nielsen's policies prevents any customer from switching to a Nationwide-like product from Eastlan.  *Id.* at. 314:1-10.  This is unsurprising as there is no evidence that the Policy has anything to do with Eastlan's competition; the Policy aims to prevent free riding by customers who do not pay for Nielsen's local data.  Dec. 8, 2025 Hr'g Tr. 71:13-22 (Orszag).

## XII.    THE REQUESTED RELIEF

143.    On October 16, 2025, Cumulus filed a motion for emergency relief, asking the Court for a preliminary injunction to (1) enjoin "any tie or constructive tie" in "any negotiation"; (2) order Nielsen "to continue providing its Nationwide product . . .  under the currently existing contract terms for that product"; and (3) prohibit "retaliatory conduct."  DX-49 (Dkt. 7-1) (PI Proposed Order).

144.    During the October 29, 2025, status conference, the Court noted that Cumulus's requested relief was "not the status quo," as it would not merely maintain the parties' current agreement.  Oct. 29, 2025 Conf. Tr. 13:12-24.  The Court recognized that Nielsen has been "offering to extend the whole contract that was agreed to," but Cumulus's request for only Nationwide is a request to "[e]xtend[] a piece of a contract."  *Id.* at 15:8-14.  As the Court explained:  "Extending a piece of a contract is not extending a contract."  *Id.* at 15:12-14.

██████████████████████████████████████████████████

████████████████████████████    *Id.* at 17:6-9.

51

145.    On November 24, 2025, Cumulus filed its pre-hearing brief, now seeking a different injunction.  PX-291 at 27 (Dkt. 60).  While Cumulus again asked the Court to (1) enjoin "any tie or constructive tie" and (3) prohibit "retaliatory conduct," *id.* ; DX-49 (Dkt. 7-1), Cumulus changed the remainder of its request.  Cumulus no longer asks the Court to impose the "currently existing contract terms."  DX-49 ¶ 2 (Dkt. 7-1).  Instead, Cumulus requests an order "requiring Nielsen to provide Cumulus with Nationwide *and local radio ratings data in markets selected by Cumulus*, at current contract rates, or alternatively, requiring Nielsen to *immediately negotiate* with Cumulus in good faith, without the Tying Policy, at reasonable rates, consistent with past practice."  PX-291 at 27 (Dkt. 60) (emphasis added).  In other words, Cumulus asks the Court to write a new ambiguous contract of its choosing that Nielsen has never offered.

146.    Cumulus notably eliminated any reference to "currently existing contract terms," likely ███████████████████████████████████████████████████████████████ ███████████████████████ DX-17 at 1.

147.    ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████. DX-52. ██████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████ DX-17 at 1; *see* DX-52; *see also* Dec. 9, 2025 Hr'g Tr. 224:10-225:3 (Tunkel). ███████████████████████████████ ████████████████████████████████████████████████████, DX-52, ██████ ████████████████████████████████████████████████████████████, DX-47 at

2-3. ██████████████████████████ Dec. 9, 2025 Hr'g Tr. 224:10-15 (Tunkel).

148. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████ DX-49 at 1 (Dkt. 7-1); Dec. 9, 2025 Hr'g Tr. 227:23-228:6 (Tunkel).

149. ████████████████████████████████████

████████████████████████ to Cumulus's requested relief to extend the "currently existing contract terms." DX-49 at 1. A vague order requiring Nielsen to "negotiate in good faith" would thus be both confusing and unnecessary.

150. ████████████████████████████████████

████████████████████████████████████

██████████████████████████ PX-291 at 27 (Dkt. 60); PX-274 ¶ 10 (Tunkel Decl.). ██████████████████

████████████████████████████████████

████████████████████████████████████

███████████████. *See* Dec. 9, 2025 Hr'g Tr. 213:24-214:9; 228:7-10 (Tunkel). ██

████████████████████████████████████

████████████████████████████████████

████████████████ DX-17 at 1.

**DEFENDANT'S PROPOSED CONCLUSIONS OF LAW**

I.    **THE PRELIMINARY INJUNCTION STANDARD**

151.    Injunctive relief "is an extraordinary and drastic remedy and should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (summary order) (cleaned up).  Courts must consider the plaintiff's showing of (1) "a likelihood of success on the merits," (2) "that [the plaintiff] is likely to suffer irreparable injury in the absence of an injunction," (3) that "the balance of hardships tips in the plaintiff's favor," and (4) "that the public interest would not be disserved by the issuance of [the] injunction." *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010) (citation modified).

152.    The Court cannot issue Cumulus's requested injunction without running afoul of the purpose of a preliminary injunction, which is "to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 742 (2d Cir. 1953); PX-291 at 9 (Dkt. 60) ("The purpose of a preliminary injunction is to preserve the 'status quo,' which is 'the last actual, peaceable uncontested status which preceded the pending controversy.'" (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014))).  No court has granted the sort of mandatory price-drop Cumulus seeks here, which would alter the last "uncontested status" between the parties: the existing contract.  *See Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024).  Cumulus is not seeking the status quo; instead, it is requesting a mandatory injunction that "mandates a specified course of conduct." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114

(2d Cir. 2006) (citation modified).  But injunctions "aim to keep matters as they are rather than shift things to the way one party would like them to be."  *Velesaca v. Decker*, 458 F. Supp. 3d 224, 234-35 (S.D.N.Y. 2020).  Specifically, Cumulus wants to receive the heavily discounted Nationwide price it currently pays, but without purchasing the local data that allowed Nielsen to offer that heavy discount while still recovering its costs.  DX-8 at 225:12-226:9 (Jones Dep. Tr.) ("The value improvement that would be derived if [Cumulus] were able to . . . drop [its] uneconomic markets, retain the nationwide product, would be about $12 million.  That's the improvement that [Cumulus] need[s] to see in order to . . . support . . . a relationship with Nielsen.").  Cumulus's request is similar to a shopper demanding the "buy one get one half off" discount while buying only the one (half off) product.  *See* DX-3 at 180:2-15 (Tunkel Dep. Tr.).

153.    Because Cumulus seeks to alter the status quo, it must meet a heightened standard to justify this Court issuing an injunction.  Cumulus seeks a mandatory injunction that would remove Nielsen's existing discretion to determine the terms on which it will deal with Cumulus and effectively force Nielsen to accept contract terms that it has not offered to Cumulus. *See Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (a mandatory injunction attempts to "alter the status quo by commanding [a] positive act"); *N. Am. Soccer League , LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37-38 (2d Cir. 2018) (status quo was federation's right to reject league's application each year, notwithstanding that federation had accepted league's application in prior years).  Such mandatory injunctions are "granted sparingly," with good reason, because they "disturb the status quo prior to final adjudication."  *Christie-Spencer Corp. v. Hausman Realty Co.*, 118 F. Supp. 2d 408, 418 (S.D.N.Y. 2000).

154.    Accordingly, Cumulus must make a "strong showing of irreparable harm" and establish a "clear or substantial likelihood of success on the merits." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023) (quoting *Actavis*, 787 F.3d at 650).  Even if Cumulus could meet the ordinary standard for issuing an injunction, Cumulus does not make a "strong" showing of irreparable harm or a "clear or substantial" showing of likelihood of success on the merits.  *Id.*

155.    Cumulus has failed to meet both the ordinary and heightened standards for a preliminary injunction.

## II.    CUMULUS HAS NOT DEMONSTRATED AN ACTUAL AND IMMINENT THREAT OF IRREPARABLE HARM

156.    This Court denies Cumulus's motion for a preliminary injunction because it does not demonstrate it will suffer irreparable harm absent an injunction.  "Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez* ex *rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233–34 (2d Cir. 1999) (citation modified). Thus, a "finding of no showing of irreparable harm is dispositive." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 68 (2d Cir. 2007).  Cumulus must show it "will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Pryor*, 481 F.3d at 66 (citation modified).  For mandatory relief, as Cumulus requests here, the threshold "become[s] more demanding still, requiring the plaintiff . . . make a strong showing of irreparable harm." *Daileader*, 96 F.4th at 356 (citation modified).  Because Cumulus cannot demonstrate it would suffer irreparable harm absent an injunction issuing, its motion fails.

157.    Cumulus's claim of irreparable harm is undermined by the shifting nature of its claim of harm.  In Cumulus's complaint and first motion for a preliminary injunction, Cumulus never referenced the alleged harm on which it later intensely focused, namely █████████ ████████████████████████████████████████████ instead, it focused on the claimed harm from not having access to Nielsen's Nationwide report.  *See* PX-290 at 1 (*Dkt. 8*) ("Without that comprehensive national radio ratings data, Westwood One would suffer grave harm that threatens its ability to survive as a business."), *id. at* 21 ("If Westwood One was unable to use the Nationwide product . . . it would not only be unable to sell advertising inventory as it does now, but it would also jeopardize the goodwill and reputation Westwood One maintains.").

