UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                              :

CUMULUS MEDIA NEW HOLDINGS, INC.,   :

                              :

            Plaintiff,          :

                              :         25-CV-08581 (JAV)

        -v-             :

                              :       <u>OPINION AND ORDER</u>

THE NIELSEN COMPANY (US) LLC,        :

                              :

           Defendants.      :

                              :

-------------------------------------------------------------------X

JEANNETTE A. VARGAS, United States District Judge:

Plaintiff Cumulus Media New Holdings, Inc. ("Plaintiff" or "Cumulus") brings this antitrust action against Defendant The Nielsen Company (US) LLC ("Defendant" or "Nielsen") for purported violations of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. Cumulus alleges that Nielsen has enacted an anticompetitive "tying policy" to illegally maintain its monopoly power over both local and national radio ratings data markets. ECF No. 1 ("Complaint" or "Compl.") ¶¶ 3, 9, 23, 166-180. Nielsen maintains that no antitrust injury has occurred and that this suit is nothing more than "a contract dispute about money." ECF No. 62 ("Opp'n Mem.") at 1. Presently before the Court is Plaintiff's motion for a preliminary injunction, which requests that the Court (1) enjoin Nielsen from imposing any tie or constructive tie in connection with its provision of national ratings data; (2) require Nielsen to continue providing its nationwide product to Cumulus's national radio network subsidiary, Westwood One, under currently existing contract terms for that product; and (3) prohibit Nielsen from retaliatory

conduct related to this litigation.  ECF No. 8 ("Pl. Mem. of Law") at 27.  For the following reasons, Plaintiff's motion for a preliminary injunction is GRANTED.

## BACKGROUND

### A.    Procedural History

Cumulus filed both the Complaint and the motion for preliminary injunction on October 16, 2025.  On October 29, 2025, the Court granted in part Cumulus's motion for expedited discovery in connection with the preliminary injunction motion.  ECF No. 49.

The Court held an evidentiary hearing on Plaintiff's motion on December 8, 9, and 11, 2025.  The Court received into evidence testimony of Nielsen's economics expert Dr. Jonathan Orszag, Cumulus's economics expert Dr. Harold Furchtgott-Roth, Managing Director of Nielsen Audio Rich Tunkel, Co-President of Cumulus Operations Dave Milner, Westwood One President and Vice President of Cumulus Corporate Strategy & Development Collin Jones, Eastlan Ratings ("Eastlan") President and Chief Executive Officer Michael Gould, and executives from other broadcasting companies.[1]

### B.    Findings of Fact

"In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence."  *Park Irmat Drug*

---

[1] The Court ordered that affidavits of party-controlled witnesses would serve as their direct testimony.  ECF No. 49.  The parties also submitted deposition transcripts for certain witnesses, which were received into evidence without objection.

*Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (citation omitted); *see Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) (holding that "hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction"). Accordingly, the following findings of fact are drawn from the entire record in this action, including, *inter alia*, the Complaint, documents cited in the Complaint, and deposition testimony and declarations submitted by the parties. *See Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New York*, 700 F. Supp. 3d 86, 92 (S.D.N.Y. 2023) (citation omitted) (relying upon operative complaint as well as party affidavits in making findings of fact); *Pawelsky v. Cnty. of Nassau, New York*, 684 F. Supp. 3d 73, 78 n.1 (E.D.N.Y. 2023) (citation omitted) (same).

### 1. The Radio Broadcast Industry

The radio broadcast industry includes both national networks, which are large-scale content producers that distribute syndicated radio programming to stations across the United States, and local radio stations, which serve a specific region. PX-277 (ECF No. 61-1) ("Furchtgott-Roth Expert Report") ¶¶ 19, 24; PX-263 (ECF No. 9) ("First Jones Decl.") ¶ 5; PX-264 (ECF No. 10) ("Milner Decl.") ¶ 3; Compl. ¶ 40. There are 275 geographic areas, referred to as "Radio Markets," in which local radio stations operate. Compl. ¶ 43. Local radio stations broadcast both original content designed to match the interest and demographics of listeners in the region, and syndicated programming provided by a national network. Milner Decl. ¶ 3.

Plaintiff Cumulus is one of the largest audio media companies in the United States, operating 395 radio stations and audio content networks across 84 separate local markets.  Furchtgott-Roth Expert Report ¶¶ 7-8.  Cumulus also distributes national audio content—including sports, news, and entertainment programming—to over 9,500 affiliated stations nationwide through its national syndication network, Westwood One, "the largest audio network in America."  *Id.* ¶ 9.

Defendant Nielsen helped pioneer market research over a century ago and maintains global leadership in the space, providing audience measurement and consumer research across a variety of media platforms.  PX-278 (ECF No. 66) ("Orszag Decl.") ¶ 13; Furchtgott-Roth Expert Report ¶ 11.  Most pertinent to Plaintiff Cumulus and to this action, Nielsen provides radio ratings products that measure and analyze broadcast radio audiences in the United States.  Its data operate at the local level across more than 270 distinct geographic areas, as well as at the national level through an amalgamation of its local ratings data known as the "Nationwide Report" or "Nationwide."  Orszag Decl. ¶¶ 13, 15; Furchtgott-Roth Expert Report ¶ 11.

Nielsen collects audio ratings data and designs panels of radio listeners at the local level, Hr'g Tr. 212:22–213:20 (Tunkel); DX-3 ("Tunkel Dep. Tr.") 13:11-23, such that Nielsen's costs arise predominantly from surveying listeners in each individual local market.  Tunkel Dep. Tr. 98:15-18, 100:1-5, 123:24–124:7; PX-024.  These costs include shipping hardware to radio stations in Portable People Meter ("PPM") markets, in which compensated listeners detect codes that Nielsen has

embedded in stations' live or streamed audio, and distributing hundreds of thousands of paper and electronic diaries in "Diary Markets," in which compensated listeners' habits are recorded over a period of twelve weeks.  Hr'g Tr. 209:19-21, 211:3-17, 211:25–212:39 (Tunkel); Compl. ¶ 72.  Nielsen then validates, de-duplicates, and weights collected observations to population and demographic benchmarks.  Hr'g Tr. 209:19–212:20 (Tunkel).

To create the Nationwide Report, Nielsen compiles local ratings data gathered for 250 designated market areas ("DMAs"), including DMAs where Nielsen no longer sells local radio ratings data, into a comprehensive data set.  PX-274 (ECF No. 63) ("Tunkel Decl.") ¶ 5; Tunkel Dep. Tr. 28:3-10, 33:25–34:4; PX-168; Jones Decl. ¶ 7.  Nielsen's Nationwide product is published biannually.  Tunkel Decl. ¶ 5.

### 2.    Radio Advertising

Radio ratings data, both national and local, are crucial for broadcasters and advertisers alike.  Furchtgott-Roth Expert Report ¶ 32.  Both national networks and local radio stations generate revenue by selling advertising inventory (radio commercial time) to advertisers and advertising agencies.  Furchtgott-Roth Expert Report ¶ 34; PX-272 (ECF No. 83) ("Jones Suppl. Decl.") ¶ 5; Compl. ¶¶ 48-49. Radio stations and advertisers rely on ratings data to determine the pricing and allocation of advertisements on broadcast radio.  PX-276 ("Furchtgott-Roth Decl.") ¶¶ 16-18.

Local radio stations that broadcast their own original content sell advertising inventory directly to advertisers or through advertising agencies.  PX-271 (ECF No.

68) ("Milner Suppl. Decl.") n.6.  A local radio station that broadcasts syndicated national programming typically splits the advertising inventory with the national network.  Furchtgott-Roth Expert Report ¶ 34.

In order to market that inventory, networks and stations rely on radio ratings that measure audience size, demographics, time spent listening, and other characteristics (the "reach" of a broadcast), as advertisers "need to see the delivery [of their content] by market" to identify worthwhile purchases.  Furchtgott-Roth Expert Report ¶ 28; Hr'g Tr. 216:25–217:4 (Tunkel); *see also* Milner Decl. ¶ 9; Jones Decl. ¶ 35; PX-281 ("Jones Dep. Tr.") 107:12–108:4.  Advertising agencies act as intermediaries in the buying and selling of advertising inventory, assisting national and local advertisers in determining what advertising inventory to purchase, how that inventory should be priced, and the advertising campaign's length.  Compl. ¶ 54.

