UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CUMULUS MEDIA NEW HOLDINGS INC., <br><br> *Plaintiff*, <br><br> v. <br><br> THE NIELSEN COMPANY (US) LLC, <br><br> *Defendant* | Case No.: 25-cv-08581 (JAV) |

# DECLARATION OF RICH TUNKEL

I, Rich Tunkel, hereby declare as follows:

1. I am the Managing Director of Nielsen Audio, a division of The Nielsen Company (US), LLC ("Nielsen"). In this role, I am responsible for the client-service division of Nielsen Audio and have represented Nielsen as the lead negotiator with Cumulus Media New Holdings Inc. ("Cumulus") for the parties' 2026 contract renewal.

2. I respectfully submit this declaration in support of Nielsen's Letter-Motion to Stay Pending Appeal this Court's Order and accompanying Opinion and Order that granted Cumulus's motion for a preliminary injunction in the above-captioned action. I submit this declaration based on my personal knowledge and my investigation of the facts herein. If called as a witness, I could and would testify competently to them.

3. I have 30 years of experience in the audience-measurement industry. I joined Nielsen in 2013 and have served as Senior Vice President, Business Development and as Senior Vice President, Sales Director. Prior to joining Nielsen I was Director of Sales at Arbitron, which Nielsen acquired in 2013. I have been involved in many hundreds of negotiations with customers over the purchase of Nielsen's local radio-ratings data and Nationwide report.

4. Nielsen would suffer significant irreparable harm if required to comply with the Court's ruling during the pendency of Nielsen's appeal. I understand that the Court has required Nielsen not to apply its Network Policy while this litigation is ongoing. As a result, Nielsen would not be able to apply that policy in any of the at least ten negotiations with clients that Nielsen expects to have in 2026.

5. If Nielsen is unable to apply the Network Policy, then it will be hindered in its ability to ensure that it can recover the costs of collecting the local radio-ratings data that make up the Nationwide report and spread those costs appropriately across the customers that use the products generated from those joint costs. If Nielsen cannot recover these costs, then it may have to retire the Nationwide report, similar to when Nielsen retired its other national data product, RADAR. If it does not retire the Nationwide report, it may have to pass a higher share of the costs of collecting local data on to other customers, including local radio stations, hurting Nielsen's negotiating position with respect to those customers, as well as those customers themselves. Nielsen will also be unable to address the problems that arise when companies purchasing the Nationwide report share data within their conglomerates improperly or free ride off of other customers' purchase of local data, which could also negatively affect Nielsen's negotiations or reputation.

6. I understand that this Court has prohibited Nielsen from charging Cumulus "commercially unreasonable" rates for its Nationwide report as a standalone product. ECF No. 132 at 2. Customers will attempt to leverage the imprecision of this Order while this litigation is ongoing, even if it does not apply to them.

7. There is no single commercially reasonable rate for the Nationwide report. Nielsen's pricing methodology for the Nationwide report accounts for the market position of the

customers requesting the report, including the size of their audience, as well as their advertising revenue, among other metrics. Customers with larger audience size or advertising revenue generally are charged a higher price than customers with smaller audience size or advertising revenue. In addition, customers that subsidize the cost of putting together the Nationwide report through their purchase of local data receive a lower price for the Nationwide report than Nielsen would otherwise charge those customers based upon their audience size alone, because the Nationwide report is built on that same local data. Cumulus itself received the benefit of this reduced pricing in its recently expired contract.

8.      Furthermore, the prices Nielsen charges for its audio data products are the result of negotiation between Nielsen and sophisticated customers. These negotiations with customers involve a give and take, with proposals and counterproposals, often including concessions by each party across the many terms under discussion in a contract negotiation. As part of these negotiations, it is commonplace for one party to make a proposal that the other party might consider to be too high or too low. Such proposals are not "commercially unreasonable," even if the receiving party might deem the proposal to be outside of the range it is willing or able to pay. To the contrary, such proposals are part of the ordinary give and take of complex contract negotiations between two sophisticated parties, such as Nielsen and Cumulus.

