UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CUMULUS MEDIA NEW HOLDINGS, INC., Plaintiff, -v- THE NIELSEN COMPANY (US) LLC, Defendant. | 25-CV-08581 (JAV) <br> OPINION AND ORDER |

JEANNETTE A. VARGAS, United States District Judge:

On July 27, 2026, Plaintiff Cumulus Media New Holdings, Inc. ("Plaintiff" or "Cumulus") moved to enforce this Court's December 30, 2025 preliminary injunction ("PI") against Defendant The Nielsen Company (US) LLC ("Defendant" or "Nielsen"). ECF No. 188. That order enjoined Nielsen from enforcing its "Network Policy," which required Nielsen national radio ratings data customers to purchase Nielsen data for their local stations or otherwise risk losing access to Nielsen's Nationwide Report, the only source of comprehensive national radio ratings data in the United States. *Cumulus Media New Holdings, Inc. v. Nielsen Co. (US) LLC*, 2026 WL 63294, at *3-4 (S.D.N.Y. Jan. 8, 2026), *aff'd*, 182 F.4th 108 (2d Cir. 2026); *see also* ECF No. 133 ("PI Op." or "PI Opinion") (unredacted opinion dated December 30, 2025).

The Court held that the Network Policy constituted an anticompetitive tying policy that violated Section 2 of the Sherman Act. 2026 WL 63294, at *9. The Network Policy sought to illegally maintain Nielsen's monopoly power over both

local and national radio ratings data markets by explicitly or effectively forcing customers of its monopoly product (the Nationwide Report) to purchase its non-monopoly product (local radio ratings data). *Id.* Accordingly, the Court's injunction also prohibited Nielsen from "charging a commercially unreasonable rate for its Nationwide Report as a complete, standalone product"—the conduct triggering Cumulus's Complaint—because doing so served as a "constructive tie." *Id.* at *13, *18. In prohibiting such conduct, the Court advised Nielsen that "a rate that is equal to or lower than the highest annual 2026 rate Nielsen charges any broadcaster (whether network or local) for Nationwide is presumptively reasonable," *id.* at *18, guidance the Second Circuit later termed "the district court's safe harbor provision," *Cumulus Media New Holdings, Inc. v. Nielsen Co. (US) LLC* 182 F.4th 108, 139 (2d Cir. 2026).

Cumulus now claims that Nielsen "has not offered a commercially reasonable rate" and has instead "hired an expert . . . to develop a sky-high price untethered from any market-based rate that Nielsen has ever commanded for the Nationwide product." ECF No. 223 at 1. Nielsen contends that Cumulus lacks evidence to render its expert's methodology unreasonable and fails to show coercion from Nielsen's latest offer. ECF No. 230 at 2-5. For the following reasons, the motion to enforce is GRANTED.

## BACKGROUND

The Court presumes familiarity with the factual record and procedural history of this action, *see generally Cumulus*, 2026 WL 63294; *Cumulus*, 182 F.4th

108, and recounts only what is necessary for the disposition of the motion.

### A. Procedural History

The PI was administratively stayed until a Second Circuit motions panel granted Nielsen's motion for a stay pending appeal in February 2026. *See* ECF Nos. 149, 155, 165. Shortly thereafter, Cumulus filed a suggestion of bankruptcy. ECF No. 175. On July 13, 2026, the Second Circuit vacated its stay and affirmed this Court's order, concluding that it was "tailored to the conduct . . . found to be unlawful: Nielsen's express and constructive enforcement of its Network Policy"—because "barring Nielsen from engaging in anticompetitive conduct during negotiations" would protect Cumulus's "ability to properly negotiate and thereby obtain [Nielsen's essential Nationwide] product." *Cumulus*, 182 F.4th at 140 (cleaned up). Nielsen unsuccessfully sought the Second Circuit's reconsideration of that decision. While that motion for reconsideration was pending, Cumulus filed the instant motion to enforce the preliminary injunction. ECF No. 188. The case was remanded to this Court for further proceedings on Wednesday, August 26, 2026. *See* ECF No. 201.