158.    Harm is only irreparable where "remedies . . at law, such as monetary damages, are inadequate to compensate" for the harm.  *Salinger*, 607 F.3d at 80.  Cumulus's purported "injury"—paying more than it wants for a contract—is "readily compensable in monetary damages," which disqualifies it from showing the requisite irreparable harm.  *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72-73 (2d Cir. 1979).

159.    If Cumulus accepted any of Nielsen's offers, *see* DX-52, it could recover any "overpayment" as damages—treble damages at that—if it prevails on the merits.  *See Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (plaintiffs could simply "either . . . bear[] the costs . . . or . . . secur[e] a loan, and . . . be recompensed after trial"); *Geminatio, Inc. v. Hustad*, 2025 WL 1220233, at *7 (N.D.N.Y. Apr. 28, 2025) (plaintiff may demand "damages for the business [it] lost," if it "prove[s]" its claim).  *See also Apotheco Pharmacy Durham LLC v. Ahmed*, 2024 WL 2925212, at *5 (S.D.N.Y. June 10, 2024) (no irreparable

harm because, if plaintiff "proves" its claim, "then [defendant] may owe" it "reasonably calculable" damages).

160. Further, Cumulus cannot offer any sufficient explanation how it is facing imminent harm warranting an "urgent need for speedy action" as a consequence of Nielsen's alleged conduct. *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). █████████

████████████████████████████████████████████████████████████

████████████████████████████ DX-17 at 1, *supra* ¶¶ 88, █████████

████████████████████████████████████████████████████████████

██████████, *supra* ¶ 80, undermines any claim that Cumulus requires "emergency" relief before the expiration of its contract in December. *See Rex Med. L.P. v. Angiotech Pharms.*, Inc., 754 F. Supp. 2d 616, 623 (S.D.N.Y. 2010) (extension of an existing contract would maintain the status quo).

161. ██████████████████████████, *supra* ¶¶ 67-89, Cumulus effectively fabricates its own "harm." Where, as here, "the harm complained of is self-inflicted, it does not qualify as irreparable." *Convergen Energy WI, LLC v. L'Anse Warden Elec. Co., LLC*, 2020 WL 5894079, at *5 (S.D.N.Y. Oct. 5, 2020). This type of "self-inflicted harm[]" is "not considered irreparable." *Expedia*, 2019 WL 1499269, at *6; see *New Pac. Overseas Grp. (USA) Inc. v. Excal Int'l Dev. Corp.*, 1999 WL 285493, at *8 (S.D.N.Y. May 6, 1999) ("Far from being irreparable, the harm at issue appears readily avoidable through cover in the market."); *Sun Chem. Corp. v. Dainippon Ink & Chems.*, Inc., 635 F.Supp. 1417, 1423 (S.D.N.Y. 1986) ("avoidable" injury "does not constitute irreparable harm"). That is because Cumulus could █████████████████████████████████

████████████████ PX-287 at 260:12-24 (Orszag Dep. Tr.); *see* DX-8 at 276:23-277:13

(Jones Dep. Tr.) (If Cumulus were to receive the same data that it receives from Nielsen today into 2026 and 2027, it's "absolutely true," that the reputational harm and harm to market share that Cumulus alleged would be reduced.).

162. 

, DX-52, that Cumulus changed its theory of harm. At this point, Cumulus pivoted entirely to arguing that ███████████████████████████████████████████████ *See supra* ¶ 144. ████████████████ ███████████████████████████████████████ ; *see* PX-291 at 11-17 (Dkt. 60) ███████████████ ████. ███████████████████████████████████████ ███████████ *See* PX-291 at 11-17 (Dkt. 60).

## A. Cumulus Faces No Threat to the Viability of Its Business Without a Preliminary Injunction

163. Cumulus has now entirely pivoted its irreparable harm arguments to claim ████████████ ███████████████████████████████████████████ *See* PX-291 at 11-17 (Dkt. 60). But Cumulus's claim to be in a precarious financial situation is not a basis for emergency relief. While relief may be warranted where there is "ample evidence" of ███████████████ *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989), Cumulus has not made such a showing here. Rather, in cases where the plaintiff alleges ███████████████████████████████████████████ ██████████████████████████████████████████████████

59

*See DeVivo Assocs., Inc. v. Nationwide Mut. Ins. Co.*, 2020 WL 2797244, at *5 (E.D.N.Y. May 29, 2020) ("Instead of presenting concrete data on █████████████████ ████ plaintiff offers only the self-serving statement of its President that ████████████ ███████ (citation modified)).

164. ███████████████████████████████████████████████

██████████████████████ *supra* ¶¶ 108-111, ████████████

██████████████████████████████████████████████

████████████████ *See* PX-272 ¶ 10 (Jones Supp. Decl.) █████████████

██████████████████████████████████████████████

███████████████████ Courts have disregarded such unsubstantiated allegations. *See Sperry Int'l Trade, Inc. v. Gov't of Israel*, 670 F.2d 8, 12 (2d Cir. 1982) ███████████

██████████████████████████████████ ); *Cramer v. Devon Group, Inc.*, 1990 WL 210306, at *4, 6 (S.D.N.Y. Dec. 12, 1990) (███████████████

██████████████████████████████████ ).   Cumulus's attempts to substantiate these allegations also fall short.

165. First, Cumulus's claim that ███████████████████████████████████████

████████████ is inconsistent with Cumulus's public financial statements, signed by its CEO and CFO. *See supra* ¶¶ 100-04.

166. Second, Cumulus claims that a failure to achieve ███████████████ would threaten "the destabilization" of its $700 million business. Dec. 8, 2025 Hr'g Tr. 31:10-11 (Pl. Opening). But ████████████████████████████████████████████████████████████

███████████████████████████ PX-272 ¶ 10.  Similarly, Cumulus's latest earnings report, released on October 30, 2025, revealed that Cumulus has $90.4 million in

cash, earned $180 million in profits in the third quarter, and has only $23.9 million debt due next year.  DX-1 at 1. ████████████████████████████████

████████████████████████████████████████████████████

████████████  PX-272 ¶ 12 (Jones Supp. Decl.)  This is more than enough to cover the ██

██████  bid-ask spread here.

167.  ████████████████████████████████████████████████

████████████████████████  *Id.* ¶ 13.  ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████  *Id.* ¶ 13.  ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

168.  ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ PX-300 ¶ 29.  Cumulus can cut ██████ in spending elsewhere, which is "an ongoing thing that [Cumulus] does in the ordinary course of business."  DX-8 at 284:19-285:5 (Jones Dep. Tr.); PX-301 ¶ 14 (noting options for cost-cutting).

169.    ████████████████████████████████████████████████████

██████████████████████ *See, e.g.*, Sophia Young, "Austin-Based Endeavor Adds Midtown Site to Growing Nashville Land Portfolio," NASHVILLE BUSINESS JOURNAL, Dec. 5, 2025, available at: https://www.bizjournals.com/nashville/news/2025/12/05/endeavor-nashville-buy-music-row-gulch-develop.html ("Austin-based Endeavor Real Estate Group spent $10.5 million on a Midtown property ... [owned by] Cumulus Broadcasting Inc.").  Cumulus has many additional assets it could—and plans to—sell, which dwarf the bid-ask spread between the parties. *See supra*, ¶¶ 112-117.

170.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████ PX-287 at 158:22-159:2 (Orszag Dep. Tr.). ████████████████████████████████████████ ████████████████████████████. *Id.* at 159:23-160:2.

171.    Cumulus relies on inapposite caselaw to argue that the Court could justify issuing an injunction here.  To start, Cumulus's "proof" of ██████████████ here falls short.  In *fuboTV*, plaintiff was armed with not only "the statements of Fubo's insiders," but "[a]mple documentary evidence kept in the ordinary course of Fubo's business," to support its claim that defendant's actions, absent injunction, "will precipitate the imminent downfall of its business."  *fuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 146 (S.D.N.Y. 2024),

*appeal dismissed*, 2025 WL 523263 (2d Cir. Jan. 8, 2025). The *fuboTV* plaintiff submitted "ordinary course data" that tracked subscriber viewership of its streaming programming that demonstrated that, absent an injunction, the launch of defendant's competing platform would deplete plaintiff's audience, pushing it to insolvency. *See id.* at 147-48. Comparable data here would include balance sheets, annual budgets, and other ordinary-course accounting documents that clearly illuminate the impact of the Nielsen contract on Cumulus's bottom line. Cumulus provides no such support. Instead, Cumulus relies entirely on self-serving declarations submitted by Mr. Jones, PX-272; PX-302, which its expert co-signs, PX-277 ¶¶ 91-94, ███████████████████████████

███████████████ PX-285 at 189:3-6 (Furchtgott-Roth Dep. Tr.).