Advertisers and advertising agencies use media-buying platforms, which incorporate radio ratings data, to compare and purchase advertising inventory.  Compl. ¶ 57.  These media-buying platforms facilitate the sale of advertising inventory, allowing advertisers to make purchases based on national radio ratings data and local radio ratings data.  *Id.*

Whereas advertisers and advertising agencies that purchase national advertising inventory seek to assess a radio broadcast's performance nationwide and accordingly rely on national radio ratings data, advertisers and advertising agencies that purchase local advertising inventory only need to assess performance

in a particular region and thus rely on local radio ratings data. Furchtgott-Roth
Expert Report ¶¶ 30, 41. Local radio stations and advertising agencies typically
purchase local radio ratings data only for the geographies in which they operate
because advertising preferences—such as target demographics, like age and
gender—often differ by geography. Compl. ¶ 90. Accordingly, local radio stations
seeking to sell to local advertisers and agencies purchase local radio ratings data,
and national networks like Cumulus's Westwood One purchase national radio
ratings data. Furchtgott-Roth Expert Report ¶ 41.

Nielsen has one competitor in the local radio ratings space: another ratings
company called Eastlan, which is primarily present in smaller-sized radio markets
and in geographic markets where Nielsen does not operate. *Id.* ¶ 49, n.92. Of the
80 local markets where Cumulus owns local radio stations and Nielsen provides
ratings data, Nielsen is the only provider of local radio ratings data in 75.
Furchtgott-Roth Expert Report ¶ 50; Milner Decl. ¶ 11. However, Eastlan's
willingness to quickly enter new markets with sufficient demand has contributed to
its growth into larger markets, allowing it to start competing directly with Nielsen.
PX-267 (ECF No. 61-2) ("Gould Decl.") ¶¶ 3, 11, 13; Milner Decl. ¶ 11; PX-067 at 1-
2; Hr'g Tr. 286:8-287:6 (Gould). Further, "in recent years, Eastlan's been coming in
and focusing directly on those larger markets [that Nielsen is in] and been entering
and succeeding." Hr'g Tr. 114:13-18 (Orszag).

In contrast, Nielsen is the only provider of comprehensive national radio
ratings data in the United States. Furchtgott-Roth Expert Report ¶¶ 46-48; Jones

Decl. ¶ 7; Jones Dep. Tr. 311:12-16; PX-266 (Small Decl.) ¶ 3.  National advertisers and advertising agencies rely on software that is only compatible with Nielsen data and media-buying platforms that do not accept Eastlan data, necessitating that networks purchase Nielsen data to compete for national advertising.  Hr'g Tr. 321:1-5 (Gould); Compl. ¶¶ 58, 75-77; Jones Decl. ¶ 8; Jones Suppl. Decl. ¶ 17.  Accordingly, Nielsen's Nationwide product is essential to Westwood One's ability to sell national advertising.  Furchtgott-Roth Expert Report ¶ 65.

### 3.     Challenged Nielsen Policies

As declines in radio broadcast listenership have translated to declines in radio advertising revenue in recent years, PX-285 (Furchtgott-Roth Dep. Tr.) 81:21–82:2, the industry has shifted, and Nielsen has had to "increase [its prices] beyond historical levels."  Tunkel Dep. Tr. 155:18–156:7; *see also*, Hr'g Tr. 214:23-25 (Tunkel) ("it gets more difficult . . . every single year, to get the same number of people to participate in [Nielsen's] surveys at historic levels").  Additionally, because in 2024 Nielsen had to retire its secondary national data service, which brought in significant revenue, Nielsen now relies on its "local ratings service [to] subsidize[] Nationwide."  Tunkel Dep. Tr. 36:15-20, 155:5-24.  As Nielsen's prices have increased, radio broadcasters have, in turn, looked to Eastlan as a viable cheaper alternative for their ratings data.  Milner Decl. ¶ 20; PX-269 ("Decl. of Third-Party Broadcaster 1") ¶¶ 5, 11; PX-270 ("Decl. of Third-Party Broadcaster 2") ¶ 5.

### a.  The Network Policy (the alleged "Tying Policy")

In September 2024, Nielsen announced its "Network Policy," Compl. ¶ 7; PX-

045; PX-046; PX-047; Tunkel Dep. Tr. 76:4–77:7; Hr'g Tr. 129:13-15 (Tunkel), which applies only to customers who operate both a national network and local radio stations. Hr'g Tr. 163:18–164:8 (Tunkel); Tunkel Decl. ¶ 6; DX-4 at 1. The Policy states as follows:

> [I]f a network or any other type of sales entity owns, manages, operates, or has a sales or operating agreement or other similar business relationship with a local station in a Nielsen-measured market that does not currently subscribe to the local market in that Metro, Nielsen Audio will no longer provide DMA or Metro data in Nielsen's National Regional Database (NRD), Act One, or via any Software Solution Provider (SSP) for that specific market to the network or such other applicable entities.

*Id.*; *see also* Hr'g Tr. 129:16-20 (Tunkel). In other words, if a customer owns both a national network and a local radio station, but that customer declines to purchase *local* Nielsen data for its local stations, Nielsen will exclude local data for the pertinent geographies from its *national* product to that customer. In effect, customers receive incomplete national data unless they elect to purchase local data as well. National radio ratings data that "have holes" do not represent a "real" or "useful" product, since the lack of comprehensive data would prevent national networks like Westwood One from accurately and reliably evaluating national radio shows and effectively engaging with advertisers and advertising agencies. Furchtgott-Roth Expert Report ¶ 56; *see also* Tunkel Dep. Tr. 193:16-20.

Nielsen maintains that the Network Policy is designed to prevent two types of free riding. One anticipated free riding issue is when national radio broadcast customers that own or have a sales relationship with a local station; purchase the

Nationwide report; and either (1) make decisions for their local stations based on information from the report, or (2) share the local data aggregated in the Nationwide report with their commonly owned and controlled local market stations that do not pay for local Nielsen data.  Hr'g Tr. 161:17-162:2, 217:21-218:7; Tunkel Decl. ¶ 7; Tunkel Dep. Tr. 82:5-16; Orszag Decl. ¶ 11.

The second free riding problem arises as a result of the nature of Nationwide as an amalgamation of local radio ratings data.  The fixed costs of creating Nationwide are largely borne by those who purchase local radio ratings data. Orszag Decl. ¶¶ 61-62.  Accordingly, "the national networks that rely on national data benefit from every station owner who contributes to covering the cost of local data." *Id.* ¶ 63.

Of Nielsen's hundreds of customers renewing their contracts in 2025, only 12 operate both a national network and local radio stations and are thereby subject to the alleged tying policy.  Tunkel Dep. Tr. 73:24–74:5; Tunkel Decl. ¶ 8.  This limited subset, however, includes "the three largest companies in radio"—Cumulus, Audacy, and iHeart—together controlling about a third of all radio advertising dollars.  Hr'g Tr. 277:22-278:11 (Gould).  Further, in many of the Top 100 radio markets, the 12 subscribers subject to this Policy account for over 75% of radio advertising revenue, including in New Orleans, LA (where 17 of 25 total stations are owned by one of the 12 vertically integrated subscribers, and those 17 stations generate 92% of the market's radio advertising revenue); Houston-Galveston, TX; Stockton, CA; Harrisburg-Lebanon-Carlisle, PA; Memphis, TN; Indianapolis, IN;

Los Angeles, CA; Detroit, MI; and San Francisco, CA.  PX-283; PX-284; Hrg Tr. 98:3-6 (Orszag); Hr'g Tr. 292:7-9 (Gould); Furchtgott-Roth Dep. Tr. 126:12-17 ("[T]here are some markets . . . where there's hardly any advertising revenue left after you take iHeart and Cumulus and Audacy and the other vertically-integrated firms out of the market.").

### b.  Subscriber First Policy

In 2022, Nielsen implemented its "Subscriber First" Policy, which excludes local radio stations from Nielsen's summary-level local radio ratings data unless those stations purchase Nielsen's local radio ratings data for the geography in which they are located.  Whereas the Network Policy prevents noncompliant customers from *receiving* Nielsen data, the Subscriber First Policy prevents noncompliant customers from *appearing in* Nielsen data.  Advertisers and advertising agencies purchase Nielsen's summary-level local radio ratings data (and often, only that data) to compare local radio station audiences in any given geography and, in turn, make advertising inventory purchases.  Compl. ¶ 64. Consequently, local stations must purchase Nielsen's local data or face significant lost revenue.  Gould Decl. ¶ 23.

Eastlan, Nielsen's sole local radio ratings competitor, lost approximately five or six existing customers as result of Subscriber First Policy, as well as a number of other prospects that chose not to engage with Eastlan after the Subscriber First Policy was announced.  Hr'g Tr. 272:17-20 (Gould).  Customers cite the Subscriber First Policy as the reason they cannot subscribe to Eastlan's data over Nielsen's.