9.      During negotiations, Cumulus requested a standalone price for the Nationwide report—and Nielsen has offered Cumulus a standalone price for the Nationwide Report since September 15, 2025. Nielsen's offer price for that standalone service was premised upon Cumulus no longer even covering the cost of putting together the Nationwide report through purchase of local data. Given the absence of local-data purchases, in formulating the appropriate price to charge Cumulus for Nationwide as a standalone service, Nielsen considered the wide reach of

Cumulus's national network audience and its high ratings. Because Nielsen was applying its typical pricing method to a novel situation, and because any price Nielsen charges could be arrived at only through a negotiation with a sophisticated counterparty, its offer price was commercially reasonable.

10. If Cumulus deemed the price proposed by Nielsen to be too high or beyond its ability to pay, the ordinary step in a complex commercial negotiation between two sophisticated parties would have been for Cumulus to counter the offer, potentially explaining why it viewed Nielsen's proposal to be unworkable. Instead, in this case Cumulus went to the Court, and received an order requiring Nielsen to price the standalone Nationwide product at a rate that is "commercially reasonable," a standard that is not defined in the Court's order.

11. The Court's order will impact the negotiations Nielsen will have with Cumulus for an upcoming contract. In an ordinary commercial negotiation, Nielsen would understand that if a customer views a pricing proposal as being too high, the proposal would be subject to negotiation, with discussions and counterproposals to follow an initial proposal. Now, however, Nielsen's commercial proposals to Cumulus will be subject to the risk that the Court will deem Nielsen to be in violation of a Court order if Cumulus should consider a pricing proposal to be too high. This risk distorts these commercial negotiations by subjecting Nielsen to a risk of being held in violation of a Court order even if it proposes what it believes to be a reasonable offer. Furthermore, I understand the Court's ruling on the motion for a preliminary injunction to express the view that Nielsen's September 15, 2025 offer for Nationwide as a standalone service was not commercially reasonable. Given that Nielsen's September 15, 2025 offer was formulated using Nielsen's ordinary approach to pricing data, combined with the Court's view that the offer was not commercially reasonable, my understanding is that the ruling will require Nielsen to change its

ordinary approach to pricing data for its negotiations with Cumulus. As a result, the Court's order will fundamentally alter the dynamics of this commercial negotiation.

12. Relatedly, in an ordinary commercial negotiation, if Cumulus were to deem the price or any other term proposed by Nielsen to be unreasonable, the negotiation over that term would likely involve give and take on other terms in the contract. Thus, for example, if Cumulus viewed a pricing proposal as being too high, the negotiation for a lower price might involve give and take on other terms that are part of the negotiation, such as a lower price in Year 1 in return for a higher escalation in later years of a contract, or a lower price structure in return for a longer term of the agreement. Now, however, the Court's order limiting the range of pricing proposals Nielsen is permitted to offer will likely impact the commercial negotiation over other terms in the contract.

13. In addition, Nielsen's negotiations with Cumulus will affect Nielsen's commercial negotiations with other customers. The bulk of Nielsen's costs are joint costs, with the same fixed costs incurred for both local and nationwide data, and the same fixed costs incurred across customers. If Nielsen is constrained in its ability to recover a fair share of its costs (as well as a return on its investments) from Cumulus, that would impact Nielsen's negotiations with other customers. It would require Nielsen to raise the prices charged those customers, possibly beyond their ability to pay, and could make it economically unviable for Nielsen to continue selling the Nationwide product to those customers.

14. Relatedly, Cumulus competes against many of Nielsen's other customers. If Cumulus is advantaged in its negotiations with Nielsen by virtue of the Court's order, Nielsen's other customers will seek the same benefits, to avoid being put at a commercial disadvantage in relation to Cumulus. The result is that any impact on Nielsen's negotiations with Cumulus would

have a knock-on effect in Nielsen's other commercial negotiations, causing harm to Nielsen's business. For example, if Nielsen charges a given price of Nationwide in negotiations with Cumulus in order to comply with the Court's order, then other customers paying more than that amount will claim that Nielsen viewed anything higher as commercially unreasonable when negotiating their contracts. In light of the complexity of commercial negotiations, such harm is impossible to isolate or unwind and therefore irreparable.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 9, 2026
in New York, New York

_____
Rich Tunkel
Managing Director, Nielsen Audio