Following the issuance of the mandate, this Court ordered the parties to appear for a conference to address whether an evidentiary hearing would be necessary to adjudicate Cumulus's motion to enforce. *See* ECF No. 202. In light of the disputed issues of fact raised by the parties, the Court scheduled an evidentiary hearing for Tuesday, September 1, 2026, and ordered Nielsen to produce pricing data responsive to discovery requests propounded by Cumulus in advance of the

hearing. ECF No. 206; ECF No. 212 ("Aug. 28, 2026 Conf. Tr.") at 17:14–20:11, 32:9-14. Cumulus requested expedited consideration of its motion to enforce, as it loses access to Nielsen's Nationwide product on September 10, 2026. Aug. 28, 2026 Conf. Tr. at 3:7-9.

## B. Factual Background

"This antitrust dispute concerns radio broadcasting data that drives the price and placement of advertisements on radio stations across the country. Cumulus, one of the largest audio media companies in the United States, sued Nielsen for its allegedly anticompetitive conduct in the sale of that crucial data." *Cumulus*, 182 F.4th at 117.

### 1. Parties

Cumulus operates both a national radio network and local radio stations. *Cumulus*, 2026 WL 63294, at *2, *4. It distributes national audio content to nearly ten thousand radio stations throughout the country via its national syndication network Westwood One, "the largest audio network in America." *Id.* at *2. "Like other broadcasters, Cumulus generates revenue by selling advertising space—*i.e.*, commercial time on its various radio stations—to advertisers." *Cumulus*, 182 F.4th at 117. Essential to those advertising sales are local and national radio ratings data, respectively, that measure audience size, demographics, time spent listening, and other characteristics that allow advertisers to identify worthwhile purchases. *Cumulus*, 2026 WL 63294, at *3. Cumulus's business requires both types of data. *Cumulus*, 182 F.4th at 117.

Nielsen maintains global dominance over these data. *Cumulus*, 2026 WL 63294, at *2. "Nielsen collects audience listening statistics in more than 270 geographic areas; it then compiles that local information into a national ratings report known as the Nationwide Report (Nationwide). It sells both its Nationwide product as well as data in each discrete local area it surveys." *Cumulus*, 182 F.4th at 117. Whereas Nielsen has one competitor in the local radio ratings space, Eastlan, it has no competitors in the market for national radio ratings data, in which it enjoys a 100% market share. *Cumulus*, 2026 WL 63294, at *11.

[redacted] ECF No. 209-1 ("Tunkel Decl."), ¶¶ 9–10; *see also* Sep. 1, 2026 Hr'g Tr. 101:1-16. For instance, Cumulus distributes premium sports, news, and entertainment programming, including NFL regular-season and playoff games, the NCAA March Madness basketball tournament, NCAA Football, and The Masters. *See, e.g.*, *Cumulus Media's Westwood One and the NCAA Renew Audio Media Partnership*, Cumulus Media (Mar. 18, 2026), https://tinyurl.com/mvepn8d6. Presumably, the deals it cuts with advertisers as a result of its access to Nielsen data are larger than those cut by a non-commercial broadcaster. ECF No. 221-1, PX-1017 ("Aug. 31, 2026 Tunkel Dep. Tr.") at 92:6-18. Further, because the Nationwide Report is merely an amalgamation of Nielsen's local data collection efforts, Nielsen sets prices for all of its products in a way that covers its high fixed costs for local data and relatively low

incremental cost for national data. *Cumulus*, 2026 WL 63294, at *14.