172.    Additionally, even if this Court were to find that ████████████████████████

███████████ under *fuboTV*, which it has not, the relief that Cumulus seeks is foreclosed by *fuboTV*'s holding. In that case, plaintiff sought both an injunction stopping the launch of an anticompetitive venture, and the reconstruction of certain contract provisions with defendants that made it impossible for plaintiff to compete with the launching venture. *See fuboTV Inc.*, 745 F. Supp. 3d 109, 114 (S.D.N.Y. 2024). While the court granted the former, it refused to play "central planner' and involve itself in "re-ordering the complexities of the ongoing contractual and business relationships of market participants." *Id.* at 145. Instead the court left the parties' existing contract in place, reasoning "[i]f bundling . . . is to be struck down as an antitrust violation, it should come only after a full trial on the merits." *Id.* So too, here, does this Court refuse to involve itself in redefining the terms of the parties' existing contract. *See infra* ¶¶ 233-240.

173.    In *Texaco Inc. v. Pennzoil Co.*, plaintiff presented evidence that its "bonds were downgraded[.]…It was forced to withdraw from the commercial paper market. Banks…would no longer lend it money on unsecured terms[,]…potential joint venturers…cancelled negotiations[, and] suppliers refused to do business." 784 F.2d 1133, 1152 (2d Cir. 1986)*,* (reversed on grounds unrelated to the Second Circuit's irreparable harm analysis, by *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987)).  In contrast, here, ███

████████████████████████████████████████████████

████████████████████████████████████████ PX-285 at 185:12-19 (Furchtgott-Roth Dep. Tr.).  Further, all the harm that Cumulus alleges is entirely forward-looking and speculative: ██ ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ DX-272 ¶ 10 (emphasis added).  ██████████████████████████████████

████████████████████████  The concrete, already-occurring harm that existed in *Texaco* highlights that the proof Cumulus has proffered is insufficient to meet this standard.

174.    The threat of financial ruin that the plaintiff faced in *Texaco* was also materially different than what Cumulus alleges to face here.  In *Texaco* plaintiff was required to post an almost $12 billion bond—a requirement that it "could not possibly meet," given that "world-wide surety bond capacity ranges from $1 billion to $1.5 billion under the best possible circumstances."  784 F.2d at 1138.  Cumulus has not put forward any proof of regulatory restrictions that would prevent it from ████████████████████ than it wishes to pay on the parties' contract.  Additionally, the *Texaco* plaintiff showed that it did not have

"sufficient liquid or immediately-liquidatable assets to post $12 billion in cash . . . and still

retain sufficient liquid assets to operate its business." *Id.* Cumulus has shown the opposite.

████████████████████████████████████████████████████████

███████████████████████████████████ PX-272 ¶ 12 (Jones Supp. Decl.). ████

████████████████████████████████████████████████████████

███████████████████████████ *Id.* ¶ 13. ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████ *See id.* This is not █████████████████ that

tipped the scales toward an injunction in *Texaco.* ██████████████████████

███████████████████████████ Cumulus recently sold a Nashville property for $10.5

million, *supra* ¶118, and ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ PX-272 ¶ 29 (Jones Supp. Decl.); *see* PX-271 ¶ 14 (Milner Supp. Decl.).

These options, as undesirable as Cumulus may claim they are, distinguish Cumulus from

the *Texaco* plaintiff and ███████████████████████████████████████████

175.    In *Tucker Anthony Realty Corp. v. Schlesinger*, the court granted an injunction because the

plaintiff demonstrated its "[c]urrent liabilities exceed[ed] current assets, and plaintiffs

[we]re obligated on three loans totaling $2,245,000 all due on demand." 888 F.2d 969, 975

(2d Cir. 1989). In effect, the plaintiff was already insolvent. In contrast, on October 30,

2025, Cumulus's CEO, Mary Berner, stated to investors that she was "confident in [2026

Cumulus's] ability to position the Company for long-term success." DX-1 at 1. Cumulus's

latest earnings report revealed that Cumulus has $90.4 million in cash, earned $180 million in profits in the third quarter, and has only $23.9 million debt due next year.  DX-1 at 1.

176.    Cumulus cites *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir. 1993), Dkt. 8 at 24, which was based on contractual language that does not exist here. This difference alone should disqualify comparison.  In *Nemer*, plaintiff-franchisee sought to enjoin defendant-franchisor from opening competing Jeep dealerships in plaintiff's area pending arbitration, per the parties' contract.  The court held that the very existence of this arbitration provision "contemplates that the manufacturer's decision to add a new dealership will cause an existing dealer serious harm, difficult to compensate with money damages, because the contract requires [defendant] to maintain the *status quo*."  *Nemer*, 992 F.2d at 435.  Cumulus does not have the benefit of implied harm baked into contractual terms with Nielsen.  The parties here are two, independent economic actors negotiating the terms of a new contract—one that Nielsen "doesn't have an obligation" to enter.  PX-285 at 137:19-22 (Furchtgott-Roth Dep. Tr.).

177.    Beyond this, *Nemer* is also confined to "recently established businesses" where "the lack of a track record . . . preclude[s] a basis from which to extrapolate damages."  *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011); *see Caruso Mgmt. Co. Ltd. v. Int'l Council of Shopping Ctrs.*, 2019 WL 1949801, at *3 (S.D.N.Y. Apr. 18, 2019) (recognizing "the threat of lost business must be paired with the inability to calculate any money damages" and "[i]f a movant can calculate the harm caused by shu[tt]ering their entire business, or a substantial component of it, then there is no irreparable harm" (citation modified)).  But Cumulus is an established business and there is a clear basis from which to extrapolate money damages here.  *See* PX-287 at 259:9-260:24, 266:23-267:20 (Orszag Dep. Tr.).

178. Cumulus also relies on inapposite franchisor-franchisee cases. In *Roso-Lino v. Coca-Cola Bottling Co. of N. Y., Inc.*, Dkt. 60 at 16, plaintiff distributed only Coca-Cola products so it unavoidably could not operate without an injunction. 749 F.2d 124, 126 (2d Cir. 1984). For Cumulus to stand in the shoes of the *Roso-Lino* plaintiff, it would need to rely on Nielsen for the very lifeblood of its business—access to AM/FM waves. Nielsen has no such control over Cumulus. Additionally, here, unlike in *Roso-Lino*, Nielsen offered and continues to offer services to Cumulus, and without Nielsen Cumulus would not █████████ ████████████████████████████████████████████████████████████████ ██████████. *Id.*; DX-3 at 116:8-16 (Tunkel Dep. Tr.).

179. A key aspect of the relief granted in each of the cases on which Cumulus relies is that it preserved the status quo. The *Texaco* court enjoined the enforcement of a court order against plaintiff on the condition that it "promptly and diligently prosecute its appeal in the . . . appellate courts." *Texaco*, 784 F.2d at 1157. In *Tucker,* the court enjoined plaintiffs' general partner from making payments to himself or his controlled entities—that is to say payments that had not yet occurred—without court approval. 888 F.2d at 975. *Nemer* granted "a status quo injunction compelling specific performance." 992 F.2d at 436. As did *Roso-Lino*. *See* 749 F.2d at 126 (affirming "the district court's order directing the parties to arbitrate the termination dispute pursuant to the distributorship agreement," and affirming "the district court's stay of further proceedings" until resolution). And as discussed *supra* ¶ 172, the court in *fuboTV* explicitly declined to craft a relief that would modify the parties' existing contracts—the status quo. Cumulus's requested relief plainly falls outside of the parameters, both implicitly and explicitly put forth in the cases it relies on for support. Cumulus's relief, in its variously-requested forms, modifies the status quo

by requiring Nielsen to provide services at rates it does not offer.  *See supra* ¶¶ 143-147. This request is unsupported by the law.

180.    Further, Cumulus, itself, confirms it can cut at least ██████████ elsewhere, *see* PX-271 ¶ 14 (Milner Supp. Decl.); PX-272 ¶ 29 (Jones Supp. Decl.), which would not constitute irreparable harm.  *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72-73 (2d Cir. 1979) (even if "entire ████████████" and Cumulus ██████████████████████████ "we do not see why it would not be rather readily compensable in monetary damages.").  In addition, ██████████████████████████ ██████████████████████████ ██████████████████████████ ████████████ PX-287 at 265:8-266:2 (Orszag Dep. Tr.).

181.    Cumulus attempts to walk back these alternative cost-cutting measures, claiming that ██ ██████████████████████████ ████████████ PX-302 ¶ 4 (Jones Second Supp. Decl.).  This assertion is unsupported and unpersuasive.  Cumulus's expert admits that he did not analyze the various cost-cutting measures that Cumulus has been taking over the past several years, PX-285 at 69:3-21 (Furchtgott-Roth Dep. Tr.), leaving the Court with no empirical support as to ████████████████ ██████████████████ *See also supra,* ¶¶ 112-120.

182. Ultimately, Cumulus's claims of imminent negative financial consequences are speculative and ████████████████████████████████████████████ ████████████████████████████████████████████ *See infra* ¶¶ 186-187.   A preliminary injunction "should not issue upon [Cumulus's] imaginative, worst case scenario of the consequences flowing from [Nielsen's] alleged wrong but upon a concrete showing of imminent, irreparable injury." *DeVivo Assocs., Inc. v. Nationwide Mut. Ins. Co.*, 2020 WL 2797244, at *5 (E.D.N.Y. May 29, 2020).