*Id*. 271:20–272:20 (Gould).  Cumulus claims the Subscriber First Policy is anticompetitive because it (1) compels radio stations to purchase ratings data that, at a given price, they might otherwise not purchase, and (2) discourages local radio stations from purchasing radio ratings data from Nielsen's competitors.  Compl. ¶ 20.

### 4.    Cumulus's Contract Negotiations with Nielsen

The operative contract between Cumulus and Nielsen has a ▇▇▇ year term running from January 1, ▇▇▇ through December 31, ▇▇▇  PX-001 § 6.1.  Under that contract, Cumulus paid Nielsen ▇▇▇▇▇ for ▇ local markets and the Nationwide service for the 2025 calendar year.  PX-007; Tunkel Decl. ¶ 10.  This contract was negotiated and signed prior to development of the Network Policy.  PX-091; PX-001; Compl. ¶ 7.

Cumulus initially approached Nielsen to begin negotiations for a new contract in May 2025.  PX-006; PX-071 at 3; *see* PX-075 at 1.  In connection with those contract negotiations, Nielsen conducted a market-by-market price analysis of its existing contract with Cumulus.  Hr'g Tr. 152:3–153:9 (Tunkel); PX-167; PX-014 at 2.  Nielsen compared the rates paid by Cumulus with the rates paid by comparable subscribers.  This analysis showed that Cumulus's current contracted rates on a cost per share basis were above those paid by other subscribers in 33 of its 76 markets.  *See* PX-014 at 2.  Cumulus simultaneously conducted its own analyses and determined that in a majority of local radio markets, the cost of Nielsen's local radio ratings data had outstripped the value Cumulus would receive

in advertising revenue.  Milner Suppl. Decl. ¶¶ 7-9; *id*. Ex. 2.  For example, Cumulus calculated that in Minneapolis, Minnesota, it paid Nielsen approximately ████████ for local ratings data and associated products, while Eastlan's product would cost approximately ███████.  Milner Suppl. Decl. ¶¶ 9-10.  While Cumulus estimated that it could lose as much as ████████ in advertising revenue by not purchasing Nielsen data, switching from Nielsen to Eastlan would still result in a net benefit.  *Id.*  Accordingly, Cumulus determined that it would drop Nielsen's local radio ratings data for all local markets except in ██ geographies, for which it wanted to obtain current pricing to help conduct a further cost-benefit analysis.  Jones Decl. ¶ 24; DX-18 at 3.

In the course of negotiating a new contract, Nielsen has put eight separate offers on the table.  Nielsen's first offer to Cumulus, on June 27, 2025, and revised on July 24, 2025, incorporated full Nationwide service, plus local service in every local market in which Cumulus operates radio stations (including markets where Cumulus had already unsubscribed, like Memphis, TN, Amarillo, TX, and New Orleans, LA), for an annual price of ████████ in the first year with a ████████ for the remaining term of the contract.  DX-12 at 2-3; Tunkel Dep. Tr. 132:24–133:10; PX-007; PX-008 at 2; Tunkel Decl., Ex. A at 2-3; Jones Suppl. Decl. ¶¶ 21, 24.  This offer, just ██████ off the prior contract price, included ratings services for local geographies that Cumulus wanted to unsubscribe from (and some it had already unsubscribed from) but removed ancillary services in certain geographies to which the company wanted to subscribe and would have to purchase

elsewhere.  Jones Suppl. Decl. ¶ 21.  This offer would also effectively prevent Cumulus from purchasing Eastlan's local radio ratings data because it would be buying all local radio ratings data in all its geographies from Nielsen.  Jones Suppl. Decl., Ex. 4; Furchtgott-Roth Expert Report ¶ 55.

On July 24, 2025, Nielsen alternatively offered to provide e-book only subscriptions for all of Cumulus's local markets, alongside Nationwide, for an annual price of ███████ in the first year with a ███████████ for the remaining term of the contract.  PX-007; DX-12 at 1-2; Tunkel Decl. Ex. A at 2-3; Jones Suppl. Decl. Ex. 4.  E-book only data is unusable standing alone, and therefore would have required Cumulus to subscribe to other peripheral services to render usable by advertisers, at additional cost.  Jones Suppl. Decl. ¶ 24; Jones Dep. Tr. 237:25–239:17.  This offer would also effectively prevent Cumulus from purchasing Eastlan's local radio ratings data because, as with the first offer, it would be buying all local radio ratings data in all its geographies from Nielsen. Jones Suppl. Decl. ¶ 9; Jones Decl. ¶ 20.

Also on July 24, 2025, Nielsen offered Cumulus ██ local markets and the incomplete Nationwide product to Westwood One (excluding ratings data for DMAs where a Cumulus-associated local station did not subscribe to Nielsen services) for an annual rate of ██████████████████ for the ██ local markets and ███ for Nationwide) with the option to expand the Nationwide service at ████ ███████████████.  DX-12 at 2.  Nielsen refused at that time to provide a

price for Nationwide as a standalone product, stating that "it [was] not possible to achieve in light of our policy on local subscription." *Id.* at 1.

The Nationwide product being offered in this deal would be incomplete, and in Nielsen's own words, "Swiss cheese." Hr'g Tr. 130:1-7. Because Cumulus owns radio stations in ▮ markets where Nielsen provides local radio ratings data, Furchtgott-Roth Expert Decl. ¶ 50, this national radio ratings data product would be missing data from ▮ geographies, including major markets such as San Francisco, CA, Los Angeles, CA, and New York, NY. *See* Jones Suppl. Decl. ¶ 24(c); DX-18; *see also* Tunkel Dep. Tr. 193:16-20 ("This is the option that I made sure Collin understood was like Swiss cheese, because they would not be receiving all markets in the Nationwide service, so I wanted to make sure he understood what he was asking for"). Nielsen supplemented this offer by telling Cumulus it could expand the Nationwide product at ▮▮▮▮▮▮▮▮▮▮: in other words, by purchasing local radio ratings data in all of Cumulus's local markets. Hr'g Tr. 182:2-15. Thus, under the terms of this offer, if Cumulus wanted a bonafide Nationwide product, it would have to subscribe to Nielsen local radio ratings data in every market where it has a station.

In light of Nielsen's refusal to put forward a price for the standalone Nationwide product, on August 1, 2025, Cumulus issued a counteroffer to purchase local ratings data in ▮ markets for a flat ▮▮▮▮▮▮▮▮▮▮▮ DX-12 at 1. On August 18, 2025, however, counsel for Cumulus sent Nielsen a letter stating that its Network Policy violated antitrust laws by unlawfully conditioning

15

the sale of Nationwide on the "purchase of uneconomic local products." DX-14 at 1. Cumulus demanded that Nielsen withdraw its policy and threatened legal action if it failed to do so. *Id.* at 2-3.

On September 15, 2025, Nielsen offered Westwood One a complete Nationwide standalone product for ███████████████████████████ ████████████ Jones Suppl. Decl. ¶ 35(a); Tunkel Decl., Ex. A at 2. Cumulus's economic expert opines that Nationwide was priced so exorbitantly that this offer was the effective equivalent of the June/July offer of ███████ for Nationwide and all local markets. Furchtgott-Roth Expert Report ¶ 65. Indeed, this was exponentially more than what any other network pays for Nationwide as a standalone product: other than one company (████████████████████), which as of April 2024 pays between ██████████████████ annually for Nationwide, no other national network pays more than ██████ annually for Nationwide, and national networks without local stations pay ██████. Tunkel Dep. Tr. 46:14–48:2, 50:23-51:4; Hr'g Tr. 174:10-24 (Tunkel); Furchtgott-Roth Dep. Tr. 131:12-15; Furchtgott-Roth Expert Report ¶ 65; PX-005 at 5. It was also ten times more than what Cumulus was paying for Nationwide under its existing contract. Jones Suppl. Decl. ¶ 25; Tunkel Dep. Tr. 171:9-12. *See also* Furchtgott-Roth Expert Report ¶ 69 ("Indeed, at the price Nielsen is offering for Nationwide as a standalone product, it forecloses Eastlan from selling Cumulus local radio ratings data not only for the ██ markets in Nielsen's September 15 offer . . . but also for the full set of ██ markets in Nielsen's July 24 offer. If Cumulus purchased Nationwide as a standalone product

(September 15, Option 1) for ███████ it would only make economic sense for Cumulus to purchase local radio ratings data for the █ markets from Eastlan if it were able to purchase an Eastlan-based alternative at a price of, at most, ████ ████. If not, Cumulus would be better off with Nielsen's July 24 proposal priced at ███████. Documentary evidence indicates that Cumulus would have to pay at least ██████ for such an alternative product in those █ local markets").