As "declines in radio broadcast listenership have translated to declines in radio advertising revenue in recent years, the industry has shifted, and Nielsen has had to increase its prices beyond historical levels." *Id.* at *4 (cleaned up). "Additionally, because in 2024 Nielsen had to retire its secondary national data service [("RADAR")], which brought in significant revenue, Nielsen now relies on its local ratings service to subsidize Nationwide." *Id.*; PX-279 ("Nov. 17, 2025 Tunkel Dep. Tr.") 155:4–156:7. "As Nielsen's prices have increased, radio broadcasters have, in turn, looked to Eastlan as a viable cheaper alternative for their [local] ratings data." *Cumulus,* 2026 WL 63294, at *4. Nielsen attempted to account for this industry shift with the Network Policy, which—until enjoined by this Court—forced customers that needed both the Nationwide Report and local ratings data to continue purchasing their local data from Nielsen, lest they lose access to Nielsen's indispensable national product. *Id.* at *4-6, *12-13. In other words, the Network Policy was a coercive tie. *Id.* at *13-14.

When Cumulus sought to cut costs (and thereby avoid bankruptcy) by dramatically downsizing its local market portfolio with Nielsen prior to this litigation, Nielsen purported to offer Cumulus an exception from its Network Policy: standalone Nationwide for an exorbitant $[redacted] PI Op. at 16-17. This offer was 10 times what Cumulus had previously paid for Nationwide in its past bundled contract and only marginally lower than offers Nielsen had made Cumulus that included local data, such that Cumulus would have ultimately paid a higher

price for standalone Nationwide plus local data from Eastlan under these terms. *Id.* "This pricing therefore served as a constructive tie." *Cumulus*, 2026 WL 63294, at *13. "The fact that Nielsen, after being accused by Cumulus of violating the antitrust laws, finally offered to sell Nationwide to Westwood One as a standalone product . . . d[id] not negate the anticompetitive effects of its Network Policy." *Id.* Accordingly, the District Court enjoined Nielsen "from enforcing its Network Policy" and "from charging a commercially unreasonable rate for its Nationwide Report as a complete, standalone product" as it had done. *Id.* at *18.

### 2. Post-PI Negotiations

On July 14, 2026, Cumulus proposed to Nielsen a standalone Nationwide price of $[redacted]—the prior contract price plus the parties' historical escalator, with a [redacted] addition. ECF No. 188-1 at 9; PX-1004 ("all products by client by market – 2026"). This price was also over 20 times higher than the highest price paid by any customer who only purchases standalone Nationwide—[redacted], paid by [redacted]. PX-1001 (Nielsen's Responses & Objections to Cumulus's RFP No. 1 dated August 29, 2026).[1]

In mid-July 2026, Nielsen retained an economic expert, Dr. Mark E.

---

[1] Nielsen charged [redacted] for Nationwide in 2026, the highest price paid by any Nielsen customer for Nationwide this year. *Compare* PX-1004, *with* ECF No. 221-2, PX-1018 ("Aug. 31, 2026 Zmijewski Dep. Tr.") at 107:18-23. Yet [redacted] purchases hundreds of products alongside the Nationwide Report, bringing its total contract price to a whopping $[redacted]. The price it would pay for Nationwide in a world where it did not purchase other Nielsen products is difficult to discern. ECF No. 209-2, PX-1002 ("Zmijewski Decl.") at 21 (Appendix).

Zmijewski, who specializes in "financial analysis, valuation, the pricing of publicly traded securities, and the ways in which various capital market participants use information to value securities." Zmijewski Decl. at 4. Nielsen directed Dr. Zmijewski "to conduct an analysis to estimate an economically reasonable price for a proposed purchase of Nationwide-only data by Westwood One." Tunkel Decl., ¶ 15.