**B.    Cumulus Faces No Harm to Competition Without a Preliminary Injunction**

183. Cumulus has also failed to establish irreparable harm to competition. *See Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987).  The Supreme Court has held that "[t]he antitrust laws . . .  were enacted for the protection of competition, not competitors," and it would be "inimical to the purposes of these laws to award damages for the type of injury claimed here." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (citation modified).  Even if Cumulus could show that Nielsen's Network Policy prevented Cumulus from doing business with Eastlan (a fact contradicted by Cumulus initiation and expansion of its relationship with Eastlan since the Policy was announced, *see* supra ¶ 34), that would not be harm to competition because it would involve just a single relationship between a competitor and a customer, not harm to the structure of the market.  *See Brunswick*, 429 U.S. at 488.

184. Because its argument about irreparable harm to competition hinges on its success on the merits, it fails to demonstrate irreparable harm for the same reasons its claim fails: (1) Nielsen does not require customers to buy Nationwide and local data together, so there is no tying here; (2) Cumulus must demonstrate that Nielsen's bundled pricing actually

forecloses competition to demonstrate the required anticompetitive effects, which it does not; and, (3) Cumulus does not allege harm to the structure of the market, it demonstrates how it would pay more than it wants for Nielsen's data, which is not an antitrust injury. *See infra*, ¶¶ 215-217.

### C. Cumulus Faces No Threat of Reputational Harm Without a Preliminary Injunction

185. Cumulus makes a "generalized damage to reputation" claim, which "falls short of irreparable injury." *TGG Ultimate Holdings, Inc. v. Hollett*, 2016 WL 8794465, at *4 (S.D.N.Y. Aug. 29, 2016). That is because Cumulus could " ██████████████████ ███████████████████████████████." PX-287 at 260:19-24 (Orszag Dep. Tr.); *see* DX-8 at 273:6-274:8 (Jones Dep. Tr.) (If Cumulus "had certainty around the nationwide product, [and] had certainty around having ratings in those markets that are economic for [Cumulus] to have them, that would [certainly] improve" potential harm to Cumulus's relationship with agencies and advertisers.).

186. Cumulus has not accepted ████████████████ because Cumulus does not like the price, not because the offers would fail to remedy any reputational harm. Dec. 9, 2025 Hr'g 222:9-24 (Tunkel); DX-8 at 250:8-251:5; 228:25-229:25 (Jones Dep. Tr.). But because Cumulus has the option to prevent any reputational harm and sue to recover any overpayment, its harm is not irreparable. *See New Pac. Overseas Grp. (USA) Inc. v. Excal Int'l Dev. Corp.*, 1999 WL 285493, at *8 (S.D.N.Y. May 6, 1999) ("Far from being irreparable, the harm at issue appears readily avoidable through cover in the market."); *Sun Chem. Corp. v. Dainippon Ink & Chems.*, Inc., 635 F.Supp. 1417, 1423 (S.D.N.Y. 1986) (denying preliminary injunction because "the injury [plaintiff] asserts is . . . speculative,

and avoidable", and so "does not constitute irreparable harm"). Even if the short term result is that Cumulus must pay a "higher price, and then recover monetary damages on the merits," it must do so, rather than complain of "loss of credibility and good will" at the preliminary injunction stage. *See Snecma v. Turbine Engine Comp. Techs. Corp.*, 531 F. Supp. 2d 354, 358 (N.D.N.Y. 2008); *see also Topps Chewing Gum, Inc. v. MLB Players Ass'n*, 641 F. Supp. 1179, 1191 (S.D.N.Y. 1986) (finding plaintiff "can easily avoid the irreparable harm it claims it will suffer by accepting the offer [defendant] has made" because, "if [it] ultimately prevails in this action, this increased cost can be quantified and will constitute an element of [its] damages").

187.    Even if Cumulus refuses to accept ▮▮▮▮▮▮, it potentially could access to Eastlan's Nationwide-like product, which can be developed within one year. Dec. 11, 2025 Hr'g Tr. 310:23-311:1 (Gould). In other words, it has the ability to recover any threat to its reputation by immediately announcing its intention to switch data providers.

188.    Further, the reputational harm that Cumulus discusses is loss of reputation with advertisers—a "quantifiable" loss to Cumulus's business—which is not an irreparable harm. *See Expedia, Inc. v. United Airlines, Inc.*, 2019 WL 1499269, at *5 (S.D.N.Y Apr. 5, 2019) (denying preliminary injunction where loss of revenue and reputational harm was "quantifiable"). Further, Cumulus did not advance its reputational harm arguments at the evidentiary hearing and therefore did not make the required showing. *See* Dec. 8, 2025 Hr'g Tr. 15:12-33:2 (Pl. Opening).

189.    In addition, harm to Cumulus's reputation is not sufficiently imminent to justify an injunction. Cumulus concedes that "[t]he expiration of the contract is driving the timing of this," Oct. 29, 2025 Conf. Tr. at 15:6-7. But it has rejected an offer to extend the current

contract; the Court therefore concludes Cumulus does not face any imminent injury requiring "an urgent need for speedy action to protect [its] rights." *Citibank*, *N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).

### D.    Cumulus Faces No Loss of Market Share Without a Preliminary Injunction

190.    Similarly, Cumulus could prevent any loss of market share it claims would occur without Nielsen's data by accepting any of the offers Nielsen has made to date.  DX-8 at 276:23-277:12 (Jones Dep. Tr.).  As with its reputational harm arguments, Cumulus did not advance its loss of market share arguments at the evidentiary hearing and therefore did not make the required showing.  *See* Dec. 8, 2025 Hr'g Tr. 15:12-33:2 (Pl. Opening).

191.    Moreover, although Cumulus attempts to style it otherwise, this is a claim about "lost sales – which would in any event be remediable at law," and therefore not irreparable.  *Danone, US, LLC v. Chobani, LLC*, 362 F. Supp. 3d 109, 124 (S.D.N.Y. 2019).  *See also Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (upholding denial of preliminary injunction where plaintiffs could simply "either…bear[] the costs…or…secur[e] a loan, and…be recompensed after trial"); *Geminatio, Inc. v. Hustad*, 2025 WL 1220233, at *7 (N.D.N.Y. Apr. 28, 2025) (denying preliminary injunction where plaintiff could demand "damages for the business [it] lost," if "plaintiff is ultimately able to prove" its claim).  Here, it would be simple to calculate any loss, which means that Cumulus's alleged lost market share is not irreparable.  *See* PX-287 at 259:9-260:24, 266:23-267:20 (Orszag Dep. Tr.).

## III.    CUMULUS IS UNLIKELY TO SUCCEED ON THE MERITS

192.    Cumulus seeks to alter the status quo and craft a new contract with Nielsen, so Cumulus must show a "clear or substantial likelihood of success on the merits."  *JTH Tax, LLC v.*

*Agnant*, 62 F.4th 658, 667 (2d Cir. 2023) (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).  It falls short of this required showing.  Even if Cumulus did not seek a mandatory injunction, it would still fail to demonstrate a likelihood of success on the merits.  *See Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010).

**A.    Cumulus Improperly Claims to Plead a Tying Claim, But Pleads a Bundling Claim**

193.    Tying "is the idea of putting together a product in one market with another product and selling them together."  Dec. 8, 2025 Hr'g Tr. 115:14-18 (Orszag).  "To state a valid tying claim under the Sherman Act, a plaintiff must allege facts plausibly showing that: (i) the sale of one product (the tying product) is conditioned on the purchase of a separate product (the tied product); (ii) the seller uses actual coercion to force buyers to purchase the tied product; (iii) the seller has sufficient economic power in the tying product market to coerce purchasers into buying the tied product; (iv) the tie-in has anticompetitive effects in the tied market; and (v) a not insubstantial amount of interstate commerce is involved in the tied market."  *In re Google Digit. Advert. Antitrust Litig.*, 721 F. Supp. 3d 230, 261 (S.D.N.Y. 2024), *appeal dismissed*, No. 24-874, 2024 WL 4491699 (2d Cir. Aug. 28, 2024) (quoting *Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016)).