On the same day, Nielsen also offered a local-only package to Cumulus for ████████████████████. Jones Suppl. Decl. ¶ 35(b); Tunkel Decl. Ex. A at 2. The offer did not include Nielsen's Nationwide product. Furchtgott-Roth Expert Report ¶ 65 ("Local radio ratings data alone are not a viable option because Nationwide data are indispensable for Westwood One to sell advertising . . . and Nielsen is the monopoly provider of this product.").

Also on September 15, 2025, Nielsen offered local ratings data in 32 geographies, plus a complete Nationwide product, for the total amount of ███ ████████████████. Tunkel Decl., Ex. A at 2. This offer is priced 64% times higher than what Cumulus currently pays for Nationwide and those same geographies in its current contract, not accounting for additional costs Cumulus would incur to purchase local radio ratings data from an alternative provider in its remaining geographies. Jones Suppl. Decl. ¶ 35(c). It is also only roughly ██████ lower than Nielsen's initial offer for ratings data for all Cumulus local markets plus Nationwide. *Id.*

On October 16, 2025, Nielsen offered to provide Cumulus with Nationwide and local radio ratings data in all 80 markets with existing services at a price ██████ ████████. Tunkel Decl., Ex. A at 2.

On October 22, 2025, shortly after Cumulus filed its Complaint, Nielsen offered to maintain all existing services with Cumulus for the duration of litigation at current prices ███████████████████████████████████████████ *Id*.

### LEGAL STANDARDS

Section 16 of the Clayton Act authorizes injunctive relief against "threatened loss or damage by a violation of the antitrust laws," such as Section 2 of the Sherman Act. 15 U.S.C. § 26. In determining whether to grant injunctive relief under this provision, the Court applies the traditional criteria that governs applications for preliminary relief under Rule 65. *fuboTV Inc v. Walt Disney Co.*, 745 F. Supp. 3d 109, 132-133 (S.D.N.Y. 2024). Specifically, "[a] plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023) (cleaned up).

A movant is held to a heightened standard, however, where "(i) an injunction is mandatory, or (ii) the injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *N.Y. ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650

(2d Cir. 2015) (cleaned up). "When either condition is met, the movant must show a clear or substantial likelihood of success on the merits and make a 'strong showing' of irreparable harm." *Id*. (cleaned up).

"Section 16 should be construed and applied with the purpose of enforcing the antitrust laws in mind, and with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. Its availability should be conditioned by the necessities of the public interest which Congress has sought to protect." *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 259 n.6 (2d Cir. 1989), *amended on unrelated grounds*, 890 F.2d 569 (2d Cir. 1989) (cleaned up).

## DISCUSSION

The parties dispute whether Plaintiff's motion seeks to maintain the status quo or whether the heightened standard applicable to mandatory injunctions should apply. The Court agrees that the relief Plaintiff seeks through this action is not maintenance of the status quo, but mandatory relief. Yet that does not preclude Plaintiff from obtaining relief. Plaintiff has made a strong showing of irreparable harm and a substantial likelihood of success on the merits sufficient to satisfy the heightened standard for mandatory injunctions. Accordingly, for the reasons set forth below, Plaintiff is entitled to a preliminary injunction to prevent.

### A.    Likelihood of Success on the Merits

Cumulus has shown a substantial likelihood of success on the merits of its Section 2 claims alleging the anti-competitiveness of Nielsen's conduct as a monopolist in the local and national radio ratings data markets.

#### 1.    Antitrust Standing

To successfully bring suit under the Sherman Act, a private plaintiff must demonstrate both constitutional standing and antitrust standing. *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016); *see also Consol. Gold Fields*, 871 F.2d at 257-258. "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983). A plaintiff seeking injunctive relief under Section 16 of the Clayton Act must therefore show a threat of antitrust injury, *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 122 (1986), and that it is an acceptable plaintiff to pursue the alleged antitrust violations, *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d at 157.

Antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The relevant inquiry is thus whether the challenged action threatens competition in the relevant market. *Arcesium, LLC v. Advent Software, Inc.*, No. 20-cv-04389 (MKV),

2021 WL 1225446, at *7 (S.D.N.Y. Mar. 31, 2021). "Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, Inc., 996 F.2d 537, 543 (2d Cir. 1993). In contrast, "a plaintiff does not suffer an antitrust injury when the plaintiff's injury was consistent with free competition." *In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 4634541, at *77 (S.D.N.Y. Aug. 4, 2015), *amended sub nom. In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2015 WL 13122396 (S.D.N.Y. Oct. 19, 2015).

Cumulus is likely to succeed in demonstrating the threat of an antitrust injury. Cumulus and Westwood One are consumers of Nielsen's products. *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d at 158 ("Generally, only those that are participants in the defendants' market can be said to have suffered antitrust injury."). They have adduced evidence that Nielsen's anticompetitive conduct has permitted it to sharply raise prices for Nationwide as a standalone product, to more than ten times what Cumulus was paying for Nationwide under its prior contract, and far more than it charges other consumers for Nationwide when packaged with local market ratings data. *See, e.g.*, PX-005 at 5; PX-007; Furchtgott-Roth Expert Report ¶¶ 54, 69; Furchtgott-Roth Dep. Tr. 131:12-15; Tunkel Decl., Ex. A at 2-3; Tunkel Dep. Tr. 46:14–47:7, 50:23–51:4, 132:24–133:10, 171:9-12; Hr'g Tr. 174:10-24 (Tunkel); Jones Suppl. Decl. ¶¶ 21, 24.

Moreover, Nielsen's refusal to adequately disaggregate its Nationwide and local radio ratings products for purchase not only prevents Cumulus from contracting with Nielsen's competitor, Eastlan, to the detriment of its subsidiary, Westwood One, but also adversely affects local radio ratings markets more broadly. Westwood One's constrained choice in radio ratings providers, as evidenced by its latest contract negotiations with Nielsen, is indicative of Nielsen's restrictions on broadcasters in local radio ratings markets at large. Even in the local areas in which Nielsen is currently the only provider of radio ratings data, Nielsen's behavior has been historically constrained by the credible threat of Eastlan's (or other competitors') entry. As such, relative to the national radio ratings data market, local radio ratings data have been more competitively provided thanks to the presence, or potential entry, of Eastlan. Furchtgott-Roth Expert Report ¶¶ 50-51.

By effectively foreclosing Eastlan's ability to compete in local markets through the Subscriber First Policy and Network Policy, Nielsen causes an "injury of the type the antitrust laws [that] were intended to prevent" and that "flows from [the conduct] that . . . makes defendants' acts unlawful." *Brunswick Corp.*, 429 U.S. at 489. The record suggests Nielsen has directly inhibited Eastlan from gaining subscribers in the local radio ratings market by conditioning subscribers' appearance in ratings data on their local radio ratings purchases. *See* Decl. of Third-Party Broadcaster 1 ¶¶ 7-9 (commercial media company became "effectively invisible" to advertisers after its station ended local Nielsen contract and was

excluded from summary-level data, such that they lost advertising revenue); Decl. of Third-Party Broadcaster 2 ¶ 6 (media company sees Eastlan as "viable option for ratings services in some of our markets," but "advertising agencies continue to rely exclusively on Nielsen's ratings," and if "we unsubscribe in these markets advertisers would not see our stations in Nielsen data at all, even if these stations are top ranked stations," so company "remains locked into purchasing Nielsen's ratings in all markets in which we operate radio stations"). Indeed, Eastlan has already lost existing clients and potential clients from the Subscriber First Policy. *See* Hr'g Tr. 271:22–272:7 (Gould) (yearslong existing clients left Eastlan for fear that advertisers would not do business with them if they did not appear in Nielsen's summary-level data, and "strong prospect[s]" made an "eleventh-hour decision to switch [to Nielsen] when the information came out about the Subscriber First Policy").