To estimate an economically reasonable price, Dr. Zmijewski relied on two benchmarking approaches, a mean evaluation and a regression analysis evaluating the relation between a customer's Nielsen expenditures (i.e., Nielsen contract value) and the customer's broadcast (non-digital) revenue data. Zmijewski Decl. at 6. Dr. Zmijewski uses revenue as a proxy of value received. Aug. 31, 2026 Zmijewski Dep. Tr. at 52:19-53:2 ("one would be the revenues of the company, using that . . . as a proxy for the value that [the customer is] going to receive from the services or products from Nielsen."). In other words, Dr. Zmijewski's analysis evaluates the relation between a customer's total 2026 Nielsen contract price and the 2024 broadcast revenue. Zmijewski Decl. at 11 ("[T]he Nielsen expenditure data reflect each customer's total contract value on Nielsen audio products and services and reflect differences across customers in the mix of products and services"). The contract price data Dr. Zmijewski used in his analysis includes a customer's aggregate contract price, including local market reports, Nationwide reports, and ancillary services. Sep. 1, 2026 Hr'g Tr. at 110:1-23. The vast majority of customers in his analysis do not purchase Nationwide at all, so Nationwide price is

not a component of their contract price. *Id.* at 82:10-14 ("there's 75 companies in the sample of which 12 have Nationwide and 63 do not").

In using the total contract price, Dr. Zmijewski relies on an assumption that the value that a company can extract from its purchase from Nielsen is the same value across local and Nationwide products. *Id.* at 121:10-17 ("What I'm assuming here—because it's all bundled prices, what I'm assuming is . . . that the average between the local value that [the customer is] extracting and the national value they are extracting is the same. So there's no other way we can do it. We can't partition those."); *id.* at 122:8-10 ("The assumption has to be, based on the data we have, that every type of report is equally valuable for a particular company.").

Further, Dr. Zmijewski assumed no unlawful monopoly conduct affected the prices or the products that Nielsen's customers purchased:

> I'm assuming there's nothing illegal that is happening. So I don't know if there's a monopoly or not a monopoly. I have no information on that whatsoever. But if there is a monopoly and it's illegal, and there was price pressure that was put on customers, that is something I would consider. To the best of my knowledge, there's no such decision or there's nothing claimed or at least nothing decided that there is some illegality going on, some monopoly pricing of some sort, so I'm assuming there isn't.

*Id.* at 53:24–54:11.

In formulating these assumptions and this model more broadly, Dr. Zmijewski did not review the PI Opinion or preceding hearing transcripts, familiarize himself with the Network Policy, interview any Nielsen customers, review any ordinary course of business documents, or conduct an independent

assessment of Nielsen's production costs for its audio ratings products. *Id.* at 45:9-21; 51:10–53:11, 65:14-22, 111:13–113:11, 121:10-17; Zmijewski Dep. at 44:22–45:16, 52:14–53:12.

On July 27, 2026, Dr. Zmijewski presented to Nielsen his finding that a range of $[redacted] to $[redacted] million for standalone Nationwide would be a commercially reasonable price point for Westwood One, Zmijewski Decl. at 6-7, 18-19, Tables 1-4, which Nielsen then used to make an offer to Cumulus of [redacted] for a [redacted] term on July 31, 2026, Tunkel Decl., ¶¶ 15-16. In formulating this proposal, Nielsen considered "what this new precedent would do to [its] business should [redacted] "[t]hat could have really severe economic implications for Nielsen's business, should more of them go in this direction." Aug. 31, 2026 Tunkel Dep. Tr. 98:16-24; Tunkel Decl., ¶¶ 11-12. On August 14, Cumulus rejected Nielsen's offer and countered at [redacted] for a [redacted] DX-73 at 5-6. On September 2, 2026, after the Court held its evidentiary hearing on Cumulus's motion, Nielsen lowered its offer to [redacted] for a [redacted] ECF No. 221-3, PX-1019 at 2. Cumulus counter-offered [redacted] for [redacted] *Id.* at 1.