194.    Tying is "not . . . found unlawful unless it is accompanied by an element of anticompetitive conduct . . . [or] conduct that impedes competition through means other than competition on the merits."  *Provepharm, Inc. v. Akorn, Inc.*, 2019 WL 2443185, at *9 (E.D.N.Y. June 11, 2019).  ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

PX-287 at 23:18-24:9 (Orszag Dep. Tr.). Indeed, tying is not necessarily anticompetitive as a matter of economics, so it may not present a threat of harm to competition. Dec. 8, 2025 Hr'g Tr. 115:19-116:7 (Orszag). There are "all kinds of situations in our economy where products that are put together are sold as a bundle, sold as tied together." *Id.* Tying is "ubiquitous in the economy" and "in everyday life." *Id.* at 116:1-7. For example, to produce a "shirt[,] somebody stitched together fabric and buttons. You can buy those two products together, but the tying of those made it more efficient and better for [one] to buy." *Id.* at 115:3-7. "The vast, vast majority of circumstances in which products are tied are pro-competitive" and "good for consumers." *Id.* at 115:21-24. It is often "better for consumers to purchase products together than to purchase them separately." *Id.* at 116:14-16. Even Cumulus's expert concedes that tying can be procompetitive. PX-285 at 88:4-6 (Furchtgott-Roth Dep. Tr.). Accordingly, determining whether tying is anticompetitive requires a multistep analytical approach. Dec. 8, 2025 Hr'g Tr. 116:17-117:4 (Orszag).

195.    Courts have only considered *forced* conditioning of sales of the tied good to be tying, unlike Nielsen's bundled pricing. *See In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 368 (S.D.N.Y. 2022) ("[W]here the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." (quoting *N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 6 n.4 (1958))); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 471 (7th Cir. 2020) (distinguishing bundling "in an effort to woo . . . customers" from Viamedia's "explicit tie"); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 n.9 (condemning ties that "*force* the buyer into the purchase of a tied product" (emphasis added)). Courts have dismissed putative tying claims that did

not include a forced condition of purchase.  *In re Google Digit. Advert. Antitrust Litig.*, 721 F. Supp. 3d 230, 261 (S.D.N.Y. 2024) (dismissing tying claim because customers were not required to use tied ad sales product).  Courts have also declined to recognize "de facto" conditions as sufficient to make out a tying claim.  *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) ("We decline to stretch the tying construct to accommodate the claim that Honeywell's conduct toward third party servicers . . . acts as an effective, or 'de facto,' condition.").  Dr. Furchtgott-Roth likewise highlighted the importance of coercion to making a bundled sale anticompetitive.  *See* PX-285 at 117:19-118:1 (Furchtgott-Roth Dep. Tr.) (explaining that bundles that "don't coerce the buyer" are not necessarily anticompetitive).

196.   DX-52.

DX-3 at 171:2-172-2 (Tunkel Dep. Tr.).

.  *See Id.* at 172:13-23 (Tunkel Dep. Tr.).

*Id.* at 172:18-23 (Tunkel Dep. Tr.).

197.  Further, Nielsen has explained in detail why its Policy and pricing *do* make economic sense, taking into account its costs.  At no point has Cumulus refuted Nielsen's points.  Nor could it, as it makes economic sense for two reasons.

*See* PX-287 at 181:11-184:4 (Orszag Dep. Tr.).

 *Id.* at 194:16-196:11.  Cumulus argues Nielsen does not charge any customer ████████ for standalone Nationwide, so it must not make economic sense.  Dec. 9, 2025 Hr'g Tr. 174:19-20 (Pl. Counsel).  ████████████████████████

████████████████████████████████.  *See* DX-3 at 45:22-46:5 (Tunkel Dep. Tr.).  ████████████████████████

████████████████████████████████████

████████████████████████████████████.  *See Id.* at 97:17-24, 98:15-22.  ████████████████

████████████████████████████████████

████████████████████████████████  *Id.* at 185:1-7.  ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████  Dec. 9, 2025 Hr'g Tr. 186:14-25 (Tunkel).

198.  The evidence also falls short of establishing that there is a constructive tie based on the price Nielsen proposed in response to Cumulus's request for a standalone Nationwide product.  For example, Dr. Furchtgott-Roth cannot state with any particularity what price level would make Nielsen's standalone offer a "constructive tie," and he had no basis to conclude that the actual price Cumulus would ultimately be able to get through the bargaining process would not allow Cumulus to purchase its local data from Eastlan.  *See* PX-285 at 133:16-134:6 (Furchtgott-Roth Dep. Tr.) ("I haven't done the analysis to figure out exactly where that break-even point is.").  He also could not say whether Nielsen

charging anywhere between ██████████████ for Nationwide as a standalone

service would be a constructive tie because he has not "done the analysis between ████

██." *Id.* at 133:16-134:20.  Instead, he was only willing to say ████████ was not a tie,

*id.* at 132:5-14, and ██████████ was, *id.* at 130:13-16, which does not provide Nielsen

enough information to remedy any supposed constructive tie.

199.    Regardless, Cumulus never even argues that Nielsen's pricing would be a *de facto* tie for

other customers, which underscores its failure to demonstrate harm to competition.  As

explained below, *see infra* ¶¶ 206-207, losing one customer is not harm to competition.

Nor is the inability of one customer to purchase a product: ████████████████████

████████████████████████████████████████████████████

██████████████████████████████ PX-287 at 158:9-12 (Orszag Dep.

Tr.).  Instead, Cumulus must show that *the market as a whole* could not purchase

Nationwide as a standalone product using Nielsen's pricing structure.  *See Granite Partners,*

*L.P. v. Bear, Stearns & Co.*, 58 F.Supp.2d 228, 239 (S.D.N.Y. 1999); PX-287 at 73:19-74:5

(Orszag Dep. Tr.).  "The fact that the defendant's actions prevent a [competitor] from

competing in a market is not enough, standing alone . . . ." *Virgin Atl. Airways Ltd. v. Brit.*

*Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001).████████████████████████

████████████████████████████████████████████████████

██████████████████████████ *See* PX-287 at 98:17-99:6 (Orszag Dep. Tr.).

200.    Regardless, Cumulus did not plead a tying claim, its claim is actually based on a bundling

theory.  The difference is key because the bundling at issue here is not anticompetitive.

"[T]here is an important distinction between bundling and tying claims. In a traditional

tying claim a seller forces the buyer to purchase the products as a package and will not sell

the 'tied' products separately.  In a bundling claim, the buyer has the option of accepting the cost savings by purchasing the bundle or forgoing the savings by purchasing the products separately."  *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 351 F. Supp. 3d 1187, 1207 (D. Minn. 2018), *aff'd*, 962 F.3d 1015 (8th Cir. 2020).  "[T]he problem for economists is that 'tying' and 'bundling' get very close – are synonymous in certain circumstances."  PX-287 at 136:19-21 (Orszag Dep. Tr.)  Dr. Furchgott-Roth also admitted there are "various forms of bundling that are really sort of tying arrangements."  PX-285 at 98:13-21 (Furchtgott-Roth Dep. Tr.).  Further, he clarified that "are bundles anticompetitive? The answer to that is no" because "most bundling is not anticompetitive."  *Id.* at 102:13-19.

201.    Bundling claims require "a Section 2 plaintiff . . . [to] allege and prove either that (a) the monopolist has priced below its average variable cost or (b) the plaintiff is at least as efficient a producer of the competitive product as the defendant, but that the defendant's pricing makes it unprofitable."  *Ortho Diagnostic Sys., Inc. v. Abbott Labs, Inc.*, 920 F. Supp. 455, 469 (S.D.N.Y. 1996).  "Any other rule would entail too substantial a risk that the antitrust laws would be used to protect an inefficient competitor against price competition."  *Id.*  Cumulus does not even attempt to make these required showings, so its claim cannot survive as a bundling claim.

### B.    Nielsen's Policy Does Not Harm Competition

202.    Cumulus's "tying"—which it now downgrades to *de facto* tying—requires it to prove "that [Nielsen] violated the Sherman Act because it unreasonably restrained competition.  That burden necessarily involves an inquiry into the actual effect . . . on competition." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984); *see also Cascade Health Sols. v.*

*PeaceHealth*, 515 F.3d 883, 898 (9th Cir. 2008) (quoting *LePage's Inc. v. 3M*, 324 F.3d 141, 155 (3d Cir. 2003) (*en banc*)).

203. Here Cumulus fails to demonstrate that Nielsen's Policy or the supposedly too-high prices it charges for the various services and packages it offers have actually foreclosed competition, *see Cascade Health*, 515 F.3d at 898; *Ortho*, 920 F. Supp. at 468-69, or that there were "anti-competitive effects on the market as a whole," *Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, 833 F.3d 399, 405 (3d Cir. 2016). "[A]llegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently allege an injury to competition. Both effects are fully consistent with a free, competitive market." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012) (citing *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009)).

204. "[A] plaintiff, who asserts actual anticompetitive effects . . . must … show anti-competitive effects on the market as a whole. Where, as here, a plaintiff shows effects only on a small subset of that market and makes no attempt to show broader effects, the plaintiff cannot meet the requirements." *Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, 833 F.3d 399, 405 (3d Cir. 2016). Cumulus does not attempt to demonstrate harm to the market as a whole, instead focusing narrowly on its own ability to switch from Nielsen to Eastlan in some local markets. Even within this narrowed scope, Cumulus fails as it cannot show that Nielsen's Policy prevents it from entirely shifting its business to Eastlan. Dec. 11, 2025 Hr'g Tr. 318:2-10 (Gould).