The Network Policy similarly contributes to Nielsen's monopolization of local radio ratings data markets. Furchtgott-Roth Dep. Tr. 210:16-21 (the Network Policy is "anticompetitive on its face"), *Id.* at 157:2-13 ("[T]he tying policy creates an additional barrier to entry" that "make[s] it very difficult for a local radio station to switch away from Nielsen to Eastlan. But [Eastlan is] a potential entrant. They could enter, but these policies of Nielsen made that much more difficult."). Eastlan has heard from other broadcasters that they would prefer Eastlan in certain markets but are worried that they will be unable to purchase Nationwide if they no longer purchase Nielsen's local radio ratings data in that market because of the

Network Policy.  Gould Decl. ¶ 21; *see also* Decl. of Third-Party Broadcaster 2 ¶ 6; PX-265 (ECF No. 61-2) ("Decl. of Third-Party Broadcaster 3") ¶¶ 4-5. (National broadcasting company with local stations and a national network attesting it "would not be able to sell network advertising without Nielsen's comprehensive national radio ratings data," such that this policy "would prevent" the company "from considering in the future alternative providers of rating services").  The Network Policy is "limiting" to Eastlan because it "makes it difficult for [broadcasters] to make some of the choices . . . at a time when money is tough and return on investment becomes even more critical."  Hr'g Tr. 278:24-279:4 (Gould). By conditioning access to Nationwide on the purchase of local radio ratings data, Niesen also impedes Eastlan and other potential rivals from competing for the largest and most influential radio groups' business.  Hr'g Tr. 276:24-277:2 (Gould); Gould Decl. ¶ 21; Furchtgott-Roth Decl. ¶ 31.  That the 12 broadcasters subject to the Network Policy cannot freely purchase Eastlan's local radio ratings data also makes it difficult for Eastlan to sell its local radio ratings data to smaller broadcasters, because these smaller broadcasters tend to follow the lead of those larger industry leaders broadcasters such as iHeart, Audacy, and Cumulus.  Hr'g Tr. 276:6-280:6 (Gould); *see also id*. 288:4-7 (Gould) ("So not having access to those three companies [iHeart, Audacy, and Cumulus], because the tying policy is certainly part of it, makes it difficult to grow in local markets and makes us less likely to target a market like that."); Furchtgott-Roth Expert Report ¶¶ 58-62.  This results in harm to competition.  *See* Hr'g Tr. 87:19-88:1 (Orszag) ("As a matter of

economic theory," Nielsen's expert agrees that tying harms competition "if a rival is diminished in its ability to compete . . . even when a rival is not completely excluded from the market.").

Cumulus is also an appropriate party to bring the instant claims.  The antitrust standing requirement "originates in the Supreme Court's recognition that . . . 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'"  *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 258 (2d Cir. 2023), *cert. denied sub nom. BASF Metals Ltd. v. KPFF Inv., Inc.*, 144 S. Ct. 681 (2024). Whether a private plaintiff has antitrust standing to pursue a damages claim under Section 4 of the Clayton Act is generally assessed under the four "efficient enforcer" factors, which look to (1) the directness or indirectness of the asserted injury; (2) the existence of more direct victims of the alleged anticompetitive conduct; (3) whether the asserted damages are speculative; and (4) the risk of duplicate recoveries or complex apportionment of damages.  *See, e.g.*, *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 778 (2d Cir. 2016).  Application of these factors is "less rigorous" in the Section 16 context, however, *Consol. Gold Fields*, 871 F.2d at 260 n.6, because claims for injunctive relief do not raise the same risks of multiple lawsuits or duplicative recoveries as do claims for treble damages.  *Cargill*, 479 U.S. at 111 n.6; *see also Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005) ("[T]he weight to be given the various factors will necessarily vary with the circumstances of particular cases.").  Cumulus, as a consumer in the relevant

markets, easily satisfies this relaxed test.  The injury to Cumulus is directly caused by the alleged anticompetitive policies, and Cumulus is well placed to represent other market consumers who are similarly affected by Nielsen's policies.

## 2.    Section 2 Claims

Section 2 of the Sherman Act prohibits a company from using anticompetitive conduct to maintain or protect its market power in a relevant market through: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *see also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir. 1979) ("Even if that power has been legitimately acquired, the monopolist may not wield it to prevent or impede competition.").  The primary point of contention between the parties is whether Plaintiff has adequately shown that Nielsen engaged in an unlawful tying arrangement through its Network Policy in order to maintain its market power in the relevant markets.  *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 369 (S.D.N.Y. 2022).  While "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices is not . . . unlawful," *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004), Cumulus has made a significant showing that Nielsen is relying on anticompetitive conduct to maintain its power in the national and local radio ratings markets.

### a. Monopoly Power in Relevant Market

"As an initial matter, it is necessary to define the relevant product and geographic market [Nielsen] is alleged to be monopolizing." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). "A relevant product market consists of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *Id.* (cleaned up). For purposes of this preliminary injunction motion, the parties are in agreement that the relevant product markets are for local radio ratings data and national radio ratings data. *See* Hr'g Tr. 55:25–56:2; *id.* at 249:4-12; *see also* ECF No. 129 at 10 (Nielsen not contesting definition of relevant markets). It is also not disputed that these are distinct products that are used differently by industry participants, are recognized as different products by the industry, are accessed through different platforms, have distinct customers, and have separate prices. *See* Furchtgott-Roth Expert Report ¶¶ 39-41; Hr'g Tr. 56:3-9.

Geographically, the market for the Nationwide product is the United States. The market for local radio ratings data is each local geographic area for which a ratings report is generated. Compl. ¶ 96.

"The core element of a monopolization claim is market power, which is defined as 'the ability to raise price by restricting output.'" *PepsiCo*, 315 F.3d at 107 (citation omitted). Monopoly power "can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market." *Geneva Pharms. Tech. Corp.*

*v. Barr Lab'ys Inc.*, 386 F.3d 485, 500 (2d Cir. 2004).  For purposes of this motion, Nielsen has accepted as true Cumulus's allegations with respect to market power. Hr'g Tr. 24:1-4; ECF No. 129 at 10; Opp'n Mem. at 26.

Cumulus has adduced both direct and indirect evidence that Nielsen has market power with respect to the market for national radio ratings data, for which it has a 100% market share, and the market for local radio ratings data, for which it has a dominant market share in each of the geographies at issue.  Orszag Decl. ¶ 25; Furchtgott-Roth Expert Report, ¶¶ 46-49; *see also* Compl. ¶ 98 (alleging that, in 75 of the 80 local radio ratings data markets, "Nielsen is the only provider of local radio ratings data and possesses a 100% market share").  "[A] share above 70% is usually strong evidence of monopoly power."  *New York v. Actavis, PLC*, No. 14 CIV. 7473, 2014 WL 7015198, at *36 (S.D.N.Y. Dec. 11, 2014) (citation omitted); *see also Maxon Hyundai Mazda v. Carfax, Inc.*, No. 13-CV-2680 (AJN), 2014 WL 4988268, at *15 (S.D.N.Y. Sep. 29, 2014) (finding that complaint plausibly alleged defendant's monopoly power based on allegation that the defendant's market share in the relevant market was 90%).  Plaintiff has therefore satisfied its burden of showing that Nielsen has a monopoly in the market for nationwide radio ratings data and substantial market power in the market for local radio ratings data.

### b. Willful Maintenance of Monopoly Power Through Anticompetitive Conduct

Cumulus alleges that the Network Policy constitutes an unlawful and anticompetitive tying arrangement.  A tying arrangement is "an agreement by a party to sell one product[,] but only on the condition that the buyer also purchases a

28

different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated in part on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *see also* Furchtgott-Roth Expert Report ¶ 44 ("[T]ying is considered anticompetitive when a firm uses its market power in the tying-product market to coerce customers into purchasing a tied product sold in an otherwise more competitive and contestable market, thereby reducing competition in the tied product market."). In contrast, "if each of the products may be purchased separately in a competitive market, one seller's decision to sell the two in a single package imposes no unreasonable restraint on either market." *Jackson Parish*, 466 U.S. at 11.

The Supreme Court has explained the anticompetitive harms inherent in unlawful tying arrangements. Competition is hindered when such arrangements insulate inferior products from competitive pressures or create barriers to entry of new competitors in the market for the tied product. *Id.* at 14. And for consumers, "the freedom to select the best bargain in the second market is impaired by his need

to purchase the tying product, and perhaps by an inability to evaluate the true cost of either product when they are available only as a package." *Id.* at 15.

To establish an unlawful tying arrangement, Plaintiff must show:

> [(1)] a tying and a tied product;
>
> [(2)] evidence of actual coercion by the seller that forced the buyer to accept the tied product;
>
> [(3)] sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product;
>
> [(4)] anticompetitive effects in the tied market; and
>
> [(5)] the involvement of a not insubstantial amount of interstate commerce in the tied market.

*Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1516-17 (2d Cir. 1989) (cleaned up). "If monopoly power (or sufficient market power) is alleged and proven, the tying arrangement may be unlawful *per se* without the need to prove anticompetitive effects or other market conditions." *In re Google Digital*, 627 F. Supp. 3d at 368. The application of a *per se* rule is appropriate, for example, "when the seller's share of the market is high or when the seller offers a unique product that competitors are not able to offer." *Jefferson Parish*, 466 U.S. at 17.

The Court concludes that Nielsen's Network Policy is an anticompetitive tying policy. Three of the five prongs of the tying test are unchallenged. It is undisputed that Nielsen has explicitly tied its dominant and essential Nationwide product ("tying product") to its costly local products ("tied products"). Nielsen concedes that, as the exclusive purveyor of Nationwide, it possesses sufficient market power to force customers to purchase local radio ratings data that they

30

would otherwise forego.  Hr'g Tr. 23:20–24:4 (counsel); 56:10-13, 57:4-17 (Orszag).

Indeed, Nielsen's express purpose in adopting the Network Policy was to bring

networks that were seeking to drop subscriptions to local ratings data "back to the

negotiation table and protect against future potential losses" of such customers to

Eastlan.  PX-005; *see also* PX-003.  Finally, it is not disputed that countrywide radio

ratings markets involve a "not insubstantial amount of interstate commerce."

*Gonzalez*, 880 F.2d at 1517 (cleaned up).

### c.  Coercion

Nielsen does, however, contest that the Network Policy is coercive.  Nielsen

attempts to recast its Network Policy as a "bundling arrangement" that merely

offers Nationwide at a discounted rate when purchased with local ratings data.

Opp'n Mem. at 20-21.  The record does not bear out this characterization.  "[W]here

the buyer is free to take either product by itself[,] there is no tying problem[,] even

though the seller may also offer the two items as a unit at a single price."  *In re*

*Google Digital*, 627 F. Supp. 3d at 368 (citation omitted).  The Network Policy does

not refer to any discounts or bundling arrangements, however.  Nor does it permit a

national radio network "to take [Nationwide] by itself."  It categorically states that

if a national network with a "relationship with a local station in a Nielsen-measured

market . . . does not currently subscribe to the local market in that Metro, Nielsen

Audio will no longer provide DMA or Metro data in Nielsen's [Nationwide Report]."

DX-4.  In other words, the Network Policy flatly prohibits the sale of the complete

Nationwide product unless purchased with all local ratings data.  *Id*.  Indeed, until

Cumulus threatened to file the instant suit, Nielsen refused to even provide a price to Westwood One for a complete standalone Nationwide product, insisting that it could only be purchased together with all local ratings data for the markets in which Cumulus operated.  DX-12 at 2.  Nielsen is therefore "[u]sing monopoly power to boost sales through consumer coercion—as opposed to persuasion—[which] constitutes improper conduct."  *In re Google Digital*, 627 F. Supp. 3d at 380 n.20.

The fact that Nielsen, after being accused by Cumulus of violating the antitrust laws, finally offered to sell Nationwide to Westwood One as a standalone product, Opp'n Mem. at 1; Jones Suppl. Decl. ¶ 35(a); Tunkel Decl. Ex. A at 2, does not negate the anticompetitive effects of its Network Policy.  Even in the absence of an explicit tie, if "the individual products are priced such that the buyer is coerced to accept both products in a discounted package, then a tying arrangement may result."  *Synergetics USA, Inc. v. Alcon Lab'ys, Inc.*, No. 08-CV-3669 (DLC), 2009 WL 435299, at *3 (S.D.N.Y. Feb. 23, 2009); *see also Am. Mfrs. Mut. Ins. Co. v. Am. Broad. Paramount Theatres, Inc.*, 388 F.2d 272, 283 (2d Cir. 1967) (pricing with "the effect of conditioning the sale of the single product to the sale of the entire package" amounts to unlawful constructive tying).

The price that Nielsen offered Cumulus for a standalone Nationwide—ten times more than it currently pays—is so exorbitant as to make it economically unfeasible to purchase Nationwide as a separate product.  Furchtgott-Roth Expert Report ¶ 65.  This pricing therefore served as a constructive tie.

### d. Anticompetitive Effect on Local Radio Ratings Market

In light of Nielsen's monopolist status as the only seller of the Nationwide product, its coercive tying policy is *per se* unlawful. *Jefferson Parish*, 466 U.S. at 17. But even were it not, Plaintiff has adequately demonstrated that the Network Policy directly inhibits competition in the market for local radio ratings data. *See supra* at Discussion.A.1.

Relying on cases from outside the Second Circuit, Nielsen contends that to prevail on a Section 2 claim, Cumulus must demonstrate that its conduct "actually foreclosed competition." Opp'n Mem. at 22 (citing *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 898 (9th Cir. 2008) and *LePage's Inc. v. 3M*, 324 F.3d 141, 155 (3d Cir. 2003)). Nielsen argues that Eastlan is hardly foreclosed from competing with Nielsen in all local radio markets, as it can enter any market with a single customer, and there are many local radio stations that are not impacted by the Network Policy that could potentially turn to Eastlan for ratings data. Opp'n Mem. at 22. Yet complete foreclosure of competition is not the appropriate legal standard. "Rather than requiring proof of foreclosure, the crux of a Section 2 claim is a showing of anticompetitive conduct. Foreclosure is instead just one way of showing anticompetitive conduct." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 729 F. Supp. 3d 298, 328 (E.D.N.Y. 2024); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) ('[T]o be condemned as

exclusionary, a monopolist's act must have an 'anticompetitive effect.' That is, it must harm the competitive *process* and thereby harm consumers.").[2]

The record evidence overwhelmingly indicates that the Network Policy poses a significant barrier to entry, preventing Eastlan from achieving any measure of scale or industry-wide acceptance. Furchtgott-Roth Expert Report ¶¶ 55-60. While Eastlan theoretically could enter any local market with just one customer, Orszag Decl. ¶¶ 37-41, that is not a sustainable business model long term. Hr'g Tr. 287:1-21 (Gould) (explaining the difficulties of entering markets with a single customer, including the thin profit margin). Moreover, the Network Policy is targeted at the largest national broadcasters, the very subscribers who would otherwise be the most likely to avail themselves of Eastlan's products. Hr'g Tr. 292:15-18 (Gould) ("You've got the large three companies that are tied up with the [T]ying [P]olicy that they can't access. So my opportunity to come into this market is with those smaller companies, and the return on investment isn't there for them [to purchase local data]."). Indeed, in local markets where the broadcasters subject to the Network Policy own a majority of the radio stations, Eastlan is effectively foreclosed from competing as a result of the Network Policy. *See* PX-283 at 7, 38; *see also* Hr'g Tr. 287:24-288:12 (Gould) ("There are many markets, many markets in America where

---

[2] The cases cited by Nielsen are not to the contrary. In *LePage's*, the Third Circuit upheld a claim of exclusionary dealing under Section 2 based upon evidence of foreclosure of competition, without suggesting that foreclosure was a necessary component of a Section 2 claim. 324 F.3d at 155-59. *Cascade Health Sols.* in turn merely described the holding of *LePage's*, and then rejected its reasoning. 515 F.3d at 898-909.

those three large companies [iHeart, Audacy, and Cumulus] control the vast majority of the audience . . . because they have the vast majority of the audience, they have the vast majority of the advertising dollars.  So not having access to those three companies . . . makes it difficult to grow in local markets and makes us less likely to target a market like that."); *id.* 287:1-21 (Gould) (explaining that Eastlan, if entering a new local market, must charge both large and small stations the same rate for its product given its cost of entry, while Nielsen can offer smaller stations discounts that would make its product cheaper in local markets).

For example, Eastlan's President and CEO testified that in New Orleans, Louisiana, where iHeart, Audacy, and Cumulus comprise 92% of the radio advertising revenue in the market, "[i]t's very unlikely that any of these ones that are not among those three would come [to Eastlan] because the advertising revenue isn't there to support it."  Hr'g Tr. 292:23-293:2 (Gould).  Nielsen's expert opines that Eastlan can enter new local markets by targeting as potential customers smaller local stations that are not subject to the Network Policy.  Orszag Decl., ¶¶ 37-41.  But the record indicates that many such stations would not earn enough in advertising revenue to make purchase of Eastlan's product feasible.  *See e.g.*, Hr'g Tr. 88:4-89:19 (noting that one of the smaller stations in New Orleans earned less in annual revenue in 2024 than the cost of Eastlan's local ratings data); Hr'g Tr. 292:19-22 (Gould).  The Network Policy therefore has an adverse effect on the competitive process in the market for local radio ratings data.