## LEGAL STANDARDS

"A motion to enforce is an appropriate procedural vehicle for parties to seek compliance with a court order." *United States v. Visa U.S.A., Inc.*, No. 98-CV-07076 (BSJ), 2007 WL 1741885, at *3 (S.D.N.Y. June 15, 2007) (citing *Pena v. New York State Div. for Youth*, 708 F.2d 877 (2d Cir. 1983)). "A court can take 'any reasonable

action . . . to secure compliance' with its orders, and the 'scope of a district court's equitable powers to remedy past wrongs is broad.'" *In re Tronox Inc.*, 855 F.3d 84, 112 (2d Cir. 2017) (quoting *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985)). "[A] finding of contempt is not a prerequisite for enforcement." *Visa U.S.A., Inc.*, 2007 WL 1741885, at *3 (citing *Berger*, 771 F.2d at 1569).

A movant seeking enforcement of a preliminary injunction must establish the non-movant's failure to abide by the injunction by a preponderance of the evidence. *Volokh v. James*, No. 22-CV-10195 (ALC), 2024 WL 1905784, at *2 (S.D.N.Y. Apr. 30, 2024) (citing *Visa U.S.A., Inc.*, 2007 WL 1741885, at *3); *see also SEC v. Collector's Coffee Inc.*, 602 F. Supp. 3d 488, 502 (S.D.N.Y. 2022) ("A motion to enforce may be granted where it is shown by a preponderance of the evidence that a court order has been violated . . . and is granted even where there is no finding that a party has acted contemptuously." (cleaned up)).

A district court may provide a supplementary remedy, including the imposition of sanctions, to compel compliance without making a finding of contempt. *E.E.O.C. v. New York Times Co.*, 196 F.3d 72, 80-81 (2d Cir. 1999). To issue such a sanction requires that "[i] the order violated . . . is 'clear and unambiguous,' [ii] the proof of the violation is 'clear and convincing,' and [iii] the violator was not reasonably diligent in attempting to comply." *Id.* (cleaned up) (citing *United States v. Local 1804–1, Int'l Longshoremen's Ass'n,* 44 F.3d 1091, 1096 (2d Cir.1995)).

## DISCUSSION

The PI is predicated upon the recognition that "[e]ven in the absence of an explicit tie, if 'the individual products are priced such that the buyer is coerced to accept both products in a discounted package, then a tying arrangement may result.'" *Cumulus*, 2026 WL 63294, at *13 (citing *Synergetics USA, Inc. v. Alcon Lab'ys, Inc.*, No. 08-CV-3669 (DLC), 2009 WL 435299, at *3 (S.D.N.Y. Feb. 23, 2009)); *see also Am. Mfrs. Mut. Ins. Co. v. Am. Broad. Paramount Theatres, Inc.*, 388 F.2d 272, 283 (2d Cir. 1967) (pricing with "the effect of conditioning the sale of the single product to the sale of the entire package" amounts to unlawful constructive tying).

The commercial reasonableness of Nielsen's [redacted] offer for standalone Nationwide to Westwood One comes down to the soundness of Dr. Zmijewski's model and of Nielsen's proposed [redacted] Nielsen's September 2 offer is an annualized reduction of $[redacted] below the constructive tie, over [redacted] times the $1.2 million delta the Court found coercive. Cumulus argues that a commercially reasonable price for standalone Nationwide must be tethered to rate cards establishing a Nationwide price within Nielsen's previously negotiated bundles. ECF No. 223, ¶¶ 10-12, 49-63. This argument, which the PI's safe harbor provision acknowledges as one mechanism to ensure anticompetitive pricing, fails to adequately account for Nielsen's bundled pricing strategy or its historic practice of charging different rates for different values extracted from its products. Tunkel Decl. ¶¶ 9-10, 14; Sep. 1, 2026 Hr'g Tr. 94:18–97:9; *see also Cumulus*, 2026 WL

63294, at *17 ("the Court finds credible Nielsen's representations that the prices offered to Cumulus under its prior contract constituted a bundled rate for all included markets and services").