205. The Policy at most applies to a fraction of Nielsen's customers, *see* Dkt. 62 at 21-22, and ███████████████████████████████████████ *see* PX-278 ¶ 24 (Orszag Decl.), ████████████████████████████████████████ *see id.* at ¶ 27 n.40.

██████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* at

¶ 38. ████████████████████████████████████████████████

████████ *See id.* at ¶¶ 39-40. ███████████████████████

████████████████ *See id.* at ¶ 40.  And Mr. Gould testified that interest from the largest customers has picked up—particularly in discussions at the "C-level"—since Nielsen announced its Policy.  Dec. 11, 2025 Hr'g Tr. 281:6-11 (Gould).

206.  "In this regard, it has long and frequently been observed that the antitrust laws were enacted 'for the protection of competition, not competitors." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005) (citation modified) (collecting cases).  "[I]t is the nature of competition that at some point there are winners and losers." *Viacom Int'l Inc. v. Tele-Commc'ns, Inc.*, 1994 WL 561377, at *6 (S.D.N.Y. Oct. 12, 1994) (citation modified). "[W]henever one firm wins, say, a sale and the other firm doesn't" is an example of this dynamic at play.  Dec. 8, 2025 Hr'g Tr. 107:1-2 (Orszag).   Harm to competition "has to be a harm to the competitive process," and may include "rais[ing] rival's costs . . . exclud[ing] them from entering the market, something that actually has a detrimental effect on consumers and consumer welfare." *Id.* at 107:8-12.  "When firms compete for a customer, that is actually a benefit to consumers because they get lower prices."  *Id.* at 107:13-1. "[J]ust because a competitor is harmed, that does not mean that competition is harmed." *Id.* at 60:4-6.

207.  In fact, even if Eastlan is "in a worse position than it would have been had the challenged agreement not been executed, . . . that fact does not by itself establish an antitrust injury. To hold otherwise would be to divorce antitrust recovery from the purposes of the antitrust

laws, which were enacted for the protection of competition, not competitors." *Juster Ass'c v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990) (citation modified).  In the case of bundling in particular, "selling products A and B as a unit is simply one strategy for gaining an edge in a free marketplace.  To allow tying doctrine to swell to the point of prohibiting such legitimate means of competition would make antitrust law its own worst enemy." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 685 (4th Cir. 2016).  Applied specifically, "lowering price to compete more vigorously harms a competitor, but does not harm the competitive process whatsoever.  So, the goal of competition policy is to protect the process of competition.  Not individual competitors."  Dec. 8, 2025 Hr'g Tr. 60:6-10 (Orszag).  In other words, the legal and economic justification for preventing harm to competition aligns and does not cover mere harm to a competitor, which is all that Cumulus alleges here.

208.    When an antitrust plaintiff pleads that a deal "has the effect of raising rivals costs" it must demonstrate "substantial foreclosure" that it exclusion from the market.  *See In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 299, 302 (S.D.N.Y. 2023).  In the context here, the "relevant question is, is there harmed competition, which would be either they are excluded from the market or they are diminished in their ability to compete, that is, there's an effect on the marginal cost.  And here, you don't have that."  Dec. 8, 2025 Hr'g Tr. 101:20-23 (Orszag).  Here, the Policy "does not restrict [Eastlan] from pricing [data] as they choose," and Eastlan has "exploited this pricing autonomy to gain market share," including from Cumulus—none of this is harm to competition.  *Grand River Enters. Six Nations, Ltd. v. King*, 783 F. Supp. 2d 516, 532 (S.D.N.Y. 2011).

209.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



*Id.* at 87:10-25.

*Id.* at ¶¶ 38-42.

210.    Cumulus's only other foreclosure argument relies on an invented price list for local data. PX-291 at 21-22 (Dkt. 60) (citing PX-277 ¶¶ 65, 69). Dec. 8, 2025 Hr'g Tr. 126:21 (Tunkel). *See* PX-278 ¶¶ 68-69 (Orszag Decl.). . *Id.* at ¶ 62.

211.    Even if Cumulus were correct about its invented price list, Nielsen cannot cause harm to competition because it has no way to generate "an effect on [Eastlan's] marginal costs" and therefore cannot impact Eastlan's ability to compete. Dec. 8, 2025 Hr'g Tr. 91:18-20 (Orszag). In the local data market, "the marginal cost of serving a second customer . . . is zero, because the data that's already been collected, or it's effectively zero from an economic perspective. And there's no sharing of production facilities or vertical arrangement where Nielsen can drive up costs of production or distribution controlled and owned by Eastlan." Dec. 8, 2025 Hr'g Tr. 91:20-92:1 (Orszag). In other words, only demonstrating Eastlan's "exclusion from the market" would establish the "possibility of a

harm to competition" here.  Id. at 92:2-92:4 (Orszag).  But "[t]hey have added ten markets this year, they have added five markets a few months ago, and they are growing into bigger and bigger markets.  That's inconsistent with the harm to competition." *Id*. at 92:4-92:7 (Orszag).

212.    ████████████████████████████████████████████████

████████████████████████.  PX-277 ¶ 49.  But Eastlan has been expanding its presence in more markets, including bigger ones, and receiving more interest from Nielsen customers following Nielsen's adoption of the Policy.  Dec. 8, 2025 Hr'g Tr. 67:17-19 (Orszag); Dec. 11, 2025 Hr'g Tr. 280:11-281:14, 306:17-25, 315:9-24 (Gould); DX-11.  And Eastlan poses a competitive threat to Nielsen in the sale of Nationwide services, too.  Eastlan can develop a "[N]ationwide-like" product in a year without difficulty—indeed, it is considering doing so.  Dec. 11, 2025 Hr'g Tr. 310:23-311:1, 312:3-9 (Gould).  Because "it faces potential entry from Eastlan in a lot of markets, and that potential entry creates competitive pressure on Nielsen," it follows that Nielsen would not be a monopolist even if it currently has "one hundred percent of the market."  PX-285 at 22:10-22 (Furchtgott-Roth Dep. Tr.).  Cumulus does not explain why the Policy prevents Eastlan achieving minimal viable scale for this product, nor could it, given that Eastlan's quoted price may even be below Nielsen's.  Cumulus's claim that it must have Nielsen's Nationwide service is, therefore, not even accurate.

213.    Ultimately, Cumulus's claimed anticompetitive effect is the prices it will have to pay for a new contract with Nielsen, not that the market price for that data will rise.  *See* Dec. 8, 2025 Hr'g Tr. 16:21-25 (Pl. Opening) (Nielsen's policy comes "at the worst possible time for *Cumulus*."  (emphasis added)).  Missing entirely from Cumulus's arguments is any

explanation why the Policy will result in increased prices for local data. In fact, Cumulus's proposed remedy—ordering Nielsen to charge it less—is itself more likely to result in increased prices for local data, at least among Nielsen's other customers, who will then have to subsidize Cumulus's below-market rate.

214.   In other words, Cumulus has not introduced information of the kind required to demonstrate sufficient foreclosure to make out a Section 2 claim based on either *de facto* tying or bundling. It is therefore unlikely to succeed on the merits.

**C.    Cumulus Alleges No Harm to the Structure of the Market and Therefore Alleges No Antitrust Injury**

215.   Cumulus cannot satisfy the requirements of antitrust standing because it has not suffered an injury of the type the antitrust laws were designed to prevent. "To satisfy the antitrust standing requirement, a private antitrust plaintiff must plausibly allege that (i) it suffered an antitrust injury and (ii) it is an acceptable plaintiff to pursue the alleged antitrust violations." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016). "In order to establish antitrust injury, the plaintiff must demonstrate that its injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Id.* (quoting *Brunswick Corp.*, 429 U.S. 477, 489 (1977)). For example, here, Cumulus would need to produce evidence that "output was restricted or prices were above a competitive level." *Ohio v. Am. Express Co.*, 585 U.S. 529, 549 (2018). Cumulus demonstrates neither—in fact the price Nielsen offered it was a *decrease* in prices over its most recent contract. Instead, Cumulus alleges monetary harm to itself in the form of paying a higher contract price than it would like to pay. "[A] plaintiff does not suffer an antitrust injury when the plaintiff's injury was consistent with free competition." *In re*

*Libor-Based Fin. Instruments Antitrust Litig.*, 2015 WL 4634541, at *77 (S.D.N.Y. Aug. 4, 2015) (MDL No. 2262), *amended*, 2015 WL 13122396 (S.D.N.Y. Oct. 19, 2015).

216.    Harm to Cumulus alone is not enough to demonstrate an antitrust injury.  A plaintiff fails to plead antitrust injury if "there are no plausible allegations of market-wide harm, as opposed to harm only to Plaintiff."  *Arcesium, LLC v. Advent Software, Inc.*, 2021 WL 1225446, at *7 (S.D.N.Y. Mar. 31, 2021).  *See also Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, Inc., 996 F.2d 537, 543 (2d Cir. 1993) ("Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors.").  Where, as here, "Plaintiffs' alleged injury amounts to personal economic loss, Plaintiffs have failed to allege antitrust injury."  *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 109 (S.D.N.Y. 2015).  "[T]here is a critical disjunction between the injuries suffered by the [plaintiffs] and the injuries to the relevant market" – only showing damage to the market structure fulfills the antitrust injury requirement.  *See Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F.Supp.2d 228, 245 (S.D.N.Y. 1999).