### e.  Procompetitive Justification

"[O]nce a plaintiff establishes that a monopolist's conduct is anticompetitive or exclusionary, the monopolist may proffer 'nonpretextual' procompetitive justifications for its conduct."  *Schneiderman*, 787 F.3d at 652.  "If the monopolist asserts a procompetitive justification—a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal—then the burden shifts back to the plaintiff to rebut that claim."  *Microsoft Corp.*, 253 F.3d at 59.  Nielsen offers three procompetitive justifications for its tying policy.  The Court examines each in turn.

First, Nielsen suggests that the policy is intended to reduce unlicensed data-sharing by local stations that do not subscribe to Nationwide.  Orszag Decl. ¶ 59. The Court concludes that this proffered explanation is pretextual.  Under Cumulus's current contract with Nielsen, sharing this data with local affiliates is already a breach of contract.  PX-001 at § 3.1. ("For the avoidance of doubt, Westwood One LLC is not permitted to disclose any Nielsen information to any Cumulus Affiliate which does not have a license to the same Nielsen information."). Per Nielsen's expert, contractual provisions to prevent national networks from sharing Nationwide data with common-ownership local stations "would tend to minimize or tend to attenuate . . . the free riding issue that would arise as an economic issue."  Hr'g Tr. 78:3-5 (Orszag).[3]

---

[3] While Nielsen was able to point to one suspected example of prohibited data-sharing, Hr'g Tr. 172:6-19 (Tunkel), the circumstances there were unique and not indicative of an industry-wide issue.

Second, Nielsen's economic expert has also suggested that "tying conduct by a monopolist could be considered competition on the merits," and therefore legal, where "the hypothetical monopolist . . . has a great product in the tied market and . . . consumers like to buy the product in the tying and the tied market together and there's an efficiency and they could buy them together cheaper than they could buy them separately." PX-287 ("Orszag Dep. Tr.") 23:18–24:9. The record demonstrates that this is not the case in today's local radio ratings data markets. Cumulus has determined that the cost of Nielsen's local radio ratings data is higher than the value Cumulus would receive in revenue in a majority of local geographies, which is why it and other broadcasters want to be able to switch to Eastlan in those markets. Milner Decl. ¶ 20; Milner Suppl. Decl. ¶ 7; Decl. of Third-Party Broadcaster 1 ¶¶ 5, 6, 11; Decl. of Third-Party Broadcaster 2 ¶¶ 5-6.

Finally, and perhaps most substantially, Nielsen asserts that its Network Policy is an economically sensible means of recovering the substantial fixed costs that Nielsen incurs in developing the Nationwide Report. Orszag Decl. ¶ 59. Nielsen's Nationwide product is unique in that it is compiled from local ratings data. Nielsen's cost in collecting that local data that does not vary by the number of customers served. Orszag Decl. ¶ 61. That cost has also increased in recent years due to the decline in the radio industry generally. *Id.* ¶ 68. In contrast, creating the national ratings data can be done at relatively low incremental cost. *Id.* ¶ 61. Nielsen sets and allocates prices for all of its products in a way that covers these fixed costs. *Id.* at ¶ 62. But in the radio broadcasting space, Nielsen's revenues are

driven by local ratings subscriptions, not the purchase of its Nationwide product. *Id.* In other words, the purchase of local ratings data essentially subsidizes the creation of the Nationwide Report. This creates a potential free riding issue apart from Nielsen's data-sharing concern. *Id.* "[T]he national networks that rely on national data benefit from every station owner who contributes to covering the cost of local data." *Id.* ¶ 63. They therefore have an incentive to rely on others to subsidize the costs of local ratings data collection, while reaping the benefits of the resulting Nationwide Report. *Id.* Nielsen's expert opines that, by demanding that national networks either subsidize the costs of the Nationwide product by purchasing local ratings data or pay an increased price for Nationwide as a standalone product, Nielsen has acted in an economically efficient manner. *Id.* ¶¶ 61-66. Nielsen's Network Policy decreases incentives to free ride and "increases overall output by making [Nationwide] available to more consumers." *Id.* ¶ 66.

Cumulus's expert, conversely, opines that "Nielsen's high price for standalone Nationwide data cannot be justified as a necessary price reflecting the costs of providing Nationwide data unbundled from local ratings. Indeed, Nielsen sells standalone Nationwide data to other customers for an amount similar to, or lower than, what Cumulus is currently paying for the Nationwide product . . . and substantially less than the price that Nielsen has proposed to Cumulus." Furchtgott-Roth Expert Report ¶ 67.

While the Court finds credible that Nielsen's fixed operating costs for collecting local radio ratings data are sizable, Orszag Decl. ¶¶ 12, 61, Nielsen has

made no effort to quantify these costs or correlate them with its price for standalone Nationwide. The dearth of evidence on this point makes it impossible to assess the extent to which legitimate efforts to combat free riding justify Nielsen's conduct. Moreover, where the evidence indicates that a Defendant's actual motive was to impede competition, the Court can reject proffered procompetitive justifications as pretextual. *Schneiderman*, 787 F.3d at 658. Cumulus has offered compelling evidence that Nielsen's intention behind the Network Policy was, at least in part, anticompetitive. PX-016 at 2, 23; PX-118; PX-003 at 1 (policy intended to "command subscriptions in local markets" and "bring groups with non-subscribing markets back to the negotiation table"); Hr'g Tr. 167:21-25 (Tunkel), PX-005 at 2 ("[The policy] will help reinforce the value of Nielsen local market measurement and secure local subscription."); *Id*. at 5 ("We will drive local subscription through this network policy."). *But see* PX-003 ("[T]his is a small but important way we can continue to command subscriptions in local markets and prevent networks from getting data through the back door."); PX-005 at 7 ("Introducing this policy increases the importance of our local service and aligns with our cost structure. It will bring these players back to the negotiation table and protect against future potential losses.").

To the extent Nielsen's Network Policy would generate any procompetitive benefits, based on the current record the Court concludes that these benefits "cannot overcome the substantial harm to competition that [Plaintiff] has shown is likely to arise." *FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 400 (S.D.N.Y.

2024).  The benefits that Nielsen has outlined are largely unquantified and hypothetical, while the harms caused by the policy are imminent and substantial.

Accordingly, Cumulus has demonstrated significant likelihood of succeeding on the merits of its anticompetitive tying claim.  Because the Court has found that Cumulus is likely to succeed on its tying claim, it does not reach the remaining claims, including Plaintiff's claim based on the Subscribers First Policy.

## B.    Irreparable Harm

Establishing irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted).  "Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Schneiderman*, 787 F.3d at 660 (cleaned up).  Moreover, to grant an injunction under Section 16, such injury must constitute an antitrust injury.  *Id.*

"Threaten[ed] economic harm to consumers is plainly sufficient to authorize injunctive relief" under Section 16.  *Schneiderman*, 787 F.3d at 661 (cleaned up).  Moreover, it is well settled in this Circuit that "major disruption" of a business can constitute irreparable harm, as can "a threatened loss of good will and customers, both present and potential." *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 727 (S.D.N.Y. 2017) (citing cases); *see also N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 296 F. Supp. 3d 442, 457 (E.D.N.Y. 2017), *aff'd*, 883 F.3d 32 (2d Cir. 2018).  Additionally, a loss of current or future market share suffices to

show irreparable harm. *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d Cir. 2007).

The Court finds credible Westwood One's representations that a loss of access to Nationwide would cause each of these harms. Nielsen's monopoly in the national radio ratings market prevents Westwood One from being able to forgo Nationwide in its refusal of local ratings data. Jones Suppl. Decl. ¶ 9. Yet the current pricing level for either the standalone Nationwide Report or Nationwide coupled with all local markets is not one Westwood One can currently bear. *Id*. ¶ 21. Westwood One's President, Collin Jones, has detailed the immediate consequences the company would suffer from a loss of access to Nationwide. *Id*. ¶¶ 9-15. Westwood One relies on Nielsen's national radio ratings data to demonstrate audience reach and other metrics in selling advertising inventory. *Id*. ¶ 31. Without Nationwide, Westwood One cannot develop credible advertising proposals for advertisers or advertising agencies for the upcoming year. *Id*. Advertisers and advertising companies, including those with long-standing relationships with Westwood One, are all but guaranteed to shift some or all of their advertising inventory purchases to competitors or refrain from purchasing advertising inventory from Westwood One at all, resulting in an immediate decrease in Westwood One's market share. *Id*. ¶ 32; Furchtgott-Roth Expert Report ¶ 56. Cumulus has made a sufficient showing of the ensuing financial consequences for Westwood One.