Yet neither is Nielsen's model without cause for concern. Dr. Zmijewski's calculations are predicated on the assumptions that no anticompetitive monopolistic conduct put "price pressure" on Nielsen's customers in his datasets, that customers value Nationwide and local radio ratings data identically, that Nielsen's costs for its services were appropriately calculated by Nielsen itself, and that exclusions from his model—such as any prices Nielsen charges for standalone Nationwide—did not meaningfully alter his conclusions. Sep. 1, 2026 Hr'g Tr. at 53:24–54:11, 57:18–58:12, 59:6-23, 117:17–118:6, 121:10–122:10, 129:6-12; Zmijewski Dep. Tr. at 30:19-25; 117:7-12, 183:7-16. Each of these assertions is dubious. Perhaps most pertinently, as this Court has concluded and the Second Circuit has affirmed, there is a substantial likelihood that Nielsen has committed antitrust violations through anticompetitive monopoly pricing, namely through its Network Policy. Because the Network Policy had not yet been enjoined when [redacted] signed its last contract with Nielsen in 2025, for instance, that policy likely impacted Dr. Zmijewski's calculations. Aug. 31, 2026 Tunkel Dep. Tr. at 114:4-8; *but cf.* Sep. 1, 2026 Hr'g Tr. at 112:2–113:15. Two broadcasters also filed declarations in connection with the PI hearing describing Nielsen's anticompetitive conduct in product negotiations. ECF No. 61-2 at 20-22, 40-41 (third-party declarations). Dr. Zmijewski admitted that his model did not take into account any illegal behavior by Nielsen that may have

skewed the inputs into his model.

One of the "business and economic considerations" Nielsen accounted for in making its standalone Nationwide offer to Westwood One was the "[redacted] Aug. 31, 2026 Tunkel Dep. Tr. at 98:5-8, 18-24. This language is not a far cry from the logic that led Nielsen to "adopt[] the Network Policy," which was designed "to bring networks that were seeking to drop subscriptions to local ratings data back to the negotiation table and protect against future potential losses of such customers to Eastlan." *Cumulus*, 2026 WL 63294, at *12 (internal quotation marks omitted). Nielsen is certainly free to structure its business to account for this concern and even to charge monopoly prices, *see, e.g., Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004), but it may not behave anticompetitively to impede competition in its non-monopoly market in doing so.

Further, Dr. Zmijewski "began with the top 100 customers by non-digital broadcast revenue because the enterprise being priced, Westwood One, generates approximately $175.3 million in revenue." ECF No. 230, ¶ 60 (citing Sep. 1, 2026 Hr'g Tr. at 58:13-24; Aug. 31, 2026 Zmijewski Dep. Tr. at 103:22–104:13); Zmijewski Decl. at 7 (Fig. 1). This figure, however, is outdated. Westwood One's revenue declined from around $175.3 million to around $135.9 million from 2024 to 2025.

PX-1009 at 74, 142; *see also* Aug. 31, 2026 Zmijewski Dep. Tr. at 107:24–115:18.[2] While Cumulus's financial troubles, and indeed its bankruptcy, should not necessarily bear on what may be considered a commercially reasonable price for it to pay for Nationwide, Nielsen's professed commitment to pricing this product in proportion to its customers' revenues—and Dr. Zmijewski's revenue regression model's foundation in the same—renders such factors relevant. *See Cumulus*, 2026 WL 63294, at *16.

On the other hand, Dr. Zmijewski's 75-customer sample spans a broad range of sizes—annual broadcast (non-digital) revenue ranging from approximately $[redacted] million to [redacted], and annual Nielsen expenditures ranging from approximately [redacted] to [redacted]. Zmijewski Decl. at 711-12, 22-23. The sample also includes broadcasters operating national networks, local stations, or a combination of both. *See id.* Only customers for whom Broadcasting Investment Analysts Advisory Services revenue data were available are included in the final sample, Zmijewski Decl. at 8; Sep. 1, 2026 Hr'g Tr. 57:21–58:12; Aug. 31, 2026 Zmijewski Dep. Tr. at 87:18–88:14, and Cumulus has not pointed to any other reliable source of revenue data to use in estimating Dr. Zmijewski's results. Indeed, Cumulus does not suggest any way to cure the faults it identifies in Dr. Zmijewski's analysis, content to rest upon its assertions that Nielsen may only sail within the

---

2 While Dr. Zmijewski dismisses this revenue data lag as insignificant so long as all the companies in his model were "all moving in the same direction, roughly the same amount," *see* Sep. 1, 2026 Hr'g Tr. at 107:24–116:1, there is no factual predicate supporting that assumption.