217.    Courts are skeptical of claims of injury from bundled pricing, like Cumulus's alleged injuries here.  Nielsen is offering a lower price for purchasing a larger quantity of services.  In general, a "package discount gives the buyer the choice of accepting the cost savings by purchasing the package, or foregoing the savings by purchasing the products separately."  *See Cascade*, 515 F.3d at 900 (citation omitted)).  Far from constituting antitrust injury, "selling products A and B as a unit is simply one strategy for gaining an edge in a free marketplace.  To allow tying doctrine to swell to the point of prohibiting such legitimate means of competition would make antitrust law its own worst enemy." *It's My Party, Inc.*

*v. Live Nation, Inc.*, 811 F.3d 676, 685 (4th Cir. 2016). In other words, bundling does not generally result in antitrust injury, so courts look with skepticism on vague claims to the contrary.

## IV.    THE BALANCE OF EQUITIES FAVORS NIELSEN

218.    A plaintiff seeking a preliminary injunction must also demonstrate "a balance of hardships decidedly favoring the moving party." *N. Am. Soccer League, LLC*, 883 F.3d at 37. Cumulus does not do so. First, as to Cumulus's alleged economic harms, the "equities tip in [defendant's] favor" where an injunction would have "restrained" defendant and caused it to suffer "damage that would be difficult to quantify," in contrast to the "availability of money damages" to plaintiff. *SG Cowen Sec. Corp. v. Messih*, 224 F.3d 79, 84-85 (2d Cir. 2000). Here, if the Court were to issue an injunction, Nielsen would be forced to provide services to Cumulus at rates that were never offered, let alone agreed upon. Cumulus's requested relief contemplates no contractual terms outside of rate and services, PX-291 (Dkt. 60) at 27, leaving Nielsen without any of the provisions, like that against unauthorized data sharing, PX-1 § 3.1, that Nielsen needs to protect its interests.

219.    Further, Nielsen would be harmed by the requested injunction.



DX-11 at 2. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Dec. 9, 2025 Hr'g Tr. 227:23-228:6 (Tunkel). ▮▮▮▮▮▮▮▮▮▮▮▮

PX-278 ¶ 68 (Orszag Decl.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



*Id.* An injunction forcing Nielsen to accept price drops would further pile onto the ongoing challenges Nielsen faces from operating in a declining industry. Where, as here, the requested relief "would not . . . preserve the status quo, but rather would work an injustice," "the balance of equities tips decidedly in [the non-movant's] favor and warrants a denial of" injunctive relief. *Gladsky v. Sessa*, 2007 WL 2769494, at *6 (E.D.N.Y. Sept. 21, 2007).

220.    Second, Nielsen has not caused any supposed harm to Cumulus's goodwill or loss of market share because: ███████████████████████████████████████████

███████████████████████████████████; and, (2) Nielsen "always had[] the right to unilaterally terminate Plaintiffs at any time and without cause" and was "never required to offer *any* alternative," much less an offer of Cumulus's own choosing. *DeVivo Assocs.*, 2020 WL 2797244, at *5. *See also infra*, ¶¶ 237-239.

221.    Third, courts often decline to interfere with the natural lifecycle of a contract where an injunction would "simply delay the harm caused by the bargained-for expiration of the [a]greement." *Expedia*, 2019 WL 1499269, at *5.

222.    Fourth, Cumulus's ███████████████████████████████████████████

████████ *Bank of Am., N.A. v. Won Sam Yi*, 294 F. Supp. 3d 62, 81 (W.D.N.Y. 2018).

223.    Finally, Cumulus's behavior, including rejecting Nielsen's offers to preserve the status quo contractual arrangement, and Cumulus's filing of this lawsuit in ██████████████

███████████████████, does not tip the equities in its favor.

## V.    THE PUBLIC INTEREST DISFAVORS FORCING NIELSEN INTO A CONTRACT AGAINST ITS WILL

224.    The Court must also consider "the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

225.    The public interest favors Nielsen. The public interest disfavors the type of judicial price regulation and intervention in contract disputes that Cumulus is seeking; instead, "[t]here is a well-recognized public interest in enforcing contracts and upholding the rule of law." *Empower Energies, Inc. v. SolarBlue, LLC*, 2016 WL 5338555, at *13 (S.D.N.Y. Sept. 23, 2016) (citing *Advance-Rumely Thresher Co. v. Jackson*, 287 U.S. 283, 288 (1932)). Inserting the Court into the contract negotiations as a central planner would not serve the public interest. *See Smithy Braedon Co. v. Hadid*, 825 F.2d 787, 790 (4th Cir. 1987) ("[T]he most enlightened judicial policy is to let people manage their own business in their own way, unless the ground for interference is very clear.") (citation modified). Cumulus is asking the Court to overrule a three-year negotiated agreement between two sophisticated parties and create a bespoke package that Nielsen does not offer at the price Cumulus prefers, which is particularly harmful given Nielsen has no duty to deal with Cumulus here. *See infra*, ¶¶ 237-239.

226.    Cumulus's requested injunction does not serve the public's interest in enforcement of the antitrust laws. Its argument to the contrary simply "rises and falls with the . . . likelihood of success on the merits." *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 321 (D.D.C. 2020). Cumulus is unlikely to succeed on the merits, it has not shown irreparable injury, and its relief request is improper. Accordingly, an injunction would not serve the public's interest in enforcement of the antitrust laws.

227.   Cumulus's requested injunction does not preserve the viability of broadcast radio. Although radio may serve an important public purpose, Cumulus is not the only provider of radio services.  *See* DX-8 at 49:24-51:1 (Jones Dep. Tr.) (identifying iHeart, Audacy, Compass, and "10 to 15 other smaller networks" as competitors in the network radio market).  Further, ███████████████████████████████████████████ ███████████████████████████████████  In addition, a ████████ contract dispute does not ████████████████████████ *supra* § I.A.2. ████████████████ ████████████████████████████████████  *see WGH Commc'ns, Inc. v. Penachio Malara LLP*, 2020 WL 8513509 at *1 (S.D.N.Y. Nov. 24, 2020).  Cumulus's claim that an injunction is critical to the viability of the broadcast radio industry is unsupported by the factual record here.

## VI.   CUMULUS'S REQUESTED RELIEF IS INAPPROPRIATE AND UNLAWFUL

228.   Cumulus has requested five different forms of injunctive relief in its filings: (1) an injunction prohibiting "any tie or constructive tie" in "any negotiation," *see* DX-49 at 1 (Dkt. 7-1); PX-291 at 27 (Dkt. 60); (2) a prohibition on "retaliatory conduct," *see* DX-49 at 1 (Dkt. 7-1); PX-291 at 27 (Dkt. 60); (3) an order requiring Nielsen "to continue providing its Nationwide product . . . under the currently existing contract terms for that product," *see* DX-49 at 1 (Dkt. 7-1); (4) an order "requiring Nielsen to provide Cumulus with Nationwide and local radio ratings data in markets selected by Cumulus, at current contract rates," *see* PX-291 at 27 (Dkt. 60); and, (5) an order "requiring Nielsen to immediately negotiate with Cumulus in good faith, without the Tying Policy, at reasonable rates, consistent with past practice," *see id.*  One by one, these requests are both legally flawed and unworkable as a practical matter.

229. First, Cumulus's requests for a prohibition of "any tie or constructive tie," a prohibition on "retaliatory conduct," and an order requiring Nielsen to negotiate "in good faith," "at reasonable rates," "without the Tying policy," and "consistent with past practice," all violate Federal Rule of Civil Procedure 65. The rule states: "Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1).

230. Cumulus's request to enjoin a "tie" and prohibit "retaliatory conduct" is vague, particularly as Cumulus never explains what "retaliatory conduct" is in this context and Nielsen is free to decline to contract with Cumulus. *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). At best, these requests equate to a "simple command that the defendant obey the law," which "would violate the specificity and clarity requirements for injunctions set forth in Rule 65(d)." *T.C. v. N.Y. State Dep't of Health*, 2022 WL 17689841, at *6 (S.D.N.Y. Dec. 15, 2022); *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240 (2d Cir. 2001).