To be sure, Westwood One's dire financial state is not Nielsen's problem. The antitrust laws do not require Nielsen to provide Plaintiff with a product it can

afford.  However, where a monopolist's anticompetitive conduct results in supracompetitive prices far above what the market would otherwise bear, an antitrust injury is present.

Financial harm to Westwood One, irreparable though it may be, is not the only harm caused by Nielsen's anticompetitive policies.  Courts in this Circuit have found that a reduction in competition due to an antitrust injury also constitutes irreparable harm.  *Consol. Gold Fields*, 871 F.2d at 257-58 (finding irreparable harm where competition in the relevant market would be reduced because this type of "threatened injury is precisely the type that the antitrust laws were designed to protect against" (citation omitted)); *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 819 (2d Cir. 1979) (customers are irreparably harmed when price competition is eliminated, "leading to higher prices and profits . . . at the expense of a large segment of the . . . public"); *fuboTV*, 745 F. Supp. 3d at 150 (finding that anticompetitive behavior "greatly increase[s] the risk that consumers will be vulnerable to price increases, decreased quality, and decreased options in the market").

The Network Policy does not just harm Cumulus, nor even just all vertically integrated broadcasting companies, nor even just Eastlan as a potential competitor to Nielsen:

> It also affects the non-vertically integrated companies that will suffer from the loss of competitive alternatives in the local ratings market, and it will affect advertisers because they'll have less efficient alternatives available for ratings data in a local market.  The higher prices for local ratings data and ultimately the American consumer

> suffers because with sort of a shrinking ratings data,
> alternatives will have less efficient, less innovation in
> local ratings data.

Furchtgott-Roth Dep. Tr. 211:13–212:2.  Accordingly, Cumulus has made a strong

showing of irreparable harm.

## C.    Balance of Hardships

"[T]he balance of hardships inquiry asks which of the two parties would

suffer most grievously if the preliminary injunction motion were wrongly decided."

*Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 922 F. Supp. 2d 435, 444

(S.D.N.Y. 2013) (citation omitted), *aff'd*, 764 F.3d 210 (2d Cir. 2014).  Whereas the

economic harms Nielsen has predicted from a preliminary injunction are purely

speculative, Cumulus has demonstrated that in the short term, it cannot absorb the

costs of Nielsen's policies.  Additionally, competition in the relevant markets is

likely to continue to suffer.  Accordingly, the balance of hardships favors Cumulus.

## D.    The Public Interest

The public interest is best served by a preliminary injunction halting

Nielsen's anticompetitive behavior.  Although "[t]here is a well-recognized public

interest in enforcing contracts and upholding the rule of law," *Empower Energies,*

*Inc. v. SolarBlue, LLC*, 16-CV-3220 (DLC), 2016 WL 5338555, at *13 (S.D.N.Y.

Sept. 23, 2016), "[t]he public [also] has an interest in enforcement of the antitrust

laws and in the preservation of competition." *trueEX, LLC*, 266 F. Supp. 3d at 726;

*see also United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412, 434

(S.D.N.Y. 1980) ("Far more important than the interests of either the defendants or

the existing industry . . . is the public's interest in enforcement of the antitrust laws and in the preservation of competition."). While courts often decline to interfere with the natural lifecycle of a contract where an injunction would "simply delay the harm caused by the bargained-for expiration of the [a]greement," *Expedia, Inc. v. United Airlines, Inc.*, 2019 WL 1499269, at *5 (S.D.N.Y Apr. 5, 2019), the harm caused by an expiration of this contract is vastly different with an anticompetitive tying policy by a monopolist party than without. Because Cumulus has shown a likelihood of success in demonstrating that Nielsen's Network Policy violates Section 2 of the Sherman Act by harming competition to preserve Nielsen's monopolies in the relevant markets, "the threatened injury to the public interest weighs heavily" in favor of a preliminary injunction. *Grumman Corp. v. LTV Corp.*, 527 F. Supp. 86, 105 (E.D.N.Y. 1981), *aff'd*, 665 F.2d 10 (2d Cir. 1981).

## E.    Relief Sought

While preliminary injunctions can be used to preserve the "status quo" or "the last actual, peaceable uncontested status which preceded the pending controversy," *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (quotations and citation omitted), "[t]he 'status quo' in preliminary-injunction parlance is really a 'status quo ante'" that "shuts out defendants seeking shelter under a current 'status quo' precipitated by their wrongdoing." *Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, No. 20-CV-181, 2020 WL 915824, at *8 (S.D.N.Y. Feb. 26, 2020) (citation omitted). Accordingly, "[p]reserving the status quo is not confined to ordering the parties to do nothing: it may require parties to take action[.]" *Mastrio*, 768 F.3d at

120-21.  Moreover, where Defendant "has altered the status quo" and "expos[ed] Plaintiff] to irreparable harm, the prohibitory standard properly applies, and may require that [Defendant] take action to restore the status quo pending a decision on the merits." *Williamson v. Maciol*, 839 F. App'x 633, 635 (2d Cir. 2021).

In the instant case, Cumulus claims that it seeks a preliminary injunction to preserve the status quo during the pendency of this litigation.  Yet the status quo as it existed prior to Nielsen's adoption of the Network Policy was the contract between Cumulus and Nielsen ██████████████████.  Cumulus does not seek to have the term of that contract extended through the course of this litigation. Indeed, Nielsen has already offered Cumulus such relief and been rejected.

What Cumulus seeks instead is a new contract with Nielsen that includes both Nationwide and ratings data for a smaller subset of local markets than provided for under its existing contract, at the prices allocated for each local market under its prior contract.  Yet Cumulus cannot cherry-pick those provisions of its prior contract that it wishes to keep and those that it wishes to drop.  Moreover, the Court finds credible Nielsen's representations that the prices offered to Cumulus under its prior contract constituted a bundled rate for all included markets and services.  *See, e.g.*, PX-189; Hr'g Tr. 126:14-22, 141:25–142:18 (Tunkel).  Cumulus is not entitled to dictate the terms of a new contract with Nielsen for a different range of products and services.

In crafting appropriate relief, the Court is mindful that "the purpose of relief in an antitrust case is so far as practicable, to cure the ill effects of the illegal

conduct, and assure the public freedom from its continuance." *United States v. Glaxo Grp. Ltd.*, 410 U.S. 52, 64 (1973). The harm to be remedied here is the anticompetitive effects of the Network Policy, i.e., a policy conditioning—both expressly and constructively—the purchase of Nationwide on the purchase of all local ratings data. An order (i) enjoining Nielsen from enforcing its Network Policy and (ii) requiring Nielsen to charge reasonable rates to customers for Nationwide as a standalone product is consistent with injunctive relief ordered in other antitrust cases and cases more broadly. *See, e.g., Glaxo Grp.*, 410 U.S. at 64 (reversing district court's refusal to order "[m]andatory selling on specified terms . . . at reasonable charges [because they] are recognized antitrust remedies"); *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 951 (9th Cir. 2025) (affirming district court's decision to mandate a "reasonable fee" at "the right price level to ensure the pro-competitive function of the app-store distribution remedy"); *Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n*, 736 F.2d 441, 445 (8th Cir. 1984) (explaining that "it was incumbent upon the district court to fashion an order which would . . . effectively open to competition the market that had been closed by [Defendants'] illegal restraints [i.e., illegal tying]").

## CONCLUSION

Accordingly, Plaintiff's motion for a preliminary injunction is GRANTED.

The Court hereby ORDERS, pursuant to its authority under Section 16 of the Clayton Act, 15 U.S.C. § 26, and Rule 65 of the Federal Rules of Civil Procedure that (i) Nielsen (including Nielsen's officers, employees, and agents) is enjoined and

restrained from enforcing its Network Policy; and (ii) Nielsen is enjoined and restrained from charging a commercially unreasonable rate for its Nationwide Report as a complete, standalone product.  For purposes of this Order, a rate that is equal to or lower than the highest annual 2026 rate Nielsen charges any broadcaster (whether network or local) for Nationwide is presumptively reasonable.  This Order shall remain in effect during the pendency of this litigation, or until further Order of the Court.

Plaintiff shall post a $100,000.00 bond, which shall remain with the Court until a final disposition of this case or until this Order is terminated.

SO ORDERED.

Dated:  December 30, 2025
New York, New York

_____
JEANNETTE A. VARGAS
United States District Judge