Court's safe harbor. But "at no point did the Court state . . . that the only commercially reasonable rate" for Nielsen to offer standalone Nationwide "was that which falls within the safe harbor." Aug. 28, 2026 Conf. Tr. at 4:11-13. That Nielsen has "never used a regression analysis" to price its products before does not inherently render that analysis commercially unreasonable now that one of its largest customers seeks to purchase standalone Nationwide. Aug. 31, 2026 Tunkel Dep. at 46: 19-22, 74:16-21; Tunkel Decl., ¶ 12.

Separately, Cumulus asserts that Nielsen's proposed [redacted] contract term is commercially unreasonable because "[a]dvertisers expect Cumulus to have access to Nationwide on a going-forward basis; a [redacted] contract would create uncertainty that would materially impair Cumulus's ability to sell advertising." PX-1016 (email between counsel) at 3. Nielsen agrees that a [redacted] contract [redacted] is not the industry standard, and that Nielsen typically offers contracts on [redacted] *See* Tunkel Decl., ¶¶ 17-18. Although Nielsen may sometimes offer [redacted] terms in certain idiosyncratic circumstances, it has not offered a convincing explanation of why it has deviated from the typical contract term in this case. *Id.*

Nielsen contends that because the PI prohibits a commercially unreasonable "*rate*" and says nothing about duration, "any ruling rejecting the reasonableness of the term Nielsen offered would modify the Order." ECF No. 209 at 2. This argument is disingenuous. The record makes clear that the standard is, and commercially reasonable rates in this industry are, based upon [redacted]

contracts. Nielsen could not plausibly contend, for example, that it could offer its Nationwide product for a single day and thereby satisfy the terms of the injunction.

The Court concludes that Cumulus has demonstrated that Nielsen's latest offer is commercially unreasonable and thus in violation of the Court's order. The serious deficiencies in Nielsen's regression analysis, as outlined above, render it an unreliable measure. That the price offered by Nielsen is many multiples above the presumptively reasonable safe harbor rate further calls into question Nielsen's good faith. Having made the decision not to avail itself of the safe harbor provided by the preliminary injunction, Nielsen assumed the risk that its offer would be found not to comply with this mandate of the preliminary injunction.

To prevent unfair prejudice and irreparable harm to Cumulus, which is now on the cusp of losing access to an essential service while it attempts to emerge from a Chapter 11 bankruptcy, Nielsen is ordered to offer its Nationwide Report as a standalone product to Cumulus for a commercially reasonable rate by **September 10, 2026, at 3:00 p.m**. Should Nielsen fail to comply with this Order, it shall be subject to monetary sanctions in the amount of $50,000 per day until it comes into compliance. *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 657 (2d Cir. 2004) ("A party who violates an injunction entered by the district court faces the threat of both civil and criminal contempt.").

## CONCLUSION

Accordingly, Plaintiff's motion to enforce is **GRANTED**. The parties' motions to seal at ECF Nos. 224, 232, and 239 are granted for the reasons stated therein.

The Court overrules Nielsen's objection to the supplementation of the record at ECF No. 222-4. *See* ECF No. 228. Nielsen suffers no prejudice, as the nearly decade-old contract at ECF No. 222-4 does not impact the Court's analysis. The Clerk of Court is directed to terminate ECF Nos. 187-188, 224, 232, and 239.

SO ORDERED.

Dated: September 9, 2026
New York, New York

JEANNETTE A. VARGAS
United States District Judge