231. Furthermore, the request to enjoin a "constructive tie" is also impermissibly vague, as it does not describe the proscribed conduct with sufficient specificity for Nielsen to understand what is required or prohibited in order to comply. *See T.C.*, 2022 WL 17689841 at *6; *S.C. Johnson & Sons, Inc.*, 241 F.3d at 240. For example, Nielsen questioned Cumulus's expert as to the price point for the Nationwide product at which he would determine that there was a "constructive tie." PX-285 at 133:16-134:6 (Furchtgott-Roth Dep. Tr.). Even with his access to confidential Cumulus information that would not be

available to Nielsen's businesspersons, Cumulus's expert was unable to identify where the line would be between what he would define as a "constructive tie" and a permissible contract offer. *Id.* ("I haven't done the analysis to figure out exactly where that break-even point is."). At bottom, Cumulus is asking the Court to join it in presuming that any proposal Cumulus does not like is necessarily a "constructive tie."

232. Cumulus's attempts to interpose the Court in its negotiations with Nielsen by requesting Nielsen "immediately negotiate in good faith, without the Tying Policy, at reasonable rates, consistent with past practice," PX-291 at 27 (Dkt. 60), is rife with impermissible vagueness, ███████████████████████████████████████████████

████████████████████████████████████████████████████

███. *See* DX-52. So, Cumulus must mean something different with its request. In other words, Cumulus uses the phrase "good faith" as cover for demanding a *particular outcome* from the contract negotiation – anything Cumulus does not want is not "good faith." Similarly, "reasonable rates" clearly equates to rates Cumulus decides are reasonable,

████████████████████████████████████████████████████

███████████████████████████████████████████ DX-11

at 2. Finally, Cumulus's version of what "without the Tying Policy" and "consistent with past practice" entails is an ahistoric fiction. ███████████████████████

████████████████████████████████████████████████████

███████████████████████████ Dec. 8 & 9, 2025 Hr'g Tr. 126:16-127:18, 142:12-143:10 (Tunkel). In effect, then, granting Cumulus's request for Nielsen to "negotiate in good faith" means the Court would be allowing Cumulus to "name its price" for whatever Nielsen services it chooses, irrespective of Nielsen's costs or wishes.

233.  The third request in Cumulus's initial motion—its demand that the Court require Nielsen to "continue providing the Nationwide product" on Cumulus's terms—also is problematic, and not something this Court can reasonably be expected to grant. Similarly problematic is Cumulus's revised version of this request, which it first made in its preliminary injunction briefing after Nielsen had offered to maintain the status quo by preserving the entire current contract (rather than just the piece Cumulus requested). This revised request demanded the Court force Nielsen "to provide Cumulus with Nationwide *and local radio ratings data in markets selected by Cumulus*, at current contract rates." PX-291 at 27 (Dkt. 90) (emphasis added).  Both versions of Cumulus's requested relief are problematic because they only purport to seek imposition of some—not all—necessary contractual terms, when there are dozens of contractual terms—such as confidentiality (a provision Nielsen learned Cumulus breached in sharing data with Eastlan), *see* PX-1 § 3.1; DX-54; DX-55; DX-56, data usage, term length, etc.—needed to protect Nielsen's business interests in any contract for Nielsen's audience measurement services. ███████████████ ███████████████████████████████████ *see* Dec. 9, 2025 Hr'g Tr. 189:19-190:4; 203:21-204:22 (Tunkel)—█████████████ ███████████████████████████████████ ████████████████. Cumulus does not contemplate or include such terms in its requested relief and they are thus not before the Court.

234.  These concerns underscore why Courts avoid interfering with or re-writing contracts. Cumulus asks this Court to either order into existence a contract that does not make sense and penalizes the non-movant, or require further negotiation of an incomplete contract that necessitates continuous Court supervision.  No matter how one slices Cumulus's request, its

proposed relief would neither resolve the parties' dispute nor extract the Court from negotiations but would instead create more disputes and further enmesh the Court as central planner.

235.    Thus, even if Cumulus succeeds on each element of the preliminary injunction analysis, the Court should not issue its requested relief because the relief would exceed the scope of the Court's equitable powers and would violate antitrust law by imposing a duty to deal on Nielsen that does not exist.

236.    Also, Cumulus's requested relief does not cure—as it must—the purported scope of its claimed injury.  Cumulus's personal economic injury is not a harm to competition, so cannot be the basis for injunctive relief.  *See* supra, § 2.III.C.  Cumulus's requested injunctive "relief should be 'narrowly tailored to fit specific legal violations" and to avoid "unnecessary burdens on lawful commercial activity.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 119 (2d Cir. 2009).  Put differently, "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006).  Because Cumulus's requested relief does nothing to impact the structure of the alleged market in any way, its request should fail.  *See* Arcesium, LLC, 2021 WL 1225446, at *7.

237.    Further, granting Cumulus's requested relief would require imposing a duty to deal on Nielsen that would be inconsistent with decades of antitrust precedent.  Nielsen has wide latitude "to choose the parties with whom [it] will deal, as well as the prices, terms, and conditions of that dealing" with any customer, including Cumulus.  *See linkLine Commc'ns, Inc.*, 555 U.S. at 448.  Nielsen "has no obligation to deal" with Cumulus for Nationwide or

local ratings, including "under terms and conditions favorable to its competitors" such as Eastlan. *Id.* at 450-51.

238.    Cumulus's arguments to the contrary rely on painting Nielsen as a monopolist. But even if Nielsen were a monopolist in some market (and it is not), "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." *Verizon Commc'ns Inc. v. L. Offs. Of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). In fact, assuming it is a monopolist, Nielsen "acquire[d] monopoly power by establishing an infrastructure that renders [it] uniquely suited to serve [its] customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Id.* at 407-08. The Court cannot issue an injunction requiring Nielsen to deal with Cumulus on the theory that it provides an "essential facility" without effectively converting every putative monopolist into a public utility, which is precisely the outcome the Supreme Court rejected in *Trinko*. *Id.* at 410 ("We have never recognized such a doctrine."). In addition, such "[e]nforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited." *Id.* at 408.

239.    The Court intervening to mandate Nielsen enter a contract, at all, much less on Cumulus's terms, would break with this long line of precedent because "as a general matter, the Sherman Act 'does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Id.* at 408 (citation modified). In particular, Nielsen

"*may announce in advance the circumstances under which [it] will refuse to sell*. 'The trader or manufacturer . . . carries on an entirely private business, and can sell to whom he pleases.'" *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) (emphasis added) (quoting *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290, 320 (1897)). This Court superintending Nielsen's business affairs by inserting itself as a price regulator in its contract negotiations would upend antitrust principles extending to the dawn of the Sherman Act. *See Trans-Missouri Freight Ass'n*, 166 U. S. at 320-21 ("The trader or manufacturer . . . may charge different prices for the same article to different individuals; he may charge as much as he can get for the article in which he deals, whether the price be reasonable or unreasonable.").

240.    Even if there were circumstances under which the Court could issue an injunction requiring Nielsen to enter a contract with a customer, here it cannot because "[n]o court should impose a duty to deal that it cannot explain or adequately and reasonably supervise." *Trinko,* 540 U.S. at 415.

241.    Cumulus tries to leverage antitrust law to secure its preferred contract before trial, but "[i]f bundling . . . is to be struck down as an antitrust violation, it should come only after a full trial on the merits." *See fuboTV Inc.*, 745 F. Supp. 3d at 114.

242.    But even a full merits trial could not save Cumulus's fatally flawed theories. At bottom, Cumulus and Nielsen are in a run-of-the-mill pricing dispute. The fact that Cumulus—a company with $700 million in revenue and $90 million cash on hand—would prefer this Court to impose on Nielsen a partial contract reflecting Cumulus' preferred pricing is insufficient reason for the Court to award the requested relief. ████████████████

████████████████████████████████████████████████████████

██████████████████████████████████  PX-287 at 158:9-12

(Orszag Dep. Tr.).

## CONCLUSION

243.    For the foregoing reasons, Cumulus's motion for a preliminary injunction is DENIED.


Dated: December 18, 2025                    Respectfully submitted,
       New York, New York

                                            */s/ Jefferson E. Bell*

                                            GIBSON, DUNN & CRUTCHER LLP

                                            Jefferson E. Bell
                                            Kathryn N. Salvaggio
                                            200 Park Avenue, New York, NY 10166
                                            Email: JBell@gibsondunn.com
                                            Email:  KSalvaggio@gibsondunn.com
                                            Telephone:    (212) 351-4000

                                            Josh Lipton (admitted *pro hac vice*)
                                            1700 M Street, N.W.
                                            Washington, D.C. 20036-4504
                                            Email: JLipton@gibsondunn.com
                                            Telephone:    (202) 955-8500

                                            Samuel Liversidge (admitted *pro hac vice*)
                                            333 South Grand Avenue
                                            Los Angeles, CA 90071-3197
                                            Email: SLiversidge@gibsondunn.com
                                            Telephone:    (213) 229-7000

                                            Scott K. Hvidt (admitted *pro hac vice*)
                                            2001 Ross Avenue, Suite 2100
                                            Dallas, Texas 75201
                                            Email: SHvidt@gibsondunn.com
                                            Telephone:    (214) 698-3100

                                            *Attorneys for Defendant The Nielsen Company
                                            (US), LLC*